William N. Sinclair (SBN 222502)
(bsinclair@mdattorney.com)
Steven D. Silverman (*Pro Hac* Motion Pending)
(ssilverman@mdattorney.com)
Andrew G. Slutkin (*Pro Hac* Motion Pending)
(aslutkin@mdattorney.com)
Stephen G. Grygiel (*Pro Hac* Motion Pending)
(sgrygiel@mdattorney.com)
Joseph F. Murphy, Jr. (*Pro Hac* Motion Pending)
(jmurphy@mdattorney.com)
**SILVERMAN|THOMPSON|SLUTKIN|WHITE|LLC**
201 N. Charles St., Suite 2600
Baltimore, MD 21201
Telephone: (410) 385-2225
Facsimile: (410) 547-2432

Thomas J. Byrne (SBN 179984)
(tbyrne@nbolaw.com)
Mel T. Owens (SBN 226146)
(mowens@nbolaw.com)
**NAMANNY BYRNE & OWENS, P.C.**
2 South Pointe Drive, Suite 245
Lake Forest, CA 92630
Telephone: (949) 452-0700
Facsimile: (949) 452-0707

*Attorneys for Plaintiffs*

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| RICHARD DENT, an individual, JEREMY NEWBERY, an individual, ROY GREEN, an individual, J.D. HILL, an individual, KEITH VAN HORNE, an individual, RON STONE, an individual, RON PRITCHARD, an individual, and JAMES MCMAHON, an individual; <br><br> on behalf of themselves and all others similarly situated; <br><br> Plaintiffs, <br><br> v. | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) **CASE NO.**_____ ) |

**CLASS ACTION COMPLAINT**                                          1

| | |
|---|---|
| NATIONAL FOOTBALL LEAGUE, a New York unincorporated association;<br><br>Defendant.<br>_____ | ) **COMPLAINT**<br>) **DEMAND FOR JURY TRIAL**<br>) **CLASS ACTION**<br>)<br>) |

COMES NOW the eight named Plaintiffs and over 500 retained Plaintiffs, by and through undersigned counsel, who bring this class-action Complaint against Defendant National Football League ("NFL" or the "League") and allege as follows:

## **INTRODUCTION**

1.      In contravention of Federal criminal laws, the NFL has intentionally, recklessly and negligently created and maintained a culture of drug misuse, substituting players' health for profit.

2.      By this lawsuit, Plaintiffs seek financial compensation for the long-term chronic injuries, financial losses, expenses, pain and suffering, mental anguish and other losses they have suffered as a result of that misconduct, and medical monitoring for the problems they suffer from and future problems they will suffer.

3.      While certain aspects of the NFL have changed a great deal from the time of the first Super Bowl until now, a constant throughout that time is the NFL's violations of these laws.

4.      In 1966, the NFL had 15 teams and the AFL had 9 teams.  Both leagues played a 14-game schedule and four pre-season games.  Only six teams played in the post-season.  Green Bay beat Dallas in the NFL Championship game before going on to beat Kansas City, which had beaten the Buffalo Bills in the AFL Championship game, in the first Super Bowl.  On the NFL side, Baltimore beat Philadelphia in the "Playoff Bowl" to finish third in the League.

5.      By 2014, the League had expanded to 32 teams, each of which played a four game pre-season, 16 regular season games (with the League looking to expand to an 18-game

**CLASS ACTION COMPLAINT**                                                                                     2

season), and could face up to four post-season games if they played in the Wildcard game before advancing to the Super Bowl.  In other words, including pre- and post-season, a team could play four more games in 2014 than it did in 1966.

6.     Moreover, whereas in 1966, players had no involvement with their team for months at a time in the offseason (and many needed second jobs), as of 2014, players have a few weeks before they report back in early April (and only a few years ago, it was early March).

7.     In addition to more games and shorter off seasons, over the same period of time, players have gotten bigger and stronger.  Mel Kiper, one of ESPN's senior football analysts, noted that in 2011 offensive lineman were on average 24 percent heavier than those in 1979 and an average of 31 percent stronger than those in 1991.  Indeed, in the 1960s the Colts' Hall of Fame tackle Art Donovan was considered a giant at 263 pounds.  In recent years, the League has seen the likes of Aaron Gibson at 440 pounds, Albert Haynesworth and Shaun Rogers at 350 pounds, and King Dunlap, who stands 6 foot 9 inches and weighs 330 pounds.

8.     Over the same time period, the League's total revenue has skyrocketed.  Between 1990 and 2013 alone, the number jumped from $1.5 billion to over $9 billion. Roger Goodell, the League's commissioner, has set a target of $27 billion by 2027.

9.     In its thirst for constantly growing revenue, the League has over the past few years increasingly scheduled more Thursday-night games than ever before, leaving players with less recovery time and greater chances for new injuries or worsening of existing injuries.

10.     More games, longer seasons, shorter recovery between games, plus bigger and stronger players, equals more frequent and debilitating injuries.  That is problematic for the League, which needs players on the field on every given Sunday so the money can keep rolling

**CLASS ACTION COMPLAINT**                                          3

in.  Indeed, named Plaintiff Jeremy Newberry spent an entire season with the 49ers in which he played every Sunday but never practiced because his injuries were too severe.

11.     While one might think that injuries need not doom a player's career, one need only look at former first pick Ki-Jana Carter, who tore knee ligaments in his first preseason game and never truly achieved his athletic (and thus earning) potential, to know otherwise.

12.     In a recent Washington Post Survey, nearly nine out of ten former players reported playing while hurt.  Fifty-six percent said they did this "frequently."  An overwhelming number – 68 percent – said they did not feel like they had a choice as to whether to play hurt.

13.     Those players are right – the NFL gave them no choice.  Rather than allowing players the opportunity to rest and heal, the NFL has illegally and unethically substituted pain medications for proper health care to keep the NFL's tsunami of dollars flowing.  For example, named Plaintiff Keith Van Horne played an entire season on a broken leg, the first month of which he a required special medical boot to reduce the swelling before he could suit-up.  He was not told about the broken leg for five years, during which time he was fed a constant diet of pills to deal with the pain.

14.     Scientific surveys of former NFL players reveal that most were improperly given medications by the NFL.

15.      Over the course of five decades, medications have changed.  Amphetamines, which at one time were left out in bowls in locker rooms, are not used as frequently now.  Toradol is a more recent drug of choice.  But while the specific medications have changed, the NFL has dealt the following types of medications to its players consistently since 1969:

- **Opioids**: narcotics whose analgesic properties operate by binding to opioid receptors found primarily in the central nervous system and gastrointestinal tract.

**CLASS ACTION COMPLAINT**                                                    4

Opioids act to block and dull pain.  The side effects of opioids include sedation and a sense of euphoria.  Opioids are commonly known to be highly addictive and are indicated for short-term use by patients with no family or personal history of drug abuse and for those without significant respiratory issues.

- **Non-Steroidal Anti-Inflammatory Medications ("NSAIDs")**: a class of medications that have analgesic and anti-inflammatory effects to mitigate pain, the most common of which are Aspirin and Ibuprofen.  All NSAIDs have blood thinning properties and have been linked to long-term kidney damage and other issues.  Physicians deem Toradol particularly dangerous and its use is therefore generally limited to short-term administrations in hospitals for surgical patients.

- **Local Anesthetics (such as Lidocaine)**: are generally indicated as a local anesthetic for minor surgery and are generally injected to numb the surrounding area.  Lidocaine has been known to result in cardiac issues for certain patients and it is indicated for surgical use in patients without heart problems.

16.    The foregoing medications were often administered without a prescription and with little regard for a player's medical history or potentially-fatal interactions with other medications.   Administering medications in this cavalier manner constitutes a fundamental misuse of carefully-controlled prescription medications and a clear danger to the players.

17.    The NFL directly and indirectly supplied players with and encouraged players to use opioids to manage pain before, during and after games in a manner the NFL knew or should have known constituted a misuse of the medications and violated Federal drug laws.

**CLASS ACTION COMPLAINT**                                                                 5

18.    The NFL directly and indirectly administered Toradol on game days to injured players to mask their pain.  Many players received Toradol over multiple games (if not every game) in a season for several seasons in a row.  Toradol should not be used this way.

19.    The NFL directly and indirectly supplied players with NSAIDs, and otherwise encouraged players to rely upon NSAIDs, to manage pain without regard to the players' medical history, potentially fatal drug interactions or long-term health consequences of that reliance.

20.    The NFL directly and indirectly supplied players with local anesthetic medications to mask pain and other symptoms stemming from musculoskeletal injury when the NFL knew that doing so constituted a dangerous misuse of such medications.

21.    The NFL sanctioned and/or encouraged the misuse of narcotic pain medications in combination with NSAIDs, anesthetics and other substances such as alcohol despite clear evidence of the potentially-fatal interactions of such combinations.  NFL doctors travel with their teams and know that players are being provided with such medications along with alcohol that the NFL provides on plane trips back from games.

22.    With its priority on profit, the NFL places a premium on return to play to the detriment of a player's health.  The time has come for that to stop.

## PARTIES

### I.    THE CLASS REPRESENTATIVES HAVE SUFFERED SERIOUS INJURIES.

23.    The named Plaintiffs played between 1969 and 2008.  Despite playing for different teams and at different times, their stories are remarkably similar.

24.    Plaintiff Richard Dent is a representative of the putative class as defined herein. As of the commencement of this action, he is a resident of Illinois.  Mr. Dent played defensive end for the Chicago Bears from 1983 – 1993 and again in 1995; the San Francisco 49ers in 1994;

**CLASS ACTION COMPLAINT**                                                    6

the Indianapolis Colts in 1996; and the Philadelphia Eagles in 1997. He was a four-time Pro Bowl selection; five-time All-Pro selection; two-time Super Bowl champion, and was inducted into the Pro Football Hall of Fame in 2011.

25. While playing in the NFL, Mr. Dent received hundreds, if not thousands, of injections from doctors and pills from trainers, including but not limited to NSAIDs and Percodan. No one from the NFL ever talked to him about the side effects of the medications he was being given or "cocktailing" (mixing medications). Over the course of his career, Mr. Dent became dependent on painkillers, a slow process that overtook him without him being cognizant of it happening. After his career ended, he was no longer able to obtain painkillers from the NFL and was forced to purchase over-the-counter painkillers to satisfy his need for medications. Over the course of that time, he has spent an extensive amount of money on such medications.

26. In addition, Mr. Dent suffers from an enlarged heart and nerve damage, particularly in his feet. In 1990 while playing in Seattle, Mr. Dent suffered a broken bone in his foot. He was told by team doctors and trainers at the time that he had done all the damage that could be done to that foot and that, while he therefore could have surgery, they could also supply him with painkillers to allow him to continue playing. Trusting that the doctors and trainers had his best interests at heart, he chose to continue playing and for the following eight weeks, he received repeated injections of painkillers as well as pills to keep playing. Today, Mr. Dent has permanent nerve damage in that foot.

27. Plaintiff Jeremy Newberry is a representative of the putative class as defined herein. As of the commencement of this action, he is a resident of California. He played 120 games (starting 107) at center for the San Francisco 49ers from 1998 to 2006, the Oakland Raiders in 2007, and the San Diego Chargers in 2008. He was a two-time Pro Bowler, twice

**CLASS ACTION COMPLAINT**                                                                 7

named to the All Pro team, and twice received the Ed Block Courage Award, an annual award voted on by their for fellow players who are models of inspiration, sportsmanship and courage.

28.     While playing in the NFL, Mr. Newberry received hundreds, if not thousands, of injections from doctors and pills from trainers, including but not limited to NSAIDs, Vicodin, Toradol, Ambien, Indocin, Celebrax, and Prednisone.  No one from the NFL ever talked to him about the side effects of the medications he was being provided or cocktailing.  He currently has Stage 3 renal failure and suffers from high blood pressure and violent headaches for which he cannot take any medications that might further deteriorate his already-weakened kidneys.

29.     Plaintiff Roy Green is a representative of the putative class as defined herein.  As of the commencement of this action, he is a resident of Arizona.  Mr. Green played wide receiver for the Saint Louis/Phoenix Cardinals from 1979 to 1990 and the Philadelphia Eagles from 1991 to 1992 during which time he caught 559 passes for 8,965 yards and 66 touchdowns and was a two-time Pro Bowler and twice named to the All-Pro team.

30.     While playing in the NFL, Mr. Green received hundreds, if not thousands, of injections from doctors and pills from trainers, including but not limited to NSAIDs, Indocin, Naprosyn, Percocet, Vicodin and Butisol.  He was also given trauma IVs.  No one from the NFL ever talked to him about the side effects of the medications he was being given or cocktailing. Since retiring, he has suffered three heart attacks.  He also suffers from high blood pressure.  In November 2012, he had a kidney transplant due to failing kidneys.  Mr. Green is currently active with a not-for-profit organization benefitting former professional athletes.

31.     Plaintiff J.D. Hill is a representative member of the putative class.  As of the commencement of this action, he is a resident of Arizona.  Mr. Hill played wide receiver for the

**CLASS ACTION COMPLAINT**                                                                 8

1   Buffalo Bills from 1971 to 1975 and the Detroit Lions from 1975 to 1978, which released him

2   during the 1979 preseason. He was named to the Pro Bowl team in 1972.

3        32.    While playing in the NFL, Mr. Hill received hundreds, if not thousands, of pills

4   from trainers and doctors, including but not limited to NSAIDs, Codeine, Valium and Librium.

5   No one from the NFL ever talked to him about the side effects of the medications he was being

6   given or cocktailing. He left the League addicted to painkillers, which he was forced to purchase

7   on the streets to deal with his football-related pain, a path that led him to other street

8   medications. He eventually became homeless and was in and out of 15 drug treatment centers

9   for a period of over 20 years until overcoming his NFL-sponsored drug addiction.

10       33.    Mr. Hill is now a pastor/substance abuse counselor for the Christian community.

11  But while he has been able to clean up his life and re-establish relationships with his wife,

12  children and grandchildren, his addiction has left deep scars, both literally and figuratively.

13  After leaving the NFL, Mr. Hill had to take Prednisone to deal with the pain from his injuries.

14  That Prednisone weakened his immune system. He then developed an abscess in his lung,

15  requiring major surgery resulting in the loss of part of a lung. In addition, he has atrial

16  fibrillation that requires doctor-supervised medication.

17       34.    Mr. Hill's post-NFL decline culminated in a 2005 guilty plea to Social Security

18  fraud, though he received probation because the violations at issue occurred while Mr. Hill was

19  in and out of drug treatment centers. He has subsequently repaid all of the money at issue.

20       35.    Plaintiff Keith Van Horne is a representative member of the putative class. As of

21  the commencement of this action, he is a resident of Illinois. Mr. Van Horne was an offensive

22  tackle for the Chicago Bears from 1981 to 1993 during which time he played in 186 games,

23  starting 169 of them, and was a member of the Bears' teams that won the 1985 Super Bowl and

24  **CLASS ACTION COMPLAINT**                                                    9

25

1    participated in the 1984, 1986 – 88, 1990 and 1991 playoffs.  Like Mr. Newberry, Mr. Van

2    Horne was a recipient of the Ed Block Courage Award.

3        36.    While playing in the NFL, Mr. Van Horne received hundreds of injections from

4    doctors and pills from trainers, including but not limited to Novocain, Halcion, Percodan and

5    NSAIDs such as Voltaren and Naproxen.  No one from the NFL ever talked to him about the

6    side effects of the medications he was being given or cocktailing.  Since retiring, he has had two

7    cardiac ablations and has suffered from, and continues to suffer from, atrial fibrillation, which

8    began in 2004, and premature ventricular contractions.  He has also suffered from tachycardia.

9        37.    Plaintiff Ron Stone is a representative member of the putative class.  As of the

10   commencement of this action, he is a resident of California.  Mr. Stone played offensive line for

11   the Dallas Cowboys from 1993 to 1995; the New York Giants from 1996 to 2001; the San

12   Francisco 49ers from 2002 to 2003, and the Oakland Raiders from 2004 to 2005.  He was a

13   three-time Pro Bowl selection; two-time All-Pro selection, and two-time Super Bowl champion.

14       38.    While playing in the NFL, Mr. Stone received hundreds of injections from doctors

15   and thousands of pills from trainers, including but not limited to NSAIDs such as Toradol,

16   Naprosyn and Indocin as well as Ambien, Percocet, and Cortisone.  No one from the NFL ever

17   talked to him about the side effects of the medications he was being given or cocktailing.  Since

18   retiring from the NFL, he has consistently suffered from severe pain in his elbow and knee

19   stemming from injuries received while playing that were masked with medications rather than

20   treated early with surgery or rest.

21       39.    Plaintiff Ron Pritchard is a representative member of the putative class.  As of the

22   commencement of this action, he is a resident of Arizona.  Mr. Pritchard played linebacker for

23

24   **CLASS ACTION COMPLAINT**                                                    10

25

1   the AFL/NFL Houston Oilers from 1969 to 1972 and for the Cincinnati Bengals from 1972 to

2   1977.  He is a member of the College Football Hall of Fame.

3        40.     While playing in the NFL, Mr. Pritchard received hundreds, if not thousands, of

4   pills from trainers, including but not limited to NSAIDs, amphetamines, Valium, Butazolidin,

5   and Quaaludes.   No one ever from the NFL talked to him about the side effects of the

6   medications he was being given or cocktailing.  Since retiring he has six knee surgeries and

7   replacements for both knees as well as shoulder, elbow, hand and foot surgery.

8        41.     Plaintiff Jim McMahon is a representative member of the putative class.  As of

9   the commencement of this action, he is a resident of Arizona.  Mr. McMahon played quarterback

10  for the Chicago Bears from 1982 to 1988; the San Diego Chargers in 1989; the Philadelphia

11  Eagles from 1990 to 1992; the Minnesota Vikings in 1993; the Arizona Cardinals in 1994; and

12  the Green Bay Packers from 1995 to 1996.  He was named League Rookie of the Year in 1982;

13  was selected to the Pro Bowl in 1985; was a two-time Super Bowl champion, and was named

14  NFL Comeback Player of the Year in 1992.

15       42.     While playing in the NFL, Mr. McMahon received hundreds, if not thousands, of

16  injections from doctors and pills from trainers, including but not limited to NSAIDs such as

17  Toradol, Percocet, Novocain injections, amphetamines, sleeping pills and muscle relaxers.  No

18  one from the NFL ever talked to him about the side effects of the medications he was being

19  given or cocktailing.  Over the course of his career and 18 surgeries, Mr. McMahon became

20  dependent on painkillers, a slow process that overtook him without him realizing it.  At one

21  point, he was taking as many as 100 Percocets per month, even in the off-seasons.  After his

22  playing career concluded, he was no longer able to obtain painkillers for free from the NFL and

23

24  **CLASS ACTION COMPLAINT**                                                          11

25

1   was forced to purchase over-the-counter painkillers to satisfy his need for medications.  Over the

2   course of that time, he has spent an extensive amount of money on such medications.

3        43.     In addition, Mr. McMahon suffers from arthritic pain in his hands and limited

4   motion, as well as extreme pain, in his right shoulder.  The foregoing pain and limitations stem

5   from injuries Mr. McMahon suffered while playing in the NFL that were never allowed to

6   properly heal and were aggravated by continued play.

7   **II.    THE STATUTE OF LIMITATIONS IS TOLLED.**

8        44.     Plaintiffs were not warned about the dangers of: (a) cocktailing; (b) ingesting

9   medication in numbers beyond a recommended dosage; (c) taking medications for periods of

10  time significantly longer than medically necessary; (d) the potential for addiction associated with

11  certain medications the League provided them; or (e) the potential for increased frequency and

12  severity of injuries as a result of taking medications, including but not limited to Toradol, that

13  masked pain.

14       45.     The NFL fraudulently concealed these dangers from its players to keep them on

15  the field when they otherwise should not have been, placing profit before player health.

16       46.     Plaintiffs had no good reason to know of these dangers until recently.  Often they

17  were not even told the names of the medications they were being given.  Further, the NFL kept

18  poor records, to the extent it kept records at all, regarding the medications it dispensed to its

19  players.

20       47.     Those failures on the part of the NFL constitute substantial factors in causing

21  Plaintiffs' injuries and damages.

22

23

24  **CLASS ACTION COMPLAINT**                                                    12

25

48.     The applicable statutes of limitations are tolled because the NFL's intentional, reckless and negligent omissions prevented Plaintiffs from learning of the foregoing hazards to their health.

## III.     THE NFL IS A RESIDENT OF THIS JUDICIAL DISTRICT.

49.     Defendant NFL, which maintains its offices at 345 Park Avenue, New York, New York, is an unincorporated association consisting of separately-owned and independently-operated professional football teams that operate out of many different cities and states in this country.  The NFL is engaged in interstate commerce in the business of, among other things, promoting, operating, and regulating the major professional football league in the United States.

50.     As an unincorporated association of member teams, the NFL is a resident of each state in which its member teams reside, including California.

51.     The NFL is a resident of the Northern District of California because it does business in this District, derives substantial revenue from its contacts with this District, and operates two franchises within this District, the Oakland Raiders and the San Francisco 49ers.

## JURISDICTION

52.     This Court has original jurisdiction pursuant to 28 U.S.C. § 1332(d)(2) because the proposed class consists of more than one hundred persons, the overall amount in controversy exceeds $5,000,000 exclusive of interest, costs, and attorney's fees, and at least one Plaintiff is a citizen of a State different from one Defendant.  The claims can be tried jointly in that they involve common questions of law and fact that predominate over individual issues.

53.     This Court has personal jurisdiction over the NFL because it does business in this District, derives substantial revenue from its contacts with this District, and operates two franchises within this District.

**CLASS ACTION COMPLAINT**                                                13

**VENUE**

54.    Venue is proper pursuant to 28 U.S.C. § 1391(b)(1) because Defendant is an entity with the capacity to sue and be sued and resides, as that term is defined at 28 U.S.C. §§ 1391(c)(2) and (d), in this District where it operates two franchises.

**INTRADISTRICT ASSIGNMENT**

55.    Pursuant to Civil L.R. 3-2(c) and 3-2(d), this action is properly assigned to either the San Francisco or Oakland Division because a substantial part of the events giving rise to the claims asserted herein occurred in Contra Costa County and the County of San Francisco.

**GENERAL ALLEGATIONS APPLICABLE TO ALL COUNTS**

**I.    FEDERAL/STATE LAW AND DOCTORS' CODES OF ETHICS REGULATE THE MANNER IN WHICH CONTROLLED SUBSTANCES, PRESCRIPTION DRUGS, AND OVER-THE-COUNTER MEDICATIONS ARE OBTAINED.**

**A.    Given the Potential Significant Detrimental Impact, Congress Imposed A Sophisticated Criminal/Regulatory Regime on Controlled Substances and Prescription Medications.**

56.    United States law imposes a sophisticated statutory regime that regulates the dispensation of certain medications that carry a greatly-enhanced risk of abuse and addiction ("controlled substances") and criminalizes violations of such regulations.  This regime protects against the dangers of abuse and addiction inherent in the use of controlled substances such as opioids and other powerful painkillers.  This regulatory regime applies to anyone involved in the dispensation of these substances, from a physician operating a solo medical practice to a multibillion-dollar machine such as the NFL.

**1.    The Controlled Substances Act Criminalizes the Dispensation and Possession of Medications that the NFL Routinely Gives Players.**

57.    In 1970, Congress enacted the Comprehensive Drug Abuse Prevention and Control Act (the "Act").  Title II of this Act, codified as 21 U.S.C. § 801 *et seq*., is known as the

**CLASS ACTION COMPLAINT**                                    14

Controlled Substances Act or the "CSA." The Act acknowledges that while "controlled substances" "have a useful and legitimate medical purpose and are necessary to maintain the health and general welfare," 21 U.S.C. § 801(1), the risk of addiction associated with such substances requires a sophisticated regime regulating their manufacture, dispensation, importation, use, distribution, and possession.

58. Regulation and enforcement of the CSA is delegated to the Food and Drug Administration ("FDA"), the Drug Enforcement Administration (the "DEA"), and the Federal Bureau of Investigation.

59. The CSA[1] organizes controlled substances into five categories, or schedules, that the DEA and FDA publish annually and update on an as-needed basis. The controlled substances in each schedule are grouped according to accepted medical use, potential risk for abuse, and psychological/physical effects.

60. Abuse of Schedule IV controlled substances "may lead to limited physical dependence or psychological dependence relative to the drugs or other substances in schedule III." 21 U.S.C. § 812(b)(4)(C). Among the medications listed as Schedule IV controlled substances are Ambien, Valium, Librium and Halcion.

61. Abuse of Schedule III controlled substances "may lead to moderate or low physical dependence or high psychological dependence." 21 U.S.C. § 812(b)(3)(C). Among the medications listed as Schedule III controlled substances are opioids and NSAIDs such as Vicodin[2] and acetaminophen with codeine.

---

[1] Medications regulated by the CSA also constitute prescription medications under the Food, Drug and Cosmetic Act, thereby requiring a prescription before they can be dispensed.

[2] On October 24, 2013, the FDA announced it would recommend to the Department of Health and Human Services that hydrocodone products such as Vicodin should be re-classified

**CLASS ACTION COMPLAINT**                                                                 15

62.     Schedule II controlled substances have "a high potential for abuse" that "may lead to severe psychological or physical dependence" such as cocaine and heroin.   21 U.S.C. § 812(b)(2).   Among the medications listed as Schedule II controlled substances are opioids – Codeine, Oxycodone – and stimulants – amphetamine and methamphetamine.

63.     Under authority provided by the Act at 21 U.S.C. § 821, the United States Attorney General can promulgate (and has promulgated) regulations implementing the Act.

### a.     The CSA's Regulatory Regime.

64.     The CSA contains a large number of provisions governing the dispensation,[3] use, distribution, and possession of controlled substances.   Under the CSA, "[e]very person who manufactures or distributes any controlled substance[,]" or "who proposes to engage in the manufacture or distribution of any controlled substance[,] … [or] who dispenses, or who proposes to dispense, any controlled substance," shall obtain from the Attorney General a registration "issued in accordance with the rules and regulations promulgated by [the Attorney General]."   *Id*. at § 822(a)(1)-(2).

65.     To distribute Schedule II or III controlled substances, applicants must establish that they: (a) maintain "effective control[s] against diversion of particular controlled substances into other than legitimate medical, scientific, and industrial channels;" (b) comply "with applicable State and local law;" and (c) satisfy other public health and safety considerations, including past experience and the presence of any prior convictions related to the manufacture, distribution, or dispensation of controlled substances.   *Id.* at § 823(b).

---

as Schedule II medications.  As of the date this action was filed, no further regulatory action has taken place regarding such products.

[3] The Act defines the dispensation of a controlled substance as the delivery of a controlled substance "to an ultimate user … by, or pursuant to the lawful order of, a practitioner, including the prescribing and administering of a controlled substance[.]"  21 U.S.C. § 802(10).

**CLASS ACTION COMPLAINT**                                                                        16

66. The CSA mandates that controlled substances may be legally dispensed only by a practitioner or pursuant to a practitioner's prescription (as similarly established by 21 U.S.C. § 353) and within the purview of the practitioner's registration. *Id.* at § 829.

67. Moreover, Schedule II substances cannot be re-filled, *see id.* at § 829(a), while Schedule III and IV substances cannot be re-filled more than six months after the initial dispensation or more than five times "unless renewed by the practitioner." 21 U.S.C. § 829(b).

68. Only those prescriptions "issued for a legitimate medical purpose by an individual practitioner acting in the usual course of his professional practice" may be used to legally dispense a controlled substance under § 829(b). 21 C.F.R. § 1306.04(a) (2013).

69. The CSA also establishes specific recordkeeping requirements for those registered to dispense controlled substances scheduled thereunder. For example, except for practitioners prescribing controlled substances within the lawful course of their practices, the CSA requires the maintenance and availability of "a complete and accurate record of each substance manufactured, received, sold, delivered, or otherwise disposed." 21 U.S.C. § 827(c).

70. The Act's recordkeeping regulations require a person registered and authorized to dispense controlled substances to maintain records regarding both the substances' prior manufacturing and the subsequent dispensing of the substance. Such records must include the name and amount of the substances distributed and dispensed, the date of acquisition and dispensing, certain information about the person from whom the substances were acquired and dispensed to, and the identity of any individual who dispensed or administered the substance on behalf of the dispenser. 21 C.F.R. § 1304(22)(c) (2013).

71. Beyond specific recordkeeping, all registrants "shall [also] provide effective controls and procedures to guard against theft and diversion of controlled substances." 21 C.F.R.

**CLASS ACTION COMPLAINT**                                                        17

§ 1301.71(a) (2013). Depending on the Schedule assigned to a particular controlled substance, such substances must be securely locked within a safe or cabinet or other approved enclosures or areas. *Id.* at §§ .72(b) & .75(b) (2013). Any theft or significant loss of controlled substances must be reported to the DEA upon discovery of the theft or loss. *Id.* at § .74(c) (2013).

### b. __The CSA's Criminal Regime.__

72. The CSA enacted a comprehensive criminal regime to penalize violations of its rules and regulations.

73. Specifically, Part D of the CSA proscribes a series of "Prohibited Acts" that run the gamut from trafficking of controlled substances to their unlawful possession.

74. For example, it is unlawful for any person to knowingly or intentionally "distribute, or dispense, or possess with intent to … distribute, or dispense, a controlled substance[]" in violation of the CSA. 21 U.S.C. § 841(a)(1).

75. Each and every single violation of this section that involves a "Schedule III" controlled substance is a Federal felony subject to a variety of penalties, including but not limited to a term of imprisonment of up to ten years (15 years if the violation results in death or serious bodily injury) and a fine of $500,000 if the violator is an individual to $2,500,000 if the violator is not an individual (for first offenses). *Id.* at § 841(b)(1)(E)(i). These penalties are __*doubled*__ if the violator has a prior conviction for a felony drug offense. *Id.* at §841(b)(1)(E)(ii).

76. It is also unlawful for anyone with a CSA registration to:

- "distribute or dispense a controlled substance" without a prescription or in a fashion that exceeds that person's registered authority. *Id.* at § 842(a)(1)-(2);

- distribute a controlled substance in a commercial container that does not contain the appropriate identifying symbol or label, as provided under 21 U.S.C. § 321(k),

**CLASS ACTION COMPLAINT** 18

or to "remove, alter, or obliterate" such an identifying symbol or label. *Id*. at §§ 825, 842(a)(3)-(4);

- "refuse or negligently fail to make, keep, or furnish any record, report, notification, declaration, order or order form, statement, invoice, or information required" under the CSA. *Id*. at § 842(a)(5); or

- A person registered and authorized to dispense controlled substances must maintain records regarding both the substances' prior distribution and the subsequent dispensing of the substance. Such records must include the name and amount of the substances distributed and dispensed, the date of acquisition and dispensing, certain information about the person from whom the substances were acquired and dispensed to, and the identity of any individual who dispensed or administered the substance on behalf of the dispenser. 21 C.F.R. § 1304.22(c) (2013).

A person who violates any of these provisions is subject to a minimum civil penalty up to $25,000. *Id.* at § 842(c)(1)(A).

77.     It is also unlawful for a person "knowingly or intentionally to possess a controlled substance unless such substance was obtained directly, or pursuant to a valid prescription or order, from a practitioner, while acting in the course of his professional practice, or except as otherwise authorized" under the CSA. *Id*. at § 844(a). A violation of this provision is subject to a term of imprisonment of up to one year and a fine of up to $1,000 for a first offense. *Id*. Multiple violations of this provision result in a term of imprisonment of up to three years and a fine of at least $5,000. *Id*.

**CLASS ACTION COMPLAINT**                                        19

78. Furthermore, "[a]ny person who attempts or conspires to commit any offense" described above "shall be subject to the same penalties as those prescribed for the offense, the commission of which was the object of the attempt or conspiracy." *Id.* at § 846.

79. Except as authorized by the CSA, it is unlawful to "knowingly open, lease, rent, use, or maintain any place, whether permanently or temporarily, for the purpose of distributing or using controlled substance" or to "manage or control any place, whether permanently or temporarily, either as an owner, lessee, agent, employee, occupant, or mortgagee, and knowingly and intentionally rent, lease, profit from, or make available for use, with or without compensation, the place for the purpose of unlawfully manufacturing, storing, distributing, or using a controlled substance." *Id.* at § 856(a). A violation of this section results in a term of imprisonment of up to 20 years and a fine of $500,000 if the violator is an individual or up to $2,000,000 if the violator is not an individual. *Id.* at § 856(b).

80. For decades, the NFL's lack of appropriate prescriptions, failure to keep records, refusal to explain side effects, lack of individual patient evaluation, proper diagnosis and attention, and use of trainers to distribute Schedule II and III controlled substances to its players, including Plaintiffs, individually and collectively violate the foregoing criminal and regulatory regime. In doing so, the NFL not only left its former players injured, damaged and/or addicted, but also committed innumerable violations of the CSA.

>2. **The Food, Drug, and Cosmetic Act Prohibits the Dispensation of Controlled Substances Without a Prescription.**

81. A significant complement to the foregoing statutory regime is the Food, Drug, and Cosmetic Act (the "FDCA"). Enacted by Congress in 1938 to supplant the Pure Food and Drug Act of 1906, the FDCA prohibits the marketing or sale of medications in interstate commerce

**CLASS ACTION COMPLAINT** 20

without prior approval from the Food and Drug Administration ("FDA"), the agency to which Congress has delegated regulatory and enforcement authority.  *See* 21 U.S.C. § 331(d).

82.     The FDCA has been regularly amended since its enactment.  Most notably, changes in 1951 established the first comprehensive scheme governing the public sale of prescription pharmaceuticals as opposed to "over-the-counter" medications. The purpose of this regulatory regime was to ensure that the public was protected from abuses related to the sale of powerful prescription medications.

83.     Pursuant to this amendment, the FDCA provides that if a covered drug has "toxicity or other potentiality for harmful effect" that makes its use unsafe unless "under the supervision of a practitioner licensed by law to administer such drug[,]" it can be dispensed only through a written prescription from "a practitioner licensed by law to administer such drug."  21 U.S.C. § 353(b)(1).   Any oral prescription must be "reduced promptly to writing and filed by the pharmacist" and any refill of such a prescription must similarly be authorized.  *Id*.

84.     Jurisprudence interpreting the FDCA establishes that a proper "prescription" under the FDCA shall include directions for the preparation and administration of any medicine, remedy, or drug for an actual patient deemed to require such medicine, remedy, or drug following some sort of examination or consultation with a licensed doctor.   Conversely, a "prescription" does not mean any mere scrape of paper signed by a doctor for medications.

85.     As a result, a key element in determining whether or not § 353(b)(1) has been violated is the existence (or non-existence) of a doctor-patient relationship from which the "prescription" was issued.

86.     The FDCA further provides that the prescribing medical professional shall be the patient's primary contact and information source on such prescription medications and their

**CLASS ACTION COMPLAINT**                                    21

effects. *Id*. at §§ 352, 353. As such, regulations promulgated by the FDA require medical professionals to provide warnings to patients about such effects.

87. Dispensers violate the FDCA if they knowingly and in bad faith dispense medications without a prescription or with the intent to mislead or defraud. 21 U.S.C. §§ 331(a) & 333(a)(2).

88. Dispensing a drug without a prescription results in the drug being considered "misbranded" while it is held for sale. *Id* at § 353(b)(1). The FDCA prohibits: (a) introducing, or delivering for introduction, a misbranded drug into interstate commerce; (b) misbranding a drug already in interstate commerce; or (c) receiving a misbranded drug "in interstate commerce, or the delivery or proffered delivery thereof for pay or otherwise[.]" 21 U.S.C. §§ 331(a) – (c).

89. It is also a violation to provide a prescription drug without the proper FDA-approved label. *Id.* at § 352; 21 C.F.R. §§ 201.50–201.57 (2013). Stringent regulations have been enacted that dictate what specific information that must be provided on a prescription drug's labeling, the order in which such information is to provided, and even specific "verbatim statements" that must be provided in certain circumstances, such as the reporting of "suspected adverse reactions." *See generally* 21 C.F.R. §§ 201.56, .57, .80 (2013).

90. For instance, labeling for any covered medication approved by the FDA prior to June 30, 2001 must include information regarding its description, clinical pharmacology, indications and usage, contraindications, warnings, precautions, adverse reactions, drug abuse and dependence, overdosage, dosage and administration, and how it was supplied, to be labeled in this specific order. *See* 21 C.F.R. § 201.56(e)(1) (2013).

91. Such information must be provided under the foregoing headings in accordance with 21 C.F.R. §§ 201.80(a)-(k) (2013). For example, labeling regarding a covered drug's

**CLASS ACTION COMPLAINT** 22

tendency for abuse and dependence "shall state the types of abuse [based primarily on human data and human experience] that can occur with the drug and the adverse reactions pertinent to them." *See id.* at § 201.80(h)(2) (2013).

92. Covered medications approved by the FDA after June 30, 2001 are subject to even more stringent labeling requirements. *See generally* 21 C.F.R. §§ 201.56(d)(1); .57(a)-(c) (2013). For instance, labeling for such covered drugs must provide: (a) if the covered drug is a controlled substance, the applicable schedule; (b) "the types of abuse that can occur with the drug and the adverse reactions pertinent to them[;]" and (c) the "characteristic effects resulting from both psychological and physical dependence that occur with the drug and must identify the quantity of the drug over a period of time that may lead to tolerance or dependence, or both." *See* 21 C.F.R. § 201.57(c)(10) (2013).

93. The NFL's use of trainers to distribute mediations, lack of appropriate prescriptions, failure to keep records, refusal to explain side effects, and lack of individual patient care, individually and collectively, violate the FDCA.

**B. All 50 States Plus the District of Columbia Have Corresponding Laws That Regulate Controlled Substances and Prescription Medications.**

94. The Act expressly contemplates that the States will implement their own laws regulating controlled substances and prescription medications. All States do and many States' laws are stricter than the Act. For example, California has enacted the Pharmacy Law, Calif. Code, Bus. & Prof. §§ 4000 *et seq.* that extensively regulates prescription drugs such as Toradol as well as the Sherman Food, Drug and Cosmetic Laws, Calif. Code, Health & Safety §§ 109910 & 110045, which largely mirrors the FDCA.

**CLASS ACTION COMPLAINT**                                                                 23

C.    **The American Medical Association Has Established a Code of Ethics That Governs Physicians' Duties to Their Patients.**

95.    The Code of Medical Ethics of the American Medical Association ("AMA") is frequently cited by Courts as persuasive evidence of the duties of medical practitioners. Leading jurists have relied on the Code in reaching some of their most important decisions in the medical field.  *See, e.g., Washington v. Glucksberg*, 521 U.S. 702, 731 (1997) (citing the Code for holding that states have a legitimate interest in preventing physicians from assisting in suicide); *Vacco v. Quill*, 521 U.S. 793, 802 (1997) (same).

96.    The Code itself is based on nine basic principles of medical ethics, such as that a physician "be honest in all professional interactions," AMA Code of Med. Ethics Principle II, "make relevant information available to patients," *id.* at V, and "regard responsibility to the patient as paramount." *Id.* at VIII.

97.    From these simple premises are derived a number of related opinions of the AMA's Council on Medical Ethics, which "lay out specific duties and obligations for physicians." AMA Council on Med. Ethics, Op. 1.01.

98.    For more than 30 years, the AMA has stood firm on the duties of physicians in the practice of sports medicine:

> Physicians should assist athletes to make informed decisions about their participation in amateur and professional contact sports which entail the risks of bodily injury. The professional responsibility of the physician who serves in a medical capacity at an athletic contest or sporting event is to protect the health and safety of the contestants. The desire of spectators, promoters of the event, or even the injured athlete that he or she not be removed from the contest should not

**CLASS ACTION COMPLAINT**                                    24

be controlling. The physician's judgment should be governed only by medical considerations.

AMA Council on Med. Ethics, Op. 3.06.

99.     Practitioners of sports medicine that work for a league or individual teams must also adhere to the duties described in Opinion 3.05, which governs physicians who are employed by a non-physician supervisee.

100.     This situation creates the possibility that the physician's interests are "placed at odds with patient care interests."

101.     However, the duty of physicians is clear: to "give precedence to their ethical obligation to act in the patient's best interest by always exercising independent professional judgment, even if that puts the physician at odds with the employer / supervisee."

102.     A practitioner employed by an NFL team undoubtedly faces this inherent conflict of interest.

103.     However inherent this conflict of interest might be, it must be disclosed to the patient pursuant to AMA Council on Med. Ethics, Op. 10.01(1) ("Patients are entitled … to be advised of potential conflicts of interest that their physicians might have[.]") – however, "[u]nder no circumstances may physicians place their own financial interests above the welfare of their patients." AMA Council on Med. Ethics, Op. 8.03.

104.     Relatedly, physicians are prohibited from unnecessarily distributing medications to a patient in order to advance the physician's own financial interests. *Id.* (This flows from three fundamental premises of medical ethics that apply regardless of any conflict of interest: (1) "[p]hysicians should not provide, prescribe, or seek compensation for medical services that they know are unnecessary[,]" AMA Council on Med. Ethics, Op. 2.19, (2) "[p]hysicians should

**CLASS ACTION COMPLAINT**                                                                                 25

prescribe medications, devices, and other treatments based solely upon medical considerations[,]" AMA Council on Med. Ethics, Op. 8.06, and (3) "[t]reatments which have no medical indication and offer no possible benefit to the patient should not be used[.]")

105.     Dispensing medications that are not medically required in order to make it more likely that a player will be able to participate in a game is therefore a breach of the duty to resolve all conflicts of interest "to the patient's benefit." AMA Council on Med. Ethics, Op. 8.03.

106.     Though these medical ethics duties serve many goals, perhaps none is more paramount than the achievement of a patient's informed consent.

107.     First and foremost, "[i]t is a fundamental … requirement that a physician should at all times deal honestly and openly with patients." AMA Council on Med. Ethics, Op. 8.12.

108.     Further, as the AMA Council of Medical Ethics has observed:

The patient's right of self-decision can be effectively exercised only if the patient possesses enough information to enable an informed choice. The patient should make his or her own determination about treatment. The physician's obligation is to present the medical facts accurately to the patient … and make recommendations for management in accordance with good medical practice.

AMA Council on Med. Ethics, Op. 8.08; *see also* AMA Council on Med. Ethics, Op. 10.01(1) ("The patient has the right to receive information from physicians and to discuss the benefits, risks, and costs of appropriate treatment alternatives.")

109.     This "duty of disclosure" based on Opinion 8.08 has been roundly recognized in our nation's courts as "requiring that patients be given enough information to enable an

**CLASS ACTION COMPLAINT**                                                    26

intelligent choice." *See Marsingill v. O'Malley*, 58 P.3d 495, 504-505 (Alaska 2002); *Matthies v. Mastromonaco*, 733 A.2d 456, 463-464 (N.J. 1999).

110.    Indeed, in many jurisdictions, the duty described in Opinion 8.08 supports a valid cause of action by a patient who has been harmed as a result of a lack of informed consent. *See, e.g., Acuna v. Turkish*, 930 A.2d 416, 425 (N.J. 2007).

111.    In sum, "[w]ithholding medical information from patients without their knowledge or consent is … unacceptable." AMA Council on Med. Ethics, Op. 8.082.

112.    NFL physicians' relationships with players are "based on trust and gives rise to physicians' … obligations to place patients' welfare above their own self-interest ***and above obligations to other groups***," AMA Council on Med. Ethics, Op. 10.015 (emphasis added), such that patients should always expect to "receive guidance from their physicians as to the optimal course of action," AMA Council on Med. Ethics, Op. 10.01, determined by "sound medical judgment, holding the best interests of the patient as paramount," AMA Council on Med. Ethics, Op. 10.015.

113.    In intentionally, recklessly and negligently distributing powerful pharmaceuticals with the primary aim of bolstering the NFL's entertainment product and little concern for either the short- or long-term effects on players, the physicians employed by the NFL and its teams have fallen far short of fulfilling the solemn duties this relationship entails.[4]

---

[4] Even if a physician has not violated any of the above duties, if the physician became aware of other practitioners that engaged "in fraud or deception" or other unethical conduct, the physician has a duty to report those individuals to the appropriate entities. AMA Code of Ethical Principles II; *see also* AMA Council on Med. Ethics, Op. 9.031.

**CLASS ACTION COMPLAINT**                                                27

II.   **RECOGNIZING THAT ITS DOCTORS/TRAINERS HAVE VIOLATED THE FOREGOING LAWS AND CODES, THE NFL HAS RECENTLY MANDATED SAFEGUARDS IT COULD HAVE EASILY PUT IN PLACE DECADES AGO.**

114.   The League has recognized the problem of painkiller abuse for decades. In 1997, one General Manager said that painkiller abuse was "one of the biggest problems facing the league right now." He said the League was trying to fix the problem, but described painkiller use among players as "the climate of the sport."

115.   And while the NFL has acknowledged that "[t]he deaths of several NFL players have demonstrated the potentially tragic consequences of substance abuse," over the ensuing decade, little changed.

116.   But a growing public disapproval of the NFL's lack of care for its players and treatment of them as disposable assets is finally forcing the League to acknowledge the looming crisis. A large part of the shifting sentiment stems from players' use of medications to fight injury and stay on the field at great cost to their future health and wellbeing. As discussed further below, the crisis is also fueled by incidents of coaches and executives engaging in unlawful conduct to protect the League from the taint of prescription drug abuse. Moreover, recent medical studies have illuminated the grave health risks to which players are exposed through overuse of the weekday and game day prescription painkillers.

A.   **Recommendations of the NFL Physicians Society Task Force.**

117.   In 2012, Dr. Mathew Matava, team doctor for the St. Louis Rams and then president-elect of the NFL Physician Society ("NFLPS"), formed a task force to examine the use of Toradol and provide recommendations regarding the future use of the substance in the NFL. Matthew Matava *et al.*, "Recommendations of the National Football League Physician Society

**CLASS ACTION COMPLAINT**                                                                 28

Task Force on the Use of Toradol Ketorolac in the National Football League," 4 *Sports Health* 5:

377-83 (2012) (hereinafter "Task Force Recommendations").

118.    The task force recognized that a decade had passed since the only other study to look at Toradol in professional sports took place.  JM Tokish, *et al.*, "Ketorolac Use in the National Football League:  Prevalence, Efficacy, and Adverse Effects," *Phys Sportsmed* 30(9): 19-24 (2002) (hereinafter the "Tokish Study").

119.    The Tokish Study sent questionnaires to the head team physician and the head athletic trainer of each of the NFL's 32 teams, with 30 of them responding.  In addition to finding that 28 of those 30 teams administered Toradol injections during the 2000 season, the Tokish Study also found the following:

- Of the 28 teams that used the drug, an average of 15 players were given injections (this answer ranged from 2 players to 35 players); and

- Twenty-six of the 28 teams used Toradol on game day.

120.    One team had a policy of no use within 48 hours of games, and another team had a policy of no use within 12 hours of games.

121.    Toradol has the potential for severe complications such as bleeding and renal damage.  In fact, the two teams that did not use Toradol injections had strong policies against its use, citing potential complications, including renal failure and increased risk of bleeding.

122.    Some players did experience Toradol complications; six teams reported one adverse outcome relating to Toradol use.  Specifically, four teams noted muscle injury, one documented a case of gastrointestinal symptoms that resolved with cessation of Toradol use, and one reported that a player had increased generalized soreness one day after injection.

**CLASS ACTION COMPLAINT**                                                                        29

123.    The Tokish Study concluded that "given that bleeding times are prolonged by 50% 4 hours after a single [shot of Toradol, use] on game day may deserve reconsideration in contact sports."  The study then called for additional investigation and sought the development of standardized guidelines for Toradol use in athletes.

124.    Over a decade later, the task force determined that standardized guidelines still had not been implemented, and that Toradol use had increased in the NFL during the intervening period.

125.    Therefore, the purpose of the task force was to "[p]rovide NFL physicians with therapeutic guidelines on the use of [Toradol] to decrease the potential risk of severe complications associated with NSAIDs – in particular, the increased risk of hemorrhage resulting from a significant collision or trauma."

126.    The task force recommended that:

- Toradol should not be administered prophylactically "prior to collision sports such as football, where the risk of internal hemorrhage may be serious" in light of the FDA's admonition "that [the drug] not be used as a prophylactic medication prior to major surgery or where significant bleeding may occur."

- Toradol should not be used "to reduce the anticipated pain, during, as well as after competition" because "[t]he perception of NFL players getting 'shot up' before competition has shed an unfavorable light on the NFL as well as on team physicians who are perceived as being complicit with the players' desire to play at all costs, irrespective of the medical consequences."

- If Toradol is to be administered, it should be given orally and not through the more aggressive injections/intramuscularly.   The Task Force found that the

**CLASS ACTION COMPLAINT**                                                                                           30

greater risks associated with injections – infections, bleeding, and injury to adjacent structures – combined with quicker onset of the drug when taken orally "favors the oral route of administration."

127.     With recommendations from the NFLPS that condemn many of the current practices regarding the administration of Toradol on game days, the task force granted the NFL a reprieve given the "unique clinical challenges of the NFL," allowing that "each team physician is ultimately free to practice medicine as he or she feels is in the best interest of the patient."

128.     Finally, despite the clear cut recommendations not to use Toradol prophylactically or intramuscularly, the task force gave itself an out by claiming that the medical literature is "deficient in terms of the ethical considerations implicit with the administration of injectable medications in the athletic setting solely for the athlete to return to competition."

**B.     Recent Efforts to Tighten Its Controls Do Not Help Plaintiffs.**

129.     Several NFL teams and physicians have recently taken affirmative steps to tighten the control and distribution of medications in the locker room.

130.     None of these efforts were mandated by the NFL, which continues to look the other way.

131.     Several teams have either eliminated the use of, or attempt to avoid providing, Toradol whenever possible.

132.     In an effort to better comply with DEA and state medical regulations, physicians associated with and licensed in the state of the host city now provide some of the "common stock" of painkillers to visiting team players.  The "common stock" is kept under lock and key in secure areas, and any distribution to a visiting player is noted on the pill-by-pill log.

**CLASS ACTION COMPLAINT**                                                                 31

133. The "common stock" means that doctors no longer unlawfully transport and prescribe medications outside the area permitted by their state license when they travel with the teams to away games in different states.

134. Upon information and belief, some teams use a company called SportsPharm, which is registered with the DEA, to maintain a detailed drug log and deliver prescription medication to team facilities and stadiums.

135. Upon information and belief, one team no longer stores any prescription painkillers at the team's complex.  Rather, all prescriptions are called into a pharmacy that then delivers the exact prescription to the facility and gives the medications directly to the identified player.

136. Following the recent scrutiny of providing players with Toradol as part of a pregame ritual, some team physicians in or around the 2012 season attempted to get players to sign liability waivers releasing the team from liability for any injury, damage or death sustained while using the drug.  DeMaurice Smith, head of the NFLPA, stated that it was "[h]ard to believe that happens in the NFL, but it does."  He then expressed his concern and posed, "[w]hat physician conditions medical care on you waiving liability?"

### C. The NFL Acknowledges Its Responsibilities.

137. It took decades for NFL teams to take action and rein in a culture that encouraged painkiller abuse.  Publically, however, the League still fails to admit that it has a drug problem that is exponentially aggravated by the cycles of injury and pain inherent in professional football. Rather, as evidenced by recent statements from NFL Executive Vice President Jeff Pash, the NFL claims that painkiller abuse is "something that needs to be addressed on a broad basis, not just in the NFL, and it is something ***our*** doctors are looking at" (emphasis added).

**CLASS ACTION COMPLAINT**                                                                                   32

138.     Its public silence notwithstanding, the League is finally taking steps to mitigate decades of willful and wanton disregard for the safety of its players during their careers and for the public at large when the NFL machine requires replacement parts and then casts aside the former gladiators, leaving them to start a life outside of football saddled with a drug addiction. At a minimum, the NFL acted with callous indifference to the duty it voluntarily assumed to the Plaintiffs and all players.

## III.     THE DAMAGE IS DONE – THE MEDICATIONS THE NFL PROVIDED ITS PLAYERS CREATE LASTING LONG-TERM HEALTH EFFECTS.

### A.     Opioid Tolerance, Dependence and Addiction.

139.     As the NFL is well aware, the overwhelming body of medical and scientific evidence demonstrates that, by their nature, prescription opioids are highly-addictive medications that should be prescribed to a very select group of patients under very limited circumstances.

140.     Opioids have been found to be so highly addictive for three principal reasons:

- First, the drug works, in part, by activating brain processes associated with feelings of pleasure and/or euphoria. Individuals who are prone to addiction find the "high" associated with these types of medications irresistible, frequently resulting in addiction.

- Second, because of the biochemical reaction triggered by opioids, people tend to plateau at a certain dosage that they will thereafter escalate for a reinforcing effect. This causes higher rates of addiction because opioids are known to be more physically and psychologically addictive at higher doses.

- Finally, long-term use of opioids causes hyperalgesia, or hyper-sensitivity to pain, which causes some patients to resort to opioids for pain that would otherwise be tolerable.

**CLASS ACTION COMPLAINT**                                                          33

141.    Concern over the addictive nature of opioids has led to a severe tightening of the guidelines for prescribing these medications for pain in non-cancer patients.  In general, physicians should prescribe opioids only for short-term acute (usually surgical) pain in patients with a suitably low risk of developing an opioid addiction.

142.    The National Institute on Drug Abuse ("NIDA") has reported that the risks for addiction to prescription narcotics increases and is amplified when they are abused and/or used in ways other than prescribed; *e.g.*, at higher doses or combined with alcohol or other medications.

143.    Peer-reviewed medical journals report that frequency of use of prescription narcotics is a key variable likely to influence an individual's risk for abuse and addiction.

144.    Medical science has clearly established that drug abuse and addiction can result in overdose and even death as well as other adverse health consequences.  Indeed, studies by NIDA have reported that more people die from overdoses of prescription opioids than from all other medications combined, including heroin and cocaine.

145.    Publications by NIDA also state that individuals who suffer from addiction often have one or more accompanying medical issues, including lung and cardiovascular disease, cancer, and mental disorders.

146.    Published, peer-reviewed scientific studies find that long-term use of "[prescription] opioids for the treatment of chronic, nonmalignant pain is surrounded by controversy because of concerns about the potential for abuse, addiction, organ damage, demotivation and questions regarding their long-term effectiveness."

**CLASS ACTION COMPLAINT**                                                      34

147. Other studies show that opioid addiction develops quickly. One publication observes that tolerance and physical dependence occur after one to two weeks of daily opioid use, resulting in a withdrawal syndrome after abrupt cessation.

148. Published medical review articles describe other potential adverse effects associated with opioid abuse, including respiratory suppression and overdose, medication interactions, infectious disease transmission (with intravenous use), and engagement in other risky behaviors, including alcohol and other drug abuse.

149. Studies and patient data also show that combining prescription narcotics with alcohol and other medications can cause a dangerous slowing of heart rate and respiration, coma or even death.

150. NIDA reports that severe physical withdrawal symptoms occur in patients who have abused prescription narcotics, including restlessness, muscle and bone pain, insomnia, diarrhea, vomiting, cold flashes, and involuntary leg movement.

151. Moreover, drug abuse and addiction have negative consequences for individuals and society in general. NIDA notes that in addition to productivity and health and crime-related costs, drug abuse and addiction can also cause destructive public health and safety consequences, including family disintegration, loss of employment, domestic violence and child abuse.

152. In addition, patients who are provided with opioids for long-term prescription use are more likely to become addicted to the medications for significant periods of time.

153. Surveys of former NFL players confirm the link between their use of prescription opioids while playing in the NFL and the addiction by which named Plaintiff J.D. Hill and other current and former NFL players have suffered.

**CLASS ACTION COMPLAINT** 35

154.    These same surveys also reveal that former NFL players suffer from the full-range of physical, emotional, financial and other harms that flow from addiction to narcotics.

**B.**    **More Severe and Permanent Musculoskeletal Injuries.**

155.    The NFL's reliance on opioids, NSAIDs, anesthetics and other medications has also directly resulted in more severe and more permanent musculoskeletal injuries in players for two reasons, both borne out by scientific research.

156.    First, opioids, NSAIDs and anesthetics operate to "mask" pain, one of the body's most fundamental protective mechanisms, and thereby heighten the severity of and render permanent injuries that would have otherwise healed.

157.    According to the International Association for the Study of Pain, pain is defined as "[a]n unpleasant sensory and emotional experience associated with actual or potential tissue damage, or described in terms of such damage."  Combined with swelling and limited range of motion, pain is the body's foremost defense against further injury.  Because of this, the vast majority of physicians recommend a period of rest and isolation of the painful body part to allow the body part to heal and to prevent further injury.

158.    Local anesthetics thwart that process as they temporarily interrupt the action of all nerve fibers, including pain-carrying ones, by interfering with the actions of sodium channels. Such medications cause a complete loss of feeling in the area into which the drug is injected, rendering ineffective all the body's normal protective mechanisms and dramatically increasing the chance of permanent injury.

159.    Analgesics, including opioids and NSAIDs, block pain by inhibiting the pain-producing chemicals that cause pain.  Clinically, these medications simply mask symptoms, thereby increase the likelihood of more severe and permanent injury.

**CLASS ACTION COMPLAINT**                                                    36

160.    Second, medical science indicates that the chemical properties of certain prescription painkillers actually inhibit healing in a wide array of musculoskeletal injuries.

161.    Peer-reviewed experimental studies suggest prescription painkillers have a detrimental effect on tissue-level repair of injuries and those medications have been shown to impair mechanical strength return from acute injury to bone, ligament and tendon.

162.    In particular, opioids and certain NSAIDs have been linked to increased rates of osteoporosis, increased fracture risk, diminished muscle mass, increased fat mass and anemia.

163.    Medical science therefore confirms the link between the use of prescription painkillers and the astounding rates of permanent neck, back, knee, shoulder and other musculoskeletal injuries suffered by former NFL players, including Plaintiffs.

**C.    Long-Term Health Consequences Caused by Prescription Pain Killers.**

164.    The constant pain Plaintiffs and other former NFL players experience from their injuries leads directly to a host of other health problems.

165.    Leading experts recognize that former NFL players who suffer from permanent musculoskeletal injuries often cannot exercise due to pain or other physical limitations, leading to a more sedentary lifestyle and to higher rates of obesity.

166.    According to the Centers for Disease Control and Prevention, obesity is linked to: coronary heart disease, type-2 diabetes, endometrial cancer, colon cancer, hypertension, dyslipidemia, liver disease, gallbladder disease, sleep apnea, respiratory problems and osteoarthritis.

167.    Surveys of former NFL players confirm that the players suffer from significantly higher rates of all these disorders when compared to the general population.

**CLASS ACTION COMPLAINT**                                          37

168.   In addition, it is well established that long-term use of opioids is directly correlated with respiratory problems and these problems are made worse by use of alcohol together with opioids.

169.   Long-term opioid use has also been tied to increased rates of certain types of infections, narcotic bowel syndrome, decreased liver and kidney function and to potentially fatal inflammation of the heart.  Opioid use coupled with acetaminophen use has been linked to hepatic (liver) failure.

170.   Long-term use of opioids has also been linked directly to sleep disorders and significantly decreased social, occupational and recreational function.

**D.     Health Effects Specifically Stemming From Use of NSAIDs.**

171.   NSAIDs are often viewed as a non-addictive "safer" alternative to narcotics. NSAIDs have been shown to be among the most highly prescribed painkillers for athletes.

172.   Despite the popular notion that NSAIDs are "safer" than other types of prescription painkillers, NSAIDs are associated with a host of adverse health consequences.

173.   The two main adverse reactions associated with NSAIDs relate to their effect on the gastrointestinal ("GI") and renal systems.  Medical studies have shown that high doses of prescription NSAIDs were associated with serious upper GI events, including bleeding. Additionally, GI symptoms such as heartburn, nausea, diarrhea, and fecal blood loss are among the most common side effects of NSAIDs.  Medical reports have also noted that 10-30% of prescription NSAID users develop dyspepsia, 30% endoscopic abnormalities, 1-3% symptomatic gastroduodenal ulcers, and 1-3% GI bleeding that requires hospitalization.  Studies also indicate that the risk of GI side effects increases in a linear fashion with the daily dose and duration of use of NSAIDs.

**CLASS ACTION COMPLAINT**                                                    38

174.     NSAIDs are also associated with a relatively high incidence of adverse effects to the renal system.  Medical journal articles note that "[p]rostaglandin inhibition by NSAIDs may result in sodium retention, hypertension, edema, and hyperkalemia."  One study showed the risk of renal failure was significantly higher with use of either Ketorolac or other NSAIDs and, as a result, the FDA prohibits treatment with Ketorolac for more than five continuous days.

175.     Patients at risk for adverse renal events should be carefully monitored when using NSAIDs.  As the NFL Physician Society Task Force stated, such patients include those with "congestive heart failure, renal disease, or hepatic disease[, and] also include patients with a decrease in actual or effective circulating blood volume (*e.g.*, dehydrated athletes with or without sickle cell trait), hypertensives, or patients on renin-angiotensis-aldosterone-system inhibitors (formerly ACE inhibitor) or other agents that affect potassium homeostasis."

176.     Additionally, the anti-coagulatory effect of certain NSAIDs, including Ketorolac, can lead to an increased risk of hemorrhage and internal bleeding.  The *Physician's Desk Reference* specifically states that the NSAID Ketorolac is "contraindicated as a prophylactic analgesic before any major surgery, and is contraindicated intra-operatively when hemostasis is critical because of the increased risk of bleeding."

177.     Moreover, certain NSAIDs can adversely affect the cardiovascular system by increasing the risk of heart attack.  Studies have shown that patients with a history of cardiac disease who use certain NSAIDs may increase their risk for heart failure up to ten times.

178.     Finally, other systemic side effects associated with the use of NSAIDs include headaches, vasodilatation, asthma, weight gain related to fluid retention and increased risk for erectile dysfunction.  Medical reports have also noted that "[i]ncreasing evidence suggests that

**CLASS ACTION COMPLAINT**                                                                 39

regular use of NSAIDs may interfere with fracture healing" and that "[l]ong-term use of NSAIDs…has also been associated with accelerated progression of hip and knee osteoarthritis."

## IV.    NFL PLAYERS SUFFER INJURY, PAIN, AND NARCOTIC MISUSE AT A RATE HIGHER THAN THE GENERAL POPULATION.

179.    As former NFL player and coach Mike Ditka testified before Congress, football is "not a contact sport, it's a collision sport."  With a player's average career truncated to about three and a half years, the majority of players walk away (to the extent they can) with beaten and tattered bodies.

180.    Former professional football players have another name for the multiple "car crashes" they survived each game – "plays."  With violent collisions a celebrated part of the king of American sports, it is clear why so many players get carted off the field – and eventually leave the sport – with lingering aches and debilitating pain similar to those sustained in car accidents.

181.    Playing in the NFL thus means playing with pain and often requires playing despite that pain.  Given the violent nature of the sport, it is hardly surprising that analyses of NFL injury data reveal that over half of NFL players suffer one or more musculoskeletal injuries in a given year and the vast majority suffer significant musculoskeletal injuries throughout their careers.  According to DeMaurice Smith, head of the NFLPA, pursuant to the League's own statistics, professional football has a 100 percent injury rate.

182.    But with media attention on, and League-mandated testing solely for, performance-enhancing drugs such as steroids and HGH, the NFL has been able to hide the true performance-enhancing drugs – opioids, NSAIDs, and local anesthetics – that not only mask players' pain, allowing them to return to play long before they should, but have equal or worse effects on players' health than steroids or HGH.

**CLASS ACTION COMPLAINT**                                                                                      40

183. Despite the NFL coordinating the illegal distribution of painkillers and anti-inflammatories for decades, an evaluation of opioid painkillers and sports pain among NFL players was exposed for the first time in 2011 by Dr. Linda Cottler of the Department of Psychiatry at Washington University. Linda B. Cottler *et al.*, "Injury, Pain, and Prescription Opioid Use Among Former National Football League (NFL) Players," 116 *Drug and Alcohol Dependence* 188-194 (2011) (the "Wash U / ESPN Study").

184. The Wash U / ESPN Study was the first of its kind, with the authors saying that "no research has been published to date concerning the impact of pain and use and misuse of opioids both during and after a player's professional athletic career."

185. Dr. Eric Strain of the Department of Psychiatry and Behavioral Sciences at the Johns Hopkins School of Medicine found that the Wash U / ESPN Study "nicely illuminates an area needing light, helping us understand a subject that has received scant attention and driving us to want to know more about a significant topic." Eric C. Strain, "Drug Use and Sport – A Commentary on: Injury, Pain and Prescription Opioid Use Among Former National Football League Football Players by Cottler *et al.*," 116 *Drug and Alcohol Dependence* 8-10 (2011).

186. Thus, the Wash U / ESPN Study surveyed 644 former NFL players "to evaluate level of pain and other factors associated with opioid misuse during their NFL career and in the past 30 days." It established that:

- 93 percent of the players sampled reported pain and 81 percent of the players perceived their pain to be moderate to severe;

- "[P]layers who misused during their NFL career were 3.2 times as likely to misuse in the past 30 days as NFL players who used just as prescribed;"

**CLASS ACTION COMPLAINT** 41

- Of the players who reported misuse in the past 30 days, "78% had a history of opioid misuse during their NFL career;"

- Comparing former players who used opioids as prescribed to those who misused, the study showed that "misusers had increased odds for poor health at retirement . . . and had 3 or more NFL injuries . . . ;"

- "Misusers were less likely than non-users . . . to report excellent health in the past 30 days . . . , more likely to report knee, shoulder and back injuries, and over 6 times as likely to report 3 or more NFL injuries;"

- "Misusers were at increased odds of having a career ending injury and nearly 8 times as likely to be using a cane, walker or wheelchair . . . compared to their non-using teammates;"

- "[T]wo additional factors were strongly associated with opioid use:  requiring a cane, walker or wheelchair . . . , and having severe pain . . .;" and

- "The overall rate of misuse during NFL play was 37% . . . , a rate 2.9 times higher than a lifetime rate of non-medical use of opioids among the general population of a comparable age."

187.    Ultimately, Dr. Cottler found that "[a]t the start of their careers, 88 percent of these men said they were in excellent health.  By the time they retired, that number had fallen to 18 percent, primarily due to injuries.  And after retirement, their health continued to decline.  Only 13 percent reported that they currently are in excellent health.  They are dealing with a lot of injuries and subsequent pain from their playing days.  That is why they continue to use and misuse pain medicines."

**CLASS ACTION COMPLAINT**                                                                     42

## V. THE NFL IS RESPONSIBLE FOR THE INJURIES ALLEGED HEREIN.

188. The League knows when its players are injured. Every week the League receives reports of players' injuries; players are classified as "in," "probable," "questionable," "doubtful," or "out." Those classifications go out from the League to the media. The League therefore also knows when injured players take the field and play. The emphasis on return to play at whatever cost comes from the League first and foremost.

### A. Medications in the NFL are a Jaw-Dropping Experience to Rookies.

189. The named Plaintiffs played at some of the most select football colleges and universities in the country – USC, BYU, Arizona State, and California – with elite medical staffs that handled whatever injuries might arise. As named Plaintiff Roy Green stated, he knew that everyone at college, from coaches to doctors to trainers, only had his best interests in mind.

190. But it was a "jaw-dropping" experience for the named Plaintiffs upon entering an NFL locker room for the first time and seeing the amount of medications provided by NFL doctors and trainers, the choice of medications available, and the manner in which they were distributed.

191. The "experience" starts at the NFL-sponsored Combine, a player's first introduction to the NFL. Every year, the NFL invites top college prospects to attend the Combine to be evaluated not only in areas such as speed and strength, but also their health. At the Combine, the NFL administers a complete physical evaluation that includes chest x-rays, EKG testing, and a complete blood and urine work-up to identify any underlying internal medical issues. Upon information and belief, the NFL pays for these tests and their processing. The NFL then gives each player a pass or fail grade and provides a numerical health ranking for each tested player, which becomes their internal system baseline upon entering the League.

**CLASS ACTION COMPLAINT**                                                                 43

192.     Thereafter, upon receiving their first injury, or "nick" as the players ironically call it, players are told to see the trainers for pills and doctors for injections to mask their pain.  Over the course of a season, players see trainers on an almost daily basis while doctors are seen on a weekly basis.

193.     Bonds are created between the trainers/doctors and players, who ultimately trust the medical staff not only because it is ingrained in our society that doctors are supposed to put a patient's concerns first but because the players and trainers/doctors become friends, as is inevitable when people spend a great deal of time with each other dealing with and sharing similar experiences.

194.     But the reality is that the faster a trainer or doctor gets his players back on the field, the more likely the team will field its best players.  This premium product consumed on Sundays, Mondays and certain Thursdays ultimately drives the NFL profit machine through television, marketing, merchandise and endorsements.  Therefore, trainers and doctors are under pressure to mask a player's pain with medications and designate a hasty rehabilitation schedule, even if it inevitably trades one injury for the next.

**B.     "Unique Clinical Challenges of the NFL" Necessitate the Availability of Painkillers and Anti-Inflammatories.**

195.     The current President of the NFL Physicians Society acknowledges that the NFL machine poses "unique clinical challenges."  Rather than deal with those challenges through bigger rosters, fewer games, or increased spacing between games, the NFL has illegally medicated its players as if they were chattel, thereby maximizing profits and reducing costs.

196.     NFL doctors and trainers gave players medications without telling them what they were taking or the possible side effects and without proper recordkeeping.  Moreover, they did so in excess, fostering self-medication.

**CLASS ACTION COMPLAINT**                                                                    44

197.    These pills were obtained by football teams in bulk. While this practice can be legal if done properly, the NFL has failed to demand proper accountability and compliance with Federal and state regulations governing the control and distribution of their stockpiles of pills.

198.    Indeed, one former trainer has described the 1980s and 1990s as "the wild west" in terms of the NFL monitoring the medications being provided to its players.

199.    For example, named Plaintiff Keith Van Horne was prescribed Percodan by a physician with no affiliation to the NFL after a foot or ankle injury. Days later, the Chicago Bears' Head Trainer Fred Caito called Van Horne into this office. Caito proceeded to lambast him for obtaining the Percodan because it led the Drug Enforcement Agency to issue a letter to the Bears inquiring why Van Horne was obtaining Schedule II medications.

200.    When Van Horne told Caito that a physician had prescribed the drug, Caito responded that was not the problem. The problem was that the Bears ordered painkillers before the season started under players' names, including Van Horne's. Van Horne had thus put Caito in a bad spot by obtaining the Percodan because there were already DEA records that hundreds of painkillers had been ordered in Van Horne's name, even though Van Horne had no need for the medications the Bears had ordered at the time the order was placed.

201.    Upon information and belief, the practice of mass ordering in a player's name no longer occurs. Instead, medications are controlled by the NFL Security Office in New York, which has implemented tighter controls in the last decade according to one former trainer who for years was a member of the NFL's Committee on Performance Enhancing and Prescription Medications. In addition, according to a 2013 Washington Post article titled "Pain and Pain Management in NFL Spawn a Culture of Prescription Drug Use and Abuse," the NFL contracted

**CLASS ACTION COMPLAINT**                                                     45

with an independent vendor, SportPharm, to track and log the extensive amounts of medications dispensed to teams.

### C. **Game-Day Medications Mask Pain, Piling Injury Upon Injury.**

202. While the named Plaintiffs played at different times, they all received painkillers or other medications on game days to mask their pain and allow them to play through injuries. While the medications changed over the years, the practice of providing players with such medications, allowing them to mask pain instead of allowing injuries to heal, has not.

203. Named Plaintiff Ron Pritchard received pills on game days. He also received an injection of a numbing agent in his foot in a playoff game against the Raiders. And while Pritchard played with the Oilers, amphetamines in the form of yellow and purple pills were available in jars in the locker room for any and all to take as they saw fit.

204. When named Plaintiffs Jim McMahon and Richard Dent began playing, amphetamines were available in jars in the locker room for any and all to take. Only after the deaths of Don Rodgers and Len Bias were the jars removed, though NFL doctors and trainers still gave players amphetamines whenever they wanted.

205. Named Plaintiff J.D. Hill received Codeine on game days.

206. Named Plaintiff Keith Van Horne received injections of numbing agents and pills. For example, during a playoff game against the New York Giants, he could not lift his arm. Doctors and trainers knew he could not lift his arm so they gave him two Percodan for the first half and two Percodan for the second half to allow him to play. Often, he was not told what he was being given.

207. Named Plaintiff Jeremy Newberry received injections of Toradol, which is the current game day drug of choice, consistently throughout his career

**CLASS ACTION COMPLAINT** 46

208.    In the Post Survey of ex-players, nearly eight out of ten prior Toradol users said they took the drug as a masking agent, intended to dull the pain they expected to feel during the games.  A 2002 survey of NFL physicians found that 28 of 30 teams used Toradol injections on game days.

209.    In the case of NFL players, Toradol is particularly problematic because it deadens feeling, inhibiting an athlete's ability to feel pain and sense injury.   The problem with prophylactically using Toradol as a masking agent is that pain tells or even compels the player to stop.  If a player cannot feel the pain, he exposes himself to further danger.

210.    Further, many players are given a "cocktail" of multiple medications, typically using Toradol in combination with other NSAIDs over the course of the week.  This heightens the potential for side effects.

211.    These injections, whether of Toradol or something else, were usually given as close to game time as possible.  Newberry and Stone would be two of as many as 15 of the 49ers starters lining up, pants down, to receive a Toradol shot in their buttocks before every game.

212.    And while Toradol is the current game day drug choice of the NFL, players are given other medications on game day too.  Named Plaintiff Jeremy Newberry received hundreds of Toradol injections over the course of his career and for many games, would receive as many as five or six injections of other medications during the course of a game.  He also would receive Vicodin before, during and after games to numb pain and often during a game would simply ask a trainer for medications, which would be provided without record as to who was receiving what.

213.    And the named Plaintiffs experienced the same post-game ritual of trainers handing out medications, including pain killers and sleeping aids, to be washed down by beer. When teams were traveling by plane, the NFL trainers would have the medications in a briefcase

**CLASS ACTION COMPLAINT**                                                                                     47

and would walk down the aisle, handing out pills or placing them on players' seats in contravention of Federal law while the players were provided with beer at the back of the plane. Doctors were aboard these flights, knew the players were drinking alcohol and being provided various medications, yet said nothing to them about the risks of these medications, or of mixing these medications with alcohol.

### D.   Weekday Medications – NSAIDs, Sleep Aids, and Opioids.

214.   While the named Plaintiffs played at different times, they describe a ritual of being provided pills and receiving injections on a daily basis to cope with the pain so they could be ready to play again the following Sunday.  This included uppers during the day, which required them to take downers at night to sleep, as well as downers and beer at the pre-game dinners.  Generally, players were not physically capable of playing again until three or four days after a game, a big problem during shortened weeks when, for example, a team would play on a Sunday and then again on a Thursday.

215.   While named Plaintiff Ron Pritchard played, amphetamines, Valium and Quaaludes were available at all times.  Pritchard describes a routine on the nights before games where, either at dinner or during bed check, trainers would give players sleeping pills or downers.  The next morning, they would be provided uppers for practice or the game.

216.   Named Plaintiff Jim McMahon regularly received sleeping pills from trainers during the week and before games.

217.   Named Plaintiff Richard Dent described a daily ritual of going to breakfast with the team, then receiving whatever medications necessary to get him on the field, taking them in time to be able to practice, and then taking downers at night to sleep.

**CLASS ACTION COMPLAINT**                                                                 48

218.     While named Plaintiff Keith Van Horne played for the Bears, the players were given Halcion and other medications, along with beer, to help sleep at night.    Also, bowls of Supac (a high-dose mixture of caffeine and aspirin) sat out in the locker rooms.  Many Bears players took Supac with their morning coffee as part of the day's ritual.

### E.     The League's Pervasively Malign Culture.

219.     Between January 2009 and April 2009, the head athletic trainer for the New Orleans Saints noticed that several Vicodin pills had disappeared from the team's drug locker.

220.     The disappearance was reported to the Saints' Director of Security, Geoffrey Santini, a 31-year veteran Supervisory Special Agent with the Federal Bureau of Investigation.

221.     Mr. Santini reported the incident to the General Manager of the Saints, Mikey Loomis, who authorized the installation of two security cameras to catch the individual unlawfully taking the controlled substances from the drug locker.

222.     The video surveillance ultimately revealed Joe Vitt, an assistant coach, illegally entering the room, opening the drug locker, and removing several pills from a Vicodin bottle.

223.     Mr. Santini insisted that the Saints report the theft to the appropriate authorities, but instead Loomis and the Saints engaged in a coordinated effort of concealment, record-altering, and improper distribution of painkillers in violation of Federal and state law.

224.     Rather than being an accessory, Mr. Santini submitted his resignation and brought a constructive discharge suit against the Saints in Louisiana state court.

225.     In that suit, he claimed that "both the individual events and pattern of events which he was directed to engage in and/or overlook . . . would have constituted state and federal felonies had he acquiesced or participated.  In particular, the actions and/or inactions plaintiff was directed to engage in would have constituted violations" of state and Federal statutes.

**CLASS ACTION COMPLAINT**                                                                                                                    49

226.     Mr. Santini's constructive discharge claim was later resolved.

227.     Upon information and belief, Mr. Santini's complaint resulted in the DEA opening an investigation now being reviewed by the United States Attorney's Office for the District of Louisiana.

228.     The Saints may not be the only team failing to properly account for its medications.  On March 16, 2014, Colts' owner Jim Irsay was arrested and found to possess several Schedule IV medications, including Xanax, Valium and Ambien, along with large amounts of cash.

**F.     Doctors/Trainers Concealed Injuries and Put a Focus on "Return to Play."**

229.     DeMaurice Smith, Executive Director of the NFLPA, has questioned whether the players were ever told about the risks and benefits of the medications they were receiving from team doctors and trainers, and concluded that they generally have not.  Smith stated "[y]ou don't have to walk far to find virtually every former player saying their team doctor never advised them about side effects of the medications they were taking."

230.     As former Bronco Nate Jackson has said, "[t]here was no hesitation, no trepidation, no point at which I felt that taking Toradol was a risk.  I trusted our team doctors. They wouldn't suggest a drug if it was dangerous."

231.     But the manner in which the NFL provides Toradol to its players **_is_** dangerous.

232.     The named Plaintiffs rarely, if ever, received written prescriptions (or for that matter, anything in writing) for the medications they were receiving.

233.     Regardless of the era, the named Plaintiffs all received the bulk of their pills not in bottles that came with directions as to use but rather in small manila envelopes that often had no directions or labeling.  The player would receive the envelope and be told to take it.

**CLASS ACTION COMPLAINT**                                                                50

234. Further, NFL doctors and trainers would push to return players to the field, regardless of what injuries they had.

235. In Mr. Dent's rookie year (1983) he played in the first preseason game. In the first practice after that game four players fell on him. His legs literally did the splits and he tore his hamstring and tendons/ligaments in his ankle. The pain was so bad it was difficult for Mr. Dent to sit on the toilet or even walk. Despite being put on several anti-inflammatory drugs and pain killers, he questioned being put back on the field. He ended up playing in the last preseason game, doped up to the point that he could hardly remember playing. This is where it started and went on from there; a pill for this a shot for that. It was not until game 14 or 15 that the pain truly began to subside.

236. When Ron Pritchard was traded to the Raiders, that team's head doctor told him his knees were so bad that he could not keep playing. Nonetheless, the doctor told the team that Pritchard could play as long as he could cope with the pain.

237. Those injuries stemmed in part from a serious injury he had suffered the previous season while with the Bengals that required major knee surgery. Six weeks after that surgery, he was back on the field playing against the Pittsburgh Steelers.

238. Named Plaintiff Ron Stone received a serious elbow injury while playing with the Dallas Cowboys. Rather than recommend surgery, NFL doctors shot him with painkillers. In addition, Mr. Stone tore his thumb while playing with the Giants. He was told that, if he were a baseball player he would have been out for the season but because he was a football player, it could wait until the off-season.

**CLASS ACTION COMPLAINT**                                                    51

239.    Stone also suffered from a MCL sprain to his knee while playing with the Raiders.  Rather than sit out and rest, he was given shots in the affected area and pain pills, was re-taped, and was sent back out to play.  He ultimately developed an MCL tear.

240.    Named Plaintiff Jim McMahon discovered for the first time in 2011 or 2012 that he had suffered a broken neck at some point in his career.  He believes it happened during a 1993 playoff game when, after a hit, his legs went numb.  Rather than sit out, he received medications and was pushed back on the field.  No one from the NFL ever told him of this injury.  In addition, he learned only a few years ago that he had broken an ankle while playing; at the time, he was told it was a sprain.

241.    While McMahon was with the Bears, he received injections for six straight weeks in the 1984 season to cope with pain in his throwing hand and ten straight weeks in the 1986 season for pain in his right shoulder.  In both instances, only later did he learn that he should have sat that time out and healed rather than mask the pain and return to play too early.

242.    Named Plaintiff Roy Green developed painful calcium build-ups on his Achilles tendons.  Rather than treat the pain through rest or surgery, doctors and trainers gave him anti-inflammatories and he skipped practices to be able to play but ultimately the pain got so bad that he demanded to have surgery.  The Cardinals' General Manager at the time, Hall of Famer Larry Wilson, pushed back but grudgingly told Green "it was his decision."

243.    Mr. Green, who received hundreds of NSAIDs (which can cause kidney damage) from NFL doctors and trainers, had tests performed on him while he played in the NFL that showed he had high creatinine levels, indicative of a limitation on his kidney function.  No one from the NFL ever told him of those findings.  In November 2012, he had a kidney transplant.

**CLASS ACTION COMPLAINT**                                                           52

244.    Similarly, while any doctor who looked at named Plaintiff Jeremy Newberry's records should have seen the decreasing kidney function from his blood levels, Mr. Newberry was never told about that problem while with the League.  Indeed, if not for one night after retiring that Newberry's blood pressure was measured at 250 over 160, at which point he was hospitalized for days, Newberry might have died from his kidney problems.

245.    Finally, while the League kept records of players' blood and urine levels, it tested only for banned substances which, when present in American sports (regardless of whether the sport is football, baseball, or cycling), has led to loss of sponsorship money and extreme dissatisfaction among fans (further affecting the NFL's bottom line).  In short, the NFL has selectively kept medical records it needed to sustain the economic machine while failing to keep records necessary to players' health.

## CLASS ACTION ALLEGATIONS

246.    Plaintiffs adopt by reference all allegations contained in the paragraphs above, as if fully set forth herein.

247.    The Class and Subclasses consist of the following:

1.    **Class.**  All retired NFL football players ("Retirees"), including without limitation all the Named Plaintiffs ("Named Plaintiffs") and their respective spouses, dependent children, and all persons and entities, heirs, successors and assigns who would have rights under applicable state law to sue the NFL independently or derivatively as a result of their relationship with a retired NFL player ("Successors") (collectively the Retirees, Named Plaintiffs and Successors are the "Class Members") who, at any time during their NFL careers, including without limitation pre-season, in-season and post-season drills, conditioning sessions, walk-throughs, practices, and games,

**CLASS ACTION COMPLAINT**                                                53

**received or were administered**:

      (i)     Prescription pain killers including, without limitation, opioids such as Percodan, Oxycodone (Percocet), Hydrocodone (Vicodin), Valium, Librium and Codeine and their pharmaceutical analogues; or

      (ii)    Other anti-inflammatory agents and analgesics, such as NSAIDS, including without limitation Aspirin, Ibuprofen, Naproxen and Ketorolac (brand name "Toradol") and other pain relievers of similar chemical composition and function; or

      (iii)    Local anesthetics, including, without limitation, Lidocaine and its pharmaceutical analogues; or

      (iv)    Sleeping aids, whether prescription-required or over-the-counter; or

      (v)    Other Schedule I - IV controlled substances, 28 U.S.C. § 801 *et seq.* (collectively "Medications")

**from**

      (i)     Any person or entity on, employed by, affiliated or associated with an NFL team training staff; or

      (ii)    Any person or entity on, employed by, affiliated or associated with an NFL team medical staff; or

      (iii)    Any non-player person or entity otherwise employed by, or associated or affiliated with an NFL team; or

      (iv)    Any non-player person or entity otherwise employed by, or associated with, the NFL or any of the NFL's associated or affiliated companies, corporations or other entities  person or entity otherwise associate

**without**

**CLASS ACTION COMPLAINT**            54

(i)      A valid prescription; or

(ii)     An objective and neutral medical examination and diagnosis; or

(iii)    Continuing medical supervision including evaluation of therapeutic value, drug interactions, toxicity and side-effects

**or**

(i)      In amounts exceeding recommended dosages; or

(ii)     For periods exceeding recommended dosage periods; or

(iii)    In combination with other drugs in a contra-indicated combination; or

(iv)    In combination with alcoholic beverages in a contra-indicated combination; or

(v)     Without a pre-administration warning of possible side effects, toxicity, dangerous drug interactions or other risks.

2.     **Subclass 1**.  All Class Members who have received a medical diagnosis of mental or physical limitation, injury or other harm causally related, in whole or in part, to the provision or administration of any Medication(s).

3.     **Subclass 2**.  All Class Members who have not received a medical diagnosis of mental or physical limitation, injury or other harm causally related, in whole or in part, to the provision or administration of any Medication(s) but who are currently experiencing symptoms that are or may be caused by the administration of such Medication(s).

4.     **Subclass 3**.  All Class Members who have not received a medical diagnoses of mental or physical limitation, injury or other harm causally related, in whole or in part, to the provision or administration of any Medication(s) and who are not currently experiencing symptoms that are or may be caused by the administration of such Medication(s).

**CLASS ACTION COMPLAINT**                  55

The Class Period includes all times during which the Class Members participated in pre-season, in-season and post-season drills, conditioning sessions, walk-throughs, practices and games.

248.   Plaintiffs bring this action on behalf of themselves and all other similarly-situated individuals pursuant to Fed. R. Civ. P. 23.

249.   The Class and Subclasses contain a sufficiently large number of persons that joining all of their claims is impractical.  Named Plaintiffs are but a few of the approximately 5,000 retired NFL players, most if not all of whom are within the Class and Subclass definitions. Named Plaintiffs are but eight of the over 500 retired NFL players who have signed Retention Agreements with undersigned counsel.  Adding Retirees and Successors greatly increases the number of Class and Subclass Members.

250.   **Commonality.**  Numerous common questions of law, and fact, exist.   They include, for example:

- Did the NFL provide or administer Medications to the Class Members as described above?

- Did the NFL intentionally provide or administer Medications to the Class Members as described above?

- Did the NFL recklessly provide or administer Medications to the Class Members as described above?

- Did the NFL negligently provide or administer Medications to the Class Members as described above?

- Did the NFL voluntarily undertake a duty of care toward the Class Members?

- Did the NFL violate its duty of care toward the Class Members by providing and administering Medications as described above?

**CLASS ACTION COMPLAINT**                                                                                        56

- Did the NFL violate the Controlled Substances Act's requirements governing acquisition of controlled substances?

- Did the NFL violate the Controlled Substances Act's requirements governing storage of controlled substances?

- Did the NFL violate the Controlled Substances Act's requirements governing distribution of controlled substances?

- Did the provision or administration of Medications to Class Members, as described above, violate the American Medical Association's Code of Ethics that governs physicians' duties to their patients?

- Did the provision or administration of Medications to Class Members, as described above, violate state pharmaceutical laws regulating the acquisition, storage and dispensing of Medications?

- Did the Class Members provide informed consent authorizing the provision or administration of Medications?

- Did the NFL intentionally affirmatively mislead Class Members about the dangers of addiction and other health risks associated with provision and administration of Medications as described above?

- Did the NFL recklessly affirmatively mislead Class Members about the dangers of addiction and other health risks associated with provision and administration of Medications as described above?

- Did the NFL negligently mislead Class Members about the dangers of addiction and other health risks associated with provision and administration of Medications as described above?

**CLASS ACTION COMPLAINT**                                                        57

- Did the NFL intentionally fail to disclose to Class Members the dangers of addiction and other health risks associated with provision and administration of Medications as described above?

- Did the NFL recklessly fail to disclose to Class Members the dangers of addiction and other health risks associated with provision and administration of Medications as described above?

- Did the NFL negligently fail to disclose to Class Members the dangers of addiction and other health risks associated with provision and administration of Medications as described above?

- Did the NFL's provision or administration of Medications as described above cause, in whole or in part, Class Members' addiction to Medications?

- Did the NFL's provision or administration of Medications as described above cause, in whole or in part, other injuries, illnesses, disabilities of the Class Members?

- Did the NFL's provision or administration of Medications as described above increase Class Member's risk of developing addictions?

- Did the NFL's provision or administration of Medications as described above increase Class Member's risk of developing physical and mental health problems, injuries, disabilities, limitations and other problems in the future?

- Did the NFL's provision or administration of Medications as described above proximately cause Class Members' economic losses, harms, lost earning potential, reduced earning capacity, loss of consortium and other economic damages?

**CLASS ACTION COMPLAINT** 58

251. Plaintiffs and their claims are typical of the absent Class Members and their claims. Plaintiffs have the same incentives as the absent Class Members in this case, ensuring the proper representation of and advocacy for the absent Class Members' interests. Plaintiffs' claims arise from the same wrongful conduct the NFL engaged in toward the absent Class Members.

252. Plaintiffs will adequately represent the Class Members. Plaintiffs have no conflicts of interest with the absent Class Members who Plaintiffs seek to represent. To the contrary, Plaintiffs' interests are fully aligned with the absent Class Members' interests in this action, in seeking redress for the NFL's common wrongful conduct to both Plaintiffs and absent Class Members. Plaintiffs will fairly and adequately protect the interests of the absent Class Members.

253. Plaintiffs' counsel will properly and vigorously represent the Class Members. Plaintiffs' counsel have no conflicts of interest with the Plaintiffs and Class Members. Plaintiffs' counsel are experienced trial lawyers and litigators, with substantial experience in complex and class action litigation. Reflecting their commitment to this case and the protection of the absent Class Members, Plaintiffs' counsel have invested a great deal of time, money, legal research and factual investigative effort in developing and understanding the facts set forth in this Complaint and analyzing the best expression of those facts in legal theories and causes of action. Further underscoring Plaintiffs' counsel's qualifications and satisfaction of the adequacy of representation requirements, Plaintiffs' counsel have met and received signed Retainer Agreements from hundreds of Class Members.

254. The Class and Subclasses are clearly defined, and can be identified and notified effectively. The members of the Class and Subclasses are readily ascertainable and identifiable

**CLASS ACTION COMPLAINT** 59

from reference to existing, objective criteria that are administratively practical, including records maintained by the NFL. The NFL has and maintains records reflecting the names of all NFL players, their games played, injuries sustained, medical and injury reports on the Class Members and reports and records of the provision of medical, pharmacological, and other therapeutic treatments to the Class Members.

255. Common questions, such as those listed above, predominate over any questions affecting only individual members. As described above, and in light of the Defendant's common misconduct toward all of the Class Members, the Class and Subclasses are sufficiently cohesive to warrant class treatment. Plaintiffs, on behalf of the Class, allege a common body of operative facts and common legal claims relevant to each Class Member's condition and claims.

256. A class action here is superior to other adjudicatory methods possibly available for resolving the Class's claim. First, the NFL is a $9 billion business annually, with virtually limitless resources to litigate against individual plaintiffs who have nowhere near the financial and legal firepower the NFL can immediately muster. Second, those vast financial and economic resource disparities between individual Class Members and the stupendously rich NFL mean that many, if not most, of the claims of individual Class Members would languish un-redressed absent class action treatment. Third, the Class Members have not expressed interest in individually controlling the prosecution of separate actions. Fourth, Plaintiffs and their counsel are unaware of any other litigation concerning the wrongful conduct described in this Complaint. Judicial economy, economic efficiency, and the goal of avoiding inconsistent rulings and conflicting adjudications, reflect the desirability of concentrating the litigation of the claims in this Complaint in the single forum this Court provides. With an appropriate trial plan,

**CLASS ACTION COMPLAINT** 60

adjudicating the claims of the clearly defined Class and Sub-Classes above will not present undue difficulties for case management.

257.    This action is properly maintainable as a class action under Fed. R. Civ. P. 23(b)(1)(A). Separate litigations by individual Class Members against the NFL would create the risk of conflicting, inconsistent or otherwise varying rulings and resolutions concerning those individual Class Members that would create conflicting or otherwise incompatible standards of conduct for the NFL.

258.    This action is properly maintainable as a class action under Fed. R. Civ. P. 23(b)(1)(B). Separate litigations by individual Class Members against the NFL would create the risk of adjudications concerning the claims of individual Class Members that, as a practical matter, would be dispositive, through preclusion, law of the case, or other doctrines, of the interests of other Class Members not parties to the individual adjudications or would otherwise substantially impair or impede their ability to protect their own interests.

259.    This action is properly maintainable as a class action under Fed. R. Civ. P. 23(b)(2). As described above, the NFL has acted or refused to act on grounds generally applicable to the Class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the Class as a whole.

## CAUSES OF ACTION

### COUNT I
### ACTION FOR DECLARATORY RELIEF

260.    Plaintiffs adopt by reference all allegations contained in the paragraphs above, as if fully set forth in this Count.

261.    A case or controversy exists between Plaintiffs on the one hand and the NFL on the other.

**CLASS ACTION COMPLAINT**                                                          61

262. Pursuant to 28 U.S.C. § 2201, Plaintiffs seeks a declaration as to the following:

a. The NFL voluntarily undertook a duty to act with reasonable care toward the Class Members.

b. The NFL knew, or in the exercise of its duty of reasonable care toward the Class Members, reasonably should have known, that the Class Members were being given or administered Medications.

c. The NFL knew, or in the exercise of its duty of reasonable care toward the Class Members, reasonably should have known, that the NFL's provision to and administration of Medications to the Class Members was causing the addiction of Class Members to those Medications, as well as resulting in attendant physical and mental injuries, impairments, disabilities and limitations.

d. The NFL knew, or in the exercise of its duty of reasonable care toward the Class Members, reasonably should have known, that the NFL's provision to and administration of Medications as described herein to the Class Members would substantially increase the risk of future addiction of Class Members and also substantially increase their risk of developing accompanying physical and mental injuries, impairments, disabilities and limitations.

e. The NFL intentionally, recklessly, or negligently violated its duty of acting with reasonable care toward the Class Members by, among other legally culpable acts and omissions, malfeasance and nonfeasance:

i. Providing and administering Medications without obtaining the informed consent of the Class Members, as described in this Complaint.

ii. Providing and administering Medications while willfully concealing, or otherwise culpably not informing the Class Members, about the dangers of

**CLASS ACTION COMPLAINT** 62

addiction and other health risks associated with those Medications, as described in this Complaint.

     iii. Providing and administering Medications in violation of the Controlled Substances Act, as described in this Complaint.

     iv. Providing and administering Medications in violation of the American Medical Association's Code of Ethics as described in this Complaint.

     v. Providing and administering Medications in violation of state laws governing the acquisition, storage and dispensation of Medications, as described in this Complaint.

     vi. Providing and administering Medications, as described in this Complaint, in a manner recklessly endangering the health, safety and overall well-being of Class Members.

    f. The NFL's misconduct, as described in this Complaint, proximately and factually caused the injuries, losses, and damages, economic and non-economic that the Class Members suffered and that the Complaint alleges.

    g. The NFL is legally liable for the injuries, losses, and damages, economic and non-economic, that the Class Members suffered and that the Complaint alleges.

    h. The NFL is required to pay all costs of the medical monitoring program described in Count II of this Complaint.

    i. The NFL is required to pay all costs of treatment, whether by medical, psychiatric, psychological, counseling, physical therapy, or other mental or health care providers incurred by Class Members as a result of the misconduct described in this Complaint.

**CLASS ACTION COMPLAINT**            63

j.      The Class Members shall have no obligation, and shall not be asked directly or indirectly, to pay for the cost of any and all treatments described in the immediately-preceding paragraph.

k.      The NFL's misconduct, as described in this Complaint, is sufficiently outrageous, beyond the bounds of conduct acceptable in a civilized society, to warrant the imposition of punitive damages.

l.      The NFL should be permanently enjoined from continuing the acts, practices and misconduct described in this Complaint.

## COUNT II
## MEDICAL MONITORING

263.    Plaintiffs adopt by reference all allegations contained in the paragraphs above, as if fully set forth in this Count.

264.    Plaintiffs and the Class Members were provided and administered vast amounts of opioids, anti-inflammatories and other analgesics, and local anesthetics during their NFL careers without proper medical diagnosis, supervision and monitoring; in quantities exceeding recommended dosages; and for periods far longer than recommended treatment intervals.

265.    As a result of the NFL's provision and administration of Medications, the Class Members are either (i) currently suffering from addiction, (ii) currently suffering from other physical and mental injuries that are either accompany or are otherwise associated with such addictions, (iii) are at substantially-increased risk of developing addiction and of developing and suffering from other physical and mental injuries that either accompany or are otherwise associated with such addictions, or (iv) currently suffering and other physical and mental injuries resulting from the provision and administration of the Medications.

**CLASS ACTION COMPLAINT**                                                      64

266. The substantially-increased risks of addiction, and of the associated physical and mental injuries that accompany or are associated with addiction, are latent injuries. They develop over time, often undetected at first, because the absence, paucity or modest nature of early symptoms are readily explained away as "old age," or caused by some other factor independent of the NFL's provision and administration of Medications.

267. Such latent injuries include, without limitation, addiction, musculoskeletal deterioration, arthritic and osteoarthritic progression, depression, and mood disorders.

268. The NFL, as described above, knew or should have known that its provision of and administration of Medications to the Class Members substantially-increased the Class Members' risk of developing those latent injuries.

269. The NFL had superior knowledge to that of the Class Members concerning the current use, and latent injuries, associated with the provision and administration of the Medications to the Class Members.

270. Breaching its duty of care to the Class Members, and despite its superior knowledge to the Class Members to whom the NFL had assumed a duty of care, the NFL systematically concealed from the Class Members the substantially-increased risks of addiction and other physical and mental health problems that the Medications entailed.

271. The NFL's breach of its duty of care to the Class Members in providing and administering these Medications, and in failing to disclose the side effects and risks posed by them, factually caused the Class Members' substantially-increased risks of later developing addictions and other physical and mental injuries.

272. The NFL's breach of its duty of care to the Class Members in providing and administering the Medications, and in failing to disclose the side effects and risks posed by these

**CLASS ACTION COMPLAINT** 65

Medications, proximately caused the Class Members' substantially-increased risks of later developing addictions and other physical and mental injuries.

273.    The Class Members' latent injuries, and substantially increased risks of developing addictions and other physical and mental maladies later in their lives, necessitate specialized medical investigation, monitoring, testing and treatment not generally required by or given to the public at large.

274.    The testing and medical monitoring regime required for the Class Members is specific to their experience with the NFL's provision and administration of the Medications.

275.    Persons not exposed to the Medications that the NFL provided and administered to the Class Members would not require a testing and medical monitoring regime like that necessary to protect the Class Members.

276.    The testing and medical monitoring regime will include baseline testing of each Class Member, with diagnostic examinations, to determine whether the Class Member is currently suffering from addiction or any of the other associated physical injuries associated with the Medications.

277.    This testing and medical monitoring regime will also include evaluations of the non-currently symptomatic Class Members to determine whether, and, if so, by how much, they are at increased risk for developing addictions in the future.

278.    This testing and medical monitoring regime will help to prevent, or mitigate, the numerous adverse health effects the Class Members suffered and will suffer from the NFL's provision and administration of the Medications.

**CLASS ACTION COMPLAINT**                                                                 66

279.   Scientifically sound and well-recognized medical and scientific principles and observations support the efficacy of the testing and medical monitoring regime the Class Members require.

280.   Testing and monitoring the Class Members will help prevent or mitigate the development of addictions and related illnesses and disabilities.

281.   Testing and monitoring the Class Members will help to ensure that they do not go without adequate treatment that could either prevent, or mitigate, the occurrence of addictions and related illnesses and disabilities.

282.   The Plaintiffs seek a mandatory continuing injunction creating and imposing a Court-ordered, NFL-funded testing and medical monitoring program to help prevent the occurrence of Medication-caused addictions and other injuries and disabilities, to help ensure the prompt diagnosis and early treatment necessary to reduce the degree or slow the progression of such Medication-caused problems, and otherwise to facilitate the treatment of such problems.

283.   This testing and medical monitoring program should include a trust fund, under the supervision of the Court, or Court-appointed Special Master who makes regular reports to the Court about the fund.

284.   This trust fund is required to pay for the testing and medical monitoring and treatment the Class Members require as a matter of sound medical practice, regardless of the frequency, cost or duration of such testing, monitoring and treatments.

285.   Plaintiffs have no adequate legal remedy.  Money damages are by themselves insufficient to compensate the Plaintiffs and Class Members for the continuing risk of developing addictions and related physical and mental illnesses, injuries and disabilities.

**CLASS ACTION COMPLAINT**                                                                 67

286. Absent the testing and medical monitoring program described in the preceding paragraphs, the Plaintiffs will remain unprotected against the continuing risk, created by the NFL's misconduct, of subsequent development and manifestation of addictions, and related physical and mental illnesses, injuries and disabilities that are now latent.

### COUNT III
### FRAUD

287. Plaintiffs adopt by reference all allegations contained in the paragraphs above, as if fully set forth in this Count.

288. The NFL knew, or should have known, that its provision and administration of Medications in the manner described in this Complaint created a substantial risk of causing addictions and related physical and mental health problems for the Class Members.

289. The NFL, with is vast economic and personnel resources and troves of data about players and injuries, was in a far superior position to the Class Members to observe and understand the substantially increased risk of addictions and other injuries and illnesses caused by the medications described herein.

290. The NFL knew, or should have known, that eliminating or reducing the risks of addictions and other illnesses associated with these medications was readily achievable, by, among other things:

a. requiring proper independent and objective medical diagnoses and treatments for the Class Members;

b. forbidding the provision and administration of Medications without a documented contemporaneous and valid prescription written by an independent and medically objective doctor;

c. providing longer periods between contact practices and games;

**CLASS ACTION COMPLAINT** 68

1        d.    reducing the number of contact practices and games;

2        e.    increasing roster sizes in order to permit substitution of a player for an

3 injured player;

4        f.    mandating that team doctors, trainers and other personnel not administer

5 or provide Medications without first obtaining and documenting the Class Member's informed

6 consent, based on a full and fair disclosure of the risks and side effects, both patent and latent, of

7 the Medications;

8        g.    forbidding the presence of controlled substances in locker rooms or other

9 team facilities; and

10        h.    requiring the immediate documentation and submission of such

11 documentation to the Class Members, their personal physicians, and the NFL League Office of

12 the provision and administration of Medications, including the substance(s) given, the amount(s),

13 and the purposes(s) for such medication's use in each case.

14    291.    The NFL knew that the Physicians Society ("NFLPS") task force had abundant

15 information about the dangers of the Medications, including the "Tokish Study" described above.

16    292.    The NFL knew the Tokish Study had documented the frequent and widespread

17 provision and administration of certain Medications without proper medical examinations,

18 diagnoses, prescriptions, follow-ups or other basics governing the provision of controlled

19 substances and other dangerous analgesic and pharmaceutical agents.

20    293.    The NFL knew that the Task Force discovered that in the ten years since the

21 Tokish Study, no standardized guidelines for the administration of Toradol had been put in place.

22    294.    The NFL knew that the Task Force also found that Toradol use had increased in

23 the ten years since the Tokish Study.

**CLASS ACTION COMPLAINT**        69

295. The NFL made none of the changes the Task Force had recommended, even though implementing those recommendations would reduce the flow of the Toradol River through the NFL. The NFL turned a blind eye to the Toradol River's overflowing its banks, accepting the flimsy pretext that medical literature did not sufficiently address the ethical issues associated with the willy-nilly, medically improper, repeated sticking of Toradol needles into Class Members so they could take, or lug themselves back onto, the field.

296. The "ethical considerations" the NFL hid behind in not making necessary changes are obvious to a remotely sentient and minimally honorable person. The NHL's Toradol practice violated the Controlled Substances Act, the AMA Code of Ethics, and basic human decency.

297. Routinely jabbing syringes filled with a potentially dangerous pharmacological agent into Class Members without anything remotely resembling proper medical practice and without telling the Class Members about the serious risks of this practice requires no formal ethical study to conclude that it is wrong.

298. The NFL knew its Toradol-to-keep-the-players-playing-while-keeping-billions-rolling-in-and costs-down gambit was both wrong and dangerous.

299. But the NFL intentionally hid the dangers of Toradol from the Class Members because the NFL intended to defraud the Class Members by keeping vital information from them, which kept the billions rolling in and profit margins high.

300. One reason the NFL intentionally hid information about the dangers of the medications described herein is because the NFL, as additional investigation and formal discovery will show (Fed. R. Civ. P. 11(b)(3)), knew that disclosing the information would lead to star players being out of action for longer and more frequent periods of time, damaging the

**CLASS ACTION COMPLAINT**                                              70

NFL's ability to command top TV rights dollars and reducing the avalanche of dollars the NFL receives from its licensing, marketing and other revenue sources.

301.    Another reason the NFL intentionally hid information about the dangers of the medications described herein is because the NFL, as additional investigation and formal discovery will show (Fed. R. Civ. P. 11(b)(3)), knew that making even one of the changes identified above would also jeopardize the NFL's giant moneymaking juggernaut. Fewer games means less money. More rostered players means higher cost, tighter margins and less profit. Star players sitting out games or even many games, especially during the revenue bonanza of the regular season and playoffs, would jam the NFL's money machine's operations.

302.    Because of the NFL's superior position of knowledge about the Medications, the Class Members during their careers and after they retired reasonably looked to, and relied on, the NFL's silence about the dangers of these Medications.

303.    Rather than protect and inform the Class Members, the NFL intentionally withheld information from them about the dangerous risks the Medications posed.

304.    The NFL made knowing and intentional misrepresentations, including deliberate omissions, about the use and distribution of the Medications.

305.    The information the NFL deliberately concealed from the Class Members about the Medications were material facts, extremely important to understanding the dangers of the Medications.

306.    The NFL intended to deceive the Class Members through its knowing and intentional misrepresentations and omissions.

**CLASS ACTION COMPLAINT**                                                                 71

307.   The Class Members were in fact deceived by the NFL's fraud, and justifiably acted and detrimentally relied on the NFL's knowing and intentional misrepresentations and omissions about the Medications.

308.   The NFL is liable for its fraudulent misconduct in concealing the risks of Toradol and other Medications from the Class Members.

309.   The NFL's fraudulent misconduct in concealing the risks of Toradol and other Medications from the Class Members was a cause in fact of the Class Members' damages, injuries and losses, both economic and otherwise, alleged in this Complaint.

310.   The NFL's fraudulent misconduct in concealing the risks of Toradol and other Medications from the Class Members proximately caused the Class Members' economic damages, injuries and losses, emotional pain and suffering, all of which are ongoing and will continue for the foreseeable future.

311.   The Class Members suffered damages and losses factually and proximately caused by the Class Members' reasonable and justifiable reliance on the NFL's intentional misrepresentations and omissions about the Medications.

312.   The NFL is liable to the Class Members for all categories of damages, in the greatest amounts, permissible under applicable law.

**COUNT IV**
**FRAUDULENT CONCEALMENT**

313.   Plaintiffs adopt by reference all allegations contained in the paragraphs above, as if fully set forth in this Count.

314.   The NFL knew that its provision and administration of Medications was producing addiction in players, causing related physical and mental health injuries.

**CLASS ACTION COMPLAINT**                                                        72

315.   The NFL knew that is provision and administration of the Medications was increasing the risk of future addictions in Players, and increasing the risk of other associated latent physical and mental injuries.

316.   The NFL had, compared to the Class Members, greatly superior knowledge of these Medications' pharmacological properties and dangers.

317.   The NFL had, compared to the Class Members, greatly superior knowledge of the health risks, physical and mental, short- and long-term, associated with the NFL's free-for-all distribution of a cornucopia of Medications to the Class Members to keep them playing.

318.   The NFL knew of, and understood the many and serious health risk implications, of its pharmaceutical carnival.

319.   Despite its superior knowledge, and flouting its duty to the Class Members, the NFL knowingly and fraudulently concealed from the Class Members the many and serious health risks to which these Medications was putting the Class Members.

320.   Rather than implementing the recommendations of the NFLPS Task Force concerning the dangers Toradol posed, especially in conjunction with NSAIDs, the NFL hid behind the Task Force's whitewash that provision and administration of these Medications was up to the team doctors.

321.   Rather than implementing the recommendations of the NFLPS Task Force, the NFL hid behind the Task Force's risible pretext for refusing to stem the Toradol flood, namely that the medical literature was insufficiently developed concerning the ethics of: (i) administering highly dangerous pharmaceutical agents, (ii) in combination with other, contra-indicated drugs, (iii) by untrained and unsupervised personnel, (iv) without proper, independent,

**CLASS ACTION COMPLAINT**                                                          73

objective, medical evaluations, diagnoses and prescriptions, (v) in quantities far greater than recommended, and (vi) for durations far longer than recommended.

322. The NFL knew the Class Members would rely on what the NFL said and did not say about the dangers and other possible health ramifications of the Medications that kept the Class Members on the field.

323. The Class Members reasonably looked to, and reasonably relied upon, the NFL for guidance and information concerning the dangers of the Medications in light of the NFL's superior knowledge and resources.

324. The Class Members reasonably relied on what the NFL did not say: that the Medications were highly addictive and dangerous, both in the short- and long-terms.

325. The Class Members reasonably relied on what the NFL did say – "here you go, take this and get out there." That message did not include: disclosure of the numerous and serious risks associated with the Medications; the need for informed consent; the need for independent medical evaluation, diagnoses and prescription; the need for monitoring for toxicity, potentially serious or even fatal drug interactions; and any recognition of let alone adherence to limitations on frequency and duration of the Class Member's exposure to these Medications.

326. The Class Members reasonably believed the NFL was taking the Class Members' best interests into consideration when the NFL provided and administered Medications.

327. The atmosphere of trust inherent in locker rooms and on teams, in which players become friendly with their clubs' medical and training staffs, inured the Class Members to any suspicion that the Medications they were given and administered might be dangerous.

**CLASS ACTION COMPLAINT**                                                                 74

328.    The Class Members reasonably believed the NFL would not act illegally and, in doing so, injure the Class Members and put them at risk of substantial and continuing future injuries.

329.    Diverting the focus from the NFL's behavior as a major drug miscreant, the NFL has continued to claim that Painkiller use, as NFL Executive Vice President Jeff Pash has said, "needs to be addressed on a broad basis, not just in the NFL."

330.    The NFL's concealment was continuous through the present.

331.    The NFL intentionally concealed material information from the Class Members, despite knowing of the importance of that information for the Class Members' health and well-being, both in the short- and long-terms, resulting in the currently manifest, and latent, injuries, illnesses, disabilities and other harms that Class Members are now suffering and will suffer in the future.

332.    The NFL's intentional concealment from the Class Members of medically vital information deprived the Class Members of the chance to seek early medical intervention, to prevent, delay or otherwise mitigate the injuries from which they now suffer and will continue to suffer.

333.    The NFL's intentional concealment from the Class Members of the current and long-term risks to which the NFL exposed the Class Members through the Painkiller program meant that the Class Members did not take the need for related medical treatment into account when planning their futures, finances and employment.

334.    The Class Members have suffered and will continue to suffer from both currently manifest and latent physical and mental health injuries, economic losses, emotional distress, pain

**CLASS ACTION COMPLAINT**                                              75

and suffering, and other losses, harms and damages caused in fact by the NFL's fraudulent concealment of the addiction risk and other dangers of the Medications.

335.    The Class Members have suffered and will continue to suffer from both currently manifest and latent physical and mental health injuries, economic losses, emotional distress, pain and suffering and other losses, harms and damages proximately caused by the NFL's fraudulent concealment of the addiction risk and other dangers of the Medications.

336.    As a result of its fraudulent concealment of the addictive risks and other dangers of the Medications, the NFL is liable to the Class Members for the full measure of damages of all categories permissible under applicable law.

## COUNT V
## NEGLIGENT MISREPRESENTATION

337.    Plaintiffs adopt by reference all allegations contained in the paragraphs above, as if fully set forth in this Count.

338.    The NFL undertook the duty to act with reasonable care toward the Class Members.

339.    The NFL assumed a special relationship with the Class Members, imposing on the NFL a duty fully, accurately, and promptly to inform the Class Members of all known and potential dangers of the Medications.

340.    The NFL knew that the Medications posed substantial immediate and long-term risks of addiction and other physical and mental health problems.

341.    Despite its superior knowledge of such dangers, and despite its superior wealth and resources enabling it promptly, fully and accurately to inform the Class Members of those dangers, the NFL did not inform the Class Members about the Medications' dangers and continually exposed the Class Members to those dangers.

**CLASS ACTION COMPLAINT**                                                                76

342.   In its public statements, of which that of NFL Executive Vice President Jeff Pash recited above is representative, the NFL never admitted that the Class Members were at greater risk from the Medications than any member of the general public.

343.   Instead, the NFL, in statements represented by Mr. Pash's, glibly elided the seriously increased risk to the Class Members from such Medications, saying that abuse "needs to be addressed on a broad basis, not just in the NFL."

344.   The NFL continuously and systematically misrepresented the current dangers to the Class Members about the Medications they were being provided.

345.   The NFL continuously and systematically misrepresented the increased risk of latent injuries resulting from the Medications.

346.   The NFL misrepresented to the Class Members the dangers of addiction, but current and latent, from the Medications.

347.   The NFL misrepresented to the Class Members the dangers of playing while the pain of injuries was masked by the Medications, including the risk of further and permanent damage to affected body parts.

348.   To their detriment, the Class Members reasonably relied on the NFL's statements, and silences, about the danger such medications, especially in light of the NFL's special relationship of trust with the Class Members and the NFL's assumption of a duty of care to the Class Members.

349.   The NFL knew or in the exercise of reasonable care should have known that its statements and omissions to the Class Members about the Medications were incomplete, inaccurate or otherwise misleading in soft-pedaling, diminishing and minimizing their dangers.

**CLASS ACTION COMPLAINT**                                                                 77

350.    The foregoing misrepresentations were the cause in fact of the Class Members' currently manifest and latent physical and mental health injuries, economic losses, emotional distress, pain and suffering and other losses, harms and damages.

351.    The foregoing misrepresentations proximately caused the Class Members' currently manifest and latent physical and mental health injuries, economic losses, emotional distress, pain and suffering and other losses, harms and damages.

352.    As a result of its misrepresentations about the addictive risks and other dangers of the Medications, the NFL is liable to the Class Members for the full measure of damages of all categories permissible under applicable law.

## COUNT VI
## NEGLIGENCE *PER SE*

353.    Plaintiffs adopt by reference all allegations contained in the paragraphs above, as if fully set forth in this Count.

354.    The NFL's provision and administration of substances described herein violated the Controlled Substances Act's requirements governing the acquisition, storage, provision and administration of, and recordkeeping concerning, Schedule II, III and IV controlled substances.

355.    The NFL violated the FDCA's requirements for prescriptions, warnings about known and possible side effects, and proper labeling, among other violations.

356.    The NFL's provision and administration of Medications also violated state laws governing the acquisition, storage, and dispensation of prescription medications.

357.    The NFL's provision and administration of Medications also violated state laws governing the recordkeeping mandated for the acquisition, storage and dispensation of prescription medications.

**CLASS ACTION COMPLAINT**                                                                 78

358.     For example, the NFL violated the California Pharmacy Law, Calif. Code, Bus. & Prof. § 4000 *et seq.* in a number of ways, including: (i) permitting the administration and provision of prescription medications by persons not properly authorized to do so, (ii) without valid prescriptions or proper medical care providers' orders, evaluations, diagnoses, warnings and monitoring.

359.     Further evidencing the NFL's violations of the Act and the FDCA, the NFL also violated the AMA's Code of Ethics.

360.     The NFL's violation of the CSA, FDCA, and state laws, proximately caused the Class Members' currently manifest and latent physical and mental health injuries, economic losses, emotional distress, pain and suffering and other losses, harms and damages.

361.     The Class Members' currently manifest and latent physical and mental health injuries, economic losses, emotional distress, pain and suffering and other losses, harms and damages resulted from events and conditions that the Act and FDCA, and applicable state laws, were designed to prevent.

362.     The Class Members are within the class of persons for whose protection the Act and FDCA, and applicable state laws, were adopted.

363.     As a result of its violations of the Act and FDCA, and of applicable state laws, the NFL is negligent *per se* and liable to the Class Members for the full measure of damages of all categories permissible under applicable law.

**COUNT VII**
**LOSS OF CONSORTIUM**

364.     Plaintiffs adopt by reference all allegations contained in the paragraphs above, as if fully set forth in this Count.

**CLASS ACTION COMPLAINT**                                                                 79

365. The NFL's misconduct described in this Complaint renders the NFL liable to the spouses, heirs, successors and assigns, and anyone who is entitled under applicable state law to claim against the NFL for that misconduct.

366. The NFL's misconduct toward the Class Members described in this Complaint is the factual and proximate cause of the following loss of consortium damages of the Class Members' spouses and significant others: (i) lost enjoyment of comfort, care, society and companionship; (ii) economic damages from lost value of household and other services; (iii) economic damages from lost value of earnings; and (iv) economic damages from purchases of medical care and treatments, including durable medical goods, prescription and non-prescription medications, and home health care aides and other services.

367. The Plaintiffs' and Class Members' spouses, and, as appropriate, heirs, successors and assigns and others entitled to claim through the Class Members' spouses are entitled to recover these loss of consortium damages in full from the NFL as a result of its misconduct.

## COUNT VIII
## NEGLIGENT HIRING

368. Plaintiffs adopt by reference all allegations contained in the paragraphs above, as if fully set forth in this Count.

369. The NFL undertook a duty to protect the Class Members, and to disclose to them the dangers of the Medications.

370. To fulfill the duty it voluntarily assumed, the NFL was obligated to hire and retain educationally well-qualified, medically competent, professionally objective and specifically trained professionals not subject to any conflicts of interest to evaluate the Medications, study their effects, and make recommendations based on solid science, analytically rigorous study methods and systematic observations to protect the Class Members.

**CLASS ACTION COMPLAINT**                                                           80

371.    The NFL breached its duty to the Class Members by hiring and retaining unqualified persons lacking the requisite scientific knowledge, independence, objectivity, and neutrality, and who were subject to conflicts of professional and economic interest, to the detriment of the Class Members.

372.    Because of the NFL's special relationship to the Class Members, the Class Members reasonably relied on the statements and omissions, actions and inactions of the persons the NFL hired and who were involved with the Medications.

373.    Because of the NFL's superior knowledge and resources, the Class Members reasonably relied on the NFL's and its employees' and agents' silence – at worst – and deceptive soft-pedaling – at best – about the nature and extent of the dangers of the Medications.

374.    As a result of the NFL's wrongful hiring of such persons, the Class Members were deceived about the nature and magnitude of the dangers to which they were subjected by the Medications.

375.    The NFL's breach of its duty to inform the Class Members about the dangers of the Medications was the cause in fact of the Class Members' current and future physical and mental health injuries, economic losses, emotional distress, pain and suffering and other losses, harms and damages.

376.    The NFL's breach of its duty to inform the Class Members about the dangers of the Medications was the proximate cause of the Class Members' current and future physical and mental health injuries, economic losses, emotional distress, pain and suffering and other losses, harms and damages.

377.     As a result of its negligent hiring described in this Complaint and in this Count, the NFL is liable to the Class Members for the full measure of damages of all categories permissible under applicable law.

## COUNT IX
## NEGLIGENT RETENTION

378.     Plaintiffs adopt by reference all allegations contained in the paragraphs above, as if fully set forth in this Count.

379.     The NFL knew, or, in the exercise of the special relationship it undertook to the Class Members, should have known, that the persons the NFL charged with overseeing, evaluating and recommending changes to distribution of Medications were neither independent, neutral, free from conflicts of professional and economic interest, or properly medically trained to ensure that the Medications did not injure or create the substantial risk of future injuries for the Class Members.

380.     The NFL knew, or in the exercise of the duty of care the NFL voluntarily assumed to the Class Members, that the persons the NFL charged with overseeing, evaluating and recommending changes to the distribution of Medications were neither independent, neutral, free from conflicts of professional and economic interest, or properly medically trained to ensure that the Medications did not injure or create the substantial risk of future injuries for the Class Members.

381.     As a result of the NFL's wrongful retention of such persons, the Class Members were deceived about the nature and magnitude of the dangers to which they were subjected by the Medications.

**CLASS ACTION COMPLAINT**                                                                    82

382.    The NFL's wrongful retention of such persons was the cause in fact of the Class Members' current and future physical and mental health injuries, economic losses, emotional distress, pain and suffering and other losses, harms and damages.

383.    The NFL's wrongful retention of such persons was the proximate cause of the Class Members' current and future physical and mental health injuries, economic losses, emotional distress, pain and suffering and other losses, harms and damages.

384.    As a result of its negligent retention of unqualified and conflicted persons as described in this Complaint and in this Count, the NFL is liable to the Class Members for the full measure of damages of all categories permissible under applicable law.

## PRAYER FOR RELIEF

385.    WHEREFORE, the Plaintiffs pray for judgment as follows:

a.    Declaratory relief pursuant to 28 U.S.C. § 2201 against the NFL;

b.    Granting an injunction and/or other equitable relief against the NFL and in favor of Plaintiffs for the requested medical monitoring;

c.    Awarding Plaintiffs compensatory damages against the NFL;

d.    Awarding Plaintiffs punitive damages against the NFL;

e.    Awarding Plaintiffs such other relief as may be appropriate; and

f.    Granting Plaintiffs their prejudgment interest, costs and attorneys' fees.

Dated: May 20, 2014                          Respectfully Submitted,

                                        _____/s/_____

                                        **SILVERMAN|THOMPSON|SLUTKIN|WHITE|LLC**

                                        Attorneys for Plaintiffs

                                        William N. Sinclair (SBN 222502)
                                        (bsinclair@mdattorney.com)

**CLASS ACTION COMPLAINT**                                              83

Steven D. Silverman (*Pro Hac* Motion Pending)
(ssilverman@mdattorney.com)
Andrew G. Slutkin (*Pro Hac* Motion Pending)
(aslutkin@mdattorney.com)
Stephen G. Grygiel (*Pro Hac* Motion Pending)
(sgrygiel@mdattorney.com)
Joseph F. Murphy, Jr. (*Pro Hac* Motion Pending)
(jmurphy@mdattorney.com)
**SILVERMAN|THOMPSON|SLUTKIN|WHITE|LLC**
201 N. Charles St., Suite 2600
Baltimore, MD 21201
Telephone: (410) 385-2225
Facsimile: (410) 547-2432

Thomas J. Byrne (SBN 179984)
(tbyrne@nbolaw.com)
Mel T. Owens (SBN 226146)
(mowens@nbolaw.com)
**NAMANNY BYRNE & OWENS, P.C.**
2 South Pointe Drive, Suite 245
Lake Forest, CA 92630
Telephone: (949) 452-0700
Facsimile: (949) 452-0707

**CLASS ACTION COMPLAINT**

84

## **DEMAND FOR JURY TRIAL**

Plaintiffs Richard Dent, Jeremy Newberry, Roy Green, J.D. Hill, Keith Van Horne, Ron Stone, Ron Pritchard, and James McMahon request a trial by jury on all issues for which they are entitled to a jury.

Dated: May 20, 2014                              By     _____/s/_____

William N. Sinclair
Silveman|Thompson|Slutkin|White|LLC

**CLASS ACTION COMPLAINT**                                                                                         85