IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

RICHARD DENT, JEREMY NEWBERRY,
ROY GREEN, J.D. HILL, KEITH VAN
HORNE, RON STONE, RON PRITCHARD,
JAMES MCMAHON, MARCELLUS
WILEY, and JONATHAN REX HADNOT,
on behalf of themselves and all others
similarly situated,

No. C 14-02324 WHA

Plaintiffs,

v.

NATIONAL FOOTBALL LEAGUE,
a New York unincorporated association,

Defendant.

/

**ORDER GRANTING
MOTION TO DISMISS**

**INTRODUCTION**

In this putative class action alleging improper administration of pain medications to
professional football players, defendant moves to dismiss plaintiffs' third amended complaint.
For the reasons stated below, the motion is **GRANTED**.

**STATEMENT**

This motion is the latest in a series of lawsuits arising out of defendant National Football
League's (NFL) alleged "return-to-play" scheme in which former players were given painkillers
indiscriminately in an effort to quickly return players back to the game and maximize profits,
despite the players' lingering physical injuries.[1]

---

[1] A separate putative class action against the individual clubs involving the same alleged conduct,
*Evans v. Arizona Cardinals Football Club, LLC*, No. C 16-01030 WHA, was filed on May 21, 2015 (and
transferred to the undersigned judge on March 1, 2016) while the instant action was on appeal.

1    A prior order set forth in detail the well-pled background facts, assumed to be true for

2  purposes of the present motion (Dkt. No. 106).  In brief, the NFL is an unincorporated

3  association of thirty-two separately-owned and independently-operated professional football

4  "clubs" or teams across the country.  Named plaintiffs are ten retired players who played for a

5  number of those individual football teams at various points in time.

6    In May 2014, plaintiffs filed the instant putative class action, alleging that they were

7  supplied an endless stream of powerful pain medications, such as opioids, Toradol, local

8  anesthetics, and combinations thereof, in order to return players back to the game as quickly as

9  possible instead of allowing them to rest and heal properly from serious football-related injuries.

10  The medications were distributed, plaintiffs alleged, without proper prescription, documentation,

11  or disclosure of the medical risks and side effects, in violation of various laws.  Plaintiffs then

12  asserted nine claims against the NFL in their second amended complaint — including claims for

13  negligent misrepresentation, negligence *per se*, negligent hiring and retention, fraud, and

14  fraudulent concealment (Dkt. No. 65).

15    The essence of the then-operative second amended complaint was that the NFL had been

16  negligent in not doing enough to police the alleged problem of the individual clubs abusing pain

17  medications in order to quickly return their injured players to the field.  But in order to evaluate

18  the reasonableness of the NFL's conduct towards the players, it would have been necessary to

19  consider the long history of provisions agreed to by the NFL in collective bargaining agreements

20  (CBA) intended to protect the players.  In turn, this consideration of the CBAs triggered the

21  preemption rule within our circuit, as exemplified by *Cramer v. Consolidated Freightways, Inc.*,

22  255 F.3d 683, 689–93 (9th Cir. 2001) (en banc).  Accordingly, in December 2014, the Court

23  found that the theory of liability was barred as preempted by Section 301 of the Labor

24  Management Relations Act, 29 U.S.C. § 185(a) (Dkt. No. 106).

25    In September 2018, our court of appeals reversed and remanded, holding that plaintiffs'

26  claims neither arose from the CBAs nor required their interpretation and were thus not

27  preempted by Section 301.  It so ruled based on plaintiffs' pitch to our court of appeals that the

28  second amended complaint alleged a "pyramidal conspiracy" — specifically, by using the club

doctors, "the NFL control[led] and direct[ed] a pyramidal scheme for the distribution of controlled substances and prescription drugs in flagrant disregard of federal and state law" (Dkt. No. 131-1 at 1–2). Plaintiffs argued that "the duty at issue [was] to obey the law" and that "[o]nce the illegality exemption [to Section 301 preemption] [was] applied, the rest of the duties flow[ed] to obey the law. You then just follow the drugs" (*id*. at 5, 8). In other words, plaintiffs argued that they alleged that the NFL *itself* supplied and distributed the endless stream of drugs, thereby violating the relevant federal and state statutes governing controlled substances.

Our court of appeals agreed with plaintiffs' reading of the second amended complaint, as demonstrated by the following exchange during oral argument between the appellate court and counsel for the NFL (*id*. at 11 (emphasis added)):

> THE COURT: Counsel, what do we do with the allegation in the complaint that the NFL directly gave drugs to athletes?
>
> MR. CLEMENT: Well, I think what you do is you read it in the context of the entire complaint, so with respect to every one of the ten plaintiffs, the specific allegations are that they were given injections by the team doctors, the doctors . . .
>
> THE COURT: I'm looking at paragraph 17 of the complaint. This is the second amended complaint, the NFL directly? *I'm going to put some ellipses in here. The NFL directly supplied players with opioids.*

This reading of the complaint drove our court of appeals' analysis. It construed the second amended complaint as "not merely alleging that the NFL failed to prevent medication abuse by the teams, but that the NFL *itself* illegally distributed controlled substances, and therefore its actions directly injured players." *Dent v. Nat'l Football League*, 902 F.3d 1109, 1118 (9th Cir. 2018) (emphasis in original). "With that reading of the complaint in mind," our court of appeals held that "to the extent the NFL is involved in the distribution of controlled substances, it has a duty to conduct such activities with reasonable care" and that the "minimum standards [of care] are established by statute," such as the Controlled Substances Act (CSA), the Food, Drugs, and Cosmetics Act (FDCA), and the California Pharmacy Laws. *Ibid*. To the extent the NFL violated those laws, a ruling on plaintiffs' claims did not require interpretation of the CBAs. *Id*. at 1118–19.

1    Based on the foregoing, our court of appeals held that plaintiffs' "negligence claim

2 regarding *the NFL's alleged violation of federal and state laws* governing controlled substances

3 [was] not preempted by [Section] 301." *Id*. at 1121 (emphasis added).  Specifically, its decision

4 noted the following.

5           [Plaintiffs] alleged that since 1969, *the NFL has distributed controlled
            substances and prescription drugs* to its players *in violation of both state
6           and federal laws*, and that the manner in which these drugs were
            administered left the players with permanent injuries and chronic medical
7           conditions.

8           Each team hires doctors and trainers who attend to players' medical
            needs.  Those individuals are employees of the teams, not the NFL.  But
9           the players' Second Amended Complaint [] asserts that *the NFL itself
            directly provided medical care and supplied drugs to players*.
10

11          The players argue that they were injured by *the NFL's "provision and
            administration" of controlled substances* without written prescriptions,
12          proper labeling, or warnings regarding side effects and long-term risks,
            and that *this conduct violated the Controlled Substances Act*, 21 U.S.C. §
13          801 *et seq*.; the Food, Drugs, and Cosmetics Act, 21 U.S.C. § 301 *et seq*.;
            and the California Pharmacy Laws, Cal. Bus. & Prof. Code § 4000 *et seq*.

14          [A]s we read the complaint, the plaintiffs are not merely alleging that the
            NFL failed to prevent medication abuse by the teams, but that *the NFL
15          itself illegally distributed controlled substances*, and therefore its actions
            *directly* injured players.
16
            [Plaintiffs] are not arguing that the NFL violated the CBAs at all, but that
17          it *violated state and federal laws* governing prescription drugs.

18          But when it comes to the distribution of potentially dangerous drugs,
            minimum standards are established by statute.  The Controlled
19          Substances Act, 21 U.S.C. § 801 *et seq*.; the Food, Drugs, and Cosmetics
            Act, 21 U.S.C. § 301 *et seq*.; and the California Pharmacy Laws, Cal.
20          Bus. & Prof. Code § 4000 *et seq*., set forth requirements governing how
            drugs are to be prescribed and labeled.  Therefore, under the plaintiffs'
21          negligence per se theory, *whether the NFL breached its duty to handle
            drugs with reasonable care can be determined by comparing the conduct
22          of the NFL to the requirements of the statutes at issue*.

23          As for causation, whether *the NFL's alleged violation of the statutes*
            caused the plaintiffs' injuries is a purely factual question that does not
24          require a court to interpret any term of a collective-bargaining agreement.

25          But the *teams'* obligations under the CBAs are irrelevant to the question
            of *whether the NFL breached an obligation to players by violating the
26          law*.  The parties to a CBA cannot bargain for what is illegal.  Therefore,
            liability for a negligence claim alleging *violations of federal and state
27          statutes* does not turn on how the CBAs allocated duties among the NFL,
            the teams, and the individual doctors.

28

4

> Regardless of what (if anything) the CBAs say about those issues, if the NFL had any role in distributing prescription drugs, it was required to follow the laws regarding those drugs. *To the extent that the plaintiffs allege they were injured by the NFL's violation of those laws*, their claims can be assessed without any interpretation of the CBAs.
>
> We express no opinion regarding the merits of the plaintiffs' negligence claim, which will require the players to *establish that the relevant statutes apply to the NFL, the NFL violated those statutes, and the alleged violations caused the players' injuries*. Perhaps plaintiffs can prove these elements; perhaps not. That must await completion of discovery. We hold only that the plaintiffs' negligence claim regarding the NFL's alleged violation of federal and state laws governing controlled substances is not preempted by § 301.
>
> In other words, the fact that the CBAs require team doctors to advise players in writing if a medical condition could be significantly aggravated by continued performance does not address *the NFL's liability for injuring players by illegally distributing prescription drugs*.

*Id*. at 1114–15, 1118–21 (citations and internal quotation marks omitted) (original alterations omitted) (emphasis added).

Our court of appeals explicitly limited its holding to the issue of preemption and further observed that it was still to be determined on remand "whether the plaintiffs have pleaded facts sufficient to support" their negligence claim. *Id*. at 1121. And, it warned plaintiffs against "conflat[ing]" actions by the club doctors and trainers from those of the NFL, as plaintiffs are "limited to claims arising from the conduct of the NFL and NFL personnel." *Ibid*.

In October 2018, after remand, plaintiffs were granted leave to amend their complaint (Dkt. No. 118). In December 2018, plaintiffs filed a third amended complaint (Dkt. No. 119). This constitutes their "best and final" pleading (Dkt. Nos. 117 at 1; 118). Now that the dust has settled after a trip to our court of appeals and the completion of the *Evans* litigation, only a single claim for negligence remains (Third Amd. Compl. ¶¶ 298–310).[2]

The NFL now moves to dismiss under Rule 12(b)(6) on the grounds that (1) plaintiffs fail to adequately plead their sole negligence claim, and (2) the claim is time-barred. Plaintiffs counter by asserting that they "have identified three common law duties owed by the NFL" (Opp. 12). This order follows full briefing and oral argument.

---

[2] The last leg plaintiffs stand on at this point in the instant litigation is a negligence claim, despite having "conceded from the very beginning that the intentional torts are [their] strongest argument" and that the negligence claims "are the weaker argument" (Dkt. No. 131-1 at 22).

**ANALYSIS**

"To state a claim for negligence in California, a plaintiff must establish the following elements: (1) the defendant had a duty, or an 'obligation to conform to a certain standard of conduct for the protection of others against unreasonable risks,' (2) the defendant breached that duty, (3) that breach proximately caused the plaintiff's injuries, and (4) damages." *Dent*, 902 F.3d at 1117 (citing *Corales v. Bennett*, 567 F.3d 554, 572 (9th Cir. 2009)).

In sum, plaintiffs now allege as follows (Third Amd. Compl. ¶ 16):

> The NFL was required to, or voluntarily undertook the duty to, comply with federal and state laws regulating the manner in which these Medications were administered and distributed. It failed to do so, consistently and repeatedly, from the 1970s through at least 2014 and that failure directly and proximately caused the injuries for which Plaintiffs seek damages.

As noted above, plaintiffs previously convinced our court of appeals that the "essence" of their claims in the second amended complaint was not only the NFL's alleged failure to prevent medication abuse, *but also that the NFL itself handled, distributed, and administered the medications*. *Dent*, 902 F.3d at 1118. Under this reading of plaintiffs' negligence *per se* theory, our court of appeals held that the NFL's *direct* involvement in the handling, distribution, and administration of the controlled substances gave rise to a duty of care. *See id*. at 1119.

Plaintiffs now argue that they have plausibly alleged conduct showing that the NFL owed an independent duty to plaintiffs based on (1) the nature of the NFL's alleged conduct; (2) the NFL's alleged voluntary undertaking of the drug program created to monitor the handling and distribution of the controlled substances; and (3) the "special relationship" allegedly existing between the NFL and its players (Opp. 8–11). This order disagrees and finds that plaintiffs have failed to adequately plead the requisite elements of negligence under Rule 12(b)(6).

**1.     NATURE OF THE ACTIVITY AT ISSUE.**

Here, plaintiffs primarily rely on a negligence *per se* theory to support their negligence claim (as they did in their second amended complaint), which is "a presumption of negligence aris[ing] from the violation of a statute which was enacted to protect a class of persons of which the plaintiff is a member against the type of harm which the plaintiff suffered as a result of the violation of the statute." *Hoff v. Vacaville Unified Sch. Dist.*, 19 Cal. 4th 925, 938 (1998); *see*

6

1    *also* CAL. EVID. CODE § 669.  "[A]n underlying claim of ordinary negligence must be viable

2    before the presumption of negligence . . . can be employed."  *Cal. Serv. Station & Auto. Repair*

3    *Ass'n v. Am. Home Assurance Co.*, 62 Cal. App. 4th 1166, 1178 (1998).  The "presumption of

4    negligence applies only after determining that the defendant owes the plaintiff an independent

5    duty of care."  *Id*. at 1180.

6         As plaintiffs acknowledge, our court of appeals held that "the NFL owed a duty to

7    [p]laintiffs because [of] the general character of the conduct at issue, *assuming, in fact*, the NFL

8    engaged in the handling, distribution and administration of [m]edications" (Opp. 8 (citing *Dent*,

9    902 F.3d at 1119) (emphasis added)).  Plaintiffs argue that they have adequately alleged such

10   conduct by the NFL.  This order disagrees.

11        Plaintiffs now explicitly base their claim that the NFL was directly involved in the

12   handling, distribution, and administration of controlled substances on the NFL's supposed "role

13   in the creation, implementation and maintenance of" an alleged "Return to Play Business Plan"

14   (*id*. at 2).  The "general character of" the NFL's maintenance of this "Business Plan" and "its

15   involvement in the distribution of the Medications violate the" CSA and FDCA, according to

16   plaintiffs (*id*. at 13).  Specifically, they argue that but for the supposed "Business Plan," "*Club*

17   *doctors and trainers would not have violated drug laws and regulations* regarding controlled

18   substances and prescription drugs" (*id*. at 2 (emphasis added)).

19        By their own admission then, plaintiffs do not allege that the NFL *itself* violated the

20   relevant drug laws and regulations governing the medications at issue — that violation is

21   specifically attributed to the club doctors and trainers.[3]  Plaintiffs attempt to handwave this

22

23        [3]  Yet plaintiffs continue to conflate conduct by the NFL and the individual clubs by sporadically
     labeling relevant actors as "NFL doctors and trainers" throughout the third amended complaint, despite our
24   court of appeals' warning.  *See Dent*, 902 F.3d at 1121 ("We do note that at many points in the [second
     amended complaint], the plaintiffs appear to conflate the NFL and the teams.  But the plaintiffs are pursuing a
25   theory of direct liability, not vicarious liability.  And they have attempted to vindicate virtually identical claims
     against the clubs themselves in separate litigation.  Therefore, on remand, any further proceedings in this case
26   should be limited to claims arising from the conduct of the NFL and NFL personnel — not the conduct of
     individual teams' employees.").
27

28        The totality of the allegations renders this conclusory label implausible.  That is, even taking all
     allegations as true, it cannot be reasonably inferred that the doctors and trainers directly distributing the drugs
     allegedly in violation of the relevant statutes were NFL personnel.  For example, plaintiffs allege that the NFL

7

1   deficiency as a mere technicality, asserting that "it matters not who actually put a pill in a

2   player's hand, but rather, how it came to be that, despite a comprehensive and thorough

3   regulatory scheme designed to prevent the abuses at issue, those abuses nonetheless occurred"

4   (*ibid.*).  They try to shore up a direct liability claim by pointing to various allegations within the

5   third amended complaint to argue that the NFL is "controlling all of this"  (Dkt. No. 134 at

6   44:10–11; Opp. 3–4).  For example, plaintiffs allege that the NFL "compiled weekly injury

7   reports and required reports from teams on the volume of drugs they [the clubs] were distributing

8   to their players"; it "mandated that the Clubs have locked drug storage areas at their facilities"; it

9   "approved Club financial arrangements with doctors and medical groups"; it "established

10  committees to discuss and oversee the distribution of Medications"; it "conduct[ed] on-site

11  inspections of the Clubs' facilities to ostensibly determine compliance with the laws identified

12  in" the third amended complaint; and it "sponsored League-wide studies on the effects of certain

13  Medications" (Opp. 2–3; Third Amd. Compl. ¶¶ 159, 163–72, 178–80, 188–96).  Plaintiffs thus

14  contend that the NFL was involved in "every aspect" of the players' medical care  — except for

15  the actual distribution of the controlled substances (Dkt. No. 134 at 44:14–15).

16          As the NFL points out, however, this distinction is dispositive.  Significantly, plaintiffs

17  do not make any specific, plausible allegation that the relevant statutes apply to the NFL, let

18

19  "has distributed these controlled substances and prescription medications with little to no regard for the law or
    the players' health" and label the relevant actors "NFL doctors and trainers" (Third Amd. Compl. ¶ 7).  To
20  support this contention they allege in the very next sentence that "*Raiders owner Al Davis* routinely pressured
    players and doctors to do anything to get a player back on the field, regardless of the risks" and that "as the
21  position of *Club* doctor and trainer have become increasingly lucrative, the pressures on the medical personnel
    to return players to the field have only increased" (*ibid.* (emphasis added)).  But these factual allegations refer to
22  an *individual team's* actions, *not* the NFL's.  The third amended complaint is replete with numerous other
    factual allegations similarly undercutting plaintiffs' conclusory allegations of the NFL's direct distribution of
23  the medications (*see, e.g.*, *id.* ¶¶ 21, 30, 39, 47, 58, 67, 77, 86, 96).  Nor can plaintiffs' reliance during oral
    argument on Dr. Pellman's alleged dual role as New York Jets' doctor and NFL medical advisor give rise to this
24  inference, as his alleged violations of the relevant laws and regulations were made in his "capacity as a *team*
    doctor" (*id.* ¶ 216 (emphasis added)).
25
           The conflation is made all the more evident by plaintiffs' contention that the "relationship [between
26  the NFL and the clubs] is complicated and, without discovery, it will not be entirely clear . . . what exactly that
    relationship is, and concomitantly, what that may mean for this case" and their musing that "although the NFL
27  and the clubs are independent legal entities, there is more to the puzzle" (Opp. 4).  At bottom, the fact remains
    that the NFL and the clubs, while closely related, *are* separate entities, and plaintiffs' plain assertion that the
28  NFL is the clubs' "super-employer" is insufficient to conjure up a direct (rather than a vicarious) liability claim
    (*see* Opp. 5).

alone that the NFL violated those statutes. Despite ninety pages of allegations (largely directed to the clubs' conduct), nowhere in the third amended complaint do plaintiffs allege, as they previously pitched before our court of appeals, that the NFL undertook to provide direct medical care and treatment to players such that its conduct violated any relevant drug laws. Though plaintiffs generally contend that the NFL controlled and directed the distribution of the players' medication via the "Business Plan," nowhere in the third amended complaint do plaintiffs specifically allege any facts as to how the NFL instructed the club doctors' handling, distribution, and administration of the drugs or otherwise forced the club doctors to violate any relevant drug laws. (In fact, the conduct by the NFL that plaintiffs *do* specifically allege largely relate to its efforts to help the clubs *comply* with those statutes (*see, e.g.*, Third Amd. Compl. ¶¶ 159–82)).

Our court of appeals previously found that the NFL owed a duty (and the claims were not preempted) where plaintiffs alleged that the NFL was directly "involved in the distribution of controlled substances" based on "the general character of [that] activity." *Dent*, 902 F.3d at 1119 (citation and quotations omitted) (alterations in original). It further explained that plaintiffs' negligence claim "will require the players to *establish that the relevant statutes apply to the NFL, the NFL violated those statutes*, and the alleged violations caused the players' injuries" and that it "le[ft] it to the district court to determine whether the plaintiffs have pleaded facts sufficient to support their negligence claim against the NFL." *Id*. at 1121 (emphasis added). Plaintiffs now acknowledge in their third amended complaint and briefing that the NFL did not itself provide medical care for or distribute medications to the players, and the operative complaint contains only conclusory allegations related to conduct by the NFL that would give rise to a duty of care. This order therefore finds that plaintiffs failed to plead sufficient facts that, if proved, would support their negligence claim against the NFL.

Instead, plaintiffs ultimately accuse the NFL of doing nothing despite awareness of the alleged conduct by club doctors and trainers (Third Amd. Compl. ¶¶ 66–71). For example, the first sentence of the section titled "Despite the Foregoing, the League Did Nothing" states as follows: "One of the most striking aspects of the audit program described above is that, despite

9

1  the thousands of pages of documented *illegal violations engaged in by all the clubs*, there [was]

2  no follow up from the League" (*id*. ¶ 213 (emphasis added)). But the NFL's alleged failure to

3  act echoes the exact theory already found preempted by Section 301 — namely, that the NFL

4  failed to intervene in the *club's* implementation of the supposed "Business Plan" (a ruling which

5  our court of appeals left undisturbed). As the Court previously held,

> To determine what the scope of this supervisory duty was, and whether
> the NFL breached it, the Court would need to determine . . . what the
> NFL, through the CBAs, required of the individual clubs and club
> physicians. The NFL's overarching duty would then depend on the
> extent to which the various CBAs required the clubs to protect the
> players' medical interests. It would thus be impossible for the Court to
> analyze whether the NFL acted negligently, and whether the NFL's
> conduct caused the players' injuries, without consulting the specific
> CBA provisions that cover the individual clubs' duties to the players.

11 (Dkt. No. 106 at 13–14). This was effectively confirmed when the Court asked plaintiffs'

12 counsel directly for an instance when the NFL violated a relevant statute during oral argument

13 (Dkt. No. 134 at 48:16–49:11):

14 THE COURT:     Give me what you would say is your best example of an
                 NFL employee violating the Controlled Substances Act.

15

16 MR. CLOSIUS:   When they are telling people to distribute it illegally.
                  Your Honor, the —

17 THE COURT:     Where is that —

18 MR. CLOSIUS:   Let me rephrase that. The Third Amended Complaint is
                  replete with people telling the NFL that what's
19               happening is illegal. The DEA is doing it. The Matava
                 report is doing it. They are being told all through about
20               illegal dispensation of controlled substances.

21 THE COURT:     By who? By the Clubs?

22 MR. CLOSIUS:   By the Clubs.

23 THE COURT:     Okay. That's not the same though. Let's say that the
                 — let's say the — somebody is telling the NFL, Hey,
24               the Clubs are violating the Controlled Substances Act.
                 That's not the same as the NFL itself violating
25               anything.

26 MR. CLOSIUS:   Well, they never did anything to remedy it.

27 THE COURT:     Well, that's the original theory.

28

10

1    Counsel then tried to pivot by next arguing that an NFL associate stated that the NFL had "joint

2    culpability on this" issue (Dkt. No. 134 at 49:12–50:12; Third. Amd. Compl. ¶ 11). This general

3    "admission" of joint culpability, however, could easily refer to some general moral sense of

4    culpability, not necessarily a legal culpability under the CSA or other relevant drug law. And,

5    mere allegations that the NFL paid for surveys and reports and did nothing despite being told of

6    the illegal distribution of medications by the clubs do not raise the reasonable inference that the

7    NFL *mandated* their illegal distribution such that the NFL itself is culpable under the relevant

8    statutes. The NFL's alleged pressure on the clubs to return players to play as soon as possible

9    does not sufficiently support plaintiffs' allegation that the NFL was directly involved in the

10   clubs' distribution of the medications such that it owed a duty to plaintiffs or violated any

11   relevant statutes. To repeat, plaintiffs escaped preemption before our court of appeals by

12   asserting the NFL's *proactive* involvement with medication distribution. Having convinced our

13   court of appeals that they were alleging that the NFL itself directly provided medical care and

14   supplied drugs to players, plaintiffs may not bob and weave back to old theories of negligence

15   that, in essence, amount to the NFL's failure to intervene.

16       Plaintiffs complain that the NFL focuses only on our court of appeals' use of the word

17   "distribute" as literally defined in the CSA. They suggest that because our court of appeals used

18   the word "handle" elsewhere in *Dent* (a word that plaintiffs assert is *not* used in either the CSA

19   or FDCA), the appellate court's choice of words "may not have been that precise" because it

20   "us[ed] all kinds of phrases" (Dkt. No. 134 at 46:15–25). As such, plaintiffs aim for a broader

21   interpretation of liability allowed under *Dent* to include the NFL's alleged activities beyond

22   those governed by the relevant drug statutes, such as recordkeeping and storage. Not so.

23   Though *Dent* arguably leaves room to find the NFL liable even if it is not physically handing out

24   drugs to players itself, the clear import of *Dent* centers on the NFL's alleged provision of

25   medical care to the players and *direct distribution* (at least, under the NFL's specific direction)

26   of the medications *in violation of the relevant statutes*.

27       To repeat, as our court of appeals understood the second amended complaint, plaintiffs

28   were "not merely alleging that the NFL failed to prevent medication abuse by the teams, but that

11

1   *the NFL itself* illegally distributed controlled substances, and therefore its actions directly injured

2   players." *Dent*, 902 F.3d at 1118 (emphasis added). Plaintiffs were "not arguing that the NFL

3   violated the CBAs at all, but that *it violated state and federal laws governing prescription*

4   *drugs*." *Ibid*. Again, it noted that "[t]he players argue[d] that they were injured by *the NFL's*

5   *'provision and administration' of controlled substances* without written prescriptions, proper

6   labeling, or warnings regarding side effects and long-term risks, and that *this conduct violated*

7   *the Controlled Substances Act*, . . . *the Food, Drugs, and Cosmetics Act*, . . . and *the California*

8   *Pharmacy Laws*. . . ." *Id*. at 1118 (emphasis added).

9           In answering the question of whether plaintiffs' negligence claim in the second amended

10   complaint required interpretation of the CBAs, our court of appeals noted, *inter alia*, that "when

11   it comes to the distribution of potentially dangerous drugs, *minimum standards are established*

12   *by statute*," such as the CSA, FDCA, and California Pharmacy Laws, which "set forth

13   requirements governing how drugs are to be prescribed and labeled." *Id*. at 1119 (emphasis

14   added). As such, under plaintiffs' negligence claim, "whether the NFL breached its duty to

15   handle drugs with reasonable care can be determined by *comparing the conduct of the NFL to*

16   *the requirements of the statutes at issue*." *Ibid*. (emphasis added). Our court of appeals further

17   noted that "[a]s for causation, whether the NFL's alleged *violation of the statutes* caused the

18   plaintiffs' injuries" is a question that does not require the interpretation of the CBAs. *Id*. at

19   1119–20 (emphasis added). The clubs' "obligations under the CBAs [we]re irrelevant to the

20   question of whether *the NFL breached an obligation to players by violating the law*" and

21   therefore "liability for a negligence claim alleging *violations of federal and state statutes* d[id]

22   not turn on how the CBAs allocated duties among the NFL, the teams, and the individual

23   doctors." *Id*. at 1121 (emphasis added). "[I]f the NFL had any role in *distributing prescription*

24   *drugs*, it was *required to follow the laws regarding those drugs*." *Ibid*. (emphasis added).

25           Our court of appeals thus clearly reversed (on the preemption issue) based on plaintiffs'

26   prior representations related to the NFL's direct involvement in the handling, distribution, and

27   administration of the medications *within the meaning of the relevant drug statutes*. Now that

28   plaintiffs have apparently abandoned these allegations in the third amended complaint —

1  perhaps in response to discovery in the *Evans* litigation — this order finds that they have failed

2  to sufficiently allege that the general character of the NFL's conduct gave rise to a duty of care

3  owed to the players (or that the NFL breached its duty).

### 2. VOLUNTARY ASSUMPTION.

5  Plaintiffs next argue that the NFL voluntarily assumed a duty to ensure the clubs'

6  compliance with the aforementioned drug laws (Opp. 9). This order disagrees.

7  "The negligent undertaking theory of liability holds that a person who has no affirmative

8  duty to act but voluntarily acts to protect another has a duty to exercise due care if certain

9  conditions are satisfied." *Univ. of S. California v. Superior Court*, 30 Cal. App. 5th 429, 448

10  (2018) (citing *Delgado v. Trax Bar & Grill*, 36 Cal. 4th 224, 249 (2005); *Paz v. State of*

11  *California*, 22 Cal. 4th 550, 558 (2000)). "The undertaking must be to render services that the

12  defendant should recognize as necessary for the plaintiff's protection. . . . [T]he plaintiff also

13  must satisfy one of two conditions: either (a) the defendant's failure to exercise reasonable care

14  increased the risk of harm to the plaintiff, or (b) the plaintiff reasonably relied on the undertaking

15  and suffered injury as a result." *Id*. at 448–49 (citations omitted).

16  Plaintiffs assert that "the NFL voluntarily involved itself in the distribution of

17  Medications to its players" by setting up a drug program designed to monitor the clubs'

18  compliance with the aforementioned drug laws (Opp. 9). Notwithstanding plaintiffs'

19  simultaneous insistence that the NFL did *nothing* to protect the players (*see, e.g.*, Third. Amd.

20  Compl. ¶¶ 213–29), plaintiffs contend they have adequately pled the assumption of the NFL's

21  duty based on the "various means" alleged, such as "the imposition of Club audits, League-wide

22  policies related to Toradol, and the security and handling of Medications" (Opp. 9). But

23  plaintiffs have not specifically alleged how the NFL's conduct *increased* the risk of harm to

24  plaintiffs. "A defendant does not increase the risk of harm by merely failing to eliminate a

25  preexisting risk." *Univ. of S. California*, 30 Cal. App. 5th at 450. Nor have plaintiffs alleged

26  any specific facts as to their reasonable reliance on the NFL's supposed assumption of duty or

27  their suffering of injury as a result of the NFL's conduct. Accordingly, plaintiffs have failed to

28  adequately plead an assumption of duty by the NFL.

**3.** **SPECIAL RELATIONSHIP.**

Finally, plaintiffs argue that the NFL owed a duty because of the " 'special relationship' that intertwines the NFL, the Clubs, and players" (Opp. 10).

"Special relationships" giving rise to a duty may exist where there is an "aspect of dependency in which one party relies to some degree on the other for protection." *Regents of Univ. of California v. Superior Court*, 4 Cal. 5th 607, 620 (2018) (citing *Baldwin v. Zoradi*, 123 Cal. App. 3d 275, 283 (1981); *Mann v. State of California*, 70 Cal. App. 3d 773, 779–80 (1977)). "The corollary of dependence in a special relationship is control. Whereas one party is dependent, the other has superior control over the means of protection." *Id.* at 621. Furthermore, "a typical setting for the recognition of a special relationship is where 'the plaintiff is particularly vulnerable and dependent upon the defendant who, correspondingly, has some control over the plaintiff's welfare.' " *Ibid*. (quoting *Giraldo v. Dep't of Corrs. & Rehab.*, 168 Cal. App. 4th 231, 245–46 (2008)). Classic examples include jailer-prisoner and common carrier-passenger relationships. *Ibid*. (citing *Giraldo*, 168 Cal. App. 4th at 245–46; *Lopez v. Southern Cal. Rapid Transit Dist.*, 40 Cal. 3d 780, 789 (1985)).

As an initial matter, plaintiffs fail to allege this "special relationship" in their third amended complaint. This order thus need not consider this argument.

Moreover, plaintiffs fail to sufficiently persuade that the relationship between the former players — who were compensated adult professional athletes with collectively bargained rights over their medical care — and the NFL is analogous to that of the relationship between students and their colleges. Plaintiffs' reliance on *Regents of University of California*, is therefore unavailing. There, the California Supreme Court held that colleges "have a special relationship with students while they are engaged in activities that are part of the school's curriculum." *Id*. at 624–25. In so holding, it considered "the unique features of the college environment," such as the provision of "social, athletic, and cultural opportunities" to students who are still "learning how to navigate the world as adults" and are "dependent on their college communities to provide structure, guidance, and a safe learning environment." *Ibid*. Moreover, colleges "have superior control over the environment and the ability to protect students," as "[t]hrough [their] providing

14

1  of food, housing, security, and a range of extracurricular activities" and their administrators and

2  educators "hav[ing] the power to influence students' values, their consciousness, their

3  relationships, and their behaviors." *Id*. at 625 (quoting *Furek v. Univ. of Delaware*, 594 A.2d

4  506, 516 (Del. 1991); Helen Hickey de Haven, *The Elephant in the Ivory Tower:  Rampages in*

5  *Higher Education and the Case for Institutional Liability*, 35 J.C. & U.L. 503, 611 (2009)).

6  While sympathetic to plaintiffs' position, this order is not sufficiently persuaded that the

7  medical care plaintiffs argue the NFL provided to them renders them "particularly vulnerable" in

8  the sense that "the unique features of the college environment" do for college students. *See id*. at

9  620, 624.  Accordingly, plaintiffs have not sufficiently pled a special relationship giving rise to a

10  duty owed by the NFL.

11  *                    *                    *

12  Based on the foregoing, this order finds that plaintiffs have failed to sufficiently allege

13  any duty owed by the NFL to plaintiffs.[4]

### CONCLUSION

15  This order again reiterates that the ruling against plaintiffs' theories herein does not

16  minimize the underlying societal issue and the need to protect the health and safety of our

17  professional athletes.  That being said, plaintiffs failed to adequately plead their sole negligence

18  claim and thus for the foregoing reasons, the NFL's motion to dismiss is **GRANTED**.  Because

19  this was plaintiffs' "best and final" pleading, the instant action is **DISMISSED** without further

20  leave to amend.  Judgment will follow.

22  **IT IS SO ORDERED.**

24  Dated:  April 18, 2019.

_____
WILLIAM ALSUP
UNITED STATES DISTRICT JUDGE

---

28    [4]  Because this order finds that plaintiffs failed to adequately plead a negligence claim, it need not and
does not reach the NFL's statute of limitations argument.

15