ALLEN RUBY (SBN 47109)
allen.ruby@skadden.com
JACK P. DICANIO (SBN 138782)
jack.dicanio@skadden.com
SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
525 University Avenue, Suite 1400
Palo Alto, CA 94301
Telephone: (650) 470-4500
Facsimile: (650) 470-4570

DANIEL L. NASH (*pro hac vice*)
DNash@akingump.com
STACEY R. EISENSTEIN (*pro hac vice*)
SEisenstein@akingump.com
AKIN GUMP STRAUSS HAUER & FELD LLP
2001 K Street, N.W.
Washington, D.C. 20006
Telephone: (202) 887-4000
Facsimile: (202) 887-4288

Attorneys for Defendant
NATIONAL FOOTBALL LEAGUE

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN FRANCISCO DIVISION

| | |
|---|---|
| RICHARD DENT, et al., | Case No.: 3:14-CV-02324-WHA |
| Plaintiffs, | **DEFENDANT NATIONAL FOOTBALL LEAGUE'S NOTICE OF MOTION AND MOTION TO DISMISS THIRD AMENDED COMPLAINT** |
| v. | |
| NATIONAL FOOTBALL LEAGUE, | |
| Defendant. | **Date:** **January 14, 2021** |
| | **Time:** **8:00 a.m.** |
| | **Courtroom:** **12 (19th Floor)** |
| | **Judge:** **Honorable William Alsup** |

**NOTICE OF MOTION**

**TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:**

**PLEASE TAKE NOTICE** that on January 14, 2021, at 8:00 a.m., or as soon thereafter as available, in the courtroom of the Honorable William Alsup, located at 450 Golden Gate Avenue, Courtroom 12, 19th Floor, San Francisco, California 94102, Defendant National Football League ("NFL" or "League") will and hereby does move for an order dismissing Plaintiffs' Third Amended Complaint ("TAC") (Dkt No. 119).

**STATEMENT OF ISSUES**

The TAC should be dismissed under Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6) because Plaintiffs' only remaining cause of action is preempted by Section 301 of the Labor Management Relations Act, 29 U.S.C. § 185(a) ("LMRA").  This Motion is based on this Notice of Motion and Motion, the attached Memorandum of Points and Authorities, the pleadings and papers on file in this action, the declarations and exhibits previously submitted, any such matters of which the Court may take judicial notice, the arguments of counsel, and any other matter that the Court may properly consider.

Dated: November 25, 2020                SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP


By: */s/ Jack P. DiCanio*
    Jack P. DiCanio

Attorneys for Defendant
NATIONAL FOOTBALL LEAGUE

# TABLE OF CONTENTS

Page

INTRODUCTION ..................................................................................................................1

BACKGROUND ...................................................................................................................2

PLAINTIFFS' ONLY REMAINING CAUSE OF ACTION IS PREEMPTED...........................7

      A.    Legal Standards.................................................................................7

      B.    Determining The Scope Of The NFL's Alleged Undertaking (Prong No. 1) Would Require Interpretation Of The CBAs...................................9

      C.    Determining Whether The NFL's Undertaking Was One That It Should Have Recognized As Necessary For The Protection Of Plaintiffs (Prong No. 2) Would Require Interpretation Of The CBAs ......14

      D.    Determining Whether The NFL Acted "Reasonably" (Prong No. 3) Would Require Interpretation Of The CBAs ...........................................16

CONCLUSION....................................................................................................................21

**TABLE OF AUTHORITIES**

**Page**

CASES:

*Allis-Chalmers Corp. v. Lueck,*
  471 U.S. 202 (1985) ........................................................................... 12

*Artiglio v. Corning Inc.,*
  18 Cal. 4th 604 (1998) ....................................................... 9, 10, 11, 12

*Atwater v. National Football League Players Ass'n,*
  626 F.3d 1170 (11th Cir. 2010) ......................................................... 12

*Baker v. City of Los Angeles,*
  188 Cal. App. 3d 902 (1986) ................................................................. 9

*Boogaard v. National Hockey League,*
  126 F. Supp. 3d 1010 (N.D. Ill. 2015) ...................................... 10, 16, 18

*Brown v. Brotman Med. Ctr., Inc.,*
  571 F. App'x 572 (9th Cir. 2014) ....................................................... 16

*Cantwell v. Allegheny Cnty.,*
  483 A.2d 1350 (Pa. 1984) .................................................................. 14

*Caterpillar, Inc. v. Williams,*
  482 U.S. 386 (1987) ............................................................................. 7

*Cramer v. Consolidated Freightways, Inc.,*
  255 F.3d 683 (9th Cir. 2001) ......................................................... 7, 14

*Curtis v. Irwin Indus., Inc.,*
  913 F.3d 1146 (9th Cir. 2019) ............................................................. 8

*Delgado v. Trax Bar & Grill,*
  36 Cal. 4th 224 (2005) ......................................................................... 9

*Dent v. National Football League,*
  902 F.3d 1109 (9th Cir. 2018) ....................................................*passim*
  968 F.3d 1126 (9th Cir. 2020) ....................................................*passim*

*Duerson v. National Football League, Inc.,*
  No. 12-C-2513, 2012 WL 1658353 (N.D. Ill. May 11, 2012) ...... 12, 15, 20

*International Bhd. of Elec. Workers v. Hechler,*
  481 U.S. 851 (1987) ........................................................................... 14

*Jabo v. YMCA of San Diego Cnty.,*
  27 Cal. App. 5th 853, 879 (2018) ........................................................ 9

*Jackson v. AEG Live, LLC,*
  233 Cal. App. 4th 1156 (2015) ............................................................ 8

iv

*Margaret W. v. Kelley R.*,
   139 Cal. App. 4th 141 (2006) ............................................................................................. 9

*Mayall ex rel. H.C. v. USA Water Polo, Inc.*,
   909 F.3d 1055 (9th Cir. 2018) ..................................................................................... 8, 18

*Montador v. National Hockey League*,
   No. 1:15-cv-10989 (N.D. Ill. Nov. 24, 2020), ECF No. 115 ..................................... 13

*N.L.R.B. v. Metlox Mfg. Co.*,
   No. 20,299, 1972 WL 3095 (9th Cir. July 19, 1972) ..................................................... 2
   1973 WL 3146 (9th Cir. Apr. 18, 1973) ......................................................................... 2

*Peredia v. HR Mobile Servs., Inc.*,
   25 Cal. App. 5th 680 (2018) ......................................................................................... 14

*Perugini v. Safeway Stores, Inc.*,
   935 F.2d 1083 (9th Cir. 1991) ...................................................................................... 14

*Santillo v. Chambersburg Eng'g Co.*,
   603 F. Supp. 211 (E.D. Pa. 1985) ................................................................................ 14

*Sherwin v. Indianapolis Colts, Inc.*,
   752 F. Supp. 1172 (N.D.N.Y. 1990) ............................................................................ 20

*Stringer v. National Football League*,
   474 F. Supp. 2d 894 (S.D. Ohio 2007) ........................................................................ 20

*Williams v. National Football League*,
   582 F. 3d 863 (8th Cir. 2009) ................................................................................ 12, 20

**STATUTES:**

29 U.S.C.
   § 185(a) ............................................................................................................................ 7

**OTHER AUTHORITIES:**

Fed. R. Evid. 201(b)-(c) ...................................................................................................... 4

# INTRODUCTION

The Ninth Circuit remanded this case—now narrowed to a single negligence claim and limited to a single "voluntary undertaking" theory—with instructions to consider whether the lone remaining claim is preempted under the LMRA.  The answer is yes:  The complaint is preempted now just as it was in 2014, when this Court first held that Plaintiffs' negligence-based claims required interpretation of the many health and safety provisions of the collective bargaining agreements governing the relationship between the parties.   Applying well-settled precedent, this Court concluded that it would be "impossible" to resolve Plaintiffs' negligence claims without interpreting the extensive CBA provisions governing the medical care to which NFL players are entitled from Clubs and Club physicians—including protections ensuring that treatment and return-to-play decisions implicating player health would be made by physicians *without NFL interference*.  Dkt. No. 106, at 13-14 ("Preemption Order").

Although Plaintiffs changed tack on appeal—obtaining reversal in their first appeal by emphasizing a claim that the *NFL itself* had broken various federal and state drug laws, before explicitly abandoning that theory during their second appeal—their original negligence claims were permeated with allegations that the NFL had voluntarily undertaken duties to Plaintiffs.  Among other things, Plaintiffs sought a declaration that "[t]he NFL voluntarily undertook a duty to act with reasonable care toward" them, Dkt. No. 65 ¶ 279, and argued that whether "the NFL voluntarily under[took] a duty of care" was a question "common" to the class, *id.* at ¶ 265.

Now that Plaintiffs have retreated to the theory that the NFL "voluntarily undertook a duty to its players," TAC at 51 (formatting modified), this Court should again hold the negligence claim preempted.  Simply put, nothing in either *Dent v. National Football League*, 902 F.3d 1109 (9th Cir. 2018) ("*Dent I*"), or *Dent v. National Football League*, 968 F.3d 1126 (9th Cir. 2020) ("*Dent II*"), undermines the Court's original analysis or the conclusion that the negligence claim is preempted. As noted, *Dent I* did not address Plaintiffs' "voluntary undertaking" theory because Plaintiffs then focused on a now-abandoned theory about alleged statutory violations.  And *Dent II* declined to reach LMRA preemption, instead recognizing that this issue again "lurks in the background" with respect to Plaintiffs' surviving theory, and must be resolved on remand.  968 F.3d at 1135, 1136.  This Court

should apply the same analysis that it applied in 2014 to Plaintiffs' refashioned "voluntary undertaking" theory, hold the negligence claim preempted under Section 301 of the LMRA (as numerous other courts have done in holding preempted similar negligence claims against the NFL), and dismiss the TAC with prejudice.

## BACKGROUND

1.  The NFL is an association of 32 Clubs that promotes, organizes, and regulates the sport of professional football in the United States.  Preemption Order at 1-2.  Plaintiffs are former football players who were employed by and played for various NFL Clubs between 1969 and 2008.  TAC ¶¶ 17, 18, 28, 37, 46, 56, 65, 75, 85, 95.  During their playing careers, each Plaintiff was represented by the National Football League Players Association ("NFLPA"), the exclusive bargaining representative of all current and future NFL players.  Dkt. No. 73, Declaration of Dennis L. Curran ("Curran Decl."), *e.g.*, Ex. 6 (1993 CBA) (preamble); Ex. 11 (2011 CBA) (preamble).  The terms and conditions of Plaintiffs' employment were and are governed by collective bargaining agreements ("CBAs") entered into in 1968, 1970, 1977, 1982, 1993, 2006, and/or 2011 (including amendments and extensions).  The CBAs expressly incorporate the NFL Player Contract, as well as the NFL Constitution and Bylaws and the NFL Drug Policy, each of which further prescribes rules, duties, and responsibilities regarding player employment and medical care.  *See, e.g.*, Curran Decl. Ex. 4 (1977 CBA), Art. I § 2; Ex. 5 (1982 CBA), Art. I § 1 & Art. XII § 2; Ex. 6 (1993 CBA), Art. III § 1, Art. IV § 2, Art. XIV §§ 1-4 & App. C, & Art. XLIV § 6.[1]

Under fundamental principles of labor relations, "safety rules" and related terms and conditions of employment are "mandatory subjects of collective bargaining," *N.L.R.B. v. Metlox Mfg. Co.*, No. 20,299, 1972 WL 3095, at *10 (9th Cir. July 19, 1972), *decision supplemented*, 1973 WL 3146 (9th Cir. Apr. 18, 1973), and may be modified only via negotiation between the NFL and the players.  Thus, while the language has changed over time, every CBA expressly addresses player health, safety, and medical care.  Among other significant player protections are those that ensure that "return to play" decisions implicating player health are made only by Club physicians.  *See, e.g.*,

---

[1] The Court took judicial notice of the CBAs in its Preemption Order (at 3).

1   Curran Decl., Ex. 13 (1980 Supplement to the NFL Constitution and Bylaws), Art. XVII ("All

2   determinations of recovery time for major and minor injuries must be by the club's medical staff and

3   in accordance with the club's medical standards.").

4           This Court's Preemption Order (at 7-11) walked through that provision and the many other

5   CBA provisions relating to player medical care and prescription drugs, including how those

6   provisions have evolved since 1968.  The Order recognized that these provisions are primarily aimed

7   at the Clubs, "impos[ing] numerous duties upon the clubs for the protection of the players' health

8   and safety."  *Id.* at 7.  And it recognized that players (including retired players) and the NFLPA may

9   use the CBAs' grievance and arbitration procedures to bring health-and-safety-related claims against

10  the Clubs and the League based on violations of CBA duties.  *See id.* at 17-19.

11          **2.**  Both individual players (including one of the named Plaintiffs) and the NFLPA have

12  brought grievances under the CBAs alleging the same player health concerns at issue in this case.

13  *See* Preemption Order at 19.  In 1995, for example, Plaintiff Richard Dent filed a grievance against

14  his Club alleging "improper" medical care based on his Club's and his Club physician's decision to

15  return him to the field with a "clearly improper purpose" and without the required "written

16  notification of the risk inherent at that time by continued performance."  *Id.*; Dkt. No. 103,

17  Declaration of Daniel Nash ("Nash Decl."), Ex. A (Dent Grievance) at 1-2.

18          As another example, in 2012, the NFLPA brought a grievance regarding the administration

19  of Toradol (one of the medications at issue in this case), asserting that both the NFL and the Clubs

20  were violating the players' CBA-conferred rights to "such medical and hospital care . . . as the Club

21  physician may deem necessary," as well as the right to have Club physicians comply with all local,

22  state, and federal laws.  Curran Decl., Ex. 18, at 2 (*NFLPA v. NFL Clubs & NFLMC (Toradol*

23  *Waivers)*).  And in 2017, the NFLPA—prompted by the allegations raised in the related *Evans v.*

24  *Arizona Cardinals Football Club, LLC* litigation—filed a grievance against the NFL and Clubs

25  accusing the NFL and Clubs of "disregard[ing] . . . explicit CBA requirements as they apply to the

26  proper, legal, medically ethical prescription, dispensing, and transportation of prescription

27  painkillers."  NFL's Rule 28(j) Letter, Ex. A at 3, *Dent I*, No. 15-15143 (9th Cir. May 8, 2017).  The

28  NFLPA alleged that the NFL had violated the CBA by "fail[ing] to meet its duty to use its 'best

3

1    efforts' to ensure that the terms and conditions of the CBA" were followed by Clubs and Club

2    physicians.  *Id.* at 7.[2]

3         **3.**    Plaintiffs filed this suit in 2014, alleging that they had been supplied prescription

4    medications "in order to return players back to the game as quickly as possible instead of allowing

5    them to rest and heal properly from serious football-related injuries."  Dkt. No. 135, at 2.  In their

6    Second Amended Complaint ("SAC"), filed in September 2014, Plaintiffs asserted nine causes of

7    action against the NFL.  Dkt. No. 65 ¶¶ 277-401.  Although the Ninth Circuit recently stated that

8    "Plaintiffs did not *expressly* plead a voluntary undertaking theory of negligence in the version of the

9    complaint that we examined in *Dent I*," *Dent II*, 968 F.3d at 1135 (emphasis added), the SAC was

10   permeated and interwoven with "voluntary undertaking" allegations.  *See, e.g.*, SAC ¶ 147 (alleging

11   a "duty [the NFL] voluntarily assumed to the Plaintiffs and all players"); *id.* ¶ 265 (common

12   questions include "Did the NFL voluntarily undertake a duty of care toward the Class Members?");

13   *id.* ¶ 279 (seeking a declaration that "[t]he NFL voluntarily undertook a duty to act with reasonable

14   care toward the Class Members"); *id.* ¶ 355 ("The NFL undertook the duty to act with reasonable

15   care toward the Class Members.").

16        This Court dismissed the SAC on preemption grounds in December 2014.  The Court held

17   that all of Plaintiffs' negligence- and fraud-based claims were preempted because to "decid[e]

18   whether the NFL has been negligent in policing the clubs and in failing to address medical

19   mistreatment by the clubs, it would be necessary to" analyze various CBA provisions.  Preemption

20   Order at 13.

21        Plaintiffs appealed.  In seeking reversal, Plaintiffs "conceded from the very beginning that

22   . . . negligence [is] the weaker argument" when it comes to preemption.  Oral Arg., *Dent I*, No. 15-

23   15143, 2016 WL 9402289 (Dec. 15, 2016).  Plaintiffs emphasized that "the stronger case [against

24

25        [2] The Court previously granted the NFL's request for judicial notice of the Dent Grievance,
     but denied requests regarding other grievances as moot.  *See* Preemption Order at 3 (court "need not
26   consider" additional grievances).  Because their "accuracy cannot reasonably be questioned," the
     NFL moves the Court to take judicial notice of the existence of, and arguments contained in, the
27   2012 and 2017 NFLPA grievances (but not the truth of any matter asserted therein).  *See* Fed. R.
     Evid. 201(b)-(c) (court may take judicial notice, on motion or *sua sponte*, of any fact that "can be
28   accurately and readily determined from sources whose accuracy cannot reasonably be questioned").

preemption] is clearly with negligence per se, fraud, and fraudulent concealment," and thus urged the Ninth Circuit to read the complaint as having alleged illegal action by the NFL. *Id.* Based on Plaintiffs' "pitch" (Dkt. No. 135 at 2) that the complaint did "not merely alleg[e] that the NFL failed to prevent medication abuse by the teams, but that the NFL *itself* illegally distributed controlled substances," the Ninth Circuit held that the claims were not preempted. *Dent I*, 902 F.3d at 1118. The court remanded for this Court "to determine whether the plaintiffs . . . pleaded facts sufficient to support their negligence claim against the NFL." *Id.* at 1121.

Following remand, Plaintiffs filed their "third and best complaint," asserting a single cause of action for negligence and abandoning the other claims that the Ninth Circuit had reviewed. Besides claiming that the NFL had violated "various federal and state laws," Plaintiffs alleged that "the NFL voluntarily undertook a duty . . . to ensure the proper recordkeeping, administration and distribution of Medications." TAC ¶¶ 304-305; *see id.* at 51 (NFL "voluntarily undertook a duty to its players with regard to the administration of medications") (formatting modified). The NFL moved to dismiss on the ground that Plaintiffs had failed to adequately plead a negligence claim, and this Court granted the motion.

As most relevant here, the Court first explained that Plaintiffs' primary theory (negligence per se) failed because they "d[id] not allege that the NFL *itself* violated the relevant drug laws and regulations governing the medications at issue," Dkt. No. 135 at 7—a point that Plaintiffs conceded on appeal. *See* Oral Arg., *Dent II*, No. 19-16017, 2020 WL 2750880 (Mar. 15, 2020) ("I don't think they [the NFL] violated the statutes."). The Court then held that Plaintiffs had failed to adequately plead their alternative "voluntary undertaking" negligence theory because they had "not specifically alleged how the NFL's conduct *increased* the risk of harm to plaintiffs"; nor had they alleged "any specific facts as to their reasonable reliance on the NFL's supposed assumption of duty or their suffering injury as a result of the NFL's conduct." Dkt. No. 135, at 13.[3]

---

[3] This Court also agreed with the NFL's argument that Plaintiffs had failed to adequately plead that the NFL owed a duty to Plaintiffs due to a "special relationship"—a holding the Ninth Circuit affirmed. *See Dent II*, 968 F.3d at 1135.

1   The Ninth Circuit affirmed in part.  The court agreed that without "facts that tether the alleged

2   statutory violations to any concrete actions of the NFL," Plaintiffs' negligence per se theory failed.

3   *Dent II*, 968 F.3d at 1131.  Indeed, the court recognized that "[b]y *Plaintiffs' own admission*"—and

4   contrary to the primary theory Plaintiffs had pressed on appeal and after remand in *Dent I*—"the

5   Club doctors and trainers appear to be the only relevant actors purportedly in violation of statutory

6   requirements."  *Id.* (emphasis added).  The Ninth Circuit thus affirmed this Court's dismissal of the

7   negligence per se theory.

8   But the Ninth Circuit disagreed with this Court on the sufficiency of Plaintiffs' voluntary

9   undertaking allegations.  The court explained that "the TAC paints a picture of the NFL's 'mandated'

10   and 'required' audits, oversight, and procedures regarding drug distribution across member Clubs,

11   as well as the NFL's failure to enforce rules that it knows are necessary to avoid further injury to

12   players."  *Dent II*, 968 F.3d at 1133-1134.  According to the Ninth Circuit, "[t]hese allegations

13   support Plaintiffs' theory that the NFL undertook 'the duty of overseeing [the] administration' of the

14   distribution of pain medications to players and is aware that it should be providing protections."  *Id.*

15   at 1134 (second alteration in original).  The Ninth Circuit further concluded that Plaintiffs had

16   sufficiently alleged breach because the NFL (purportedly) could "promulgate rules or guidelines that

17   could improve safety for players across the league."  *Id.*  And with claims that the "wrongful

18   administration of Medications" worsened Plaintiffs' injuries, the Ninth Circuit held that the TAC had

19   adequately alleged that the breach increased Plaintiffs' risk of physical harm.  *Id.* at 1134-1135.  The

20   Ninth Circuit thus determined that Plaintiffs' voluntary undertaking theory could survive a motion

21   to dismiss for failure to state a claim.  *Id.* at 1135.

22   In reversing and remanding, however, the Ninth Circuit opted not to address whether

23   Plaintiffs' "voluntary undertaking negligence claim . . . requires interpretation of the [CBAs]."  *Dent*

24   *II*, 968 F.3d at 1135.  "[R]ecogniz[ing] that the issue of § 301 preemption under the LMRA lurks in

25   the background," and that the Ninth Circuit (unlike this Court) did "not have all potentially relevant

26   CBAs before" it, the Ninth Circuit left the question whether the claim is preempted by the LMRA to

27   be addressed on remand.  *Id.*

28

DEF.'S MOTION TO DISMISS THIRD AMENDED COMPLAINT                    Case No.: 3:14-cv-02324-WHA

**PLAINTIFFS' ONLY REMAINING CAUSE OF ACTION IS PREEMPTED**

Because resolving Plaintiffs' voluntary assumption cause of action would require interpretation of the CBAs, the claim is preempted by Section 301 of the LMRA.  Accordingly, the TAC should be dismissed with prejudice.[4]

A.      **Legal Standards**

Section 301 of the LMRA governs "[s]uits for violation of contracts between an employer and a labor organization[.]" 29 U.S.C. § 185(a).  It "has been interpreted as 'a congressional mandate to the federal courts to fashion a body of federal common law to be used to address disputes arising out of labor contracts.'" *Dent I*, 902 F.3d at 1116.  Because Section 301 is supposed to "protect the primacy of grievance and arbitration as the forum for resolving CBA disputes and the substantive supremacy of federal law within that forum," the section "preempts state-law claims founded directly on rights created by collective-bargaining agreements, and also claims substantially dependent on analysis of a collective-bargaining agreement." *Id.* (internal quotation marks omitted) (citing *Caterpillar, Inc. v. Williams*, 482 U.S. 386, 394 (1987)).  Thus, Section 301 preempts and requires dismissal of any claim that "necessarily requires the court to interpret an existing provision of a CBA that can reasonably be said to be relevant to the resolution of the dispute." *Cramer v. Consolidated Freightways, Inc.*, 255 F.3d 683, 693 (9th Cir. 2001) (en banc).

To determine whether a state-law claim is preempted by Section 301, courts determine "whether litigating the state law claim . . . requires interpretation of a CBA." *Dent I*, 902 F.3d at 1116.  Needing to "consider, refer to, or apply" the CBA is insufficient. *Id.* (internal quotation marks omitted).  There must be "an active dispute over the meaning of contract terms. . . . A *hypothetical* connection between the claim and the terms of the CBA is not enough to preempt the claim[.]" *Id.*

---

[4] In its 2018 motion, the NFL alternatively sought dismissal on the ground that Plaintiffs' claims are time-barred under California's two-year statute of limitations, given that all Plaintiffs retired at least six years before they filed suit.  Dkt. No. 121, at 13-18.  In light of its holdings under Rule 12(b)(6), however, the Court concluded that "it need not and d[id] not reach the NFL's statute of limitations argument."  Dkt. No. 135, at 15 n.4.  The NFL requests the opportunity to renew its statute of limitations argument in the event that this motion is denied.

1  But if "establishing the elements of the claim" necessitates CBA interpretation, then the claim is

2  preempted.  *Id.* at 1117.

3          In California, "the negligent undertaking doctrine is not favored in the law," *Jackson v. AEG*

4  *Live, LLC*, 233 Cal. App. 4th 1156, 1176 (2015), because it imposes tort liability on those who

5  voluntarily try to protect others.[5]  Sometimes referred to as the "good Samaritan" rule, the doctrine

6  requires a plaintiff to allege that:

7              (1) an actor undertook to render services to another; (2) . . . of a kind the actor should
             have recognized as necessary for the protection of [the plaintiff]; (3) the actor failed
8              to exercise reasonable care in the performance of the undertaking; (4) the failure . . .
             resulted in physical harm to the [plaintiff]; and (5) . . . the actor's carelessness
9              increased the risk of such harm[.]

10  *Dent II*, 968 F.3d at 1132 (alterations in original) (quoting *Mayall ex rel. H.C. v. USA Water Polo,*

11  *Inc.*, 909 F.3d 1055, 1066 (9th Cir. 2018)).  *Dent II* relied on *Mayall*, which analyzed whether

12  plaintiffs had stated a claim for voluntary undertaking in the context of the rules of a youth water

13  polo association—not in the context of unionized workers suing their employer over mandatory

14  subjects of collective bargaining—and therefore had no occasion to address whether the claim was

15  preempted by Section 301 of the LMRA.

16          Unlike the relationship between the association and the youth participants in *Mayall*, the

17  relationship between the NFL, the Clubs, and the Clubs' player-employees has long been governed

18  by a series of CBAs allocating health-and-safety rights and responsibilities among the various

19  parties.  As we demonstrate below, with the exception of the "purely factual" causation factors

20  (Prong Nos. 4 and 5), *Dent I*, 902 F.3d at 1119, the voluntary undertaking factors are all

21  "substantially dependent on analysis of the CBA[s]," *Curtis v. Irwin Indus., Inc.*, 913 F.3d 1146,

22  1153 (9th Cir. 2019) (alteration omitted).  Accordingly, like the many negligence claims brought

23  against the NFL held preempted by courts around the country, Plaintiffs' remaining claim is

24  preempted.

25  

26          [5] Because Plaintiffs have never specified what law applies to their claims, the NFL (like the
    Ninth Circuit) continues to analyze the law under California's version of the "good Samaritan" rule
27  at this stage of the proceedings.  *Dent II*, 968 F.3d at 1130 n.2; *Dent I*, 902 F.3d at 1117 n.4.  If
    Plaintiffs' claim survives preemption, each will need to establish which state's law appropriately
28  applies to him.

### B. Determining The Scope Of The NFL's Alleged Undertaking (Prong No. 1) Would Require Interpretation Of The CBAs

In deciding whether the NFL "undertook to render services to another," *Dent II*, 968 F.3d at 1132, this Court will need to assess "precisely what it was that the defendant undertook to do," *Artiglio v. Corning Inc.*, 18 Cal. 4th 604, 615 (1998). "The foundational requirement of the good Samaritan rule is that in order for liability to be imposed upon the actor, he must *specifically* have undertaken to perform the task that he is charged with having performed negligently," because "without the actual assumption of the undertaking there can be no correlative duty to perform that undertaking carefully." *Id.* at 614-615 (emphasis added). California courts thus apply the voluntary undertaking doctrine narrowly, limiting "the scope of any duty assumed" based "upon the nature of the undertaking." *Delgado v. Trax Bar & Grill*, 36 Cal. 4th 224, 249 (2005); *see Margaret W. v. Kelley R.*, 139 Cal. App. 4th 141, 163 (2006) ("The scope of any assumed duty must be measured by what respondent actually undertook to do."); *see also Baker v. City of Los Angeles*, 188 Cal. App. 3d 902, 907 (1986) ("The duty of a 'good Samaritan' is limited.").

Although the question of what the defendant actually did may present a factual question, whether a defendant's "alleged actions, if proven, would constitute an 'undertaking' sufficient . . . to give rise to an actionable duty of care is a legal question for the court." *Artiglio*, 18 Cal. 4th at 615. Resolving that question would require the court to determine whether, and to what precise extent, defendant undertook a duty to the plaintiff. *See, e.g.*, *Margaret W.*, 139 Cal. App. 4th at 163 (noting that defendant, in "[h]iring a security guard for a particular assignment[,] does not undertake a general duty to protect invitees") (citing *Delgado*, 36 Cal. 4th at 249-250)); *Jabo v. YMCA of San Diego Cnty.*, 27 Cal. App. 5th 853, 879 (2018) ("[E]nact[ing] and implement[ing] . . . [automatic external defibrillator] rules and policies" is not "an undertaking of such breadth and magnitude as to create a duty . . . to ensure the safety of all adult users of the soccer field at all times it was in use[.]") (internal quotation marks omitted).

As a threshold matter, only two of the actions upon which Plaintiffs rely as evidence of the alleged voluntary undertaking—the prescription drug oversight program and the League's audits—were even in existence before the last of the Plaintiffs retired in 2008. TAC ¶¶ 159-163. All of the

9

1  other alleged actions, including funding studies on Toradol use and "mandat[ing] procedures to

2  control the drug distribution system," occurred after 2010—at least two years after the last Plaintiff

3  retired. *Id.* ¶¶ 164-182. When considering what "precisely" the League "undertook to do" for the

4  benefit of Plaintiffs and whether CBA interpretation is necessary for that determination, such post-

5  2008 activities are irrelevant. *Artiglio*, 18 Cal. 4th at 615.

6      In any event, no matter which individual acts this Court considers, the Court cannot determine

7  what duty the NFL *specifically undertook* towards the Plaintiffs without interpreting the CBAs. In

8  *Boogaard v. National Hockey League,* the district court considered whether federal law preempted

9  claims similar to those alleged here: that the NHL "breached its voluntarily undertaken duty to

10 protect [plaintiff's] health by failing to" "protect [plaintiff] from brain trauma" and "prevent team

11 doctors from injecting him with Toradol." 126 F. Supp. 3d 1010, 1018 (N.D. Ill. 2015). The court

12 found those claims "preempted because they would require the court to interpret the 2005 CBA to

13 determine the scope of any duty that the NHL had actually assumed." *Id.*

14     Plaintiffs' negligence claim is preempted for similar reasons. As in *Boogaard*, Plaintiffs here

15 are alleging the NFL undertook a broad duty to its players based on specific acts. 126 F. Supp. 3d

16 at 1019. Plaintiffs point to the NFL's audits, oversight, and similar actions as evidence that it

17 "undertook a duty to 'ensure the proper recordkeeping, administration and distribution of

18 Medications'" for the ultimate "protect[ion] [of] players." *Dent II*, 968 F.3d at 1132 (quoting TAC

19 ¶ 305). But to determine whether and to what extent the NFL undertook such a duty, the Court would

20 need to "consider[] all of the [NFL]'s relevant acts"—including the "hyper-specific commitments

21 . . . made in the CBA[s]." *Boogaard*, 126 F. Supp. 3d at 1019. Like the NHL, the NFL "spent years

22 bargaining with" its players' union and ultimately agreed to "document[s] exhaustively detailing

23 each party's specific obligations to the others." *Id.* The Court's Preemption Order confirms in detail

24 (at 7-11) that the CBAs and related documents specify the commitments that the Clubs and the NFL

25 already made in writing with respect to player medical care. For example:

26 • The home team must provide a physician for medical care of visiting players. Curran
   Decl., Ex. 12 (1971 Constitution and Bylaws), Art. XIX.

27

28 • Each Club is required to "have a board-certified orthopedic surgeon as one of its club
   physicians" and to bear "[t]he cost of medical services rendered by Club physicians."

10

*E.g. id.*, Ex. 5 (1982 CBA), Art. XXXI §1; Ex. 6 (1993 CBA), Art. XLIV § 1; Ex. 10 (2006 CBA), Art. XLIV § 1; Ex. 11 (2011 CBA), Art. 39 § 1.

- Club physicians must conduct a "standardized minimum pre-season physical examination" of each player. *E.g.*, *id.*, Ex. 5 (1982 CBA), Art. XXXI § 5; *see also* Ex. 6 (1993 CBA), Art. XLIV § 5; Ex. 10 (2006 CBA), Art. XLIV § 5; Ex. 11 (2011 CBA), Art. 39 § 6.

- If a player "is injured in the performance of his services under this contract and promptly reports such injury to the Club physician or trainer, then the Player will receive such medical and hospital care during the term of this contract as *the Club physician* may deem necessary[.]" *Id.*, Exs. 6-11 (Player Contract, ¶ 9) (emphasis added).

- "All determinations of recovery time for major and minor injuries must be made by *the club's* medical staff and in accordance with *the club's* medical standards." *Id.*, Ex. 13, Art. XVII (emphases added).

- "If a Club physician advises a coach or other Club representative of a player's physical condition which adversely affects the player's performance or health, *the physician* will also advise the player." *Id.*, Ex. 6 (1993 CBA), Art. XLIV § 1 (emphasis added); *see also* Ex. 5 (1982 CBA), Art. XXXI § 1; Ex. 10 (2006 CBA), Art. XLIV § 1; Ex. 11 (2011 CBA), Art. 39 § 1(c).

- If a "condition could be significantly aggravated by continued performance, *the physician* will advise the player of such fact in writing before the player is again allowed to perform on-field activity." *Id.*, Ex. 6 (1993 CBA), Art. XLIV § 1 (emphasis added); *see also* Ex. 5 (1982 CBA), Art. XXXI § 1; Ex. 10 (2006 CBA), Art. XLIV § 1; Ex. 11 (2011 CBA), Art. 39 § 1(c).

- "The parties agree that it is the responsibility of everyone in the industry to treat, care for and eliminate chemical dependency problems of players." Ex. 5 (1982 CBA), Art. XXXI § 6.

- Parties to the CBAs must "deter and detect substance abuse" and "offer programs of intervention, rehabilitation, and support to players who have substance abuse problems." *Id.*, Ex. 6 (1993 CBA), Art. XLIV § 6; Ex. 10 (2006 CBA), Art. XLIV § 6.

- The abuse of prescription drugs is prohibited, and each Club must designate a "Team Physician for Substance Abuse" to monitor players' involvement and treatment in the Program for Substances of Abuse. *See, e.g.*, *id.*, Ex. 14 (1997 Policy and Program for Substances of Abuse) at I.A.4.

- Each Club physician owes his or her "primary duty in providing player medical care . . . not to the Club but instead to the player-patient;" is "required to disclose to a player any and all information about the player's physical condition" that the physicians disclose to coaches or other team representatives ("whether or not such information affects the player's performance or health"); and must "comply with all federal, state, and local requirements, including all ethical rules and standards." *Id.*, Ex. 11 (2011 CBA), Art. 39 § 1(c).

These CBA obligations are plainly relevant to ascertaining "precisely" what the NFL voluntarily "undertook to do." *Artiglio,* 18 Cal. 4th at 615. As this Court explained on the first go-

1   round, "because the CBAs expressly and repeatedly allocate so many health-and-safety duties to the

2   clubs" and Club physicians, "the CBAs can fairly be interpreted, by implication, to negate any such

3   duty at the league level."  Preemption Order at 14.  That interpretation bears directly on the legal

4   question of whether the NFL's alleged actions "constitute an 'undertaking' sufficient . . . to give rise

5   to an actionable duty of care."  *Artiglio*, 18 Cal. 4th at 615.  "Even if this interpretation were

6   ultimately rejected, it is a fair one and that is sufficient for Section 301 preemption."  Preemption

7   Order at 14; *see, e.g.*, *Williams v. National Football League*, 582 F. 3d 863, 881 (8th Cir. 2009)

8   ("[W]hether the NFL or the individual defendants owed the Players a duty to provide . . . a [particular]

9   warning cannot be determined without examining the parties' legal relationship and expectations as

10  established by the CBA and the [relevant] Policy.").

11          Even if this Court were to find that the CBA provisions quoted above cannot fairly be

12  interpreted to *negate* health-and-safety duties at the League level, "in determining the scope of any

13  duty the NFL owed Plaintiffs (which is part of Plaintiffs' affirmative case), [the Court] would . . .

14  still have to consult the CBA to determine the scope of the legal relationship between the Plaintiffs

15  and the NFL."  *Atwater v. National Football League Players Ass'n*, 626 F.3d 1170, 1182 (11th Cir.

16  2010); *see, e.g.*, *Duerson v. National Football League, Inc.*, No. 12-C-2513, 2012 WL 1658353, at

17  *4 (N.D. Ill. May 11, 2012) (explaining that it could "plausibly interpret those [health and safety]

18  provisions to impose a duty on the NFL's clubs to monitor a player's health and fitness to continue

19  to play football," which "would tend to show that the NFL could reasonably rely on the clubs to

20  notice and diagnose player health problems," and the "NFL could then reasonably exercise a lower

21  standard of care in that area itself").  And "questions relating to what the parties to a labor agreement

22  agreed, and what legal consequences were intended to flow from breaches of that agreement, must

23  be resolved by reference to uniform federal law."  *Allis-Chalmers Corp. v. Lueck*, 471 U.S. 202, 211

24  (1985).

25          The Ninth Circuit did not address this reasoning in *Dent I*.  Instead, it viewed the CBAs'

26  allocation of duties pertaining to medical care as "irrelevant" due to Plaintiffs' (since-abandoned)

27  theory that the NFL itself was "violating the law," *i.e.*, federal and state drug statutes.  *Dent I*, 902

28  F.3d at 1121.  That is, because "liability for a negligence claim alleging violations of federal and

1   state statutes does not turn on how the CBAs allocated duties among the NFL, the teams, and the

2   individual doctors," it did not matter "what (if anything) the CBAs say about those issues"—for "if

3   the NFL had any role in distributing prescription drugs, it was required to follow the laws regarding

4   those drugs." *Id.*; *see, e.g.*, *id.* ("The parties to a CBA cannot bargain for what is illegal.").  But this

5   case no longer concerns allegations that the NFL violated a statute or did anything illegal; indeed,

6   Plaintiffs themselves now concede that the NFL did not "violate[] the statutes." Oral Arg., *Dent II*,

7   No. 19-16017, 2020 WL 2750880; *see Dent II*, 968 F.3d at 1131 (NFL did not violate statutory

8   requirements "[b]y *Plaintiffs' own admission*") (emphasis added).[6]   Accordingly, this Court's

9   original conclusion continues to apply with full force. *See* Order at 10, *Montador v. National Hockey*

10  *League*, No. 1:15-cv-10989 (N.D. Ill. Nov. 24, 2020), ECF No. 115 (holding similar "voluntary

11

12

---

13   [6] Here is the relevant colloquy between the Ninth Circuit and Plaintiffs' counsel:

14   JUDGE:             Let's take your allegations, 18 of them.  Name your best one
15                      of those allegations, which would suggest that [the NFL]
                        violated the statutes in doing what they did.

16   MR. SINCLAIR:      You -- your Honor, I . . .

17   JUDGE:             That's the only thing you've alleged, a violation of the statute.

18   MR. SINCLAIR:      Yeah, I, I -- and that . . .

19   JUDGE:             And it's an assumption of a duty[,] but violating the statute is
20                      what you've alleged.

21   MR. SINCLAIR:      We, we have . . .

22   JUDGE:             So what did they do?

23   MR. SINCLAIR:      *I, I don't think they violated the statutes*, and I don't think
24                      we've only pled that they violated the statutes.  I recognized
                        we did plead that they violated the statutes.

25   JUDGE:             Well, where did you plead other than that they violated the
                        statutes?

26   MR. SINCLAIR:      Paragraph 305.

27   Oral Arg., *Dent II*, No. 19-16017, 2020 WL 2750880 (emphasis added); *see* TAC ¶ 305 ("[T]o the
28   extent the NFL voluntarily undertook a duty apart from those identified above to ensure the proper
     recordkeeping, administration and distribution of Medications, it breached that duty.").

1    undertaking" negligence claim preempted, and distinguishing *Dent I* as involving allegations that the

2    NFL distributed drugs "in violation of state and federal laws").

3          In sum, the CBA provisions set forth above prescribe collectively bargained duties that were

4    "accepted by each of the parties and the scope of those duties." *International Bhd. of Elec. Workers*

5    *v. Hechler*, 481 U.S. 851, 860 (1987).  It would be "impossible" to determine the scope of any

6    specific voluntary undertaking by the NFL without interpreting those provisions.  Preemption Order

7    at 13.  Because "[t]his line of interpretation has a 'reasonable level of credibility,'" at least, "that

8    alone is enough to trigger preemption." *Id.* at 14 (quoting *Cramer*, 255 F.3d at 692).

9       **C.    Determining Whether The NFL's Undertaking Was One That It Should Have
         Recognized As Necessary For The Protection Of Plaintiffs (Prong No. 2) Would
10       Require Interpretation Of The CBAs**

11        For similar reasons, without interpreting the CBAs, this Court cannot decide whether the

12   NFL's alleged undertaking was one that the NFL "should have recognized as necessary for the

13   protection of" Plaintiffs.  This prong "is essentially a requirement of foreseeability." *Santillo v.*

14   *Chambersburg Eng'g Co.*, 603 F. Supp. 211, 214 (E.D. Pa. 1985) (cited by *Peredia v. HR Mobile*

15   *Servs., Inc.*, 25 Cal. App. 5th 680, 697 (2018)).  It asks whether the NFL, in undertaking the alleged

16   services, "should have foreseen that [its] actions were necessary" to protect players. *Cantwell v.*

17   *Allegheny Cnty.*, 483 A.2d 1350, 1354 (Pa. 1984) (analyzing requirements for voluntary undertaking

18   cause of action under section 324A of Restatement (Second) of Torts).  And the Ninth Circuit has

19   previously found CBA provisions "relevant to the question whether the harm to [plaintiff] caused by

20   [employer's and union's] failure . . . was foreseeable." *Perugini v. Safeway Stores, Inc.*, 935 F.2d

21   1083, 1089 (9th Cir. 1991).

22        Through extensive negotiations, the League and the NFLPA agreed in the CBAs on the

23   measures that they recognized as necessary for the protection of NFL players, including with respect

24   to medication use and abuse.  *See* Preemption Order at 7 ("The league has taken many steps to address

25   the issue of player medical care by imposing on the clubs detailed provisions in numerous collective-

26   bargaining agreements between the players' union and the NFL from 1968 onward.").  Besides

27   imposing duties on the Club physicians to advise players of physical conditions that will adversely

28   affect their health and to offer whatever medical and hospital care during the players' contracts that

1  the Club physicians may deem necessary, *supra* p. 11, the CBAs also (for example) afford players

2  the right to a second medical opinion, as well as the right to have medical care provided at the Club's

3  expense by a surgeon of the player's choice. *E.g.*, Curran Decl., Ex. 5 (1982 CBA), Art. XXXI § 3;

4  Ex. 6 (1993 CBA), Art. XLIV § 3; Ex. 10 (2006 CBA), Art. XLIV § 3; Ex. 11 (2011 CBA), Art. 39

5  § 4.  The 1982 CBA established a Chemical Dependency Program, noting "that it is the responsibility

6  of everyone in the industry to treat, care for and eliminate chemical dependency problems of

7  players."  Ex. 5 (1982 CBA), Art. XXXI § 6.  Following suit, the 1997 Policy and Program for

8  Substances of Abuse sets forth multiple provisions delegating responsibility for detecting and

9  treating substance abuse among the NFLPA, the NFL, the Clubs, and various medical professionals

10  appointed under the terms of the Policy.  *See, e.g.*, *id.*, Ex. 14 (1997 Policy and Program for

11  Substances of Abuse) I.A.6, I.C.2, I.A.2, I.A.3, I.A.4.  And if a given Club's medical care is

12  insufficient, Plaintiffs' union has the "right to commence an investigation before the Joint Committee

13  [on Player Safety and Welfare.]"  *Id.*, Ex. 9 (2002 Am. to 1993 CBA), Art. XIII § 1(d); Ex. 10 (2006

14  CBA), Art. XIII § 1(d); Ex. 11 (2011 CBA), Art. 50 § 1(d); *see also* Ex. 11 (2011 CBA), Art. 39

15  § 3(a) (establishing an NFL-NFLPA "Accountability and Care Committee, which will provide

16  advice and guidance regarding the provision of preventive, medical, surgical, and rehabilitative care

17  for players by all clubs during the term of" the CBA).

18        It would be "reasonable" for the NFL to view the specifically bargained-for provisions as

19  sufficient for Plaintiffs' protection, such that the NFL's alleged actions were not ones the NFL

20  "should have recognized as necessary for" Plaintiffs' protection. *Dent II*, 968 F.3d at 1132.  Indeed,

21  "[a] court could plausibly interpret those provisions to impose a duty *on the NFL's clubs* to monitor

22  a player's health and fitness to continue to play football." *Duerson*, 2012 WL 1658353, at *4

23  (emphasis added); *see also* Curran Decl., Ex. 20 (*Maxwell v. National Football League*) at 1-2 ("The

24  CBA places primary responsibility for identifying . . . physical conditions on the team physicians,"

25  and thus those "provisions of the CBA must be taken into account in determining the degree of care

26  owed by the NFL.").  "If that interpretation were to prevail, . . . it would tend to show that the NFL

27  could reasonably rely on the clubs" and their physicians to appropriately treat the players in their

28  care, *Duerson*, 2012 WL 1658353, at *4—or perhaps that the NFL could rely on the players' personal

15

doctors, other medical professionals appointed under the 1997 Policy and Program for Substances of Abuse, or the NFLPA—regardless of any additional actions that the NFL may have voluntarily undertaken for other reasons.  Each of those interpretations, even if "ultimately rejected, . . . is a fair one and that is sufficient for Section 301 preemption."  Preemption Order at 14.  Thus, determining whether the NFL "should have recognized" that any voluntary undertaking was "necessary for the protection" of the players would require CBA interpretation as well.

### D.   Determining Whether The NFL Acted "Reasonably" (Prong No. 3) Would Require Interpretation Of The CBAs

Even if the Court could conclude that the NFL specifically undertook a duty it felt was necessary to protect Plaintiffs despite—but without interpreting—the duties outlined in the CBAs, the fact that the CBAs placed responsibility for players' health and medical care on the Clubs would still bear on whether the NFL acted *reasonably*.  *See Brown v. Brotman Med. Ctr., Inc.*, 571 F. App'x 572, 576 (9th Cir. 2014) (preemption appropriate when CBA interpretation required "to determine the standard of care that [the defendant] agreed to assume and, in turn, whether [its] actions violated that duty").

First, to determine whether the NFL acted reasonably, the Court would need to consider what the NFL *could* do.  Read together, various CBA provisions "could plausibly be taken to provide that teams [and their physicians] were free to develop their own 'medical standards' for" administering medications and returning players to the field "*without* the [League]'s interference."  *Boogaard*, 126 F. Supp. 3d at 1020 (emphasis added).  Since 1980, the NFL Constitution and Bylaws, which are expressly incorporated by reference in every CBA,[7] have required *Club medical personnel* to decide the amount of recovery time needed by a given injured player.  *See* Curran Decl., Ex. 13 (1980 Supplement to the NFL Constitution and Bylaws), Art. XVII ("All determinations of recovery time for major and minor injuries must be by the club's medical staff and in accordance with the club's medical standards."); Curran Decl. at 2, ¶ 13 (noting 1980 Supplement "has been an operative

---

[7] Curran Decl., Ex. 4 (1977 CBA), Art. I § 2 (The provisions of the NFL Constitution and Bylaws "pertaining to terms and conditions of employment of NFL players . . . , which are not superseded by this Agreement, will remain in full force and effect for the continued duration of this Agreement, and, where applicable, all players, clubs, the NFLPA, the NFL, and the Management Council will be bound thereby.").

1  provision of every NFL Constitution and Bylaws since 1980").  Since 1982, the CBAs have required

2  Clubs to maintain a comprehensive program to "treat, care for and eliminate chemical dependency

3  problems of players" and to evaluate players, on reasonable cause, for chemical abuse or dependency

4  problems.  *E.g.*, *id.*, Ex. 5 (1982 CBA), Art. XXXI § 6.  Since 1993, Club physicians have had the

5  authority (and duty) to determine the scope of player medical care.  *Id.*, Exs. 6-11 (Player Contract

6  ¶ 9) ("Player will receive such medical and hospital care . . . as the Club physician may deem

7  necessary.").  The CBAs have long required Club physicians to provide notice to players "in writing"

8  whenever *the physicians* determine that a player's "condition could be significantly aggravated by

9  continued performance."  *Id.*, Ex. 6 (1993 CBA), Art. XLIV § 1; *see also* Ex. 5 (1982 CBA), Art.

10 XXXI § 1; Ex. 10 (2006 CBA), Art. XLIV § 1; Ex. 11 (2011 CBA), Art. 39 § 1(c).  Further, the

11 CBAs have allocated investigatory authority over Club medical practices to the collectively

12 bargained-for Joint Committee on Player Safety and Welfare.  *Id.*, Ex. 9 (2002 Am. to 1993 CBA),

13 Art. XIII § 1(d); Ex. 10 (2006 CBA), Art. XIII § 1(d); Ex. 11 (2011 CBA), Art. 50 § 1(d).  And since

14 2011, the CBAs have made explicit that "all Club physicians and medical personnel" are required to

15 "comply with all federal, state, and local requirements, including all ethical rules and standards."

16 Ex. 11 (2011 CBA), Art. 39, § 1(c).[8]

17      Those provisions exist for good reason.  Take some of the longest standing mandates:  that

18 "[a]ll determinations of recovery time for major and minor injuries must be by the *club's medical*

19 *staff and in accordance with the club's medical standards*," Curran Decl., Ex. 13 (1980 Supplement

20 to the NFL Constitution and Bylaws), Art. XVII (emphasis added), and that Club physicians must

21 warn players "in writing" of return-to-play decisions that could harm them, *see id.*, Ex. 6 (1993

22 CBA), Art. XLIV § 1.  These and many other collectively bargained-for provisions are explicitly

23 designed to protect injured players from undue influence by Club coaching staffs, Club front offices,

24 and the League.  Put differently, they are supposed to prevent exactly what Plaintiffs alleged occurred

25

26     [8] In its 2017 grievance, the NFLPA argued that the NFL was bound to ensure that the parties

27 followed this provision based on the "best efforts" clause in the CBA.  *See* Ex. 11 (2011 CBA), Art. II § 2 ("The parties will use their best efforts to faithfully carry out the terms and conditions of this

28 Agreement and to see that the terms and conditions of this Agreement are carried out in full by players and Clubs.").

here:  the implementation of a "return to play business plan" focused on "returning players to the game as soon as possible" at the expense of their health.  TAC ¶¶ 1-2.  Since at least 1980, for the good of the players, Club physicians have made all return-to-play decisions, and the NFL has had no authority to interfere with such decisions by, for example, dictating Club medical protocols.  To be sure, the NFL has long played specific roles related to player medication use—but those roles are set forth in writing and developed through collective bargaining.  *See*, *e.g.*, Curran Decl., Ex. 14 (CBA-incorporated Drug Policies regarding performance enhancing drugs).

In light of the specific allocation of those responsibilities to Clubs and Club physicians, it is at least reasonable to interpret the CBAs as "prevent[ing] [the NFL] from imposing" and unilaterally enforcing protocols related to the on-field administration of medications and return-to-play decisions.  *Boogaard*, 126 F. Supp. 3d at 1020.  Accordingly, unlike defendants in *Mayall*, who "regulate[d] . . . the enactment of rules regarding player safety and health" and were required under their own bylaws "to ensure proper safety precautions have been taken to protect the personal welfare of the athletes," 909 F.3d at 1067, "the [NFL] likely could not be found to have" acted negligently in failing to unilaterally mandate new safety rules or guidelines, *Boogaard*, 126 F. Supp. 3d at 1020.  After all, the League could hardly have acted unreasonably for failing to do what it could not do.  Yet failing to "promulgate rules or guidelines that could improve safety for players across the league" is the exact "breach alleged by Plaintiffs."  *Dent II*, 968 F.3d at 1134; *see* TAC ¶¶ 213-214 (alleging that, despite awareness of legal violations by the Clubs, "there is no follow up from the League" and "the League did nothing").  That is not to say that this Court needs "to run to ground the question whether the [NFL] has in fact correctly read" the above CBA provisions.  *Boogaard*, 126 F. Supp. 3d at 1020.  Instead, "the point is that the [NFL]'s reading is, at a minimum, plausible and arguable, which means that ascertaining the" reasonableness of the NFL's actions "would require interpreting the CBA[s]."  *Id.* at 1020-1021.

Second, to determine if the NFL was acting reasonably, the Court would need to consider not only what the NFL *could* do but what the NFL *did* do.  This Court explained before:  "The league has taken many steps to address the issue of player medical care by imposing on the clubs detailed provisions in numerous collective-bargaining agreements between the players' union and the NFL

1    from 1968 onward." Preemption Order at 7. Those Club duties were imposed "for the protection of

2    the players' health and safety." *Id.* As demonstrated by the provisions' "scope and development[,]

3    . . . this is not a situation in which the NFL has stood by and done nothing." *Id.* at 11. To be clear,

4    this does not mean that imposing these duties on the Clubs somehow "cancel[s] out" a careless act

5    by the NFL. *Dent I*, 902 F.3d at 1121. Rather, it means that where Plaintiffs allege that the NFL

6    was negligent for not doing enough—as opposed to doing something illegal—this Court will need

7    to consider what is "enough" in light of the specific NFL commitments set forth in the CBAs. The

8    Court can do that only after understanding what the NFL has actually agreed to in the CBA.

9           If there were any doubt whether resolving Plaintiffs' claims would require CBA

10   interpretation, the grievances filed by NFL players and the NFLPA dispel it. Unions and employees

11   file grievances to address violations of collectively bargained terms, and for decades, grievances

12   have been filed against the NFL and its Clubs alleging CBA violations for conduct similar to that

13   alleged here. *See* Nash Decl., Ex. A; Curran Decl., Exs. 17-18. For example, as this Court previously

14   recognized, "named Plaintiff Richard Dent filed a grievance against the San Francisco 49ers in 1995,

15   alleging many of the same abuses plaintiffs allege here." Preemption Order at 19; *see* Nash. Decl.,

16   Ex. A (Dent Grievance). Specifically, Dent alleged that his Club chose to "return[] Mr. Dent to

17   performance (i.e., football activity)" with a "clearly improper purpose" and without "written

18   notification of the risk inherent at that time by continued  performance"—and thus in a manner that

19   was "violative of the rights afforded Mr. Dent under his Contract and the 1993 [CBA]." Nash Decl.,

20   Ex. A at 1-2.

21          More recently, the NFLPA filed a grievance in 2012 setting forth the NFLPA's "position"

22   regarding the various CBA obligations of the NFL, the Clubs, and Club physicians related to the

23   administration of prescription drugs like Toradol—including that all decisions regarding

24   "unacceptable medical risk" and "long-term effects" of Toradol use must be made by the "Club

25   physician." Curran Decl., Ex. 18, at 2. And in 2017, the NFLPA, prompted by the allegations from

26   the related *Evans* litigation, filed a CBA grievance based on *the exact same conduct alleged here*

27   related to player medication use. The NFLPA claimed that "the NFL and Clubs have violated their

28   respective legal duties concerning the health and safety of the NFL players." NFL's Rule 28(j)

1   Letter, Ex. A at 1-2.  The NFLPA alleged, among other things, that the NFL and Clubs have

2   "disregarded . . . *explicit CBA requirements* as they apply to the proper, legal, medically ethical

3   prescription, dispensing, and transportation of prescription painkillers."  *Id.* at 3 (emphasis added).

4   It further alleged (at 7) that the NFL violated the CBA by "fail[ing] to meet its duty to use its 'best

5   efforts' to ensure that the terms and conditions of the CBA" were followed by Clubs.  Just as the

6   NFLPA asked of the arbitrator, this Court would have to interpret various CBA provisions bearing

7   on player health and safety—including provisions in effect for decades—to determine whether the

8   NFL acted reasonably or negligently.

9       At bottom, "the degree of care owed cannot be considered in a vacuum."  *Stringer v. National*

10  *Football League*, 474 F. Supp. 2d 894, 910 (S.D. Ohio 2007).  Whether the NFL acted reasonably

11  "cannot be determined without examining the parties' legal relationship and expectations as

12  established by the CBA[.]"  Preemption Order at 15 (quoting *Williams*, 582 F.3d at 881) (emphasis

13  omitted).  That is why so many other courts have routinely held preempted similar state-law

14  negligence claims brought by NFL players and other professional athletes related to the provision of

15  medical care.  *See, e.g.*, *Stringer*, 474 F. Supp. 2d at 910 ("The degree of care owed by the NFL . . .

16  and what was reasonable under the circumstances, must be considered in light of pre-existing

17  contractual duties imposed by the CBA on the individual NFL clubs concerning the general health

18  and safety of the NFL players."); *Duerson*, 2012 WL 1658353, at *4 (explaining that CBA provisions

19  could "plausibly" be read to mean that the NFL could reasonably exercise a lower standard of care

20  given the Clubs' duties to players); Curran Decl., Ex. 20 (*Maxwell v. National Football League*) at

21  1-2 (finding negligence claim based on game-related injuries preempted because the "physician

22  provisions of the CBA," along with "provisions relating to the teams' athletic trainers," "must be

23  taken into account in determining the degree of care owed by the NFL and how it relates to the NFL's

24  alleged failure to establish guidelines or policies to protect the mental health and safety of its

25  players"); *Sherwin v. Indianapolis Colts, Inc.*, 752 F. Supp. 1172, 1178 (N.D.N.Y. 1990) (holding

26  negligence claim for allowing, or failing to prevent, deficient medical care was preempted because

27  "[t]he court cannot resolve plaintiff's claims . . . without interpreting the clauses establishing those

28  duties in the agreements").  This Court recognized years ago that these same principles foreclosed

1   Plaintiffs' claims.   Without the statutory-violations claim on which the Ninth Circuit rested its

2   reversal, the result should be the same today.

3                                               **CONCLUSION**

4           For the reasons stated above, Plaintiffs' Third Amended Complaint should be dismissed with

5   prejudice.

6

7    Dated:  November 25, 2020                    SKADDEN, ARPS, SLATE, MEAGHER & FLOM
                                                  LLP
8

9                                            By:  */s/ Jack P. DiCanio*
                                                  Jack P. DiCanio
10
                                                  Attorneys for Defendant
11                                                NATIONAL FOOTBALL LEAGUE

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

**<u>CERTIFICATE OF SERVICE</u>**

2

      I hereby certify that on November 25, 2020, I electronically filed the foregoing document

3

with the Clerk of the Court using the CM/ECF system, which will send a notice of electronic filing

4

to counsel of record for Plaintiffs and which constitutes service under L.R. 5-1(h)(1).

5

6

 Dated:  November 25, 2020             */s/ Jack P. DiCanio*

7

                                     Jack P. DiCanio

8

                                     Attorneys for Defendant
                                     NATIONAL FOOTBALL LEAGUE

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

DEF.'S MOTION TO DISMISS THIRD AMENDED COMPLAINT         Case No.: 3:14-cv-02324-WHA