UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| RICHARD DENT, JEREMY NEWBERRY, ROY GREEN, J.D. HILL, KEITH VAN HORNE, RON STONE, RON PRITCHARD, JAMES MCMAHON, and MARCELLUS WILEY, on behalf of themselves and all other similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>NATIONAL FOOTBALL LEAGUE, a New York unincorporated association,<br><br>Defendant. | No. C 14-02324 WHA<br><br>**ORDER DENYING DEFENDANT'S MOTION TO DISMISS** |

**INTRODUCTION**

In this putative class action alleging improper administration of pain medications to professional football players, defendant moves to dismiss plaintiffs' third amended complaint. For the reasons stated below, the motion is **DENIED**.

**STATEMENT**

This action comes remanded on the heels of six years of litigation and two trips to our court of appeals. Prior orders have set forth in detail the well-pled background facts, assumed to be true for purposes of the present motion (Dkt. Nos. 106, 135). In brief, defendant National Football League is an unincorporated association of 32 separately-owned and independently-operated professional football "clubs" or teams. The NFL promotes, organizes, and regulates

the sport of professional football in the United States. Named plaintiffs are nine retired individuals who were employed by and played for a number of those football teams at various points in time between 1969 and 2008 (Third Amd. Compl. ¶¶ 17, 18, 28, 37, 46, 56, 65, 75, 85, 95).[1]

Since 1968 onward, the NFL players' union ("NFLPA"), "which is recognized as the sole and exclusive bargaining representative of present and future employee players in the NFL," and the NFL Management Council ("NFLMC"), "which is recognized as the sole and exclusive bargaining representative of present and future employer member Clubs of the [NFL,]" have entered into various collective-bargaining agreements ("CBAs") (Curran Exhs. 1–13) (Preamble). The NFL, the clubs, and the players have all been bound by the CBAs' terms.[2]

In May 2014, plaintiffs brought this putative class action against the NFL, followed by a second amended complaint in September 2014. They alleged that they sustained various injuries— such as muscular/skeletal injuries and internal organ injuries — as result of what they have coined the NFL's "return to play" business plan. Under this plan, which aimed to maximize profits, injured players were supplied an endless stream of strong pain medications — such as Toradol, opioids, local anesthetics, and combinations thereof — to dull their pain so that they could be returned to the filed as quickly as possible, without allowing for proper healing time. The medications were distributed, plaintiffs alleged, without proper prescription, documentation, or disclosure of medical risks and side effects, in violation of various laws. Plaintiffs' second and then-operative complaint brought nine claims against the NFL arising

---

[1] The previous two complaints included former player Jonathan Rex Hadnot as a plaintiff. Hadnot had played in the NFL as recently as 2012. For that reason, in considering the NFL's 2014 motion to dismiss the second amended complaint, a prior order took judicial notice of not just the 1968, 1970, 1977, 1977, 1982, 1993, and 2006 collective bargaining agreements ("CBAs"), but also the 2011 CBA. The 2011 CBA, however, is not applicable to any of the plaintiffs in the third amended complaint, as none of them played in the NFL beyond 2008.

[2] Although the NFL was not a formal signatory to the CBAs until 2011, our court of appeals held that that the pre-2011 CBAs were nevertheless binding on the NFL. *Dent v. Nat'l Football League*, 902 F.3d 1109, 1114 n.2 (9th Cir. 2018) ("*Dent I*"); *see also Atwater v. National Football League Players Ass'n*, 626 F.3d 1170, 1178 (11th Cir. 2010) ("although not a formal signatory, the NFL is bound by the CBA's terms.").

out of this alleged conduct. Among other claims, plaintiffs brought claims for negligent misrepresentation, negligent hiring and retention, and negligence *per se*. Their negligence claim was predicated on *per se* violations of various federal drug statutes, such as the Controlled Substances Act ("CSA"), the Food, Drug, and Cosmetic Act ("FDCA"), and corresponding state laws.[3]

1.  **PROCEDURAL HISTORY.**

    A.  *DENT I.*

In 2014, the NFL moved to dismiss plaintiffs' second amended complaint on the ground that all the claims stated therein were preempted under Section 301 of the Labor Management Relations Act, 29 U.S.C. § 185(a). Section 301 preempts state-law claims, "founded directly on rights created by collective-bargaining agreements, and also claims substantially dependent on analysis of a collective-bargaining agreement." *Caterpillar, Inc. v. Williams*, 482 U.S. 386, 394 (1987) (citation and quotation omitted). A claim that requires interpretation of a CBA is substantially dependent on analysis of the CBA and is thus preempted. *See Dent I*, 902 F.3d at 1116. A 2014 order granted the NFL's motion, finding that plaintiffs' claims required interpreting the CBA provisions related to player health and safety (Dkt. No. 106).

The essence of the then-operative second amended complaint, the 2014 order said, was "that the *individual clubs* mistreated their players and the league was negligent in failing to intervene and stop their alleged mistreatment" (Dkt. No. 106 at 3) (emphasis added). That order held that plaintiffs' negligence based claims were preempted because to assess the reasonableness of the NFL's conduct towards the players, it would have been necessary to consider the long history of provisions agreed to by the NFL in CBAs intended to protect the players. In turn, this consideration of the CBAs triggered the preemption rule within our circuit, as exemplified by *Cramer v. Consolidated Freightways Inc.*, 255 F.3d 683, 689–93 (9th Cir. 2011) (en banc). More specifically, in evaluating whether or not the *NFL* had acted

---

[3] In May 2015, a separate putative class action against the individual clubs involving the same alleged conduct was filed. *See Evans v. Arizona Cardinals Football Club, LLC*, No. C 16-01030 WHA. That action was deemed related to this action and thus transferred to the undersigned judge on March 1, 2016.

negligently "in *policing* the clubs and in failing to address medical mistreatment by the clubs," various provisions in the CBAs protecting player health and safety would need to be consulted and interpreted (*id*. at 7) (emphasis added). Accordingly, the 2014 order found that that theory of liability was preempted by Section 301.

A fundamental canon of the 2014 order was that the doctors and trainers that treated the plaintiffs were employees of the clubs, not the NFL — and that plaintiffs' claims were thereby predicated on the NFL's failure to police the clubs and their physicians who were the ones administering and distributing drugs in violation of various laws (allegedly). It thus rejected plaintiffs' argument that their claims against the NFL should fall under the illegality exemption to Section 301 preemption first articulated in *Allis-Chalmers Corp. v. Lueck*, 471 U.S. 202, 212 (1985) (Section 301 "does not grant the parties to a collective-bargaining agreement the ability to contract for what is illegal under state law.").[4]

Plaintiffs appealed the 2014 order. In 2018, our court of appeal reversed and remanded. *Dent v. Nat'l Football League*, 902 F.3d 1109, 1118 (9th Cir. 2018) ("*Dent I*"). As relevant here, it held that plaintiffs' negligence *per se* theory neither arose from the CBAs nor required their interpretation and was thus not preempted by Section 301. It so ruled based on plaintiffs' pitch that the thrust of their complaint was that the NFL *itself* supplied and distributed the endless stream of controlled substances alleged, in violation of various federal and state statutes regulating their distribution. Our court of appeals agreed with plaintiffs' reading of their second amended complaint, as evidenced by the following exchange between the appellate court and counsel for the NFL (Dkt. No. 131-1 at 11) (emphasis added):

> THE COURT: Counsel, what do we do with the allegation in the complaint that the NFL directly gave drugs to athletes?
>
> MR. CLEMENT: Well, I think what you do is you read it in the context of the entire complaint, so with respect to every one of the ten plaintiffs, the specific allegations are that they were given injections by the team doctors, the doctors . . .

---

[4] By contrast, in *Evans v. Arizona Cardinals Football Club LLC*, 2016 WL 3566945 (N.D. Cal. July 1, 2016), a related litigation brought against the NFL clubs, the undersigned judge held that the plaintiffs' claims fell under the illegality exemption and were thus not preempted.

4

> THE COURT: I'm looking at paragraph 17 of the complaint. This is the second amended complaint, the NFL directly? *I'm going to put some ellipses in here. The NFL directly supplied players with opioids.*

This reading of the complaint drove our court of appeals' analysis. It construed the second amended complaint as "not merely alleging that the NFL failed to prevent medication abuse by the teams, but that the NFL *itself* illegally distributed controlled substances, and therefore its action directly injured players." 902 F.3d at 1118 (emphasis in original). "With that reading of the complaint in mind," our court of appeals held that "to the extent the NFL is involved in the distribution of controlled substances, it has a duty to conduct such activities with reasonable care" and that the "minimum standards [of care] are established by statute," such as the CSA and FDCA. *Ibid*. To the extent the NFL violated those laws, a ruling on plaintiffs' claims did not require interpretation of the CBAs. *Id.* at 1118–19. Specifically, citing *Allis-Chalmers*, *Dent I* reasoned that:

> the *teams'* obligations under the CBAs are irrelevant to the question of whether the NFL breached an obligation to players by violating the law. The parties to a CBA cannot bargain for what is illegal. Therefore, liability for a negligence claim alleging violations of federal and state statutes does not turn on how the CBAs allocated duties among the NFL, the teams, and the individual doctors.

*Id*. at 1121 (emphasis in original).

Accordingly, our court of appeals held that plaintiffs' "negligence claim regarding *the NFL's alleged violation of federal and state laws* governing controlled substances [was] not preempted by [Section] 301." *Id.* at 1121 (emphasis added). *Dent I* expressly limited its holding to the issue of preemption and remanded the action to consider "whether the plaintiffs have pleaded facts sufficient to support" their negligence claim. Plaintiffs were warned by the appellate court not to "conflate" actions by the club doctors and trainers with those of the NFL, as plaintiffs were "limited to claims arising from the conduct of the NFL and NFL personnel." *Ibid*.

5

### B. *DENT II*.

Once remanded, plaintiffs were granted leave to file their "best and final" complaint (Dkt. Nos. 117 at 1; 118). Their third and operative complaint brought only a single claim for negligence. In 2019, the NFL moved to dismiss under Rule 12(b)(6) contending that plaintiffs had failed to state a claim. Plaintiffs opposed, contending that they had plausibly alleged conduct showing that the NFL owed them an independent duty based on three different theories: (1) special relationship; (2) voluntary undertaking; and (3) negligence *per se*. An April 2019 order disagreed with plaintiffs and granted the NFL's motion to dismiss (Dkt. No. 135). That order dismissed the negligence *per se* theory because, "nowhere in the third amended complaint do plaintiffs allege, as they previously pitched before our court of appeals, that the NFL undertook to provide *direct* medical care and treatment to players such that its conduct violated any relevant drug laws" (Dkt. No. 135) (emphasis added).

Again, plaintiffs appealed. Our court of appeals affirmed in part and reversed in part. It affirmed dismissal based on the special relationship and negligence *per se* theories, but reversed based on its finding that plaintiffs had pled a plausible negligence claim based on voluntary undertaking. *Dent v. Nat'l Football League*, 968 F.3d 1126 (9th Cir. 2020) ("*Dent II*").

As to negligence *per se*, our court of appeals noted that the 2019 district court order rigidly construed *Dent I* and "missed the mark somewhat" insofar as it required plaintiffs to allege the NFL's "direct" involvement in the handling, distribution, and administration of controlled substances, as opposed to the NFL's "indirect" supply or "coordination" of the same. It nonetheless held that the 2019 order correctly identified the main deficiency in plaintiffs' third amended complaint: "the dearth of allegations regarding NFL behavior that violates the duty to 'comply with federal and state laws' outlined [therein.]" *Id*. at 1131. Importantly, in *Dent II*, plaintiffs again flip-flopped, that is, they retreated from their winning pitch in *Dent I* that the NFL *itself* had violated the controlled substances statutes. At oral argument before the appellate court, plaintiffs' counsel conceded that:

> the phrase "NFL doctors and trainers," as used in the TAC, does not actually refer to any employees of the NFL itself.

6

> the Club doctors and trainers appear to be the only relevant actors purportedly in violation of statutory requirements.

*Id*. at 1131.  This deficiency doomed plaintiffs' negligence *per se* theory, even at the court of appeals.

As to voluntary undertaking, *Dent II* held that plaintiffs had plausibly alleged such a theory of negligence under California law, and that the 2019 district court order had erred in its ruling to the contrary. In our court of appeals' own words, the following factual allegations supported the complaint's allegation "that the NFL 'voluntarily undertook the duty' to 'ensure the proper recordkeeping, administration and distribution of Medications,' but ultimately failed to protect players due to its 'business culture in which everyone's financial interest depends on supplying Medications to keep players in the game' ":

> [T]he NFL created a drug oversight program in 1973, which "*required* teams and their doctors to report to the NFL regarding the administration of Medications."
>
> Beginning in at least the early 1990s, the NFL allegedly "began auditing clubs' compliance with [federal drug] laws," such as "the types of drugs being administered, the amounts in which they were administered," and related information.
>
> Plaintiffs also claim that the NFL has "*mandated* procedures to control the drug distribution system," including the registration of the Clubs' facilities as storage facilities for controlled substances, the use of tracking software by SportPharm, and periodic drug-use audits by the NFL Security Office.  NFL Club trainers and doctors are supposedly "mandated by the NFL to meet on a yearly basis" with NFL officials, and doctors provide "reports directly to the League about the Medications."
>
> The NFL also purportedly funded studies on Toradol use, which resulted in Toradol guidelines that were not followed.
>
> Furthermore, Plaintiffs claim that the NFL is aware of improper handling of pain medications and that its "standard of treatment for professional athletes [is] 'outside the lines.' "  A document written by a non-Club doctor, which was apparently commissioned by the NFL, bluntly states that both "appropriate (properly prescribed and monitored) and inappropriate opioid and non-opioid pain medication use" are "much more prevalent in the NFL than in virtually any other industry, population or endeavor," which "means that there is a shared responsibility and joint culpability for the problem."  And the NFL was alerted, via the same report, that players "who would otherwise not play or play at the same level of competitiveness may be induced by a pain medication and their personal financial/reputational incentives to play under conditions

7

> that could exacerbate their injuries and hinder their recovery," and "will be at longer-term risk for developing abuse or addiction."
>
> The NFL has promulgated rules such as the "NFL Prescription Drug Program and Protocol," with the purpose (as that document allegedly states) of "provid[ing] guidelines for the utilization of all prescription drugs provided to players and team personnel by physicians and other healthcare providers and associated the [*sic*] NFL clubs" and "to ensure [ ] appropriate handling (purchase, distribution, dispensing, administration and recordkeeping)" in compliance with "regulations of the Federal Drug Enforcement Administration (DEA) as they apply to controlled substances." And yet, "when the DEA investigated the clubs [in 2010], nothing had changed. The clubs still did not understand — and were in woeful non-compliance with — the law regarding controlled substances, as evidenced by the many, many violations thereof." Players continued to face the heightened risks associated with playing through their injuries while receiving improperly handled and administered medications, and the NFL allegedly was aware of this from its audit results but nonetheless turned a blind eye to maximize its revenues.
>
> The TAC paints a picture of the NFL's "mandated" and "required" audits, oversight, and procedures regarding drug distribution across member Clubs, as well as the NFL's failure to enforce rules that it knows are necessary to avoid further injury to players.

*Dent II*, 968 F.3d at 1132–1133 (quoting Third Amd. Compl. ¶¶ 159–182, 305). The foregoing allegations supported "[p]laintiffs' theory that the NFL undertook 'the duty of overseeing [the] administration' of the distribution of pain medications to players and is aware that it should be providing protections." *Id*. at 1134 (quoting Third Amd. Compl. ¶ 162).

In finding that plaintiffs had stated a plausible voluntary undertaking claim, *Dent II* relied mainly on *Mayall on Behalf of H.C. v. USA Water Polo, Inc.*, 909 F.3d 1055 (9th Cir. 2018). There, the plaintiffs, youth water polo players, alleged that USA Water Polo breached its voluntary undertaken duty to protect their health and safety by "failing to establish a concussion-management and return-to-play protocol for its youth water polo league." *Id*. at 1066–67. *Dent II* linked the breach alleged by plaintiffs here — "physical harm that resulted from their premature return to play after suffering otherwise debilitating injuries masked by over-prescription of pain-relieving medications" — to "the alleged failure on the part of USA Water Polo to 'use its authority to provide routine and important safety measures' regarding return-to-play methods after an injury has been sustained." 968 F.3d at 1134 (quoting *Mayall*, 909 F.3d at 1067). It noted that:

8

> Despite the NFL's one-step-removed relationship to the players, it was within the NFL's control to promulgate rules or guidelines that could improve safety for players across the league.
>
> The [complaint] even alleges that the NFL has already demonstrated its ability to create better policies, regarding Toradol use for example, but has failed to enforce them.

*Ibid*. As to the last element of a claim for voluntary undertaking, *Dent II* held that plaintiffs' allegations supported their claim that "the NFL's alleged carelessness in allowing drugs to be distributed as they were increased the risk of harm to plaintiffs." *Id*. at 1135. It reasoned that:

> In the TAC, each player recounts the drugs he recalls being given during his NFL career and the injuries he suffered on the field that were allegedly "caused, aggravated, extended, worsened, prolonged, exacerbated, intensified, perpetuated, protracted, or made permanent by the wrongful administration of Medications to him." Plaintiffs state that some "doctors they saw after their careers concluded . . . that some of their ailments might be the result of the amount of Medications they took during their NFL careers." Additionally, we have already previewed Plaintiffs' contention that the NFL received a medical report stating that the organization's policies regarding drug distribution create "short and long term risks of pain medication use and abuse."

*Id*. 1134–35. For the foregoing reasons, our court of appeals concluded that plaintiffs had properly pled all elements of a voluntary undertaking claim under California law.

Our court of appeals did not rule, however, on the issue of whether or not plaintiffs' voluntary undertaking theory of negligence was preempted under Section 301 of the LMRA. Plaintiffs had not pled a voluntary undertaking claim in *Dent I* and our court of appeals thus had not occasion to consider it then. Noting that the preemption issue lurked in the background, it remanded this action for this Court to consider whether the voluntary undertaking claim was preempted "in light of the relevant CBAs and [its] guidance in *Dent I*." Specifically, *Dent II* gave the following instruction:

> We said [in *Dent I*] that "[t]he negligence analysis is not an equation, whereby one careless act can be canceled out by a careful act in a related arena — especially when the careful act is to be performed by a different party." *Dent I*, 902 F.3d at 1121. The district court should examine afresh whether the NFL's general disclaimer of liability for individual players' medical treatment is relevant to the sufficiently pled allegations of the organization's inaction, where audit results demonstrate failure to safely distribute pain killers to keep marquee players in the game and maximize television revenues.

9

1   968 F.3d at 1135–36.

2   \*               \*               \*

3   The NFL now moves to dismiss plaintiffs' third amended complaint, claiming that plaintiffs' sole negligence claim is preempted because their voluntary undertaking theory is a reincarnation of the theory deemed preempted by the 2014 order (*i.e.,* that the NFL failed to curb the clubs' health abuses), and thus should be deemed preempted for the same reasons: namely, that plaintiffs' claim is substantially dependent on and would require interpretation of many of the CBAs' health and safety provisions to determine whether it acted negligently (Dkt. No. 150). Plaintiffs oppose. This order follows full briefing and oral argument.

**ANALYSIS**

As an initial matter, there's some ambiguity in our court of appeals' instruction that this Court "examine afresh whether the NFL's general disclaimer of liability for individual players' medical treatment is relevant" to the preemption inquiry. Our court of appeals did not provide a citation as to which CBA or which section(s) thereof it was referring to. The NFL says that the appellate court was alluding to a disclaimer in the 2011 CBA, a disclaimer it had previously referenced in *Dent I. See* 902 F.3d at 1124 n.9. That disclaimer states that nothing in the 2011 CBA should "be deemed to impose or create any duty or obligation upon either the [NFL] or the NFLPA regarding diagnosis, medical care and/or treatment of any player" (Curran Exh. 11 at Article 39, Section 3) (2011). The NFL does not rely on this disclaimer for purposes of its present motion and no similar disclaimer appears in previous CBAs. At the hearing, both parties conceded that, with Jonathan Rex Hadnot no longer a plaintiff, the 2011 CBA has no application to the current plaintiffs named in the third amended complaint, though it may become relevant if and when a class is certified. Accordingly, at this stage of litigation, the general disclaimer of liability is irrelevant.

Having considered the applicable CBAs, the NFL's motion to dismiss is **DENIED WITHOUT PREJUDICE** to raising all the preemption points again on summary judgment or at trial. While the NFL says that the "core" injury plaintiffs allege arises out of their premature "return-to-play" — an issue the CBAs cover — other injuries, such as the harmful and long-

10

term side effects from over-administration of prescription medications, are also implicated. And, unlike "return-to-play," the proper administration and distribution of medications is not a subject the CBAs explicitly cover. Counsel for plaintiffs insist they can prove the voluntary undertaking claim without reference to any of the CBAs, such as through voluntary programs that the NFL allegedly imposed on the individual clubs. To illustrate the viability of their proposed method of proof, there will need to be a matching of each such undertaking against the CBAs to assess the extent to which interpretations of the CBAs are intertwined with the voluntary programs.

Another problem is whether the plaintiffs' proof and theory will be that the undertaking itself was negligently carried out, as opposed to whether the NFL failed to intervene and stop the clubs' alleged abuses of controlled substances in the face of receiving information to that effect. For example, plaintiffs point to the NFL's audits of the clubs' use of prescription drugs, which allegedly showed or should have showed that the clubs were supplying copious amounts of painkillers to players. Now, if the theory is that the audits themselves were negligently conducted (such that they failed to reveal the true extent of the problem), then little or no interpretation of any CBA will be required. On the other hand, if the theory is that the audits showed rampant misuse of painkillers by the clubs and that the NFL's failure to intervene constituted negligence, then in evaluating whether the NFL failed to do enough, we will need to look at what the NFL committed to do on that subject (if anything) in the CBAs. And, we will need to evaluate the extent to which the terms of any CBA need to be "interpreted." At the hearing, the NFL's counsel was unable to identify a single provision of any CBA that was ambiguous and needed "interpretation." *See Dent I*, 902 F.3d at 1116 ("claims are only preempted to the extent that there is an active dispute over the meaning of contract terms.") (citation and quotation omitted)).

This case has been to the court of appeals twice and the NFL has failed to win an affirmance of prior dismissals. Rather than a third dismissal and overindulgence in judicial notice, the Court believes the record for the court of appeals will be more complete and true to history if we proceed to trial and/or summary judgment.

11

# CONCLUSION

For the foregoing reasons, the NFL's motion to dismiss is **DENIED WITHOUT PREJUDICE**. A case management order will follow.

**IT IS SO ORDERED.**

Dated: February 19, 2021.

WILLIAM ALSUP
UNITED STATES DISTRICT JUDGE