1
2
3
4
5
6                           UNITED STATES DISTRICT COURT
7
8                           NORTHERN DISTRICT OF CALIFORNIA
9

10   RICHARD DENT, J.D. HILL, JAMES
     MCMAHON, JEREMY NEWBERRY,
11   RON PRITCHARD, RON STONE, KEITH           No.  C 14-02324 WHA
     VAN HORNE, AND MARCELLUS
12   WILEY,

13          Plaintiffs,
                                               **ORDER DENYING CLASS**
14      v.                                     **CERTIFICATION**

15   NATIONAL FOOTBALL LEAGUE,

16          Defendant.

17   _____

18                                **INTRODUCTION**

19         This case has seen seven years of litigation, three motions to dismiss, two trips to our

20   court of appeals, and now a motion for class certification.  Plaintiffs move to certify a

21   nationwide class of former professional football players who played for 32 different teams

22   across 23 different states over a period of 35 years asserting a common law claim of negligent

23   voluntary undertaking for failure to ensure the proper recordkeeping, administration and

24   distribution of pain killers and other prescription drugs used in professional football.  For the

25   following reasons, the motion is **DENIED**.

26
27
28

United States District Court
Northern District of California

United States District Court
Northern District of California

**STATEMENT**

Defendant National Football League is an unincorporated association of 32 separately-owned and independently-operated professional football "clubs" or teams. "The NFL promotes, organizes, and regulates professional football in the United States, but it does not employ individual football players; they are employees of the teams for whom they play." *Dent v. National Football League*, 902 F.3d 1109, 1114 (9th Cir. 2018) (cleaned up) (*Dent I*).

"Since 1968, the NFL, its member teams, and NFL players have been bound by a series of CBAs [collective bargaining agreements] negotiated by the NFL Players' Association (the players' bargaining unit) and the NFL Management Council (the teams' bargaining unit). Since 1982, the CBAs have included provisions regarding 'players' rights to medical care and treatment.' Those provisions have changed somewhat over the years, but generally speaking, they have required teams to employ board-certified orthopedic surgeons and trainers who are certified by the National Athletic Trainers Association, and they have guaranteed players the right to access their medical records, obtain second opinions, and choose their own surgeons. The CBAs imposed certain disclosure requirements on team doctors; for example, the 1982 CBA established that 'if a Club physician advised a coach or other Club representative of a player's physical condition which could adversely affect the player's performance or health, the physician would also advise the player.' The 1993 CBA added the requirement that 'if such condition could be significantly aggravated by continued performance, the physician would advise the player of such fact in writing.'" *Dent I*, 902 F.3d at 1114 (footnotes omitted).

**1.    *DENT I*.**

Plaintiffs Richard Dent, Jeremy Newberry, J.D. Hill, Keith Van Horne, Ron Stone, Ron Pritchard, James McMahon, and Marcellus Wiley are retired NFL players who played for many different NFL teams from 1969 to 2008.

Plaintiffs filed this action in May 2014 on behalf of a putative nationwide class of all retired NFL players. Before the NFL filed an answer, plaintiffs followed up with a first, then second, amended complaint. At all material times, plaintiffs have alleged that the NFL has maintained a "return to play business plan," pursuant to which players are pressured to perform

1    at their highest possible competitive levels, including by prematurely returning to play after a

2    severe injury.  Plaintiffs allege that the NFL and the clubs pressured them to prematurely return

3    to play in the face of frequent, painful injuries by providing them with excessive amounts of

4    addictive opioid pain killers, like Vicodin, Percodan, and Percocet, and non-steroidal anti-

5    inflammatories drugs (NSAIDs), like Toradol.  In addition, plaintiffs have alleged that club

6    doctors and trainers gave them the drugs without written prescriptions, in unlabeled manila

7    envelopes, and without proper warnings about risks of side effects, including long-term risks of

8    excessive use.

9        The second amended complaint asserted state common law claims for relief, including

10    fraud, concealment, misrepresentation, and negligence *per se* predicated in part on the NFL's

11    alleged provision and administration of controlled substances without written prescriptions,

12    proper labeling, or disclosures in violation of the Controlled Substances Act, 21 U.S.C. § 801

13    *et seq.*

14        A December 2014 order dismissed the second amended complaint in its entirety (Dkt No.

15    106).  The order found that Section 301 of the Labor Management Relations Act preempted the

16    state common law claims because assessing what duty the NFL owed the players to protect

17    them from medication abuse by the clubs, and whether the NFL breached that duty, would

18    require interpretation of the CBAs.  Specifically, the order stated (*id.* at 12):

19            In determining the extent to which the NFL was negligent in
20            failing to curb medication abuse by the clubs, it would be essential
                to take into account the affirmative steps the NFL has taken to
21            protect the health and safety of the players, including the
                administration of medicine.  The NFL addressed the problem of
22            adequate medical care for players in at least one important and
                effective way, *i.e.*, through a bargaining process that imposed
23            uniform duties on all clubs — without diminution at the whim of
                individual state tort laws.  Therefore, the NFL should at least be
24            given credit, in any negligence equation, for the positive steps it
                has taken and imposed on the clubs via collective bargaining.

25

26

27

28

Our court of appeals reversed in *Dent I*.  Our court of appeals focused on the allegations that the NFL *itself* had distributed and administered drugs in violation of potentially applicable statutes:

> Each team hires doctors and trainers who attend to players' medical needs.  Those individuals are employees of the teams, not the NFL.  But the players' Second Amended Complaint (SAC) asserts that the NFL itself directly provided medical care and supplied drugs to players.  For example, the SAC alleges that:
>
> - "The NFL directly and indirectly supplied players with and encouraged players to use opioids to manage pain before, during and after games in a manner the NFL knew or should have known constituted a misuse of the medications and violated Federal drug laws."
>
> - "The NFL directly and indirectly administered Toradol on game days to injured players to mask their pain."
>
> - "The NFL directly and indirectly supplied players with NSAIDs, and otherwise encouraged players to rely upon NSAIDs, to manage pain without regard to the players' medical history . . . ."
>
> - "The NFL directly and indirectly supplied players with local anesthetic medications to mask pain and other symptoms stemming from musculoskeletal injury when the NFL knew that doing so constituted a dangerous misuse of such medications."
>
> - "NFL doctors and trainers gave players medications without telling them what they were taking or the possible side effects and without proper recordkeeping. . . ."
>
> - "Medications are controlled by the NFL Security Office in New York . . . ."
>
>       \*            \*            \*
>
> The players argue that they were injured by the NFL's "provision and administration" of controlled substances without written prescriptions, proper labeling, or warnings regarding side effects and long-term risks, and that this conduct violated the Controlled Substances Act, 21 U.S.C. § 801 *et seq.*; the Food, Drugs, and Cosmetics Act, 21 U.S.C. § 301 *et seq.*; and the California Pharmacy Laws, Cal. Bus. & Prof. Code § 4000 *et seq.*
>
> The district court believed that the "essence" of the plaintiffs' negligence claim "is that the individual clubs mistreated their players and the league was negligent in failing to intervene and stop their alleged mistreatment."  However, as we read the complaint, the plaintiffs are not merely alleging that the NFL failed

4

to prevent medication abuse by the teams, but that the NFL *itself* illegally distributed controlled substances, and therefore its actions directly injured players.  The SAC alleges that the NFL "directly and indirectly supplied players" with drugs.  It also alleges that the NFL implemented a "League-wide policy" regarding Toradol, that "medications are controlled by the NFL Security Office in New York," that "the NFL coordinated the illegal distribution of painkillers and anti-inflammatories for decades," and that "NFL doctors and trainers" gave players medications "without telling them what they were taking or the possible side effects."

902 F.3d at 1115, 1118 (footnote omitted).  A footnote to the latter paragraph stated:  "The NFL argues that the doctors and trainers who actually provided medications to players were employees of the teams, not the NFL.  But at this stage of the litigation, we must take the allegations in the SAC as true."  *Id.* at 1118, n.5.

This reading of the second amended complaint drove our court of appeals' analysis.  "With that reading of the complaint in mind," our court of appeals stated, "to the extent the NFL is involved in the distribution of controlled substances, it has a duty to conduct such activities with reasonable care" and that "when it comes to distribution of potentially dangerous drugs, minimum standards are established by statute," such as the Controlled Substances Act and Food, Drug, and Cosmetics Act.  *Id.* at 1118–19.  To the extent the NFL violated those laws, our court of appeals held, adjudicating plaintiffs' claims did not require interpretation of the CBAs:

> [T]he district court noted that the CBAs place medical disclosure obligations "squarely on Club physicians, not on the NFL."  But the *teams'* obligations under the CBAs are irrelevant to the question of whether the *NFL* breached an obligation to players by violating the law.  The parties to a CBA cannot bargain for what is illegal.  *Allis-Chalmers* [*Corp. v. Lueck*, 471 U.S. 202, 212 (1985)]; *see also Cramer* [*v. Consolidated Freightways, Inc.*, 255 F.3d 683, 695 (9th Cir. 2001)].

*Id.* at 1121.

*Dent I* held "only that the plaintiffs' negligence claim regarding the NFL's alleged violation of federal and state laws governing controlled substances [was] not preempted by § 301."  *Ibid.*  *Dent I* reversed and remanded for a determination whether the negligence claim was sufficiently pled.

1

2     **2.      *EVANS V. ARIZONA CARDINALS FOOTBALL, LLC*.**

3          Meanwhile, in 2015, after plaintiffs had filed the first notice of appeal in *Dent*, a different

4     group of retired NFL players (and the widow of one), represented by the same counsel, filed a

5     class action complaint on behalf of the same putative class with virtually identical allegations

6     this time against each of the clubs in federal court in Maryland.  Compl., *Evans et al. v.*

7     *Arizona Cardinals Football Club, LLC, et al.* (No. WMN-15-1457) (Dist. of Md., May 21,

8     2015) (Judge William M. Nickerson).  Judge Nickerson transferred *Evans* to this district under

9     28 U.S.C. Section 1404, finding that the transfer would serve judicial economy because *Evans*

10    could be assigned to the undersigned judge as a case related to *Dent*.  *Evans v. Arizona*

11    *Cardinals Football, LLC*, 2016 WL 759208 (Dist. of Md., Feb. 25, 2016) (Judge William N.

12    Nickerson).  Upon arrival here, an order assigned *Evans* to the undersigned judge as related to

13    *Dent* under Civil Local Rule 3-12.

14         The complaint asserted claims for intentional misrepresentation and "civil conspiracy."

15    The teams moved to dismiss the complaint on the grounds that Section 301 of the Labor

16    Management Relations Act preempted the claims and that the claims were time-barred by the

17    statute of limitations.  A July 2016 order denied the motion.  As for preemption, the order

18    distinguished the *Dent* claims as grounded in the NFL's negligent failure to intervene to protect

19    the players from the clubs' excessive dispensation of drugs thereby implicating the affirmative

20    steps taken by the NFL in the form of the CBA provisions on that topic.  In contrast, the claims

21    against the clubs alleged intentional conduct that violated, *inter alia*, the Controlled Substances

22    Act and, therefore, the claims fell within the illegality exception to Section 301 preemption as

23    described in *Cramer v. Consolidated Freightways, Inc.*, 255 F.3d, 683 (9th Cir. 2001) (en

24    banc).  As for the statute of limitations, the July 2016 order rejected the argument without

25    prejudice.

26         A November 2016 order granted the *Evans* plaintiffs leave to file a first amended

27    complaint adding claims under the Racketeer Influenced and Corrupt Organizations Act, 18

28    U.S.C. §§ 1962, 1964, and for concealment, in addition to previously asserted claims for

      intentional misrepresentation and "civil conspiracy."

United States District Court
Northern District of California

United States District Court
Northern District of California

In February 2017, an order dismissed the RICO claims with prejudice, finding that the four-year statute of limitations for civil RICO claims barred the *Evans* plaintiffs' RICO claims. To establish a civil RICO claim, a plaintiff had to show injury to business or property.  18 U.S.C. § 1964(c).  In an attempt to satisfy that requirement, the *Evans* plaintiffs alleged that the clubs' distribution of excessive medications cut their NFL careers short and diminished their post-NFL employment prospects.  The four-year limitations period for a civil RICO claim began to run when the plaintiffs knew or should have known of their underlying injury. *Rotella v. Wood*, 528 U.S. 549, 553–55 (2000); *Pincay v. Andrews*, 238 F.3d 1106, 1109 (9th Cir. 2001).  The *Evans* plaintiffs who asserted RICO claims had all retired from the NFL by 2004 (at the latest), at which point they had constructive knowledge of their underlying injuries; therefore, the statute of limitations barred them from asserting RICO claims more than a decade later.

Two subsequent orders granted summary judgment on the remaining claims based on the statute of limitations and the exclusive remedy rule of the workers' compensation statutes of the remaining plaintiffs' resident states.  Final judgment entered in *Evans* in July 2017.  Our court of appeals affirmed.  *Evans v. Arizona Cardinals Football Club, LLC*, 761 Fed. App'x 701 (9th Cir. 2019).

### 3.    *DENT II*.

On remand from our court of appeals in *Dent I*, plaintiffs were given leave to file their best and final complaint.  Plaintiffs filed a third amended complaint (the operative complaint), abandoning their other theories of liability leaving only a common law negligence claim.  In addition to a negligence *per se* theory previously asserted, plaintiffs proffered two additional theories of negligence:  special relationship, and negligent voluntary undertaking.

An April 2019 order dismissed the complaint entirely for failure to state a claim (Dkt No. 135).  As for negligence *per se*, the order found that the third amended complaint did not sufficiently allege that the NFL *itself* had violated the statutes governing distribution and administration of controlled substances (*id.* at 8–9):

> Significantly, plaintiffs do not make any specific, plausible allegation that the relevant statutes apply to the NFL, let alone that the NFL violated those statutes. . . .  [N]owhere in the third amended complaint do plaintiffs allege, as they previously pitched before our court of appeals, that the NFL undertook to provide direct medical care and treatment to players such that its conduct violated any relevant drug laws.  Though plaintiffs generally contend that the NFL controlled and directed the distribution of the players' medication via the "Business Plan," nowhere in the third amended complaint do plaintiffs specifically allege any facts as to how the NFL instructed the club doctors' handling, distribution, and administration of the drugs or otherwise forced the club doctors to violate any relevant drug laws.

The April 2019 order further found that the third amended complaint failed to plausibly allege a negligent voluntary undertaking theory because the complaint had "not specifically alleged how the NFL's conduct *increased* the risk of harm to plaintiffs" (*id.* at 13).

Plaintiffs appealed again.  *Dent v. National Football League*, 968 F.3d 1126 (9th Cir. 2020) (*Dent II*).  Importantly, in *Dent II*, plaintiffs did an about face, disavowing the assertion that had carried the day in *Dent I*.  Namely, in *Dent I*, our court of appeals had relied on the allegations that the *NFL itself*, as opposed to the clubs, had distributed the drugs to the players. *Dent I*, 902 F.3d at 1118.  But at oral argument in *Dent II*,

> Plaintiffs' counsel acknowledged that the phrase "NFL doctors and trainers," as used in the [third amended complaint], does not actually refer to any employees of the NFL itself.  Despite the [third amended complaint's] references to "Club doctors and trainers," Plaintiffs' counsel conceded that the "NFL" and "Club" doctors and trainers are one and the same, and are in fact the hired hands of the Clubs.

*Dent II*, 968 F.3d at 1131.  That concession doomed plaintiffs' negligence *per se* theory.  *Dent II* also affirmed dismissal of the special relationship theory of negligence.

Our court of appeals reversed, however, dismissal of the negligent voluntary undertaking theory.  As *Dent II* noted, California follows the theory of liability to third persons for physical harm caused when, under certain circumstances, one negligently performs a voluntary undertaking to another, as articulated by Section 324A of the Restatement (Second) of Torts. *Dent II*, at 1132 (citing *Artiglio v. Corning Inc.*, 18 Cal. 4th 604 (1998)).  *Dent II* held that plaintiffs had sufficiently pled such a theory under the following elements:

> (1) The defendant undertook to render services to another; (2) of a kind the defendant should have recognized as necessary for the

protection of the plaintiff; (3) the defendant failed to exercise reasonable care in the performance of the undertaking; (4) the failure resulted in physical harm to the plaintiff; and (5) the defendant's carelessness increased the risk of such harm.

*Ibid.* (cleaned up).

*Dent II* held that the allegations of the NFL's voluntary undertaking resembled *Mayall ex rel. H.C. v. USA Water Polo, Inc.*, 909 F.3d 1055 (9th Cir. 2018). *Mayall* held that a claim based on a theory of voluntary undertaking survived a motion to dismiss where the complaint alleged that, "by failing to establish a concussion-management and return-to-play protocol for its youth water polo league, USA Water Polo had failed to exercise reasonable care in the performance of its undertaking—ensuring a healthy and safe environment for its players." *Mayall*, 909 F.3d at 1067. Quoting from the operative complaint, *Dent II* stated:

> Similarly, the [third amended complaint] alleges that the NFL "voluntarily undertook a duty" to "ensure the proper recordkeeping, administration and distribution of medications," but ultimately failed due to its "business culture in which everyone's financial interest depends on supplying medications to keep players in the game." Plaintiffs support this statement with factual allegations that the NFL created a drug oversight program in 1973, which "*required* teams and their doctors to report to the NFL regarding the administration of medications." Beginning in at least the early 1990s, the NFL allegedly "began auditing clubs' compliance with federal drug laws," such as "the types of drugs being administered, the amounts in which they were administered," and related information. Plaintiffs also claim that the NFL has "*mandated* procedures to control the drug distribution system," including the registration of the Clubs' facilities as storage facilities for controlled substances, the use of tracking software by SportPharm, and periodic drug-use audits by the NFL Security Office. NFL Club trainers and doctors are supposedly "mandated by the NFL to meet on a yearly basis" with NFL officials, and doctors provide "reports directly to the League about the medications." The NFL also purportedly funded studies on Toradol use, which resulted in Toradol guidelines that were not followed.

>         *            *            *

> The NFL has promulgated rules such as the "NFL Prescription Drug Program and Protocol," with the purpose (as that document allegedly states) of "providing guidelines for the utilization of all prescription drugs provided to players and team personnel by physicians and other healthcare providers and associated NFL clubs" and "to ensure appropriate handling" . . . in compliance with "regulations of the Federal Drug Enforcement Administration (DEA) as they apply to controlled substances." . . .

United States District Court
Northern District of California

. . . [The third amended complaint] paints a picture of the
NFL's "mandated" and "required" audits, oversight, and
procedures regarding drug distribution across member Clubs, as
well as the NFL's failure to enforce rules that it knows are
necessary to avoid further injury to players.  These allegations
support Plaintiffs' theory that the NFL undertook "the duty of
overseeing the administration" of the distribution of pain
medications to players and is aware that it should be providing
protections.

*Id.* at 1132–34.

Dent II remanded the negligent voluntary undertaking claim, instructing the district court

to "examine afresh whether the NFL's general disclaimer of liability for individual players'

medical treatment is relevant to the sufficiently pled allegations of the organizations' inaction,

where audit results demonstrate failure to safely distribute pain killers . . . ."  *Id.* at 1136.

Upon remand, a February 2021 order denied the NFL's second motion to dismiss based

on Section 301 preemption (Dkt. No. 154).  That order first found that the 2011 CBA

contained the NFL's general disclaimer of liability alluded to by *Dent II* but no prior CBAs

contained such a disclaimer.  The parties agreed that because no named plaintiff played after

2008, the 2011 CBA did not apply.

As for preemption based on the earlier CBAs, the February 2021 order explained (*id.* at

10–11):

While the NFL says that the "core" injury plaintiffs allege
arises out of their premature "return-to-play" — an issue the CBAs
cover — other injuries, such as the harmful and long-term side
effects from over-administration of prescription medications, are
also implicated.  And, unlike "return-to-play," the proper
administration and distribution of medications is not a subject the
CBAs explicitly cover.  Counsel for plaintiffs insist they can prove
the voluntary undertaking claim without reference to any of the
CBAs, such as through voluntary programs that the NFL allegedly
imposed on the individual clubs.  To illustrate the viability of their
proposed method of proof, there will need to be a matching of each
such undertaking against the CBAs to assess the extent to which
interpretations of the CBAs are intertwined with the voluntary
programs.

Another problem is whether the plaintiffs' proof and theory
will be that the undertaking itself was negligently carried out, as
opposed to whether the NFL failed to intervene and stop the clubs'
alleged abuses of controlled substances in the face of receiving
information to that effect.  For example, plaintiffs point to the
NFL's audits of the clubs' use of prescription drugs, which
allegedly showed or should have showed that the clubs were

10

supplying copious amounts of painkillers to players.  Now, if the theory is that the audits themselves were negligently conducted (such that they failed to reveal the true extent of the problem), then little or no interpretation of any CBA will be required.  On the other hand, if the theory is that the audits showed rampant misuse of painkillers by the clubs and that the NFL's failure to intervene constituted negligence, then in evaluating whether the NFL failed to do enough, we will need to look at what the NFL committed to do on that subject (if anything) in the CBAs.  And, we will need to evaluate the extent to which the terms of any CBA need to be "interpreted."

Plaintiffs now seek to certify the following class:

All NFL players who played in the National Football League at any time between January 1, 1973 and December 31, 2008, and who received Medications from an NFL club, including, but not limited to, opioids (such as Vicodin, Percocet, Percodan, Hydrocodone, etc.), non-steroidal anti-inflammatory drugs (such as Toradol, Vioxx, Naprosyn, Indocin, Celebrex, etc.), corticosteroids (such as Prednisone), or local anesthetics (such as Lidocaine, Xylocaine, etc.).

This order follows full briefing and a hearing.

## ANALYSIS

Certification of a class action is governed by Federal Rule of Civil Procedure 23.

Plaintiffs must show that the proposed class action satisfies each of the four prerequisites of

Rule 23(a) and one of the three requirements of Rule 23(b).  Rule 23(a) requires plaintiffs to

show:

(1) the class is so numerous that joinder of all members is

impracticable;

(2) there are questions of law or fact common to the class;

(3) the claims or defenses of the representative parties are typical of

the claims or defenses of the class; and

(4) the representative parties will fairly and adequately protect the

interests of the class.

Plaintiffs seek certification under Rule 23(b)(3), which requires them to show that:

the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy.

A district court must do a rigorous analysis to determine if the requirements of Rule 23 are satisfied. *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350–51 (2011). "Frequently that rigorous analysis will entail some overlap with the merits of the plaintiff's underlying claim. That cannot be helped. The class determination generally involves considerations that are enmeshed in the factual and legal issues comprising the plaintiff's cause of action." *Id.* at 351 (cleaned up).

### 1.   PLAINTIFFS' THEORY OF LIABILITY AFTER *DENT I* AND *DENT II*.

The briefing and hearing on the instant motion have revealed that, despite two opinions from our court of appeals on the subject, the precise nature of plaintiffs' theory of the NFL's liability remains elusive.

As noted, in *Dent I*, our court of appeals held that Section 301 of the LMRA did not preempt plaintiffs' claims against the NFL "to the extent the NFL is involved in the distribution of controlled substances" and to the extent the NFL's conduct in such distribution violated relevant statutes, in particular the Controlled Substances Act. *Dent I*, 902 F.3d at 1119. *Dent I* repeatedly emphasized plaintiffs' allegations that the "NFL *itself* illegally distributed controlled substances, and therefore its actions directly injured players." 902 F.3d at 1118.

In their second appearance before our court of appeals, plaintiffs admitted those allegations were incorrect; the NFL did not distribute or administer medications to the players, only club physicians and trainers did so:

> Plaintiffs' counsel acknowledged that the phrase "NFL doctors and trainers," as used in the [third amended complaint], does not actually refer to any employees of the NFL itself. Despite the [third amended complaint's] separate references to "Club doctors and trainers," Plaintiffs' counsel conceded that the "NFL" and "Club" doctors and trainers are one and the same, and are in fact the hired hands of the Clubs.

*Dent II*, 968 F.3d at 1131. Thus, because the "NFL doctors and trainers" allegedly acting in violation of the drug laws were not NFL employees or agents at all, *Dent II* affirmed dismissal of the negligence *per se* theory. *Id.* at 1132.

United States District Court
Northern District of California

*Dent II* saved, however, the negligent voluntary undertaking theory.  *Dent II* held that plaintiffs had plausibly alleged the following elements of that claim:

> (1) The defendant undertook to render services to another; (2) of a kind the defendant should have recognized as necessary for the protection of the plaintiff; (3) the defendant failed to exercise reasonable care in the performance of the undertaking; (4) the failure resulted in physical harm to the plaintiff; and (5) the defendant's carelessness increased the risk of such harm.

*Id.* at 1132 (cleaned up).

*Dent II* articulated the content of the NFL's duty under that theory, in part, as follows:

- "[T]he NFL 'voluntarily undertook a duty' to 'ensure the proper recordkeeping, administration and distribution of medications' . . . ."  *Id.* at 1132.

- "[T]he NFL created a drug oversight program in 1973, which '*required* teams and their doctors to report to the NFL regarding the administration of medications.'" *Ibid.*

- The NFL "'audit[ed] clubs' compliance with federal drug laws,' such as 'the types of drugs being administered, the amounts in which they were administered,' and related information."  *Id.* at 1132–33.

- "[T]he NFL has '*mandated* procedures to control the drug distribution system,' including the registration of the Clubs' facilities as storage facilities for controlled substances . . . ."  *Id.* at 1133.

- "[T]he NFL undertook 'the duty of overseeing the administration' of the distribution of pain medications to players and is aware that it should be providing protections."  *Id.* at 1134.

- Despite the NFL's one-step-removed relationship to the players, it was within the NFL's control to promulgate rules or guidelines that could improve safety for players across the league.  *Ibid.* (*citing Mayall*, 909 F.3d at 1068).

Thus, to determine whether the NFL breached its duty "to ensure the proper recordkeeping, administration and distribution of medications" by the clubs, a duty specifically called out by the appellate opinion, and whether such a breach caused harm to a player, we must by definition look at the actions *of the clubs* vis á vis the players and determine if those club-level actions were "proper."

At the hearing on the instant motion, the undersigned judge suggested that the necessity of such an approach presented an obstacle to class adjudication, given the likelihood that the 32 different clubs (in 23 different jurisdictions) had significantly different medical practices over the 35-year period plaintiffs seek to certify.  Plaintiffs' counsel responded that *Dent II* precluded consideration of the conduct of the clubs.  Not so.  Please consider each of the bullet items listed above that our court of appeals held supported a duty by the NFL.  Those items necessarily turn in part on the propriety of conduct by the clubs.

As will be shown, the principal Rule 23 problem is that there is no set of common methods of proof on a class-wide basis.

### 2.   COMMON QUESTIONS OF LAW DO NOT PREDOMINATE.

As stated, plaintiffs seek to bring a state common law negligence claim on behalf of a nationwide class of all NFL players who played at any time during the 35-year period from 1973 to 2008 and who received any drugs from his team.  Plaintiffs assert that New York negligence law should apply to the entire class, or, if New York law cannot be applied to the entire class, the law of the named plaintiffs' resident states, California, Arizona, and Illinois, should apply to the entire class (Br. at 29–30).  (Recall that our court of appeals applied only California law.)

"A federal court sitting in diversity must look to the forum state's choice of law rules to determine the controlling substantive law."  *Zinser v. Accufix Research Inst., Inc.*, 253 F.3d 1180, 1187 (9th Cir. 2001).

California employs a three-step governmental interest analysis for choice-of-law problems:

> First, the court determines whether the relevant law of each of the potentially affected jurisdictions with regard to the particular issue in question is the same or different.  Second, if there is a difference, the court examines each jurisdiction's interest in the application of its own law under the circumstances of the particular case to determine whether a true conflict exists.  Third, if the court finds that there is a true conflict, it carefully evaluates and compares the nature and strength of the interest of each jurisdiction in the application of its own law to determine which state's interest would be more impaired if its policy were subordinated to the policy of the other state and then ultimately applies the law of the

14

state whose interest would be more impaired if its law were not applied.

*McCann v. Foster Wheeler LLC*, 48 Cal. 4th 68, 87–88 (2010) (cleaned up).

At the hearing on the instant motion, plaintiffs' counsel misstated that plaintiffs' briefing had done a comprehensive survey of the law of all 50 states and shown that virtually all 50 states follow Section 323 of the Restatement (Second) of Torts in recognizing a claim for negligent voluntary undertaking. Plaintiffs have produced no such comprehensive survey in their briefs. At the hearing, plaintiffs' counsel baldly asserted that "[e]very jurisdiction in the United States has based its voluntary negligence law off of Restatement [(Second) of Torts Sections] 323 and 324[A]" (Tr. 3:5–6). But plaintiffs' briefing compared the law of only four states: New York (where the NFL is headquartered), Arizona, California, and Illinois (where named plaintiffs live). We "cannot rely merely on assurances of counsel that any problems with predominance or superiority can be overcome." *Zinser*, at 1189 (citation omitted). This failure to analyze all possible jurisdictions, as required under the law of the forum state, is a showstopper. Plaintiffs' counsel has simply assumed away the problem and provided an inadequate record for certification. The problem is that a proper adjudication of each player's claim may lead to application of the law of 23 different states. Plaintiffs' brief offers no help to find otherwise.

Under California's choice-of-law rules, "a jurisdiction ordinarily has the predominant interest in regulating conduct that occurs within its borders. . . ." *McCann*, 48 Cal. 4th at 97–98 (cleaned up). "[A]lthough the law of the place of the wrong is not necessarily the applicable law for all tort actions, the situs of the injury remains a relevant consideration." *Offshore Rental Co. v. Continental Oil Co.*, 22 Cal. 3d 157, 168 (1978) (citation omitted). In addition, however, the state where a plaintiff resides at the time of the lawsuit also generally has an interest in providing its residents with a remedy, even when the wrong and the injury occurred outside of the state. *McCann*, 48 Cal. 4th at 95; *Zinser*, 253 F.3d at 1187.

Look at a map of the United States. At least 23 states are implicated. The putative class members include thousands of current and former NFL players spanning 35 years of play, 32

15

different teams, and medications administered and distributed (and injuries suffered) in at least

23 different states.  According to plaintiffs (Br. at 34, 36):

> The NFL's voluntary undertaking of a duty to protect the
> health and safety of its players League-wide, and its concomitant
> breach of that duty by acting contrary to the health and safety of its
> players, resulted in every Class member's injuries in every
> NFL-sanctioned stadium in the United States.

*          *          *

> NFL players did not play, were not injured by the NFL's
> tortious conduct, and were not doled out massive amounts of
> medications in any one particular state.  As plaintiffs' [third
> amended complaint] makes clear, Plaintiffs — and all Class
> members — were harmed in dozens of different cities during the
> course of their NFL careers.

In other words, the potentially affected jurisdictions are (1) the states where class

members sustained injuries and (2) the states where they reside.  "[T]he three-part California

choice of law inquiry requires comparison of each non-forum state's law and interest with

California's law and interest *separately*.  As required by California law, [plaintiffs] thus must

apply California's three-part conflict test to *each* non-forum state with an interest in the

application of its law."  *Zinser*, at 1188 (cleaned up).

Plaintiffs have cited a single decision granting certification of a state law claim on behalf

of a nationwide personal injury litigation class:  *In re Copley Pharmaceutical, Inc.*, 158 F.R.D.

485 (D. Wyo. 1994) (Judge Clarence Addison Brimmer).  In that multidistrict litigation, Judge

Brimmer certified a nationwide class of all persons in the United States "who suffered damages

as a result of the inhalation of Albuterol manufactured, supplied, distributed or placed in

commerce by Copley Pharmaceutical, Inc."  158 F.R.D. at 493.  Judge Brimmer certified the

class under Rules 23(b)(3) and 23(c)(4).  Pursuant to Rule 23(c)(4), Judge Brimmer found that

while "individual questions predominate[d] as to the issues of causation and injury," "common

issues predominate[d] the Plaintiffs' claims for strict liability, negligence, [and] negligence per

se."  *Id.* at 492.  Judge Brimmer found that trying the "common issues" of negligence and strict

products liability for the class before one jury, then trying the individualized questions of

causation and damages before separate juries, was "the most equitable approach."  *Ibid.*

United States District Court
Northern District of California

*In re Copley Pharmaceuticals* is distinguishable because the district court's order stated that "the standard for ordinary negligence does not significantly differ throughout the country, and the differences that do exist can be remedied through careful instructions to the jury." *Id.* at 491.  Our court of appeals has recognized, however, that "the laws of negligence, products liability, and medical monitoring all differ in some respects from state to state." *Zinser*, 253 F.3d at 1188 (citation omitted).

Plaintiffs have not met their burden to show that a single body of law can be applied to the entire class, or even that the differences among the states would be manageable.  The Court is concerned that trial of plaintiffs' proposed nationwide negligence class implicating the law of at least 23 different states would become a sprawling train-wreck.  Variation in the law from state to state might make the trial unmanageable.  Perhaps the differences would prove manageable.  But plaintiffs have not met their burden to show it.  "[N]o case law supports th[e] unduly burdensome task" of requiring "the district court [to] *sua sponte* survey the law of all fifty states." *In re Hyundai and Kia Fuel Economy Litig.*, 926 F.3d 539, 562, n.6 (9th Cir. 2019).  "The prospect of having to apply the separate laws of dozens of jurisdictions present[s] a significant issue for trial manageability, weighing against a predominance finding." *Id.* at 563.

### 3.   CLUB BY CLUB FACTUAL QUESTIONS PREDOMINATE AND NO COMBINATION OF METHODS OF COMMON PROOF EXIST TO PROVE THE NFL'S CLASS-WIDE LIABILITY.

In the early 1970s, the NFL developed a formal annual prescription drug audit program in "response to well-publicized dispensing of controlled substances from a few training rooms" and "practices among some teams in the early 1970s which were contrary to the normal prescribing of controlled substances" (Dkt. No. 169-7 at 61, 201).  The head of the prescription drug audit program held the title NFL Drug Advisor.  Dr. Forest S. Tennant, MD, took over as NFL Drug Advisor in 1986.  That year, Dr. Tennant wrote to the team physicians and head trainers describing the purpose of the program:

> The Annual Prescription Audit is primarily designed to insure that controlled substances which are by definition, abusable, are stored, prescribed, and recorded in appropriate documents as is normally

done in regular medical and pharmaceutical practice. The Annual
Prescription Drug Audit is not intended to dictate the practice of
medicine or to unnecessarily limit prescribing options but to
minimize abuse, diversion, and to present a sound image of quality
record-keeping and pharmaceutical practice.

Dr. Tennant described the double-check audit system utilized by the program:

The League utilizes a double-check audit system, headed by Mr.
Charles Jackson of NFL Security, to prevent diversion of
controlled (abusable) substances. One check is an on-site audit
conducted in NFL training rooms by our security representatives.
This mechanism gives us the opportunity to determine, first-hand,
if any performance-enhancing drugs such as anabolic steroids or
amphetamines are being dispensed. Also, controlled substances
are actually counted to determine if inventory matches written
records. The second check is done by having each team submit
their inventory records relative to controlled substances. Proper
record-keeping should provide an audit trail which shows the
quantity of controlled substances which are purchased and
dispensed.

For purposes of class certification, there are four important takeaways from the
prescription drug audits. *First*, the prescription drug audits showed substantial variation
among the teams both in terms of recordkeeping and administration. For example, the 1990
report stated that "[a]udit trails by use of the dispensing-prescribing log and internal audit
summary are well done by some Clubs and essentially absent in others" (*id.* at 209). The
report went on (*ibid.*):

Some Clubs don't seem to know which drugs are controlled
substances, and some don't apparently understand the necessity
(and law) to keep dispensing logs and an internal audit. A review
of Club logs and internal audits . . . reveal excellent tracking by
some . . . and some other Clubs do not have enough documentation
to know if controlled substances are accounted for.

Importantly, the variations among the clubs in terms of recordkeeping affect not only the
lack of common proof, but also the *substantive* liability of the NFL. Recall that the NFL's
voluntary duty is, in part, to "ensure the proper *recordkeeping*, administration and distribution
of medications" by the clubs. *Dent II*, 968 F.3d at 1132 (emphasis added). So, if a club
maintained good drug records, the NFL did not breach its duty to players of that club, while
players of a club who negligently maintained drug records might have claims. And, again, for
players of clubs that failed to maintain proper drug records, we won't have a method of
common proof to show that such failure *caused* injury to the player, given the lack of records.

The 1992 report stated:  "The range of non-steroidal anti-inflammatory drugs (NSAIDs) and controlled substances used in the NFL is quite wide."  For example, in 1986, the maximum number of distinct types of controlled substances dispensed by a team was 15.  In 2004, the 32 teams averaged seven different types of NSAIDs and seven different types of controlled substances per team.  In 2012, the average was 9.3 different kinds of NSAIDs and 13.6 different kinds of controlled medications per club.  The 2014 audit report confirmed that the variation in drug utilization among the clubs did not diminish over time, reporting "substantial variation exists in reported prescribing behaviors of NSAIDs and controlled medications" (Dkt No. 169-8 at 20; Dkt. No. 169-7 at 7, 59, 64, 70 108).

The audit reports showed that not only did the teams dispense a wide variety of NSAIDs and controlled substances but dispensed the same drugs at significantly different volumes.  For example, in the 2005 regular season (July 2005–January 2006), the New York Jets dispensed 320 tablets of Toradol and 148 Toradol injections.  By contrast, the previous season, the Indianapolis colts dispensed more than twice as many (651) doses of Toradol tablets and more than 1.5 times (249) as many Toradol injections (Dkt. No. 169-7 at 105, 111).

Plaintiffs would have us wave our hand at these inter-team differences as merely a question of damages, not liability because, they say, the volumes were all unreasonable.  At oral argument, plaintiffs' counsel brazenly compared the differences in volumes of medications dispensed by the NFL teams to the difference in number of victims between "a serial killer who killed 20 people and a murderer who committed one[.]  I guess I could say the murderer who committed one, you know, is better than the one who committed 20, but they're all murderers" (Tr. 28:11–18).  But this dogma cannot be presumed as a given.  Plaintiffs have provided no reason or evidence, other than exaggerated rhetoric, to believe that the least volume of medications was equally unreasonable to the most and that such differences are immaterial.  Moreover, plaintiffs have made no showing whatsoever that the wide variety of painkillers and non-steroidal anti-inflammatory drugs (NSAIDs) posed a uniform risk in terms of excessive use.  The inter-team differences in terms of volumes and varieties of drugs cannot be ignored.

United States District Court
Northern District of California

*Second*, the few team-specific (as opposed to league-wide) audit results provided by plaintiffs show substantial variation over time even *within one team*.  Again, to take the New York Jets as an example, in the 2006 regular season, the Jets dispensed 511 doses of Vicodin tablets.  But the following year, the Jets dispensed 1275 doses of the same drug.  Again, plaintiffs have provided no reason to believe that such differences are a matter of damages only rather than liability versus non-liability.

*Third*, the prescription drug audits did not (and could not) provide a uniform standard of medical care for the team physicians trainers.  The 1986 report emphasized that it did not "dictate how physicians should practice medicine.  The practice of medicine is an art and science that is based upon a physician's experience, training, patient's needs, and local standards, to name a few factors" and is controlled by state law of the place of the practicing physician (Dkt. No. 169-7 at 63).  The NFL made the point again in the 1992 report (Dkt. No. 169-8 at 20):

> It is crucial to point-out that this program is not designed to comprehensively examine the prescribing behaviors of NFL physicians, the drug dispensing/administering behaviors of athletic trainers, or whether there existed the appropriate clinical diagnoses justifying the prescribing, dispensing, or administration of these drugs.

To determine whether the NFL breached its duty to ensure the proper recordkeeping, administration and distribution of medications by the clubs, we will need to look at the reasonableness of the conduct of the club physicians and trainers in that regard, which is in turn governed by state law of the place of the practicing professionals.  Plaintiffs have given us no record whatsoever to evaluate these differences.

*Fourth*, the NFL has frequently modified the audit program itself over time in response to changing circumstances within the league.  For example, in 1987, the NFL began auditing only controlled substances; prescription drugs that were not controlled substances were no longer subject to the audits.  Also in 1987, the NFL recommended standard dispensing log and internal audit forms for controlled substances to the teams; prior to 1987, "there was no standardization in the League, and controlled substances were, therefore, difficult to control

United States District Court
Northern District of California

1    and audit."  In 1992, "[u]nlike previous years, NSAIDs were included along with controlled

2    substances as the focus of the audits. . . .  [T]he inclusion of the NSAIDs was based upon the

3    significant utilization of these agents in organized sports and the great potential for deleterious

4    consequences with high dosages or prolonged use."  Later on, the prescription drug audit

5    program mandated that the clubs use an electronic recordkeeping system (Dkt. No. 169-7 at

6    207–09; Dkt. No. 169-8 at 22).

7        Plaintiffs allege that by voluntarily undertaking the prescription drug audit program, the

8    NFL assumed a duty to conduct the audits with reasonable care for the benefit of the players.

9    Whether the NFL did so will turn in large part on the drug recordkeeping, administration and

10   distribution practices of the teams and how the NFL conducted the audits in response.  But

11   those factors have changed significantly over the 35-year period from 1973–2008.

12       Finally, plaintiffs have attached to their motion a report published in 2011 of a telephonic

13   survey of 644 retired NFL players who retired between 1979 and 2006 (the proposed class

14   period is players who played between 1973–2008).  Linda B. Cottler et al., *Injury, Pain, and*

15   *Prescription Opioid Use Among Former National Football League (NFL) Players*, 116 Drug

16   and Alcohol Dependence 188–194 (2011).  To assess any correlation between injuries and

17   opioid use in the NFL, and opioid misuse after retirement, interviewers asked the retired

18   players about opioid use or misuse during their NFL careers; sources of opioids; concussions;

19   other injuries; frequency and severity of injuries; and post-retirement use or misuse of opioids.

20   *Id.* at 189.[*]

21       Important for our purposes, 48% of the retired players reported using no prescription

22   opioids during their NFL careers.  *Id.* at 189–90.  The study further found that those who did

25           [*] "Professional interviewers utilized a standard oral script to contact potential study participants by telephone
26   to explain the purpose of the study and obtain verbal consent.  No incentives were provided for participation in the 20
     minute survey.  Study protocols were approved by the Human Research Protection Office at the Washington
27   University School of Medicine.  [¶]  The *Survey of Retired NFL Football Players* is a 62-item assessment, developed
     for a telephone interview format and vigorously pre-tested among NFL players who were not part of the sample pool."
28   *Ibid.*

United States District Court
Northern District of California

1   use prescription opioids in the NFL (52% of those surveyed) reported obtaining them from

2   different sources:

> 37% obtained their opioids exclusively from a doctor, 12% got
> them exclusively from a non-medical source, and *the remaining
> majority* (51%), *reported the source of their prescription opioids to
> be a combination of both doctors and illicit sources such as a
> teammate*, coach, athletic trainer, *or family member*.

6   *Id.* at 190 (emphases added).

7       Although the survey respondents may not be perfectly representative of the putative class

8   as a whole, they do overlap completely, *i.e.*, all of the 644 survey respondents are putative

9   class members. And, although plaintiffs do not allege injuries based solely on opioids (they

10  also allege injuries from NSAIDs), their allegations rest heavily on injuries stemming from

11  opioids. Therefore, the Cottler study is significant because it shows that a significant number

12  of putative class members received opioids from sources other than their clubs. Even

13  plaintiffs' counsel do not contend that the NFL undertook to regulate the acquisition of pain

14  killers by players from sources other than clubs. Yet this factor would have to be accounted

15  for. But there is no practical way to do so on a class-wide basis.

16      For the foregoing reasons, a Rule 23(b)(3) class will not be certified.

17      **4.**    **CLASS MEMBERS CLAIM LARGE DAMAGES.**

18      Rule 23(b)(3)(A) provides that one of the factors relevant to determining whether a class

19  action is superior is "the class members' interests in individually controlling the prosecution or

20  defense of separate actions." "Where damages suffered by each putative class member are not

21  large, this factor weighs in favor of certifying a class action." *Zinser*, 253 F.3d at 1190. In

22  contrast, where putative class members claim relatively large damages, this factor weighs

23  against class action. *Ibid.*

24      Here, several putative class members claim damages greater than two million dollars

25  (Dkt. No. 174-4 at 45). Moreover, plaintiffs represent that more than 1,800 putative class

26  members have signed retainer agreements with plaintiffs' counsel (Br. at 34). These facts

27  show that individual class members have substantial incentive to pursue individual claims

28  weighing against the superiority of a class action.

**5.    A RULE 23(c)(4) CLASS.**

Plaintiffs argue that this case is appropriate for certification of an "issue class" under Rule 23(c)(4), which states: "When appropriate, an action may be brought or maintained as a class action with respect to particular issues."

Plaintiffs argue that certification of the duty and breach elements of the negligence claim are "issues" within the meaning of Rule 23(c)(4) such that whether (1) the NFL voluntarily assumed a duty to the class and (2) the NFL breached that duty, can be tried on a class-wide basis. Then, plaintiffs argue, assuming the class prevails on the first two elements, individual class members can bring actions against the NFL in state courts across the country to prove that the NFL's class-wide breach proximately caused their injuries and to prove damages.

"[T]he theory of Rule 23(c)(4)[] is that the advantages and economies of adjudicating issues that are common to the entire class on a representative basis may be secured even though other issues in the case may need to be litigated separately by each class member." 7AA WRIGHT & MILLER, FEDERAL PRACTICE AND PROCEDURE § 1790 (3d ed. 2021).

In order to be approved, class-wide adjudication of the common issues isolated under Rule 23(c)(4) must still achieve judicial economy *as to the action as a whole*. *Valentino v. Carter-Wallace, Inc.*, 97 F.3d 1227, 1234 (9th Cir. 1996); *In re Northern Dist. of California, Dalkon Shield IUD Products Liability Litigation*, 693 F.2d 847, 856 (9th Cir. 1982); 1 MCLAUGHLIN ON CLASS ACTIONS § 4:43 (17th ed. 2020); WRIGHT & MILLER, *supra*.

Here, certification under Rule 23(c)(4) is not appropriate. If we were to certify a Rule 23(c)(4) class to evaluate the conduct of the NFL itself, we would still need to have evidence concerning what the NFL itself knew about the extent of problems, if any, at the club level. Consider the element of the tort, namely that the defendant should have recognized the service as necessary for the protection of the plaintiff. In evaluating what the NFL "should have recognized" as "necessary for the protection of the plaintiffs," it will be essential to prove the extent of knowledge by the NFL of specific club level safeguards. As plaintiffs say, and the NFL should have known it, then the NFL should have recognized the need. But if the NFL believed the safeguards were adequate as to some teams (or all teams), there would not be

United States District Court
Northern District of California

1   liability.  A club by club probing of the NFL's knowledge would still devolve into a myriad set

2   of club by club issues.

3      Furthermore, if a verdict in favor of a Rule 23(c)(4) class were rendered, then the state

4   courts would have a devil of a time trying to dovetail that finding into the specifics of follow-

5   up trials by individual players in state court (the procedure proposed by plaintiffs).

6      The most effective and efficient way to litigate this case is to proceed to trial on a non-

7   class basis.  It is expected that some of the verdicts rendered by the jury in favor of plaintiffs

8   would have collateral estoppel effect that would benefit their teammates.  And, in the event of

9   loss by plaintiffs, it would not prejudice other class members suing on their own.

10      The decisions referred to by plaintiffs do not support their position.  Plaintiffs refer

11   repeatedly to *Martin v. Behr Dayton Thermal Products LLC*, 896 F.3d 405 (6th Cir. 2018).

12   There, the Sixth Circuit affirmed certification of a class of owners of some 540 Ohio

13   residential properties who alleged that the defendant automotive and dry-cleaning businesses

14   had negligently allowed toxic substances to be released from their facilities into the

15   groundwater underlying the class members' properties.  The class members asserted claims for

16   diminution in property values and loss of use and enjoyment; they did not assert damages for

17   personal injuries.

18      The district court certified several common issues relating to the defendants' breach, *e.g.*,

19   "[w]hether or not it was foreseeable to [the defendants] that their improper handling and

20   disposal of [the toxins] could cause" the groundwater plumes.  *Id.* at 410.  The district court did

21   not certify the claims as a whole because the issues of fact-of-injury, proximate causation, and

22   extent of damage would require individualized inquiries.  *Ibid.*  The Sixth Circuit affirmed,

23   finding that while common issues did not predominate as to the case as a whole, common

24   issues did predominate within the issues certified and trying the certified issues on a common

25   basis was superior because it would materially advance the litigation and because the

26   properties at issue were "in a low-income neighborhood, meaning that class members might

27   not otherwise be able to pursue their claims."  *Id.* at 416.

28

*Martin* is inapposite because the subject properties were all located in Ohio so only Ohio law applied.  Here, as discussed, the laws of 23 different states (where each club was headquartered) are implicated.  Moreover, recall that the NFL's voluntarily assumed duty is to "ensure the proper recordkeeping, administration and distribution of medications" by the clubs. *Dent II*, 968 F.3d at 1132.  The administration and distribution of medications is governed by a professional standard of care, not the ordinary reasonable person standard.  Thus, the complexities raised by the differences in law are compounded by the necessity of examining both the NFL's conduct towards the clubs under 23 different bodies of law, *and* the clubs' conduct towards the players under the medical professional standards of 23 different jurisdictions.

The other decisions referred to by plaintiffs do not support certification of a Rule 23(c)(4) class here.

## CONCLUSION

For the forgoing reasons, plaintiffs' motion for class certification is **DENIED**.

**IT IS SO ORDERED.**

Dated:  August 31, 2021

_____
WILLIAM ALSUP
UNITED STATES DISTRICT JUDGE