1   William N. Sinclair (SBN 222502)
       (bsinclair@silvermanthompson.com)
2   Steven D. Silverman (admitted *pro hac vice*)
       (ssilverman@silvermanthompson.com)
3   Andrew G. Slutkin (admitted *pro hac vice*)
       (aslutkin@silvermanthompson.com)
4   Joseph F/ Murphy, Jr. (admitted *pro hac vice*)
       (jmurphy@silvermanthompson.com)
5   Phillip J. Closius (admitted *pro hac vice*)
       (pclosius@silvermanthompson.com)
6   Christopher Macchiaroli (admitted *pro hac vice*)
       (cmacchiaroli@silvermanthompson.com)
7   **SILVERMAN|THOMPSON|SLUTKIN|WHITE|LLC**
    201 N. Charles Street, Suite 2600
8   Baltimore, MD  21201
    Telephone:  410/385-2225                    Stuart A. Davidson (admitted *pro hac vice*)
9   410/547-2432 (fax)                              (sdavidson@rgrdlaw.com)
                                                 Mark J. Dearman (admitted *pro hac vice*)
10  Mel T. Owens (SBN 226146)                       (mdearman@rgrdlaw.com)
       (mowens@nbolaw.com)                       **ROBBINS GELLER RUDMAN**
11  **NAMANNY BYRNE & OWENS, P.C.**                 **& DOWD LLP**
    2 South Pointe Drive, Suite 245             120 East Palmetto Park Road, Suite 500
12  Lake Forest, CA  92630                      Boca Raton, FL  33432
    Telephone:  949/452-0700                    Telephone:  561/750-3000
13  949/452-0707 (fax)                          561/750-3364 (fax)

14  Attorneys for Plaintiffs and Proposed Class Counsel

15                  UNITED STATES DISTRICT COURT

16                  NORTHERN DISTRICT OF CALIFORNIA

17                      SAN FRANCISCO DIVISION

18  RICHARD DENT, *et al.*, Individually and on   )   Case No. 3:14-cv-02324-WHA-JCS
    Behalf of All Others Similarly Situated,      )
19                                                )   PLAINTIFFS' NOTICE OF MOTION
                                     Plaintiffs,  )   AND MOTION FOR CLASS
20                                                )   CERTIFICATION, APPOINTMENT OF
           vs.                                    )   CLASS REPRESENTATIVES, AND
21                                                )   APPOINTMENT OF CLASS COUNSEL
    NATIONAL FOOTBALL LEAGUE, a New               )
22  York Unincorporated Association,             )   Date:      July 8, 2021
                                                  )   Time:      8:00 a.m.
23                                    Defendant.  )   Dept:      Courtroom 12, 19th Floor
                                                  )   JUDGE:     Hon. William H. Alsup
24

25

26

27

28

**TABLE OF CONTENTS**

PAGE

I.    INTRODUCTION ...................................................................................................1

II.   STATEMENT OF FACTS PLAINTIFFS INTEND TO PROVE AT A CLASS
      TRIAL ON THEIR NEGLIGENCE CLAIM .........................................................3

      A.   The Historical Ubiquity of Medications in the NFL................................3

      B.   The NFL Voluntarily Undertakes a Duty to Its Players Regarding the
           Administration of Medications ...............................................................7

      C.   The NFL's Clear Knowledge that its Teams Are Doping Up Players in
           Extraordinary Amounts.........................................................................11

      D.   The NFL Breached Its Assumed Duty by Doing Nothing to Curb the
           Improper Distribution of Medications to Players – Until, that Is, Plaintiffs
           Sued and the Department of Justice Began an Investigation ...............14

      E.   The Long-Term, Devastating Effect of the NFL's Negligence on Plaintiffs
           and the Class ........................................................................................19

           1.   The General Health Consequences of Long-Term Use of the
                Medications..................................................................................19

           2.   Plaintiffs' Specific Injuries ........................................................22

III.  ARGUMENT .......................................................................................................24

      A.   Legal Standards.....................................................................................24

      B.   Plaintiffs' Proposed Class Meets the Requirements of Rule 23(a)......25

           1.   The Class Is Sufficiently Numerous ..........................................25

           2.   There Are Questions of Fact and Law Common to the Class....26

           3.   Plaintiffs' Claim Is Typical of the Class...................................27

           4.   Plaintiffs Will Adequately Represent the Class.........................28

           5.   Plaintiffs' Counsel Are Qualified to Serve as Class Counsel
                Pursuant to Rule 23(a) and (g)(1) ..............................................29

      C.   Rule 23 Permits Certification of a Rule 23(b)(3) Class on the Common
           Elements of Duty and Breach for Plaintiffs' Negligence Claim..........29

           1.   New York Law Should Govern the Class' Negligence Claim ...29

                a.   California's Choice of Law Rules Apply.......................30

                b.   The State of the Law of Negligence in the Potentially
                     Affected Jurisdictions ................................................31

c.     True Conflict Exists ............................................................... 33

     (1)    California ................................................................. 34

     (2)    New York ................................................................ 34

     (3)    Arizona ................................................................... 34

d.     Comparative Impairment Analysis ................................. 35

2.     Rule 23(c)(4) Certification of the Elements of the NFL's Duty and Breach ........................................................................................ 37

3.     Even Assuming Predominance Must Be Met, the Elements of Duty and Breach by One Defendant Predominate Over Any Individual Issues ............................................................................................ 40

4.     Class Certification Is a Superior Method for Trying the Duty and Breach Elements of All Class Members' Claims ...................... 43

IV.     CONCLUSION ........................................................................................... 44

# TABLE OF AUTHORITIES

**CASES**                                                                                     **PAGE**

*Adkins v. Facebook, Inc.*,
    424 F. Supp. 3d 686 (N.D. Cal. 2019) ................................................................24

*Amador v. Baca*,
    No. 10-1649 SVW, 2014 WL 10044904 (C.D. Cal. Dec. 18, 2014) ......................................37

*Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*,
    568 U.S. 455 (2013) ...................................................................41

*Bateman v. Am. Multi-Cinema, Inc.*,
    623 F.3d 708 (9th Cir. 2010) ...........................................................24

*Bell v. Hutsell*,
    955 N.E.2d 1099 (Ill. 2011) ............................................................32

*Briseno v. ConAgra Foods, Inc.*,
    844 F.3d 1121 (9th Cir. 2017) ........................................................24, 25

*Butler v. Sears, Roebuck & Co.*,
    727 F.3d 796 (7th Cir. 2013) ........................................................38, 39

*Calla v. Shulsky*,
    543 N.Y.S.2d 666 (App. Div. 1989) ....................................................34

*Cohen v. Trump*,
    303 F.R.D. 376 (S.D. Cal. 2014) ......................................................25

*Davidson v. Apple, Inc.*,
    No. 16-CV-04942-LHK, 2018 WL 2325426 (N.D. Cal. May 8, 2018) ...................................40

*Delgado v. Trax Bar & Grill*,
    113 P.3d 1159 (Cal. 2005) ............................................................32

*Denham v. Farmers Ins. Co.*,
    262 Cal. Rptr. 146 (Ct. App. 1989) ............................................33, 34, 35, 37

*Dent v. Nat'l Football League*,
    902 F.3d 1109 (9th Cir. 2018) .........................................................29

*Dent v. Nat'l Football League*,
    968 F.3d 1126 (9th Cir. 2020) .........................................................29

*Engle v. Liggett Grp., Inc.*,
    945 So. 2d 1246 (Fla. 2006) ..........................................................39

*Frezza v. Google Inc.*,
    No. 5:12-cv-00237-RMW, 2013 WL 1736788 (N.D. Cal. Apr. 22, 2013) .........................34, 35

*Giroux v. Essex Prop. Tr., Inc.*,
    No. 16-cv-01722-HSG, 2018 WL 2463107 (N.D. Cal. June 1, 2018) ...........................26, 42

*Grodzitsky v. Am. Honda Motor Co.*,
No. 2:12-cv-01142-SVW-PLAx, 2014 WL 718431 (C.D. Cal. Feb. 19, 2014) .....................31

*Hanlon v. Chrysler Corp.*,
150 F.3d 1011 (9th Cir. 1998) ..............................................................................2, 27, 28

*Hernandez v. Motor Vessel Skyward*,
61 F.R.D. 558 (S.D. Fla. 1973), *aff'd*, 507 F.2d 1278 (5th Cir. 1975) ....................................43

*In re ConAgra Foods, Inc.*,
90 F. Supp. 3d 919 (C.D. Cal. 2015), *aff'd*, 844 F.3d 1121 (9th Cir. 2017) ...........................26

*In re Copley Pharm., Inc.*,
158 F.R.D. 485 (D. Wyo. 1994) .............................................................................................42

*In re Deepwater Horizon*,
739 F.3d 790 (5th Cir. 2014) .................................................................................................38

*In re Hanford Nuclear Rsrv. Litig.*,
292 F.3d 1124 (9th Cir. 2002) ..............................................................................................38

*In re Hyundai & Kia Fuel Econ. Litig.*,
926 F.3d 539 (9th Cir. 2019) ................................................................................................30

*In re: Lenovo Adware Litig.*,
No. 15-md-02624-RMW, 2016 WL 6277245 (N.D. Cal. Oct. 27, 2016)...............................40

*In re Lidoderm Antitrust Litig.*,
No. 14-md-02521-WHO, 2017 WL 679367 (N.D. Cal. Feb. 21, 2017)..................................28

*In re Morning Song Bird Food Litig.*,
320 F.R.D. 540 (S.D. Cal. 2017) ...........................................................................................44

*In re Nassau Cty. Strip Search Cases*,
461 F.3d 219 (2d Cir. 2006)..................................................................................................38

*In re Nat'l Football League Players Concussion Injury Litig.*,
821 F.3d 410 (3d Cir. 2016)..................................................................................................25

*In re Pac. Fertility Ctr. Litig.*,
No. 18-cv-01586-JSC, 2020 WL 3432689 (N.D. Cal. June 23, 2020) ...................................38

*In re Sch. Asbestos Litig.*,
789 F.2d 996 (3d Cir. 1986)..................................................................................................42

*In re Telectronics Pacing Sys., Inc.*,
172 F.R.D. 271 (S.D. Ohio 1997) .........................................................................................42

*In re Tri-State Crematory Litig.*,
215 F.R.D. 660 (N.D. Ga. 2003)...........................................................................................42

*In re Whirlpool Corp. Front-Loading Washer Prods. Liab. Litig.*,
722 F.3d 838 (6th Cir. 2013) ................................................................................................38

*Int'l Serv. Ins. Co. v. Gonzales,*
    239 Cal. Rptr. 341 (Ct. App. 1987) ....................................................................................32

*Ivanhoe Fin., Inc. v. Highland Banc Corp.,*
    No. 03 C 7336, 2004 WL 2091997 (N.D. Ill. Sept. 15, 2004)................................................32

*Jabbari v. Farmer,*
    965 F.3d 1001 (9th Cir. 2020) ...............................................................................................2

*Jimenez v. Allstate Ins. Co.,*
    765 F.3d 1161 (9th Cir. 2014) ........................................................................................26, 38

*Jordan v. Paul Fin., LLC,*
    285 F.R.D. 435 (N.D. Cal. 2012)......................................................................................2, 25

*Just Film, Inc. v. Buono,*
    847 F.3d 1108 (9th Cir. 2017) ........................................................................................27, 40

*Kamakahi v. Am. Soc'y for Reprod. Med.,*
    305 F.R.D. 164 (N.D. Cal. 2015)..........................................................................................39

*Katz v. AvalonBay Cmties., Inc.,*
    No. 15-2740 (JLL), 2018 WL 5278702 (D.N.J. Oct. 24, 2018) ......................................26, 27

*Kearney v. Salomon Smith Barney, Inc.,*
    137 P.3d 914 (Cal. 2006) ......................................................................................................31

*Kloner v. United States,*
    196 F. Supp. 3d 375 (E.D.N.Y. 2016) ..................................................................................32

*Kuberski v. Allied Recreational Grp., Inc.,*
    No. 1:15-CV-320-HAB, 2020 WL 5230588 (N.D. Ind. Sept. 2, 2020) ................................30

*Laborers Local 17 Health & Benefit Fund v. Philip Morris, Inc.,*
    7 F. Supp. 2d 277 (S.D.N.Y. 1998), *rev'd on other grounds*, 191 F.3d 229 (2d Cir. 1999)....33

*Lilly v. Jamba Juice Co.,*
    308 F.R.D. 231 (N.D. Cal. 2014)..........................................................................................38

*Marlo v. United Parcel Serv., Inc.,*
    251 F.R.D. 476 (C.D. Cal. 2008), *aff'd*, 639 F.3d 942 (9th Cir. 2011) ................................40

*Marsh v. First Bank of Del.,*
    No. 11-cv-05226-WHO, 2014 WL 554553 (N.D. Cal. Feb. 7, 2014) ....................................42

*Martin v. Behr Dayton Thermal Prods. LLC,*
    896 F.3d 405 (6th Cir. 2018) ................................................................................................38

*Mayall ex rel. H.C. v. USA Water Polo, Inc.,*
    909 F.3d 1055 (9th Cir. 2018) ..............................................................................................32

*Mazza v. Am. Honda Motor Co.,*
    666 F.3d 581 (9th Cir. 2012) ..................................................................................31, 33, 36

*McCutchen v. Hill,*
    710 P.2d 1056 (Ariz. 1985)..............................................................................................33

*McGhee v. Arabian Am. Oil Co.,*
    871 F.2d 1412 (9th Cir. 1989) .......................................................................................30

*Mullen v. Treasure Chest Casino, LLC,*
    186 F.3d 620 (5th Cir. 1999) ....................................................................................26, 42

*Nitsch v. DreamWorks Animation SKG Inc.,*
    315 F.R.D. 270 (N.D. Cal. 2016)...................................................................................25

*Offshore Rental Co. v. Cont'l Oil Co.,*
    583 P.2d 721 (Cal. 1978) ..........................................................................................33, 35

*Olden v. LaFarge Corp.,*
    383 F.3d 495 (6th Cir. 2004) .........................................................................................38

*Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods LLC,*
    No. 19-56514, 2021 WL 1257845 (9th Cir. Apr. 6, 2021)......................................2, 24, 41, 43

*Parsons v. Ryan,*
    754 F.3d 657 (9th Cir. 2014) ...........................................................................24, 25, 26, 27

*Paulsen v. Towers, Perrin, Forster & Crosby, Inc.,*
    No. C 03-03960 JW, 2010 WL 11614258 (N.D. Cal. Oct. 7, 2010) ...................................42

*Petersen v. Costco Wholesale Co.,*
    312 F.R.D. 565 (C.D. Cal. 2016)...........................................................................37, 41, 42

*Reich v. Purcell,*
    432 P.2d 727 (Cal. 1967) ..........................................................................................31, 35

*Renteria v. United States,*
    452 F. Supp. 2d 910 (D. Ariz. 2006) ............................................................................33

*Sala v. Nat'l R.R. Passenger Corp.,*
    120 F.R.D. 494 (E.D. Pa. 1988)....................................................................................43

*Sali v. Corona Reg'l Med. Ctr.,*
    889 F.3d 623 (9th Cir. 2018) .........................................................................................24

*Senne v. Kan. City Royals Baseball Corp.,*
    934 F.3d 918 (9th Cir. 2019), *cert. denied,* __ U.S. __, 141 S. Ct. 248 (2020)................31, 35

*Slocum v. Int'l Paper Co.,*
    No. 16-12563, 2019 WL 2192099 (E.D. La. May 21, 2019)...........................................38

*Steinberger v. McVey,*
    318 P.3d 419 (Ariz. Ct. App. 2014) ..............................................................................33

*Tasion Commc'ns, Inc. v. Ubiquiti Networks, Inc.,*
    308 F.R.D. 630 (N.D. Cal. 2015)...........................................................................37, 39

*Tavarez v. Lelakis,*
   143 F.3d 744 (2d Cir. 1998) ............................................................................................32, 33

*Tollenaar v. Chino Valley Sch. Dist.,*
   945 P.2d 1310 (Ariz. Ct. App. 1997) .......................................................................................32

*Tyson Foods, Inc. v. Bouaphakeo,*
   577 U.S. 442 (2016) .................................................................................................................41

*Valentino v. Carter-Wallace, Inc.,*
   97 F.3d 1227 (9th Cir. 1996) ........................................................................................ *passim*

*Wahl v. Am. Sec. Ins. Co.,*
   No. C 08-00555 RS, 2010 WL 1881126 (N.D. Cal. May 10, 2010) ........................................40

*Wal-Mart Stores, Inc. v. Dukes,*
   564 U.S. 338 (2011) .................................................................................................................26

*Walker v. R.J. Reynolds Tobacco Co.,*
   734 F.3d 1278 (11th Cir. 2013) ...............................................................................................39

*Wash. Mut. Bank, FA v. Super. Ct.,*
   15 P.3d 1071 (Cal. 2001) .........................................................................................................30

*Watson v. Shell Oil Co.,*
   979 F.2d 1014 (5th Cir. 1992) .................................................................................................42

*Weisblatt v. Chi. Bar Ass'n,*
   684 N.E.2d 984 (Ill. App. Ct. 1997) .......................................................................................32

*Yang v. M/V Minas Leo,*
   No. C 93-2495 MHP, 1994 WL 36921 (N.D. Cal. Jan. 25, 1994), *aff'd,* 76 F.3d 391 (9th Cir.
   1996) ........................................................................................................................................30

*Zimmerman v. Allstate Ins. Co.,*
   224 Cal. Rptr. 917 (Ct. App. 1986) ............................................................................30, 36, 37

*Zinser v. Accufix Rsch. Inst., Inc.,*
   253 F.3d 1180 (9th Cir. 2001) .................................................................................................30

**STATUTES, RULES AND REGULATIONS**

Federal Rules of Civil Procedure
   Rule 23 ........................................................................................................................... *passim*
   Rule 23(a)....................................................................................................................... *passim*
   Rule 23(a)(1)............................................................................................................................25
   Rule 23(a)(2)............................................................................................................................26
   Rule 23(a)(3)............................................................................................................................27
   Rule 23(a)(4)............................................................................................................................28
   Rule 23(b) ................................................................................................................................24
   Rule 23(b)(3) ................................................................................................................. *passim*
   Rule 23(c)(4) ................................................................................................................. *passim*
   Rule 23(c)(5) ............................................................................................................................30
   Rule 23(g) ................................................................................................................................29

1

Rule 23(g)(1)(A) ..................................................................................29
Rule 23(g)(4) ......................................................................................29

2

3

**SECONDARY AUTHORITIES**

7AA C. Wright, A. Miller & M. Kane, FEDERAL PRACTICE & PROCEDURE
    §1778 (3d ed. 2005) ........................................................................41
    §1790 (3d ed. 2005) ........................................................................37

RESTATEMENT (SECOND) OF CONFLICT OF LAWS .........................................35

RESTATEMENT (SECOND) OF TORTS §323 ...........................................32, 33

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1
2
**PLAINTIFFS' NOTICE OF MOTION AND MOTION FOR CLASS CERTIFICATION,
APPOINTMENT OF CLASS REPRESENTATIVES AND
APPOINTMENT OF CLASS COUNSEL**

3
**TO ALL PARTIES AND THEIR COUNSEL OF RECORD:**

4        **PLEASE TAKE NOTICE** that, pursuant to the Stipulation and Order Regarding Class

5   Certification Briefing Schedule and Page Limits (ECF No. 167), on July 8, 2021, at 8:00 a.m., or

6   as soon thereafter as available, in the courtroom of the Honorable William H. Alsup, located at

7   450 Golden Gate Avenue, Courtroom 12, 19th Floor, San Francisco, California 94102, Plaintiffs

8   will and hereby do move, pursuant to Rule 23 of the Federal Rules of Civil Procedure, for: (a) class

9   certification; (b) their appointment as Class Representatives; and (c) the appointment of their

10   counsel as Class Counsel.

11        This motion is based upon this Notice of Motion, the Memorandum of Points and

12   Authorities, the accompanying Declarations of Phillip J. Closius, Richard Dent, Jeremy Newberry,

13   J.D. Hill, Keith Van Horne, Ron Stone, Ron Pritchard, James McMahon, and Marcellus Wiley,

14   the exhibits appended hereto, the pleadings and papers on file in this action, any other such matters

15   of which the Court may take judicial notice, the arguments of counsel, and any other matters the

16   Court may properly consider.

17                 **MEMORANDUM OF POINTS AND AUTHORITIES**

18        Pursuant to Federal Rule of Civil Procedure 23, Plaintiffs Richard Dent, Jeremy Newberry,

19   J.D. Hill, Keith Van Horne, Ron Stone, Ron Pritchard, James McMahon, and Marcellus Wiley

20   (collectively, "Plaintiffs"), by and through their undersigned counsel, respectfully move for class

21   certification.  Plaintiffs request that the Court appoint them as Class Representatives and appoint

22   their counsel as Class Counsel.

23   **I.      INTRODUCTION**

24        Plaintiffs ask this Court to certify a Class defined as:

25        All NFL players[1] who played in the National Football League ("NFL" or "League")
           at any time between January 1, 1973 and December 31, 2008, and who received
26         Medications from an NFL club, including, but not limited to, opioids (such as

27   _____

     [1]   For Class purposes, "NFL players" means anyone listed on one of the NFL's clubs' rosters
28   from the first game of a season through the completion of that season.

1  Vicodin, Percocet, Percodan, Hydrocodone, etc.), non-steroidal anti-inflammatory
2  drugs (such as Toradol, Vioxx, Naprosyn, Indocin, Celebrex, etc.), corticosteroids
   (such as Prednisone), or local anesthetics (such as Lidocaine, Xylocaine, etc.).

3  Plaintiffs' only claim in this case (negligence) meets the requirements for certification

4  under Rule 23(b)(3) because the central issues in this case – whether the NFL voluntarily assumed

5  a duty to protect the health and safety of its players, whether the NFL breached that duty, and

6  general causation – are "capable of resolution in one fell swoop[,]" *Jabbari v. Farmer*, 965 F.3d

7  1001, 1006 (9th Cir. 2020),[2] such that resolving those issues on a piecemeal basis for thousands of

8  retired NFL players, potentially risking inconsistent rulings or verdicts, makes little sense.  The

9  Ninth Circuit has explicitly endorsed class certification under Rule 23(b)(3) and (c)(4), even when

10 some issues in the case must be decided on an individual basis.  *See Valentino v. Carter-Wallace,*

11 *Inc.*, 97 F.3d 1227, 1234 (9th Cir. 1996).  This case, involving one claim under either one state's

12 common law (or alternatively four), presents a perfect vehicle for certification of Plaintiffs'

13 negligence claim to resolve, on a class-wide basis, several of the common elements of Plaintiffs'

14 negligence claim against the NFL.  Those issues predominate over the issues of specific causation

15 and damages.  Importantly, the "predominance" requirement under Rule 23(b)(3) does not require

16 that 90%, 75%, or even 60% of the issues in the case can be decided on a class-wide basis.  The

17 word "predominate" is defined as "to hold advantage in numbers or quantity."[3]  Thus, as long as

18 the predominant issues in the case "hold advantage" over any individual issues, the requirement is

19 met.  That is true here.  Accordingly, as explained further below, class certification should be

20 granted.

21

22

---

23 [2]   Citations, internal quotations, and footnotes omitted and emphasis added unless otherwise
   noted.

24 [3]   Predominate, MERRIAM-WEBSTER DICTIONARY, https://www.merriam-webster.com/diction
25 ary/predominate (last visited Apr. 2, 2021).  The Ninth Circuit recently adopted this very
   definition.  *See Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods LLC*, No. 19-56514,
26 2021 WL 1257845, at *11 (9th Cir. Apr. 6, 2021).  This is also consistent with courts' view of the
   predominance element.  *See Jordan v. Paul Fin., LLC*, 285 F.R.D. 435, 463 (N.D. Cal. 2012)
27 ("Claims need not be identical for common issues of law and fact to predominate, they need only
   be reasonably coextensive with those of absent class members.") (citing *Hanlon v. Chrysler Corp.*,
28 150 F.3d 1011, 1020 (9th Cir. 1998)).

## II.   STATEMENT OF FACTS PLAINTIFFS INTEND TO PROVE AT A CLASS TRIAL ON THEIR NEGLIGENCE CLAIM

### A.   The Historical Ubiquity of Medications in the NFL

Since at least the early 1970s, the NFL has created and maintained a culture in which everyone, from the League and its owners to the coaching staff, general managers, and trainers, exerted pressure on the players to play even if they were hurt or seriously injured.  Pain was a part of the players' daily lives, and everyone had a financial interest in overcoming it.[4]  The club doctors and trainers were the focal point of the return-to-play culture and their dispensing of drugs critical to its success.[5]  As stated by the New York Jets trainers and medical staff in a slide show presented to players in its 2007 training camp, "Our *only job* is to keep you on the field."[6]  Trainers and doctors met with club coaches and general managers every week in the regular season to discuss player injuries and player availability for the upcoming game.[7]  A Harvard study on healthcare in the NFL concluded that the NFL's return-to-play culture placed club doctors in an inherent conflict of interest.[8]  A 1986 summary audit to NFL Commissioner Pete Rozelle specifically noted that clubs were dispensing amphetamines to assist player performance.[9]

---

[4]   BROWN_EVANS_0000005308 at 14, *see* Declaration of Phillip J. Closius ("Closius Decl."), Ex. 12, filed contemporaneously herewith; BROWN_EVANS_0000005314, Closius Decl., Ex. 13.

[5]   Excerpts from Deposition of Anthony P. Yates, M.D. ("Yates Dep.") at 89:4-22, Closius Decl., Ex. 14; Excerpts from Deposition of T. Pepper Burrus ("Burrus Dep.") at 120:8-123:8, Closius Decl., Ex. 15; Executive Summary and excerpts from Christopher R. Deubert, *et al.*, *Protecting and Promoting the Health of NFL Players: Legal and Ethical Analysis and Recommendations* (Nov. 2016) ("Harvard Report") at 167 (noting that "athletic trainers are pressured by the club and coaches to have players on the field"), Closius Decl., Ex. 16.  The full, 493-page Harvard Report can be accessed at https://footballplayershealth.harvard.edu/wp-content/uploads/2016/11/01_Full_Report.pdf.

[6]   Deposition of Elliot Pellman, M.D., Ex. 27 at 7, Closius Decl., Ex. 17.

[7]   Excerpts from Deposition of David J. Chao, M.D. ("Chao Dep.") at 45:2-25, 218:8-220:2, Closius Decl., Ex. 18; Excerpts from Deposition of Matthew Matava, M.D. ("Matava Dep.") at 113:7-114:22, Closius Decl., Ex. 19; Yates Dep. at 74:7-75:23, Closius Decl., Ex. 14.

[8]   Harvard Report at 13, 16, Closius Decl., Ex. 16.

[9]   BROWN_EVANS_0000010153, Closius Decl., Ex. 20.

The volume of controlled substances and non-steroidal anti-inflammatory drugs ("NSAIDs") (collectively, "Medications") required to keep players on the field was staggering. The amount of Medications doled out to players by the Pittsburgh Steelers is representative of a slightly above average NFL team – for the 2012 season Dr. Lawrence Brown, who has overseen the NFL's entire drug program since 1990, noted that the Steelers were tenth in the NFL in doses of NSAIDs distributed and fourteenth in doses of controlled substances distributed.[10]  The Steelers traveled with thousands of the Medications for international games and a few practices in Barcelona (1993), Dublin (1997), and Mexico City (2000).[11]  The same was true for a trip to the Super Bowl and a few practices before the game.[12]  For the 2012 season, an NFL summary audit to the Steelers noted that they had distributed 7,442 doses of NSAIDs to players and 2,123 doses of controlled substances to players.[13]  In 2004, the Colts dispensed 900 doses of Toradol and 585 doses of Vicodin.[14]  In 2008, the Jets dispensed 1,031 doses of Toradol and 1,295 doses of Vicodin.[15]

The volume of Medications needed to keep players on the field required a distribution system that was part illegal, part unethical, and wholly unrelated to player health.  The NFL relied on clubs storing stock bottles and ordering them, usually by trainers, from pharmacies in the club's, doctor's, or trainer's name.[16]  The players were then given pills, usually by the trainers, in

---

[10]   BROWN_EVANS_0000022290 at 91, Closius Decl., Ex. 21.

[11]   PIT_EVANS_0000000714, Closius Decl., Ex. 22; PIT_EVANS_0000000964, Closius Decl., Ex. 23.

[12]   PIT_EVANS_0000000825, Closius Decl., Ex. 24.

[13]   Yates Dep., Ex. 13, Closius Decl., Ex. 25.

[14]   IND_EVANS_0000004051, Closius Decl., Ex. 26.

[15]   NYJ_EVANS_0000004273, Closius Decl., Ex. 27.

[16]   Matava Dep. at 124:3-130:17, Closius Decl., Ex. 19; Burrus Dep. at 157-159, Closius Decl., Ex. 15; NO_EVANS_0000006046 at 2, Closius Decl., Ex. 28.

1  envelopes, small cups, or small bottles.[17]  This practice meant that players were almost never given

2  individual prescriptions or individual side-effects warnings.  Doctors and trainers also carried

3  controlled substances across state lines for away games.[18]  Finally, the doctors and trainers

4  dispensed Medications to players before a game, before any injury, to ensure a player's ability to

5  play and be at a maximum performance level.  Despite frequent warnings about the dangers and

6  legality of these practices by the Drug Enforcement Administration ("DEA") and studies it

7  commissioned, the NFL took no action to change or disrupt this distribution system until after

8  Plaintiffs filed their complaint in May 2014.

9        The most common NSAIDs the NFL used for the 1998 season were Toradol, Indocin, and

10  Naprosyn.  The most common controlled substances were Vicodin and Valium.[19]  A 2016 study

11  noted that the most consistent controlled substances used in the NFL for pain were Vicodin,

12  Percocet, and Oxycontin.[20]  Ambien, also a controlled substance, has been the NFL's preferred

13  sleep aid for decades.[21]  In the mid-1990s, Toradol became the NFL's ***pregame*** drug of choice

14  because of its potency as a pain killer and its status as an NSAID, not a controlled substance.

15  Players lined up right before the game for their shots to maximize the efficacy of their dose.[22]

16  Literally every team in the NFL used pregame doses of Toradol for its players.[23]  Usage of Toradol

17  was so widespread that the NFL sponsored two different studies in 2002 and 2012 to report on the

18

19

20

21  [17]  Matava Dep. at 162:13-18, Closius Decl., Ex. 19; Burrus Dep. at 252:4-255:12, Closius Decl., Ex. 15.

22  [18]  Excerpts from Deposition of Elliot Pellman, M.D. ("Pellman Dep.") at 54:25-56:5, Closius Decl., Ex. 29.

23

24  [19]  NFLPS_EVANS_0002096 at 97, Closius Decl., Ex. 30.

25  [20]  Harvard Report at 145, Closius Decl., Ex. 16.

26  [21]  PIT_EVANS_0000000676, Closius Decl., Ex. 31.

27  [22]  Yates Dep. at 140:23-142:13, Closius Decl., Ex. 14; Excerpts from Deposition of Gerald Wunsch at 184:5-185:19, Closius Decl., Ex. 32.

28  [23]  GB_EVANS_0000000880, Closius Decl., Ex. 33.

clubs' practices regarding Toradol.[24]  The recommendations of both studies that Toradol ***not*** be used as a pregame painkiller were ignored until after Plaintiffs filed their lawsuit.  Other drugs, particularly Vicodin, were also used on game day to supplement Toradol.  Clubs gave some of these other drugs through pregame IVs.[25]

To be sure, a survey commissioned by ESPN in 2011 examined opioid use in the NFL and concluded that, of the 644 former NFL players surveyed, 52% used prescription opioids during their NFL career, 71% of whom reported misusing opioids while playing in the League, and 51% of retired NFL players who used opioids while playing reported obtaining the painkillers from a combination of doctors and nonmedical sources, like a teammate, coach, or trainer.[26]  Not surprisingly, former players who misused opioids during their playing career were 3.2 times more likely than players who used opioids as prescribed to misuse these drugs in the preceding month.[27]

The NFL and the club doctors and trainers defended this distribution system by repeatedly asserting that the NFL presented unique clinical challenges.  For example, Dr. Elliot Pellman, a rheumatologist and the NFL's medical liaison, characterized the NFL health culture as special because the "patient population was highly motivated, . . . healthy and ambitious, gifted

---

[24]  PLAINTIFFS-NFL 0000240, Closius Decl., Ex. 34; SD_EVANS_0000003498, Closius Decl., Ex. 35.

[25]  NFLPS_EVANS_0000294, Closius Decl., Ex. 36.

[26]  Linda B. Cottler, *et al.*, *Injury, pain, and prescription opioid use Among former National Football League (NFL) players*, DRUG ALCOHOL DEPEND. (2011), NFL_COTTLER_00000413, Closius Decl., Ex. 37.

[27]  Indeed, after perennial All-Pro wide receiver Calvin "Megatron" Johnson abruptly retired from the NFL in 2016, he discussed the challenges of dealing with injuries while in the NFL and said team trainers and physicians were passing out painkillers "like candy" in locker rooms.  According to Mr. Johnson,

> If you were hurting, then you could get 'em, you know. It was nothing.  I mean, if you needed Vicodin, call out, "My ankle hurt," you know.  "I need, I need it. I can't, I can't play without it," or something like that.  It was simple.  That's how easy it was to get 'em, you know.  So if you were dependent on 'em, they were readily available.

*Calvin Johnson Tells E:60 He Had His 'Fair Share' of Concussions*, ESPN (July 6, 2016), https://www.espn.com/nfl/story/_/id/16822053/calvin-johnson-talks-painkillers-concussions-player-safety (last visited Apr. 13, 2021), Closius Decl., Ex. 38.

athletically."[28]  These characteristics justified in the minds of the NFL and its clubs practices they would never employ in the context of a non-NFL patient.  At the same time, the doctors had no real understanding of the federal and state laws that governed the distribution of the Medications.[29] In fact, the trainers who regularly ordered the Medications and dispensed them to players and maintained the distribution logs had no background in pharmacology at all before joining the NFL.[30]  However, the standard of care throughout the League was the same for every club because the belief of the NFL's clinical uniqueness was shared at combine meetings, its scientific and business sections, and informal dialogue among the clubs' doctors.[31]

**B.    The NFL Voluntarily Undertakes a Duty to Its Players Regarding the Administration of Medications**

The NFL voluntarily undertook responsibility for the distribution and administration of the Medications in the mid-1970s with the creation of the NFL Prescription Drug Advisory Program ("Program").  Dr. Walter Riker was appointed as the first NFL drug advisor and head of the Program in 1973.  He was succeeded by Dr. Forest Tennant in 1984 who was in turn followed by Dr. Brown in 1990.  Dr. Brown still serves in the capacity.[32]  Dr. Pellman was hired by the NFL as a special medical liaison in February 2003 (he was also the team doctor of the New York Jets).[33] Dr. Pellman was hired to fill gaps in the Program which he defined as operational issues relating to drugs.[34]  The Program was originally started because some teams were acting contrary to the normal prescribing of controlled substances.  The Program was designed to minimize abuse

---

[28]   Pellman Dep. at 73:21-24, Closius Decl., Ex. 29; *see also* SD_EVANS_0000003498 at 3510 (discussing the "nature of professional football and the risk of injury" in relation to systemic Toradol dispensing by NFL clubs), Closius Decl., Ex. 35.

[29]   Yates Dep., Ex. 12, Closius Decl., Ex. 39; Yates Dep. at 16:3-10, 20-21, Closius Decl., Ex. 14.

[30]   Excerpts from Deposition of Ronnie Barnes ("Barnes Dep.") at 14:8-15:21, Closius Decl., Ex. 40.

[31]   Yates Dep., Ex. 12, Closius Decl., Ex. 39.

[32]   BROWN_EVANS_0000010153, Closius Decl., Ex. 20.

[33]   NFLPS_EVANS_0001631 at 32, Closius Decl., Ex. 41.

[34]   Pellman Dep. at 92:15-93:10, Closius Decl., Ex. 29.

1    diversion and present a sound image of quality record keeping and pharmaceutical practice.[35]   The

2    Program from its inception required each NFL club to report quarterly/annually on the Medications

3    it was giving to the players, maintain a Medications dispensing log, and submit to annual on-site

4    inspections.[36]   The Program director would send each club an audit summary at the end of each

5    year.[37]   Communications between the NFL and the clubs' doctors and trainers took place at the

6    respective annual meetings of the National Football League Physicians Society ("NFLPS") and

7    the Professional Football Athletic Trainers Society ("PFATS"), both of which eventually met at

8    the NFL's annual combine.

9           The Program was, from its inception, the intersection between the entire NFL management

10   structure and the distribution of the Medications.   All of the NFL Commissioners since the

11   Program's inauguration have interacted with the Program's director, the NFLPS president and,

12   later, the medical liaison.   Commissioner Pete Rozelle requested an NFLPS *ad hoc* committee to

13   nominate a successor to Dr. Riker[38] and received audit reports from Dr. Tennant for the 1986

14   season.[39]   Dr. Pellman reported directly to Commissioner Paul Tagliabue and frequently met with

15   him to discuss concerns of club physicians.[40]   The current Commissioner, Roger Goodell, has been

16   involved with the distribution of the Medications throughout his long career with the NFL.

17   Commissioner Goodell received a copy of all of Brown's summary audits to the clubs for the 1995

18   season when Commissioner Goodell was in a football and operations position with the NFL.[41]

19   Dr. Pellman testified that he met with the Commissioner 30 times in person, phoned 25-50 times,

20

21   ─────────────────────────

22   [35]   BROWN_EVANS_0000010177 at 77-78. Closius Decl., Ex. 42.

     [36]   BROWN_EVANS_0000000287, Closius Decl., Ex. 43.

23   [37]   *Id*.

24   [38]   NFLPS_EVANS_0002751 at 51-52, Closius Decl., Ex. 44.

25   [39]   BROWN_EVANS_0000010153, Closius Decl., Ex. 20.

26   [40]   Pellman Dep. at 93:11-23, Closius Decl., Ex. 29; NFLPS_EVANS_0001631 at 32, Closius

27   Decl., Ex. 41.

28   [41]   GB_EVANS_0000000488 at 94, Closius Decl., Ex. 45.

1    and emailed at least once a week in a typical year as medical liaison.[42]  Drs. Yates and Matava met

2    with Commissioner Goodell to discuss the Commissioner's desire for a new task force studying

3    the League-wide use of Toradol.[43]  The NFLPS president typically met a few times each year with

4    the Commissioner.[44]

5           Senior NFL management officials other than the Commissioner were also involved in

6    Medication-related issues.  Jeff Pash, the NFL's General Counsel, was involved in discussions

7    with Dr. Pellman and NFLPS officers regarding solutions to the problem of the DEA telling Dr.

8    Pellman and the other doctors that travelling with controlled substances across state lines was a

9    federal crime.[45]  Dr. Brown noted to Dr. Pellman and NFLPS officers that he must seek clearance

10   from his NFL superiors before the release of any written communication regarding the

11   Medications.[46]  The NFLPS president would also meet several times a year with League owners

12   and a variety of senior NFL management personnel in addition to the Commissioner.[47]  In addition

13   to regular attendance by Drs. Brown and Pellman, NFL management personnel frequently attended

14   NFLPS and PFATS annual meetings and often gave reports on a variety of issue regarding the

15   Medications.[48]

16          Moreover, the NFL Security Office has conducted the on-site inspection of the clubs'

17   storage facilities and Medications logs since the inception of the Program in the mid-1970s.[49]  In

18

19   _____

     [42]   Pellman Dep. at 208:17-210:15, Closius Decl., Ex. 29.

20   [43]   MATAVA0000638 at 39. Closius Decl., Ex. 46.

21   [44]   Yates Dep. at 43:1-46:22, Closius Decl., Ex. 14.

22
     [45]   PELLMAN_EVANS_0000000561 at 62, Closius Decl., Ex. 47; Pellman Dep. at 128, Closius
23   Decl., Ex. 29.

24   [46]   PELLMAN_EVANS_0000000207    at    12,    Closius    Decl.,    Ex.    48;
     PELLMAN_EVANS_0000000008, Closius Decl., Ex. 49.
25
     [47]   Yates Dep. at 43:1-46:22, Closius Decl., Ex. 14.
26
     [48]   NFLPS_EVANS_0000168, Closius Decl., Ex. 50; NFLPS_EVANS_0002680, Closius Decl.,
27   Ex. 51; NFLPS_EVANS_0002038, Closius Ex. 52.

28   [49]   BROWN_EVANS_0000000287, Closius Decl., Ex. 43.

1  fact, the NFL Security Office frequently distributed tips on how to conduct an on-site audit to each

2  club.  The NFL Management Council is another office of the NFL involved with the Program since

3  its earliest days.  Management Council personnel frequently gave presentations at NFLPS annual

4  meetings.[50]  Dr. Brown regularly copied the Management Council on annual summary audits,

5  discussed compliance issues with them, and threatened clubs with Management Council

6  investigations.[51]

7         The Program also promised the clubs legal advice.  Dr. Brown described the purposes of

8  the Program as: (1) guidance regarding the use of prescription drugs; (2) auditing the storage and

9  record keeping of prescription drugs; and (3) monitoring compliance with federal regulations for

10 controlled substances.[52]  Indeed, Dr. Brown assured trainers that the Program existed to assist

11 trainers with how to comply (ostensibly) with federal and state drugs laws.[53]  In fact, the Program

12 mandated that doctors and facilities have DEA registrations and have them available on-site,

13 controlled substances must be stored under lock-and-key, and controlled substances must be

14 recorded on Program-described dispensing logs in order to ensure compliance with federal law.[54]

15 Club doctors[55] and trainers[56] assumed that compliance with Program regulations satisfied federal

16 and state drug laws.

17

18

19

20

---

21 [50]   NFLPS_EVANS_0002680, Closius Decl., Ex. 51.

22 [51]   NYJ_EVANS_0000001667 at 69, Closius Decl., Ex. 53; NYJ_EVANS_0000001187, Closius
   Decl., Ex. 54.

23 [52]   BROWN_EVANS_0000000367, Closius Decl., Ex. 55.

24 [53]   GB_EVANS_0000000336 at 60-72, Closius Decl., Ex. 56.

25 [54]   ARI_EVANS_0000014903, Closius Decl., Ex. 57.

26 [55]   PELLMAN_EVANS_0000000265 at 65-66, Closius Decl., Ex. 58.

27 [56]   Excerpts from Deposition of Jim Anderson ("Anderson Dep.") at 40:23-41:20; 55:10-16,
28 Closius Decl., Ex. 59.

1

**C.** **The NFL's Clear Knowledge that its Teams Are Doping Up Players in Extraordinary Amounts**

2

3      The NFL knew the volume of Medications players were being given through the Program's

4  requirements of quarterly and annual reports from the clubs and the summary audits prepared by

5  the Program's director each year.[57]  The summary audits with club reports attached were ***always***

6  copied to various other NFL management officials.[58]  A 1986 email from Dr. Tennant specifically

7  noted that the clubs must report the number of doses of oxycodone (Percodan and Percocet),

8  propoxyphene (Darvon and Darvocet), Valium and amphetamines the clubs had dispensed to

9  players.[59]  The NFL was also aware of the names of all Medications given to players and the

10  number of doses in each year beginning in the mid-1970s.  As enormous as the reported volume

11  of Medications dispensed was, the NFL also mandated and knew that the number was drastically

12  underreported.  The NFL did not require the clubs to report any Medications that were given to the

13  players at a club doctor's office, the player picked up from the pharmacy himself, or were given

14  to players by non-NFL doctors.[60]  The Program also didn't require reporting of the thousands of

15  non-Medications drugs being given to players by the clubs every year.[61]

16      The NFL also knew, through the summary audits and its commissioned studies, that the

17  distribution system needed to dispense the volume of Medications continued unabated.  The NFL

18  knew that non-licensed ***trainers*** were ordering and dispensing Medications,[62] commingling

19

20  ───────────────────────
   [57]  PIT_EVANS_0000000550,   PIT_EVANS_0000000568,   and   PIT_EVANS_0000000473,
21  Closius  Decl.,  Exs.  60-62;  GB_EVANS_0000000488,  GB_EVANS_0000000231,  and
   GB_EVANS_0000000336, Closius Exs. 45, 63, 56; BROWN_EVANS_0000008878, Closius
22  Decl., Ex. 64; BROWN_EVANS_0000002900, Closius Decl., Ex. 65.

23  [58]  GB_EVANS_0000000336, Closius Decl., Ex. 56.

24  [59]  BROWN_EVANS_0000010177, Closius Decl., Ex. 42.

25  [60]  Pellman Dep. at 410, Closius Decl., Ex. 29; GB_EVANS_0000000336, Closius Decl., Ex. 56.

26  [61]  PIT_EVANS_0000000959, Closius Decl., Ex. 66; PIT_EVANS_0000000954, Closius Decl.,
   Ex. 67.
27
   [62]  BROWN_EVANS_0000015231, BROWN_EVANS_0000003250, and BROWN_EVANS_
28  0000013328, Closius Decl., Exs. 68-70.

drugs,[63] using their own names on prescriptions,[64] using stock bottles,[65] and giving Medications in cups and envelopes.[66]  A 1998 KPMG Peat Marwick report commissioned by Dr. Brown to review NFL drug distribution between 1984-1997 noted a number of legally problematic NFL practices, including: (1) improper labels when transferring drugs from large to small containers; (2) pharmacies were not keeping hard copies of phoned-in prescriptions; (3) samples were not accounted for; (4) trainers were calling-in prescriptions for Schedule II drugs; (5) drug storage was insecure; (6) credentials were routinely violated; and (7) inventories were not reconciled and no doctor signatures or initials were on logs.[67]  A memo from the Chiefs' doctor circulated in February 2003 confirmed that doctors were prohibited from sharing medical information about a player with team management without the player's specific consent, a doctor needed specific side-effects warnings to receive valid player consent, and trainers could not be trusted to handle the documentation of the Medications.[68]  Drs. Brown and Pellman, and the NFL Management Council, knew that trainers were dispensing controlled substances and the DEA regarded the practice as illegal.[69]  Finally, the NFL knew that the "unique" standard-of-care theory adopted by every club in the League was legally dubious – the DEA and others informed the NFL that the general standard-of-care applies to the NFL; there was no such thing as a special "NFL" standard-of-care.[70]

---

[63]   CIN_EVANS_0000004605, Closius Decl., Ex. 71.

[64]   BROWN_EVANS_0000014842, Closius Decl., Ex. 72.

[65]   BROWN_EVANS_0000004407, Closius Decl., Ex. 73.

[66]   Pellman Dep. at 299, Closius Decl., Ex. 29; Excerpts from Deposition of David E. Olson, M.D. at 249:14-250:11, Closius Decl., Ex. 74.

[67]   Brown Dep., Ex. 13, Closius Decl., Ex. 75; SD_EVANS_0000003498, Closius Decl., Ex. 35.

[68]   NFLPS_EVANS_0002110, Closius Decl., Ex. 76; SD_EVANS_0000003498, Closius Decl., Ex. 35.

[69]   Brown Dep. at 195:5-10, Closius Decl., Ex. 77; PELLMAN_EVANS_0000000015, Closius Decl., Ex. 78.

[70]   NFLPS_EVANS_0002110, Closius Decl., Ex. 76; SD_EVANS_0000003498, Closius Decl., Ex. 35; DEN_EVANS_0000007900, Closius Decl., Ex. 79.

1    The NFL knew that its clubs were using Toradol as part of their "pregame" routine because

2    it enabled players to play more effectively and mask any later pain from a game-induced injury.[71]

3    The NFL further knew that Toradol was used pregame by virtually every club in the League.[72]

4    The NFL also knew that the pregame use of Toradol was dangerous and illegal – Dr. Brown

5    reported in 2001 that the DEA was concerned with pregame usage of Toradol and Vicodin and its

6    increasing use as the season progresses,[73] the Tokish report in 2002 warned that the pregame use

7    of Toradol should be stopped because of concerns over internal bleeding,[74] and the Chiefs' doctor's

8    memo stated that Toradol's manufacturer verified that weekly dosing of Toradol was off-label and

9    that Toradol was *not* approved for chronic or long-term use.[75]   The 2012 Matava Report also

10   recommended that Toradol not be used pregame.[76]  Despite all these warnings, the NFL knew that

11   Toradol pregame use continued unabated until at least 2016.[77]

12       The NFL was forcefully made aware of the illegal nature of the Medications distribution

13   system in a meeting with the DEA attended by NFLPS officers and Dr. Pellman on August 15,

14   2010.  The DEA informed the doctors that the following deficiencies were legally problematic for

15   the distribution of controlled substances: (1) the law required individual player prescription – the

16   NFL could not prescribe or order stock bottles with a standard written prescription; (2) the DEA

17   registrant was responsible for the stock bottle; (3) most state laws do not allow trainers to handle,

18   transport, distribute, dispense, or administer controlled substances; (4) written prescriptions for

19   players cannot be held by trainers for later distribution; (5) controlled substances could not be

20   handed to players in Ziploc baggies or envelopes; and (6) *no one* may cross state lines with

21   _____

22   [71]   NFLPS_EVANS_0001512, Closius Decl., Ex. 80.

23   [72]   CHI_EVANS_0000002950, Closius Decl., Ex. 81; Brown Dep., Ex. 16, Closius Decl., Ex. 82.

24   [73]   TEN_EVANS_0000000382, Closius Decl., Ex. 83.

25   [74]   PLAINTIFFS-NFL 0000240 at 45, Closius Decl., Ex. 34.

26   [75]   NFLPS_EVANS_0002110, Closius Decl., Ex. 76.

27   [76]   SD_EVANS_0000003498, Closius Decl., Ex. 35.

28   [77]   Yates Dep. at 140:11-143:7, Closius Decl., Ex. 14.

1    controlled substances or distribute them in another state (the law concerning international travel

2    was even stricter).[78]  Dr. Pellman discussed all of these DEA deficiencies with NFL officer Jeff

3    Past and the NFL Management Council.[79]   At bottom, the NFL knew for years that the drug

4    distribution system it had overseen for decades was allowed to run rampant.

5           D.      **The NFL Breached Its Assumed Duty by Doing Nothing to Curb the**
                    **Improper Distribution of Medications to Players – Until, that Is,**
6                   **Plaintiffs Sued and the Department of Justice Began an Investigation**

7           The NFL mandated that its clubs comply with federal and state laws when it came to issues

8    like maintaining dispensing logs, requiring doctor and facility DEA registration, keeping

9    Medications locked and safeguarded, and reporting Medications dispersed on an annual basis to

10   the Program director.  But, even as to those regulations, the NFL did not reasonably enforce its

11   mandates and its clubs continued to be in systemic non-compliance.  However, the NFL did

12   nothing to limit the volume or type of Medications given to the players or to reform the distribution

13   system required to sustain the enormous quantity of drugs dispensed, at least not until Plaintiffs

14   filed their complaint in May 2014 and the DEA opened an investigation a few months later.

15          NFL trainers kept the Medication logs and doctors never checked them for accuracy.[80]  The

16   Medications were frequently locked, but the trainers (not the doctors) held the keys, and sometimes

17   as many as eight people held keys to access the Medications.[81]   In a January 2008 email, the

18   Vikings trainer reported on "week 17's fiasco" – stock bottles missing from storage and large

19   discrepancies in the number of drugs distributed and the dispensing logs.[82]   A February 2010

20   summary of phone calls between Atlanta Falcons staff and Mary Ann Fleming of the NFL Benefits

21   office encapsulated the chronic issues with Medications; logs were inaccurate, controlled

22

23   _____

     [78]   MIN_EVANS_0000000539 at 41. Closius Decl., Ex. 84.
24
     [79]   Pellman Dep. at 128:5-129:1; 272:12-273:5, Closius Decl., Ex. 29.
25
     [80]   NFL_EVANS_0000001183, Closius Decl., Ex. 85; Pellman Dep. at 126:15-19, Closius Decl.,
26   Ex. 29.

27   [81]   Anderson Dep. at 42:10-44:25, Closius Decl., Ex. 59.

28   [82]   MIN_EVANS_0000000735, Closius Decl., Ex. 86.

substances were kept in unlocked storage, team doctors were not present for audits, there was improper insurance billing, and doctors were not checking the logs.  The call ultimately concluded with a keen understanding that the doctors had no idea what drugs had been given to the players.[83]

NFL oversight (or lack thereof) was even more unreasonable as to the distribution system it had created to support the volume of Medications distributed.  Nothing changed even after the DEA had specifically told the NFL in August 2010 that the distribution system that had been in place for decades was illegal.[84]  Trainers were still commingling drugs.[85]  Trainers were still dispensing and ordering the Medications in 2014.[86]  Despite the recommendation of both the Tokish Report in 2002 and the Matava Report in 2012 to stop pregame, prophylactic use of Toradol, the practice continued unabated.[87]  Clubs continued to transport controlled substances across state lines.  In reaction to the 2010 DEA investigation, the NFLPS executive committee and the NFL Commissioner's Office proposed – for the first time – that visiting teams hire a neutral doctor in the game state to order and dispense drugs at the hotel and during or after the game.[88]  The NFL's club doctors rejected the neutral doctor plan.[89]  The club doctors forcefully stated that a neutral doctor would be unaware of the so-called NFL standard of care and how NFL doctors dispense the Medications, and, remarkably, would be uncomfortable giving pregame, prophylactic Toradol shots.[90]  The NFL, thus, abandoned the neutral physician plan based on the club doctors'

---

[83]   ATL_EVANS_0000000171, Closius Decl., Ex. 87.

[84]   MIN_EVANS_0000000539, Closius Decl., Ex. 84.

[85]   NE_EVANS_0000001835 at 1838, Closius Decl., Ex. 88.

[86]   Yates    Dep.    at    116:19-117:22,    130:9-134:25,    Closius    Decl.,    Ex.    14; COTTLER_EVANS_000573 at 614, Closius Decl., Ex. 89; BROWN_EVANS_0000005611, Closius Decl., Ex. 90.

[87]   Yates Dep. at 140:1-142:13, Closius Decl., Ex. 14; MATAVA0000752, Closius Decl., Ex. 91.

[88]   CIN_EVANS_0000004643, Closius Decl., Ex. 92.

[89]   Pellman Dep. at 322:13-25, Closius Decl., Ex. 29.

[90]   PELLMAN_EVANS_0000000051 ("I'm not sure that an outside Doc is going to be comfortable going to the visiting teams hotel and giving toradol, ambien or narcotics to folks from the other team any more than any of us would be."), Closius Decl., Ex. 93; DEN_EVANS_0000007900 ("team physicians have verbalized a concern that the local physician

1   arguments.  The NFL did this despite the fact that the DEA in 2010 had specifically told the NFL

2   that it was subject to the generally accepted standard of care for patients, not a special NFL

3   standard of care for players.[91]

4          Despite the NFL's knowledge of the volume of the Medications and the deficiencies in the

5   distribution system contained in the Program's summary audits, the NFL never did anything to

6   reduce the volume or remedy the deficiencies.  Dr. Brown admitted under oath that **no club** had

7   ever been penalized because of audits or log failures.[92]  In fact, Dr. Brown admitted under oath

8   that he had never followed up with a single club for problems noted in his summary audits during

9   his entire tenure as Program director.[93]  The clubs confirmed that there was no reaction from the

10  NFL based on the Program's summary audits.[94]  Dr. Pellman specifically noted that there were no

11  changes by club physicians in the pregame use of Toradol after the Matava Report.[95]  Dr. Pellman

12  never told the club doctors to comply with the law after the 2010 DEA meeting.[96]  The volume of

13  Medications dispensed, and the distribution system needed to sustain it, continued undisturbed.

14         To be sure, the NFL had, in fact, taken affirmative steps – not just inaction – to ensure the

15  uninterrupted flow of Medications to the players.  The NFL created a Program audit system that

16  underreported the volume of Medications dispensed to players and ignored dangerous non-

17  controlled substances that were also being dispensed to players.  When NFL Benefits official Mary

18  Ann Fleming was made aware of the many deficiencies and insurance overbillings of the Atlanta

19

20  may not know much about how things are typically managed with NFL players"), Closius Decl.,
    Ex. 79.

21  [91]  DEN_EVANS_0000007900 ("Independent and according to DEA physicians are to prescribe

22  controlled substances in a manner that is consistent with the standard of the medical community
    ... not the NFL medical community."), Closius Decl., Ex. 79.

23  [92]  Brown Dep. at 112:15-119:25, Closius Decl., Ex. 77.

24  [93]  *Id.* at 229:1-24.

25  [94]  Norwig Dep. at 326:1-25, Closius Decl., Ex. 94; Anderson Dep. at 155:11-18, 168:1-13,

26  Closius Decl., Ex. 59.

27  [95]  Pellman Dep. at 362:19-363:10, Closius Decl., Ex. 29.

28  [96]  *Id.* at 323:6-325:25.

1  Falcons, for example, she suggested to the Falcons that the team doctors should be replaced.  The

2  Falcons responded by requesting that Dr. Pellman force her to retract her demand, noting that it

3  would not be fair to fire the doctors because the **trainers** really handled the Medications.[97]  The

4  Falcons doctors were never terminated.  Instead of disciplining the Falcons for their violations, the

5  NFL simply paid the fines levied by the insurance companies against the club.[98]  In 2001, Dr.

6  Brown noted that DEA had expressed concerns over pregame use of Toradol and Vicodin.[99]  In

7  2002, the Tokish Report recommended reconsideration of the pregame use of Toradol because of

8  internal bleeding risks.[100]  In response, Dr. Brown announced on February 18, 2003 that special

9  reporting for Toradol and Vicodin use would no longer be required because they purportedly posed

10  no significant problems.[101]  Indeed, when the DEA in 2010 began an investigation of Dr. Chao,

11  the San Diego team doctor, for improper handling of the Medications, Dr. Chao asked the NFL to

12  write him a statement of support because it was common practice in the NFL for club doctors to

13  obtain the Medications by writing prescriptions to themselves.[102]  When the NFL refused to do so,

14  Dr. Chao circulated a survey to all the clubs asking them to confirm that all of them wrote stock

15  bottle prescriptions to themselves and allowed trainers to dispense the Medications to players.  Dr.

16  Pellman quashed the survey by ordering clubs not to respond and mandating that Dr. Chao retract

17  the survey.[103]

18          The meeting with the DEA in 2010 threatened the distribution system that supported the

19  volume of Medications dispensed to the players.  The club doctors were deeply concerned about

20

21

22  [97]  ATL_EVANS_0000000337, Closius Decl., Ex. 95.

23  [98]  ATL_EVANS_0000000171, Closius Decl., Ex. 87.

24  [99]  TEN_EVANS_0000000382 at 83, Closius Decl., Ex. 83.

25  [100]  PLAINTIFFS-NFL 0000240, Closius Decl., Ex. 34.

26  [101]  TEN_EVANS_0000000320 at 32, Closius Decl., Ex. 96.

27  [102]  PELLMAN_EVANS_0000000214 at 16-19, Closius Decl., Ex. 97.

28  [103]  PELLMAN_EVANS_0000000543 at 46, Closius Decl., Ex. 98.

1    public exposure and potential liability.[104]   In response, Dr. Brown – for the first time – stated that

2    he was, in essence, only a messenger and could not give advice to the clubs on the legality of their

3    practices.  Incredibly, Dr. Brown also noted that player health was not even his concern.[105]  Dr.

4    Pellman also claimed that it was not his role to know how or if the clubs complied with their DEA

5    obligations.[106]  These statements were clearly inconsistent with the decades-long practices of the

6    Program and Dr. Pellman's involvement in the neutral doctor plan for visiting teams.  The club

7    doctors and trainers were furious at the NFL's unexpected refusal to help them in the first real

8    challenge to the distribution of the Medications.[107]   The clubs specifically noted that this was a

9    League-wide problem that demanded a League-wide solution.[108]  Dr. Yates, the Steelers doctor,

10   noted that the club doctors and trainers were only in this position because of their association with

11   the NFL.[109]  The NFL's betrayal of the club doctors and trainers in their hour of need is further

12   evidence of their unreasonable actions regarding the NFL's voluntary involvement in the

13   distribution of the Medications.

14        The NFL did finally begin to act reasonably regarding the Medications, but only after the

15   Plaintiffs filed their lawsuit in May 2014 and the DEA opened an investigation of the NFL shortly

16   thereafter.[110]  The NFL mandated that all clubs use a neutral doctor for away-game distribution of

17

---

18   [104]  PELLMAN_EVANS_0000000008 at 10, Closius Decl., Ex. 49.

19   [105]  Brown Dep. at 292:20-24, 294:6-8, 20-25, Closius Decl., Ex. 77.

20   [106]  Pellman Dep. at 323:6-325:25, Closius Decl., Ex. 29.

21   [107]  PELLMAN_EVANS_0000000207  at  10-11,  Closius  Decl.,  Ex.  48;
     GB_EVANS_0000000778, Closius Decl., Ex. 99.

22   [108]  PELLMAN_EVANS_0000000008 at 8-11, Closius Decl., Ex. 49; Chao Dep. at 176:6-177:9,
23   Closius Decl., Ex. 18.

24   [109]  Yates Dep., Ex. 12 at 1, Closius Decl., Ex. 39.

25   [110]  See Ryan Van Bibber, Why the DEA Is Investigating NFL Teams and What Comes Next,
     SBNATION  (Nov.  17,  2014),  https://www.sbnation.com/nfl/2014/11/17/7231649/nfl-dea-
26   investigation-drug-abuse-painkillers; Sally Jenkins & Rick Maese, Federal Drug Agents Launch
     Surprise Inspections of NFL Teams Following Games, WASH. POST (Nov. 16, 2014),
27   https://www.washingtonpost.com/sports/redskins/federal-drug-agents-launch-surprise-
     inspections-of-nfl-teams-following-games/2014/11/16/5545c84e-6da5-11e4-8808-
28   afaa1e3a33ef_story.html.

1   the Medications for the 2015 season, the same plan the NFL refused to implement in 2011.[111]   The

2   2015 season was the last one for reporting Medications to the Program.   The NFL thereafter

3   mandated that clubs no longer store the Medications in any club stadium or facility.   Therefore,

4   the reporting and audits were no longer needed.[112]   In response to NFL's lobbying efforts, Congress

5   specifically amended the Controlled Substances Act to allow team sports doctors travelling with

6   their teams to away games to bring the Medications across state lines.   Now, the neutral doctor

7   plan was no longer needed.   In 2019, the NFL announced a new drug task force with the NFLPS

8   to study the distribution of the Medications, but mandated that, for the upcoming 2019 season,

9   each club hire an independent doctor who would be solely responsible for prescribing and

10   distributing the Medications to the players.   In March 2020, the NFL and the NFLPS announced a

11   new collective bargaining agreement.   A *new* provision – Article 39, section 20 – incorporated the

12   independent drug doctor from 2019 and imposed many new rights and requirements for the

13   distribution of Medications to players.

### E.   The Long-Term, Devastating Effect of the NFL's Negligence on Plaintiffs and the Class

#### 1.   The General Health Consequences of Long-Term Use of the Medications

17   Leslie Z. Benet, Ph. D., is a nationally recognized expert in the fields of pharmacology and

18   biopharmaceutics.   Dr. Benet prepared a Declaration in the related *Evans* litigation,[113] which

19   Plaintiffs incorporated into their Third Amended Class Action Complaint ("TAC") (ECF No. 119)

20   at ¶¶230-259.   Dr. Benet noted,

> In my opinion, the use of pain masking drugs leads to increased morbidity in terms
> of musculoskeletal, kidney, liver, cardiac and for drug addiction beyond what is
> experienced by NFL players who do not receive drugs to mask pain sensors

---

[111]   Burrus Dep. at 148:2-149:13, Closius Decl., Ex. 15; Excerpts from Deposition of Patrick Michael Connor, M.D. at 314:7-316:15, Closius Decl., Ex. 100.

[112]   Burrus Dep. at 99:1-18, Closius Decl., Ex. 15.

[113]   *See* Declaration of Leslie K. Benet, Ph.D ("Benet Decl."), Closius Decl., Ex. 101.

indicating debilitation conditions that should be allowed to heal without constant contusions.[114]

Dr. Benet was particularly critical of providing Medications to NFL players before a game, as a prophylactic. There is no doubt, Dr. Benet opined, "that NFL players in their job will experience pain. However, administering drugs to NFL players prior to experiencing pain eliminates the signals to the player of actual or potential tissue damage and ultimately leads to more severe damage."[115] Dr. Benet concludes,

> One does not need a medical degree to understand that masking the pain due to tissue and/or organ damage will undoubtedly lead to greater damage of a player's tissues and organs as he continues to play with pain masked, which will lead to negative health consequences as the players age. I have particularly concentrated on dosing of pain medication before and during a game, thereby allowing a player to continue to potentially further injure tissues and organs without recognizing the potential negative effects, since this violates a physician's duty to prescribe medications to best serve the long term health interests of patients.[116]

As reflected in Dr. Benet's Declaration, the damage caused by the abuse of opioids (controlled substances) is well known in the medical community. By masking pain and enabling players to undertake physical activity that is detrimental to recovery, opioids heighten the severity of, and render permanent, injuries that otherwise would have healed. Chemical properties of certain opioids actually inhibit healing in a wide array of musculoskeletal injuries. Opioids have been linked to increased rates of osteoporosis, increased fracture risk, diminished muscle mass, increased fat mass, and anemia. Exaggerated musculoskeletal injuries frequently lead to obesity in retired players who are unable to exercise or move without pain. Long-term opioid use has also been tied to organ damage such as decreased liver and kidney functions, inflammation of the heart, and sleep disorders.

The damage caused by NSAIDs is equally well known in the medical community. NSAIDs can cause headaches, vasodilatation, asthma, weight gain, interference with fracture healing, and

---

[114] *Id.* at 20, ¶37.

[115] *Id.* at 10, ¶19.

[116] *Id.* at 17, ¶35.

accelerated progression of hip and knee osteoarthritis.  NSAIDs can also cause internal damage, specifically serious upper gastrointestinal events (including bleeding), renal failure, and damage to the cardiovascular system by increasing the risks of heart attacks.

The NFL was acutely aware of the potential long-term damages to the players.  Drs. Brown and Pellman, and all the club doctors, were aware, or at a minimum should have been aware, of the black box side effects warnings mandated by the federal government for inclusion with the dispensing of each of the Medications.  Dr. Benet stated,

> In my opinion there was, at the time of drug administrations to the NFL players, clear-cut warning in the FDA approved package inserts for these drugs, based on sound scientific evidence, that continued use of these medications could have significant deleterious effects on the players during and beyond their active career as players in the NFL, particularly with respect to musculoskeletal morbidity, but also with respect to kidney, liver and cardiac morbidities and addiction conditions.[117]

The NFL was particularly aware of the dangerous damage caused by overuse of Toradol.  Dr. Brown was aware in at least 1997,[118] and the 2002 Tokish Report[119] also noted that pregame use of Toradol masked the worsening of injuries that normally occurred in a game of NFL football which led to an increase in reported muscular-skeletal damage.  The Tokish Report also noted renal failure as a possible side effect of frequent Toradol use.[120]  The 2012 Matava Report issued ten years later confirmed that Toradol could cause renal damage and also gastrointestinal problems and internal bleeding.[121]  Matava also stated under oath that the particular worry about pregame Toradol use was damage to the kidney.[122]  He added neurological damage in a later document.[123]

---

[117] *Id.* at 10, ¶17.

[118] NFLPS_EVANS_0001512, Closius Decl., Ex. 80.

[119] PLAINTIFFS-NFL 0000240, Closius Decl., Ex. 34.

[120] *Id.*

[121] SD_EVANS_0000003498, Closius Decl., Ex. 35; DEN_EVANS_0000007900, Closius Decl., Ex. 79.

[122] Matava Dep. at 185:7-14, Closius Decl., Ex. 19.

[123] MATAVA0001425 (Matava 12), Closius Decl, Ex. 102.

1    In his capacity as the Jets' team doctor, Dr. Pellman used player blood tests to determine

2    specifically if the player was exhibiting any damage to his liver or kidney.[124]   He further testified

3    under oath that he tested for liver and kidney damage for any player who took Toradol for more

4    than two weeks out of concern for damage to those organs at that frequency of Toradol.[125]  Dr.

5    Benet aptly concluded,

> In my opinion the fact that NFL teams supported and condoned the administration
> by team physicians of pain masking drugs to players sustaining injuries during a
> game, thereby allowing the player to re-enter the game with a possibility of
> sustaining further injuries, was an insidious action guaranteed to lead to long-term
> negative health effects in the NFL players.[126]

9    Thus, it's hardly surprising that the NFL Prescription Drug Program Advisory Committee

10   noted that the NFL shared joint liability for the massive damage done to the health of its players.[127]

### 2.      Plaintiffs' Specific Injuries

12   Plaintiffs allege that, as a direct result of the systemic dispensing of Medications to them

13   while playing in the NFL, they suffered, and currently suffer from, myriad injuries to their

14   bodies.[128]

15   Plaintiff Richard Dent has suffered, and continues to suffer, from an enlarged heart, nerve

16   damage in his feet, muscular-skeletal pain in his right big toe, and constant pain in his left ankle,

17   left hip, both shoulders, right wrist, and hands and fingers.[129]

18   Plaintiff J.D. Hill has suffered, and continues to suffer, from atrial fibrillation, blood clots,

19   and muscular-skeletal pain in his ankles, shoulders, fingers, neck, and back.[130]

---

[124]  NYJ_EVANS_0000012090, Closius Decl., Ex. 103.

[125]  Pellman Dep. at 148:7-149:25, Closius Decl., Ex. 29.

[126]  Benet Decl. at 16, ¶33, Closius Decl., Ex. 101.

[127]  BROWN_EVANS_0000005308 at 12, Closius Decl., Ex. 12.

[128]  *See generally* TAC, ¶¶17-106.

[129]  Declaration of Richard Dent in Support of Plaintiffs' Motion for Class Certification, ¶17, Closius Decl., Ex. 1.

[130]  Declaration of J.D. Hill in Support of Plaintiffs' Motion for Class Certification, ¶14, Closius Decl., Ex. 2.

1    Plaintiff Keith Van Horne has suffered, and continues to suffer, from two cardiac ablations,

2  atrial fibrillation, premature ventricular contractions, tachycardia, and muscular-skeletal pain in

3  his arms, ankles, knees, back, biceps, neck, shoulders, and elbows.[131]

4    Plaintiff Ron Stone has suffered, and continues to suffer from, muscular-skeletal pain in

5  his elbows, thumbs, and knee.[132]

6    Plaintiff Ron Pritchard suffered, and continues to suffer from, pain from six knee surgeries,

7  a knee replacement for both his right and left knees, surgeries for his shoulder, elbow, hand and

8  foot, and muscular-skeletal pain in his knees, right hand, right elbow, and right foot.[133]

9    Plaintiff James McMahon suffered, and continues to suffer from, pain from a broken neck

10 and broken ankle, arthritic pain, limited motion in his hands, kidney problems, and muscular-

11 skeletal pain in his knees, back, elbows, and ankles.[134]

12   Plaintiff Jeremy Newberry suffered, and continues to suffer, from Stage 3 renal failure,

13 high blood pressure, violent headaches, and muscular-skeletal pain in both of his knees, both

14 shoulders, his spine, left ankle, and both hands.  Moreover, Mr. Newberry's kidney problems limit

15 his current ability to use pain medication.[135]

16   Plaintiff Marcellus Wiley – by age 39 – began suffering from partial renal failure resulting

17 in the loss of half his kidney function, as well as muscular-skeletal pain in his back, feet, and right

18 shoulder.[136]

19

20 [131]  Declaration of Keith Van Horne in Support of Plaintiffs' Motion for Class Certification, ¶16, Closius Decl., Ex. 3.

21 [132]  Declaration of Ron Stone in Support of Plaintiffs' Motion for Class Certification, ¶14, Closius
22 Decl., Ex. 4.

23 [133]  Declaration of Ron Pritchard in Support of Plaintiffs' Motion for Class Certification, ¶16, Closius Decl., Ex. 5.

24 [134]  Declaration of Jim McMahon in Support of Plaintiffs' Motion for Class Certification, ¶17,
25 Closius Decl., Ex. 6.

26 [135]  Declaration of Jeremy Newberry in Support of Plaintiffs' Motion for Class Certification, ¶15, Closius Decl., Ex. 8.

27 [136]  Declaration of Marcellus Wiley in Support of Plaintiffs' Motion for Class Certification, ¶18,
28 Closius Decl., Ex. 9.

1   **III.    ARGUMENT**

2        **A.    Legal Standards**

3        This Court has broad discretion to grant class certification pursuant to Rule 23.  *Parsons v.*

4   *Ryan*, 754 F.3d 657, 673 (9th Cir. 2014); *Bateman v. Am. Multi-Cinema, Inc.*, 623 F.3d 708, 712

5   (9th Cir. 2010).   "Before certification, the district court must conduct a rigorous analysis to

6   determine whether the party seeking certification has met the prerequisites of Rule 23."  *Adkins v.*

7   *Facebook, Inc.*, 424 F. Supp. 3d 686, 694-95 (N.D. Cal. 2019) (Alsup, J.).   Rule 23(a) provides

8   that a class may be certified when:

9        (1) the class is so numerous that joinder of all members is impracticable; (2) there
         are questions of law or fact common to the class; (3) the claims or defenses of the

10       representative parties are typical of the claims or defenses of the class; and (4) the
         representative parties will fairly and adequately protect the interests of the class.

11

12   Fed. R. Civ. P. 23(a).  In addition to meeting the requirements of Rule 23(a), Plaintiffs' proposed

13   Class must also satisfy one section of Rule 23(b).  *Briseno v. ConAgra Foods, Inc.*, 844 F.3d 1121,

14   1124 (9th Cir. 2017).   Certification under Rule 23(b)(3) requires that "questions of law or fact

15   common to class members predominate over any questions affecting only individual members,

16   and that a class action is superior to other available methods for fairly and efficiently adjudicating

17   the controversy."  *Sali v. Corona Reg'l Med. Ctr.*, 889 F.3d 623, 629 (9th Cir. 2018).   The Ninth

18   Circuit recently held that "a district court must find by a preponderance of the evidence that the

19   plaintiff has established predominance under Rule 23(b)(3)."  *Olean*, 2021 WL 1257845, at *4.

20        Even if the Court determines that Plaintiffs have failed to satisfy one or more of the

21   requirements of Rule 23(b), however, the Court has discretion to certify the Class "with respect to

22   particular issues" that are common among all Class members.  *See* Fed. R. Civ. P. 23(c)(4); *see*

23   *also Valentino*, 97 F.3d at 1229 n.3, 1234 (explaining that Rule 23(c)(4) "authorizes the district

24   court in appropriate cases to isolate . . . common issues" and that "an action may be brought or

25   maintained as a class action with respect to particular issues"); *see also Adkins*, 424 F. Supp. 3d at

26   697 (recognizing rule, but declining to certify issues).

27        It is well-established that in "determining the propriety of a class action, the question is not

28   whether the plaintiffs have stated a cause of action or will prevail on the merits, but, rather, whether

1   the requirements of Rule 23 are met.  The Court is obliged to accept as true the substantive

2   allegations made in the complaint." *Jordan*, 285 F.R.D. at 446-47.  In deciding a motion for class

3   certification, a "[c]ourt is required to examine the merits of the underlying claim . . . only inasmuch

4   as it must determine whether common questions exist; not to determine whether class members

5   could actually prevail on the merits of their claims." *Cohen v. Trump*, 303 F.R.D. 376, 381 (S.D.

6   Cal. 2014).

7   **B.      Plaintiffs' Proposed Class Meets the Requirements of Rule 23(a)**

8          Plaintiffs easily meet their burden of satisfying the requirements of Rule 23(a) – *i.e.*, the

9   "numerosity," "commonality," "typicality," and "adequacy of representation" showings.  *See*

10   *Parsons*, 754 F.3d at 674.  "In addition to the four requirements explicitly provided in Rule 23(a),

11   courts have held that Rule 23(a) also implicitly requires that the class be ascertainable." *Nitsch v.*

12   *DreamWorks Animation SKG Inc.*, 315 F.R.D. 270, 285 (N.D. Cal. 2016).  Each of these Rule

13   23(a) requirements is discussed, in turn, immediately below.

14   **1.      The Class Is Sufficiently Numerous**

15          Rule 23(a) requires that "the class is so numerous that joinder of all members is

16   impracticable[.]"  Fed. R. Civ. P. 23(a)(1).  To date, over 1,800 retired NFL players have signed

17   retention agreements with undersigned counsel to be Class members.  *See* Closius Decl., ¶2.  In

18   addition, the NFL keeps track of all retired NFL players, which number in the thousands, *see*

19   https://www.nfl.com/players/retired/all, and the Third Circuit agreed that numerosity was met in

20   connection with the class action settlement reached in the *NFL Concussion* lawsuit.  *See In re Nat'l*

21   *Football League Players Concussion Injury Litig.*, 821 F.3d 410, 426 (3d Cir. 2016), as amended

22   (May 2, 2016) ("The District Court found that a class of 20,000 retired players would be sufficient

23   for numerosity.").

24          Plaintiffs, accordingly, satisfy the "numerosity" requirements of Rule 23(a)(1).[137]

25

26

---

[137]  Plaintiffs also satisfy the Ninth Circuit's test for ascertainability, because the Class definition
uses objective characteristics – membership turns on whether an individual played in the NFL and
received Medications from an NFL club.  *See Briseno*, 844 F.3d at 1124.

1

## 2.    There Are Questions of Fact and Law Common to the Class

2          Rule 23(a) also requires that "there are questions of law or fact common to the class."  Fed.

3    R. Civ. P. 23(a)(2).  "The commonality requirement is construed liberally, and the existence of

4    some common legal and factual issues is sufficient."  *In re ConAgra Foods, Inc.*, 90 F. Supp. 3d

5    919, 972 (C.D. Cal. 2015), *aff'd*, 844 F.3d 1121 (9th Cir. 2017).  The commonality "analysis does

6    not turn on the number of common questions, but on their relevance to the factual and legal issues

7    at the core of the purported class' claims."  *Jimenez v. Allstate Ins. Co.*, 765 F.3d 1161, 1165 (9th

8    Cir. 2014).  Indeed, the Supreme Court has made clear that "[e]ven a single [common] question

9    will do[.]"  *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 359 (2011).  "Thus, [w]here the

10   circumstances of each particular class member vary but retain a common core of factual or legal

11   issues with the rest of the class, commonality exists."  *Parsons*, 754 F.3d at 675.  Assessing

12   commonality requires courts to have "a precise understanding of the nature of the underlying

13   claims."  *Id.* at 676.  This allows courts to determine if the class' "claims . . . depend upon a

14   common contention" that is "of such a nature that it is capable of classwide resolution—which

15   means that determination of its truth or falsity will resolve an issue that is central to the validity of

16   each one of the claims in one stroke."  *Wal-Mart*, 564 U.S. at 350.

17          The one common-law claim raised in this case – *i.e.*, negligence based on the NFL's

18   voluntary undertaking of a duty to protect the safety and health of its players – readily satisfies the

19   commonality requirement, as it is premised on the NFL's common course of conduct in voluntarily

20   injecting itself into the drug-distribution process and failing to act reasonably, putting the health

21   and safety of all Class members at substantial risk for long-term negative health consequences.  As

22   discussed in more detail below, in a case such as this, where the operative conduct giving rise to

23   both the NFL's duty and breach, as well as the question of general causation, is uniform, Plaintiffs'

24   negligence claim is appropriate for class-wide resolution.  *See, e.g.*, *Giroux v. Essex Prop. Tr.,*

25   *Inc.*, No. 16-cv-01722-HSG, 2018 WL 2463107, at *4 (N.D. Cal. June 1, 2018); *see also Mullen*

26   *v. Treasure Chest Casino, LLC*, 186 F.3d 620, 625 (5th Cir. 1999) (common issue of defendant's

27   alleged negligence satisfied commonality); *Katz v. AvalonBay Cmties., Inc.*, No. 15-2740 (JLL),

28

1   2018 WL 5278702, at *8 (D.N.J. Oct. 24, 2018) (commonality satisfied where defendant's

2   "alleged negligent conduct is central to the liability inquiry.").

3   Among the common questions of law and fact relevant to Plaintiffs' negligence claim is:

4   (a) whether the NFL acted unreasonably when it knew of illegal activity of its member clubs with

5   respect to the distribution of Medications; (b) whether Class members provide informed consent

6   authorizing the provision or administration of Medications; (c) whether the NFL assumed a duty

7   to Class members relating to the distribution of Medications; (d) whether the NFL assumed a duty

8   to protect the safety and health of Class members; (e) whether the NFL breached those duties to

9   Class members; and (f) whether the element of general causation is satisfied.

10   ### 3.   Plaintiffs' Claim Is Typical of the Class

11   Rule 23(a) further requires that "the claims . . . of the representative parties are typical of

12   the claims . . . of the class." *See* Fed. R. Civ. P. 23(a)(3). Like commonality, the "typicality"

13   requirement is evaluated under a "permissive standard[]." *Hanlon*, 150 F.3d at 1020. "Under the

14   rule's permissive standards, representative claims are typical if they are reasonably coextensive

15   with those of absent class members; they need not be substantially identical." *Parsons*, 754 F.3d

16   at 685. "The test of typicality is whether other members have the same or similar injury, whether

17   the action is based on conduct which is not unique to the named plaintiffs, and whether other class

18   members have been injured by the same course of conduct." *Id.* "[I]t is not necessary that all class

19   members suffer the same injury as the class representative to satisfy Rule 23(a)(3). The

20   requirement of typicality is not primarily concerned with whether each person in a proposed class

21   suffers the same type of damages; rather, it is sufficient for typicality if the plaintiff endured a

22   course of conduct directed against the class." *Just Film, Inc. v. Buono*, 847 F.3d 1108, 1118 (9th

23   Cir. 2017).

24   Here, representing all absent Class members, Plaintiffs are all retired NFL players who

25   played through the NFL's voluntary injection of itself into the drug-distribution process and failure

26   to act reasonably under the circumstances. TAC, ¶¶17-106. Plaintiffs allege a League-wide

27   scheme involving negligent conduct resulting in injuries to all Plaintiffs and Class members.

28   Specifically, Plaintiffs allege that the NFL voluntarily undertook a duty to safeguard the health

1    and safety of its players, and breached that duty by creating, fostering, and requiring its individual

2    teams to follow certain drug-distribution obligations, resulting in the widespread, illegal, and

3    uniform distribution of Toradol and other Medications to players.  *Id.*, ¶¶1-16.  This alleged

4    common course of conduct is not unique to Plaintiffs but, rather, implicates the same evidence

5    needed to prove a negligence claim on behalf of all Class members.  Plaintiffs, accordingly, satisfy

6    the requirement of typicality.

7                    **4.        Plaintiffs Will Adequately Represent the Class**

8           Rule 23 also requires a showing that "the representative parties will fairly and adequately

9    protect the interests of the class."  Fed. R. Civ. P. 23(a)(4).  "Adequate representation depends on,

10   among other factors, an absence of antagonism between representatives and absentees, and a

11   sharing of interest between representatives and absentees."  *In re Lidoderm Antitrust Litig.*, No.

12   14-md-02521-WHO, 2017 WL 679367, at *14 (N.D. Cal. Feb. 21, 2017).  The issue of adequacy

13   triggers a two-part inquiry: "(1) do the named plaintiffs and their counsel have any conflicts of

14   interest with other class members and (2) will the named plaintiffs and their counsel prosecute the

15   action vigorously on behalf of the class?"  *Hanlon*, 150 F.3d at 1020.

16          Plaintiffs and their counsel have no conflicts of interest, actual or foreseeable, with any

17   putative Class member.  *See* Closius Decl., Exs. 1-9 (Plaintiffs' Declarations).  To the contrary,

18   Plaintiffs, their counsel, and the Class members have fully aligned interests: to seek redress for the

19   NFL's breach of its voluntarily undertaken duty.  *Id.*  As noted above, in furtherance of the Class'

20   obligation to the interests of Class members, Plaintiffs' counsel have met with and received signed

21   retainer agreements from over 1,800 of them.  Closius Decl., ¶2.  This not only affirms the absence

22   of a conflict of interest, but demonstrates Plaintiffs' dedication to vigorously prosecuting the action

23   on behalf of all Class members, which they have done since the inception of this case six years

24   ago, including answering numerous discovery requests and recently sitting (or agreeing to sit soon)

25   for depositions.  Adequacy under Rule 23(a)(4), therefore, is satisfied.

26

27

28

1

        **5.**      **Plaintiffs' Counsel Are Qualified to Serve as Class Counsel Pursuant to Rule 23(a) and (g)(1)**

2

3        In appointing class counsel under Rule 23(g), the Court considers: "(i) the work counsel

4  has done in identifying or investigating potential claims in the action; (ii) counsel's experience in

5  handling class actions, other complex litigation, and the types of claims asserted in the action; (iii)

6  counsel's knowledge of the applicable law; and (iv) the resources that counsel will commit to

7  representing the class[.]"  Fed. R. Civ. P. 23(g)(1)(A).  Additionally, "[c]lass counsel must fairly

8  and adequately represent the interests of the class."  Fed. R. Civ. P. 23(g)(4).  Plaintiffs' counsel

9  are experienced trial lawyers and litigators, with substantial experience in complex and class action

10  litigation.  *See* Closius Decl., Exs. 10-11 (Firm Resumes of Silverman Thompson Slutkin White

11  ("STSW") and Robbins Geller Rudman & Dowd LLP ("Robbins Geller")).  Plaintiffs' counsel

12  have invested substantial time, money, legal research, and investigation efforts in developing and

13  understanding the issues of this case, briefing and arguing multiple rounds of motions to dismiss,

14  and twice successfully appealing this Court's motion-to-dismiss rulings.  *See Dent v. Nat'l*

15  *Football League*, 968 F.3d 1126 (9th Cir. 2020); *Dent v. Nat'l Football League*, 902 F.3d 1109

16  (9th Cir. 2018).  Accordingly, Plaintiffs' counsel are qualified to serve as Class Counsel.

17     **C.**     **Rule 23 Permits Certification of a Rule 23(b)(3) Class on the Common Elements of Duty and Breach for Plaintiffs' Negligence Claim**

18

19        **1.**      **New York Law Should Govern the Class' Negligence Claim**

20        California's choice-of-law rules clearly indicate that New York law should be applied to

21  the Class' negligence claim.  However, if the Court determines that a single state's substantive law

22

23

24

25

26

27

28

1  cannot be applied to the entire Class, Plaintiffs propose that the law of Plaintiffs' states of residency

2  – California,[138] Arizona, and Illinois—should control.[139]

3  ### a.   California's Choice of Law Rules Apply

4  "Subject to constitutional limitations and the forum state's choice-of-law rules, a court

5  adjudicating a multistate class action is free to apply the substantive law of a single state to the

6  entire class." *In re Hyundai & Kia Fuel Econ. Litig.*, 926 F.3d 539, 561 (9th Cir. 2019).  Here,

7  California's choice of law rules must be used to determine which state's substantive law should

8  apply to Plaintiffs' negligence claim. *Zinser v. Accufix Rsch. Inst., Inc.*, 253 F.3d 1180, 1187 (9th

9  Cir. 2001) ("A federal court sitting in diversity must look to the forum state's choice of law rules

10 to determine the controlling substantive law.").

11 California utilizes a three-part "governmental interest test" to decide which state's

12 substantive law applies to a plaintiff's claims:

13    First, the court determines whether the relevant law of each of the potentially
14    affected jurisdictions with regard to the particular issue in question is the same or
      different.  Second, if there is a difference, the court examines each jurisdiction's
      interest in the application of its own law under the circumstances of the particular
15    case to determine whether a true conflict exists.  Third, if the court finds that there

---

16 [138]  Plaintiff Jeremy Newberry recently moved from California to Idaho.  However, under Idaho
17 tax law, residency is not established until an individual has kept "home in Idaho for the entire tax
   year and spen[t] more than 270 days of the year in Idaho; or [is] domiciled in Idaho for the entire
18 tax year."  *See* Idaho Residency Status, https://tax.idaho.gov/i-2015.cfm (last visited Apr. 27,
   2021).  Moreover, "[i]t makes little sense that a parties' change in residence that has nothing to do
19 with the substantive claims presented should affect the choice of law analysis." *Kuberski v. Allied
   Recreational Grp., Inc.*, No. 1:15-CV-320-HAB, 2020 WL 5230588, at *2 n.1 (N.D. Ind. Sept. 2,
20 2020); *see also Yang v. M/V Minas Leo*, No. C 93-2495 MHP, 1994 WL 36921, at *2 (N.D. Cal.
   Jan. 25, 1994), *aff'd*, 76 F.3d 391 (9th Cir. 1996) ("[W]here [an individual] presently lives or seeks
21 residency is irrelevant to a choice-of-law determination."); *McGhee v. Arabian Am. Oil Co.*, 871
   F.2d 1412, 1423 (9th Cir. 1989) ("[C]ourts have consistently declined to recognize after-acquired
22 residence as a source of governmental interest on the grounds that consideration of this factor
   would encourage forum shopping."); *Zimmerman v. Allstate Ins. Co.*, 224 Cal. Rptr. 917, 920 (Ct.
23 App. 1986) (applying law of state of newly acquired residency would abrogate interest of state
   where the bulk of defendant's conduct occurred).

24 [139]  Due to the clear similarities in the law (*see* Elements of Negligence – Voluntary Undertaking
25 by State, Closius Decl., Ex. 104), the Court may also certify two separate classes, specifically a
   class asserting negligence claims under California and Illinois law, and a class asserting a
26 negligence claim under Arizona law.  *See Wash. Mut. Bank, FA v. Super. Ct.*, 15 P.3d 1071, 1083
   (Cal. 2001) ("[C]ertification may be appropriate if the class action proponent shows that state law
27 variations can be effectively managed through the creation of a small number of subclasses
   grouping the states that have similar legal doctrines."); Fed. R. Civ. P. 23(c)(5) ("When
28 appropriate, a class may be divided into subclasses that are each treated as a class under this rule.").

1
2
3

> is a true conflict, it carefully evaluates and compares the nature and strength of the interest of each jurisdiction in the application of its own law to determine which state's interest would be more impaired if its policy were subordinated to the policy of the other state, and then ultimately applies the law of the state whose interest would be the more impaired if its law were not applied.

4   *Senne v. Kan. City Royals Baseball Corp.*, 934 F.3d 918, 928 (9th Cir. 2019), *cert. denied*, __ U.S.

5   __, 141 S. Ct. 248 (2020) (quoting *Kearney v. Salomon Smith Barney, Inc.*, 137 P.3d 914, 922

6   (Cal. 2006)).   This analysis "must be conducted on a case-by-case basis because it requires

7   analyzing various states' laws under the circumstances of the particular case and given the

8   particular [legal] issue in question."   *Grodzitsky v. Am. Honda Motor Co.*, No. 2:12-cv-01142-

9   SVW-PLAx, 2014 WL 718431, at *9 (C.D. Cal. Feb. 19, 2014).  "In a complex situation involving

10  multi-state contacts, . . . [t]he forum must search to find the proper law to apply based upon the

11  interests of the litigants and the involved states."  *Reich v. Purcell*, 432 P.2d 727, 729 (Cal. 1967).

12
13

### b. The State of the Law of Negligence in the Potentially Affected Jurisdictions

14       The first step of the analysis is to determine whether the law of the states involved differ,

15  and, if so, ascertain whether such "differences in state law are material, that is, if they make a

16  difference in this litigation." *Mazza v. Am. Honda Motor Co.*, 666 F.3d 581, 590 (9th Cir. 2012).

17  Here, this analysis implicates four states: (1) California, the forum and the state of residency of

18  Plaintiffs Jeremy Newberry, Ron Stone, and Marcellus Wiley[140]; (2) New York, the location of

19  the NFL's principal place of business and the situs for its negligent conduct[141]; (3) Arizona, the

20  state of residency of Plaintiffs J.D. Hill, Ron Pritchard, and James McMahon[142]; and (4) Illinois,

21  the state of residency of Plaintiffs Richard Dent and Keith Van Horne.[143]

22
23
24

---

25  [140] TAC, ¶¶28, 65, 95.

26  [141] *Id.*, ¶111.

27  [142] *Id.*, ¶¶37, 46, 75, 85.

28  [143] *Id.*, ¶¶18, 56.

1    Although each state has adopted or relied on the voluntary undertaking doctrine as set forth

2  in the RESTATEMENT (SECOND) OF TORTS §323,[144] the respective contours of both New York and

3  Arizona's doctrines differ materially from California's doctrine.[145]  Under California law,

> a voluntary undertaking claim requires a showing that (1) an actor undertook to render services to another; (2) the services rendered were of a kind the actor should have recognized as necessary for the protection of third persons; (3) the actor failed to exercise reasonable care in the performance of the undertaking; (4) the failure to exercise reasonable care resulted in physical harm to the third persons; and (5) either (a) the actor's carelessness increased the risk of such harm, or (b) the undertaking was to perform a duty owed by the other to the third persons, or (c) the harm was suffered because of the reliance of the other or the third persons upon the undertaking.

9  *Mayall ex rel. H.C. v. USA Water Polo, Inc.*, 909 F.3d 1055, 1066 (9th Cir. 2018).

10    Illinois' "voluntary undertaking doctrine imposes liability upon one who gratuitously

11  undertakes to render services to another and who fails to perform those services with due care or

12  with such competence and skill as he or she possessed."  *Weisblatt v. Chi. Bar Ass'n*, 684 N.E.2d

13  984, 987 (Ill. App. Ct. 1997).  "The doctrine applies, however, only if the voluntary undertaking

14  caused physical injury or damage."  *Ivanhoe Fin., Inc. v. Highland Banc Corp.*, No. 03 C 7336,

15  2004 WL 2091997, at *2 (N.D. Ill. Sept. 15, 2004).   In short, Illinois' doctrine is essentially

16  identical to California's doctrine.  *Compare Bell*, 955 N.E.2d at 1104-05, *with Mayall*, 909 F.3d at

17  1066.

18    Under New York law, "[a] defendant owes an assumed duty of care when his or her conduct

19  places the plaintiff 'in a more vulnerable position than he would have been in had [the defendant]

20  never taken any action at all.'"  *Kloner v. United States*, 196 F. Supp. 3d 375, 386 (E.D.N.Y. 2016)

21  (quoting *Tavarez*, 143 F.3d at 746-47).  "However, assumed duties arise only where (1) the failure

22  to exercise due care increases the risk of harm to the plaintiff or (2) the harm is suffered because

---

[144]  *See Delgado v. Trax Bar & Grill*, 113 P.3d 1159, 1175 n.28 (Cal. 2005); *Tavarez v. Lelakis*, 143 F.3d 744, 746-47 (2d Cir. 1998); *Tollenaar v. Chino Valley Sch. Dist.*, 945 P.2d 1310, 1311-12 (Ariz. Ct. App. 1997); *Bell v. Hutsell*, 955 N.E.2d 1099, 1104-05 (Ill. 2011).

[145]  As demonstrated below, Illinois' doctrine is essentially identical to California's doctrine. Accordingly, the analysis as to Illinois ends here, since no conflict exists between California and Illinois law.  "The sole fact that two states are implicated does not create a conflict of laws" where "the result would be the same" under either state's laws.  *Int'l Serv. Ins. Co. v. Gonzales*, 239 Cal. Rptr. 341, 344 (Ct. App. 1987).

of plaintiff's reliance on the undertaking." *Tavarez*, 143 F.3d at 747 (citing RESTATEMENT (SECOND) OF TORTS §323, cmt. c (1965)). Unlike California and Illinois, "New York courts have recognized that economic loss or damage to property may give rise to an action for breach of an assumed duty." *Laborers Local 17 Health & Benefit Fund v. Philip Morris, Inc.*, 7 F. Supp. 2d 277, 292 (S.D.N.Y. 1998), *rev'd on other grounds*, 191 F.3d 229 (2d Cir. 1999).

Lastly, under Arizona's Good Samaritan Doctrine, "a party may be liable for negligent performance of an assumed duty by either: (1) increasing the risk of harm to another, or (2) causing another to suffer harm because he or she relied on the party exercising reasonable care in undertaking the duty." *Steinberger v. McVey*, 318 P.3d 419, 431 (Ariz. Ct. App. 2014). Additionally, the Arizona Supreme Court has extended the Doctrine beyond ordinary physical harm to include economic harm. *Id.* (citing *McCutchen v. Hill*, 710 P.2d 1056, 1059 (Ariz. 1985)); *see also Renteria v. United States*, 452 F. Supp. 2d 910, 914 (D. Ariz. 2006) (recognizing that "the Good Samaritan Doctrine applies to economic harm").

Among the differences between each state's version of the voluntary undertaking doctrine, the inconsistent application of a "physical harm" requirement is most stark. Review of the relevant law of each jurisdiction reveals that both California and Illinois impose a physical harm requirement, whereas New York and Arizona do not. Since application of these differences would "spell the difference between the success and failure of a claim," it is evident that they are material. *Mazza*, 666 F.3d at 591. Accordingly, the analysis advances to the inquiry of whether a true conflict exists between California, New York, and Arizona law.

### c.   True Conflict Exists

Even though the negligence law of California, New York, and Arizona differ, a "true conflict" is not necessarily presented. "A true conflict arises only if both states have an interest in having their law applied." *Denham v. Farmers Ins. Co.*, 262 Cal. Rptr. 146, 148 (Ct. App. 1989); *see also Offshore Rental Co. v. Cont'l Oil Co.*, 583 P.2d 721, 725 (Cal. 1978) ("Only if each of the states involved has a legitimate but conflicting interest in applying its own law will we be confronted with a true conflicts case."). In the instant case, California, New York, and Arizona each have legitimate, conflicting interests in applying their own law.

### (1)     California

California has a legitimate interest in applying its own law.  For one, California is the forum in this case.  But, more broadly, California has "an interest in being able to delineate the appropriate standard of liability and the scope of recovery based on its understanding of the balance between the interests of individuals and corporate entities operating within its territory."  *Frezza v. Google Inc.*, No. 5:12-cv-00237-RMW, 2013 WL 1736788, at *7 (N.D. Cal. Apr. 22, 2013).  Although this interest is somewhat augmented by the fact that three Plaintiffs reside in California, it also directly conflicts with the identical interests of the states where the remaining Plaintiffs reside. *Denham*, 262 Cal. Rptr. at 148 ("[A]ppellants are residents of California.  California therefore has an interest in protecting them from [negligent conduct].").

### (2)     New York

New York clearly has a legitimate interest in applying its own law given that virtually all of the corporate acts and decisions by the NFL implicated by each Class member's negligence claim were New York-based.  The NFL's voluntary undertaking of a duty to protect the health and safety of its players League-wide, and its concomitant breach of that duty by acting contrary to the health and safety of its players, resulted in every Class member's injuries in every NFL-sanctioned stadium in the United States.

In that same vein, New York "also has an interest in regulating the conduct of corporations organized according to its laws."  *Calla v. Shulsky*, 543 N.Y.S.2d 666, 669 (App. Div. 1989).  The NFL is organized under the laws of, ***and*** has its principal place of business in, New York (specifically, 645 Park Avenue, New York, New York).  Indeed, the NFL's existence, and the rights of its owners, are governed by New York law.  Specifically, New York has an interest in applying its voluntary undertaking doctrine – *sans* a physical harm requirement – so that negligent conduct occurring within its borders is sufficiently deterred.

### (3)     Arizona

Arizona also has a legitimate interest in applying its own law.  Like California, Arizona has "an interest in being able to delineate the appropriate standard of liability and the scope of recovery based on its understanding of the balance between the interests of individuals and

1   corporate entities operating within its territory." *Frezza*, 2013 WL 1736788, at *7.  Although this

2   interest is somewhat augmented by the fact that four Plaintiffs reside in Arizona, it also directly

3   conflicts with the identical interests of the states where the remaining Plaintiffs reside.  *See*

4   *Denham*, 262 Cal. Rptr. at 148.

5       It is evident that California, New York, and Arizona all hold legitimate, conflicting

6   interests in applying their own law.  Accordingly, the analysis moves to the third part of the

7   governmental interest test, the comparative impairment analysis.

8                   **d.      Comparative Impairment Analysis**

9       "Once a true conflict is identified, the comparative impairment approach is used to

10  determine which state's interest would be more impaired if its policy were subordinated to the

11  policy of the other state." *Denham*, 262 Cal. Rptr. at 148.  "This analysis proceeds on the principle

12  that true conflicts should be resolved by applying the law of the state whose interest would be the

13  more impaired if its law were not applied." *Offshore Rental*, 583 P.2d at 726.  "[W]hen conducting

14  the governmental interest analysis, [courts] must also recognize that a state ordinarily has the

15  predominant interest in regulating conduct within its borders." *Senne*, 934 F.3d at 934.

16      Here, New York "is concerned with conduct within her borders and as to such conduct she

17  has the predominant interest of the states involved." *Reich*, 432 P.2d at 730.  As discussed above,

18  essentially all of the NFL's corporate acts and decisions giving rise to Plaintiffs' negligence claim

19  occurred within New York.  Moreover, the NFL is organized under the laws of, and has its

20  principal place of business in, New York.  Thus, applying another state's law would significantly

21  impair New York's interest in regulating conduct occurring within its borders, by businesses

22  organized under its laws, through the imposition of a physical harm requirement that would not

23  otherwise apply to negligence claims predicated on the voluntary undertaking doctrine.

24      The RESTATEMENT (SECOND) OF CONFLICT OF LAWS is most instructive on this topic.  In

25  the comments to subsection (2), the authors explained that, "[w]hen the injury occurred in ***two or***

26  ***more states***, or when the place of injury cannot be ascertained or is fortuitous . . ., the place where

27  ***the defendant's conduct occurred*** will usually be given particular weight in determining the state

28  of the applicable law." RESTATEMENT (SECOND) OF CONFLICT OF LAWS, §145 cmt. e (1988).  This

1   case presents the quintessential set of facts demanding the application of the RESTATEMENT's

2   comments.  NFL players did not play, were not injured by the NFL's tortious conduct, and were

3   not doled out massive amounts of Medications in any one particular state.  As Plaintiffs' TAC

4   makes clear, Plaintiffs – and all Class members – were harmed in dozens of different cities during

5   the course of their NFL careers.[146]

6          Therefore, it is clear that New York has the predominant interest in regulating the conduct

7   of the NFL, and this interest will be significantly impaired if it is subordinated to the interests of

8   either California or Arizona.  Applying another state's law under these circumstances would

9   conflict with the principle that "courts should not attempt to apply the laws of one state to behaviors

10  that occurred in other jurisdictions."  *Mazza*, 666 F.3d at 593; *see also Zimmerman*, 224 Cal. Rptr.

11  at 920 ("Such a holding would also abrogate the interest of a jurisdiction . . . in the application of

12  its law to a situation . . . where the complained of conduct . . . occurred [within its borders],

13  although its effect was upon a third party residing in [another state].").

14         On the other hand, applying New York's negligence law will not severely impair the

15  interests of California, Illinois, or Arizona.  While California, Illinois, and Arizona each have an

16  interest in determining the appropriate standard of liability and the scope of recovery of its

17  negligence law based on its understanding of the balance between the interests of its residents and

18  corporate entities operating within its territory, this interest is significantly diminished where, as

19  here, virtually all of the negligent conduct occurred in New York, and Plaintiffs reside in

20  California, Arizona, and Illinois.  *See Mazza*, 666 F.3d at 594 ("We recognize that California has

21  an interest in regulating those who do business within its state boundaries, and foreign companies

22  located there, but we disagree with the dissent that applying California law to the claims of foreign

23  residents concerning acts that took place in other states . . . is necessary to achieve that interest in

24  this case.").

25

26

---

27  [146]  For example, Richard Dent played in Chicago, San Francisco, Indianapolis, and Philadelphia,
TAC, ¶18; J.D. Hill played in Buffalo and Detroit, *id.*, ¶46; and Marcellus Wiley played in Buffalo,
28  San Diego, Dallas, and Jacksonville, *id.*, ¶95.

1      Arizona has the most attenuated interest in applying its own law, as its only contact with

2   this case is that four Plaintiffs are Arizona residents.  *See Denham*, 262 Cal. Rptr. at 149 (finding

3   that applying the law of a state whose "only link to this case" was a party's residence would

4   "abrogate the interest of a jurisdiction" in applying its law to wrongful conduct occurring within

5   its borders); *Zimmerman*, 224 Cal. Rptr. at 920.  Moreover, Arizona, like New York, does not

6   impose a physical harm requirement, and there does not appear to be any other material difference

7   between the two states' voluntary undertaking doctrines.  Accordingly, Arizona's interests will not

8   be impaired if New York law is applied.

9      Thus, New York's negligence law should be applied in the instant case, as New York's

10  interests would be more significantly impaired than either California's, Illinois', or Arizona's

11  interests if another jurisdiction's laws were applied.

12            **2.      Rule 23(c)(4) Certification of the Elements of the NFL's Duty
                        and Breach**

13

14     "When appropriate," Rule 23(c)(4) allows a court great discretion to certify an action "as

15  a class action with respect to particular issues."  The rule does not prescribe elements that would-

16  be representatives must to maintain a class for resolution of certain issues, but courts recognize its

17  value in resolving cases where, though common questions may not predominate, denying

18  certification of common issues would all but strip class members of their right to seek relief.

19     The Ninth Circuit has expressly endorsed the use of issue certification.  *Valentino*, 97 F.3d

20  at 1234; *see also Tasion Commc'ns, Inc. v. Ubiquiti Networks, Inc.*, 308 F.R.D. 630, 639 (N.D.

21  Cal. 2015) (explaining that "'[c]ourts have applied subdivision (c)(4)[] to allow a partial class

22  action to go forward, leaving questions of . . . damages[] . . . to be adjudicated on an individual

23  basis'") (quoting 7AA C. Wright, A. Miller & M. Kane, FEDERAL PRACTICE & PROCEDURE §1790

24  (3d ed. 2005)); *Amador v. Baca*, No. 10-1649 SVW, 2014 WL 10044904, at *2 (C.D. Cal. Dec.

25  18, 2014) (explaining that "the Ninth Circuit endorses 23(c)(4) liability classes"); *Petersen v.

26  Costco Wholesale Co.*, 312 F.R.D. 565, 584 (C.D. Cal. 2016) (exercising "its discretion pursuant

27  to Rule 23(c)(4) of the Federal Rules of Civil Procedure to certify the proposed class solely for

28  purposes of determining liability" because, "as the Ninth Circuit has repeatedly made clear,

1   damage calculations alone cannot defeat certification" and "Plaintiff has established . . . all of the

2   [other] required elements of class certification"); *Lilly v. Jamba Juice Co.*, 308 F.R.D. 231, 244

3   (N.D. Cal. 2014) ("Since Plaintiff has established that, with the exception of determining damages,

4   all of the required elements of class certification have been met, the Court will exercise its

5   discretion pursuant to Rule 23(c)(4) . . . to certify the proposed class solely for purposes of

6   determining liability.").

7        So, too, have many other circuit courts of appeal. *See, e.g.*, *Martin v. Behr Dayton Thermal*

8   *Prods. LLC*, 896 F.3d 405, 413 (6th Cir. 2018); *In re Deepwater Horizon*, 739 F.3d 790, 817 (5th

9   Cir. 2014); *In re Whirlpool Corp. Front-Loading Washer Prods. Liab. Litig.*, 722 F.3d 838, 860

10  (6th Cir. 2013); *In re Nassau Cty. Strip Search Cases*, 461 F.3d 219, 222, 231 (2d Cir. 2006)

11  (holding that "the District Court exceeded its allowable discretion by failing to certify a class on

12  the issue of liability pursuant to . . . (c)(4)[]" and "remand[ing] to the District Court with

13  instructions to certify a class as to liability").  In *Butler v. Sears, Roebuck & Co.*, 727 F.3d 796

14  (7th Cir. 2013), for example, Judge Posner explained that a trial "limited to determining liability

15  on a class-wide basis, with separate hearings to determine—if liability is established—the damages

16  of individual class members . . . will often be a sensible way to proceed." *Id.* at 800. Indeed, in

17  *Jimenez*, the Ninth Circuit expressly noted that *Butler*, *Whirlpool*, and *Deepwater Horizon* "are

18  compelling.  And their reasoning is consistent with our circuit precedent." 765 F.3d at 1168.

19       As explained above, basic liability questions of duty and breach predominate for Plaintiffs'

20  claims.  However, Plaintiffs concede that each Class member will nevertheless require a more

21  specific showing of specific causation[147] and injury to prevail at trial on their negligence claim

22

---

23  [147] ***General*** causation, however – "whether the [Medications] at issue had the capacity to cause
    the harm alleged," *In re Hanford Nuclear Rsrv. Litig.*, 292 F.3d 1124, 1133 (9th Cir. 2002) – is a

24  common question capable of a class-wide answer.  *See, e.g.*, *Olden v. LaFarge Corp.*, 383 F.3d
    495, 508 (6th Cir. 2004) ("Whether the defendant's negligence caused some increased health risk

25  and even whether it tended to cause the class minor medical issues can likely be determined for
    the entire class"); *Slocum v. Int'l Paper Co.*, No. 16-12563, 2019 WL 2192099, at *6 (E.D. La.

26  May 21, 2019) (common issues predominated "[w]ith respect to general causation"); *but see In re
    Pac. Fertility Ctr. Litig.*, No. 18-cv-01586-JSC, 2020 WL 3432689, at *6 (N.D. Cal. June 23,

27  2020) (holding that "[p]redominance is easily satisfied as to the proposed general causation
    issue[,]" but denying class certification on superiority and efficiency grounds).

28

1   against the NFL.  *Tasion*, 308 F.R.D. at 633 (Rule 23(c)(4) issues class "must still meet the

2   requirements of Rule 23(a) and (b) (except for the predominance requirement of Rule 23(b)(3))").

3   The Court may certify issues under Rule 23(c)(4) if it materially advances the litigation as a whole,

4   with the focus being "judicial economy and efficiency."  *Kamakahi v. Am. Soc'y for Reprod. Med.*,

5   305 F.R.D. 164, 193 (N.D. Cal. 2015).

6           Here, the issues Plaintiffs propose to certify for class resolution are two key elements of

7   their claim – duty and breach.  They are costly and complicated issues to litigate, and the answers

8   to the questions posed by those issues will be the same for every Class member.  If the answer to

9   one of the questions is "no," then the litigation ends.  If the answers to both questions are "yes,"

10  then each Class member's individual trial will be limited to whether his injuries were proximately

11  caused by the NFL's breach of the duty of care, and whether they are entitled to damages.  Thus,

12  answers to the first two negligence elements will help to efficiently resolve the litigation for all

13  Class members.

14          Class-wide resolution of issues common to a similarly situated group while later resolving

15  issues of, for example, causation and damages in individual trials is precisely the approach the

16  Florida Supreme Court applied in its seminal *Engle* decision.  *See Engle v. Liggett Grp., Inc.*, 945

17  So. 2d 1246, 1276-77 (Fla. 2006).  Following reversal of certification of a damages class by the

18  Florida Supreme Court,[148] thousands of individual smokers filed and tried their individual

19  negligence and fraud claims against the cigarette manufacturers, only needing to prove causation

20  and damages (and entitlement to punitive damages) in order to prevail.  *See Walker v. R.J. Reynolds*

21  *Tobacco Co.*, 734 F.3d 1278, 1283 (11th Cir. 2013); *cf. Butler*, 727 F.3d at 798.

22

23

---

24  [148]  In *Engle*, the Florida Supreme Court instead allowed numerous issues common to all tobacco
    smokers to be applied class-wide; including: (1) smoking cigarettes causes various diseases (*i.e.*,

25  general causation); (2) nicotine in cigarettes is addictive; (3) cigarette manufacturers placed
    cigarettes on the market that were defective and unreasonably dangerous; (4) cigarette

26  manufacturers concealed or omitted material information not otherwise known or available
    knowing that the material was false or misleading or failed to disclose a material fact concerning

27  the health effects or addictive nature of smoking cigarettes or both and that all of the cigarette
    manufacturers were negligent; and (5) all of the cigarette manufacturers were negligent.  *Id.*

28

1    Here, Plaintiffs are seeking Rule 23(c)(4) certification on the issues of the NFL's duty of

2    care, breach of such duty of care, and general causation for all Class members.  Just as in the

3    tobacco cases, issues of the NFL's duty, breach of that duty, and general causation are common to

4    the Class, and certification under Rule 23(c)(4) would increase the efficiency of the litigation for

5    all Class members and the NFL.  The answer to those fundamental common factual issues will

6    drive every Class members' negligence case, such as whether the NFL voluntarily undertook a

7    duty of care with respect to the health and safety of its players.  Allowing **one jury** to decide central

8    common legal and factual issues will provide the most efficient manner to resolve the claims of

9    Class members, who may then individually seek damages for their personal injuries.  Rule 23(c)(4)

10   certification is appropriate.

11
              **3.      Even Assuming Predominance Must Be Met, the Elements of
                         Duty and Breach by One Defendant Predominate Over Any**
12                       **Individual Issues**

13   There is "clear justification for handling the dispute on a representative rather than an

14   individual basis if common questions present a significant aspect of the case and they can be

15   resolved for all members of the class in a single adjudication," as is the case here.  *In re: Lenovo*

16   *Adware Litig.*, No. 15-md-02624-RMW, 2016 WL 6277245, at *17 (N.D. Cal. Oct. 27, 2016); *see*

17   *also Wahl v. Am. Sec. Ins. Co.*, No. C 08-00555 RS, 2010 WL 1881126, at *8 (N.D. Cal. May 10,

18   2010) (Rule 23(b)(3) "encompasses those cases in which a class action would achieve economies

19   of time, effort, and expense, and promote uniformity of decision as to persons similarly situated,

20   without sacrificing procedural fairness or bringing about other undesirable results.").

21   "The predominance analysis under Rule 23(b)(3) focuses on the relationship between the

22   common and individual issues in the case, and tests whether proposed classes are sufficiently

23   cohesive to warrant adjudication by representation." *Just Film*, 847 F.3d at 1120; s*ee also*

24   *Davidson v. Apple, Inc.*, No. 16-CV-04942-LHK, 2018 WL 2325426, at *14 (N.D. Cal. May 8,

25   2018) (articulating five principle approach to predominance analysis).   Ultimately, the

26   predominance requirement is "designed to promote the goals of efficiency and judicial economy

27   by focusing on whether a class action makes sense based upon the balance of common and

28   individual issues." *Marlo v. United Parcel Serv., Inc.*, 251 F.R.D. 476, 484 (C.D. Cal. 2008), *aff'd*,

1   639 F.3d 942 (9th Cir. 2011).  Rule 23(b)(3)'s predominance inquiry, thus, "'asks whether the

2   common, aggregation-enabling, issues in the case are *more prevalent or important* than the non-

3   common, aggregation-defeating, individual issues." *Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S.

4   442, 453 (2016) (quoting 2 W. Rubenstein, NEWBERG ON CLASS ACTIONS §4:49 at 195-96 (5th ed.

5   2012)).  This inquiry requires "courts to give careful scrutiny to the relation between common and

6   individual questions in a case."  *Id.*  "When 'one or more of the central issues in the action are

7   common to the class and can be said to predominate, the action may be considered proper under

8   Rule 23(b)(3) even though other important matters will have to be tried separately, such as

9   damages or some affirmative defenses peculiar to some individual class members.'"  *Id.* (quoting

10  7AA C. Wright, A. Miller & M. Kane, FEDERAL PRACTICE & PROCEDURE §1778 at 123-24 (3d ed.

11  2005)).  "[E]vidence used to satisfy predominance be sufficient to sustain a *jury* finding as to

12  [liability] if it were introduced in each plaintiff's individual action."  *Olean*, 2021 WL 1257845,

13  at *5 (emphasis in original).

14         Here, as explained above, the overarching legal and factual issues to present to a jury in

15  this case are whether the NFL undertook a duty to protect the health and safety of its players,

16  breached that duty, and the issue of general causation.  Critically, there is only one defendant – the

17  NFL – and either the law of one state (New York) will apply to the claims of the entire Class, or

18  the laws of three states (California, Illinois, and Arizona) will apply.  Either way, Plaintiffs will

19  submit common, "class-wide proof" of the NFL's voluntary undertaking of a duty to all Class

20  members, breach of that duty, and general causation, each of which will undoubtedly "generate

21  common answers" as to the NFL's liability.  *Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*, 568

22  U.S. 455, 492 (2013).  "Put differently, determining whether [the NFL owed a duty to the Class

23  and breached that duty, and whether Medications cause long-term health consequences,] will not

24  require a searching individualized inquiry; rather, there will be significant common proof at issue

25  in resolving [the NFL's] liability.  Thus, there is glue holding together the proposed class."

26  *Petersen*, 312 F.R.D. at 579.

27         There is no legitimate reason to require thousands of former NFL players (including

28  Plaintiffs' counsel's 1,800 clients) to prove – using the exact same evidence – the NFL's voluntary

1    undertaking of a duty to protect them, breach of that duty, and general causation.  It is also of no

2    moment that there may be a few different state common laws at issue.  If New York does not apply

3    to the entire Class, "Plaintiffs' proposed single-state []classes both overcome the state law

4    variation problems and present a manageable option for the litigation moving forward." *Id.* at 582;

5    *see also In re Sch. Asbestos Litig.*, 789 F.2d 996, 1010 (3d Cir. 1986) (affirming certification of a

6    nationwide class when the plaintiffs had grouped relevant state law into four categories).

7              There is "ample support in federal decisions for granting certification of negligence

8    claims."  *In re Tri-State Crematory Litig.*, 215 F.R.D. 660, 696 (N.D. Ga. 2003) (citing cases).

9    Not only have courts certified negligence claims arising under one state's laws, *see Marsh v. First*

10   *Bank of Del.*, No. 11-cv-05226-WHO, 2014 WL 554553, at *16 (N.D. Cal. Feb. 7, 2014)

11   (certifying negligence class where only California law at issue); *Giroux*, 2018 WL 2463107, at *4

12   (finding predominance for settlement class "where defendant's negligence and breach were

13   uniform as to all class members"),[149] but many courts have certified negligence claims where

14   individual issues of causation and damages must be tried separately.  *See, e.g.*, *Mullen*, 186 F.3d

15   at 626 (affirming class certification where "district court held that the issues to be tried

16   commonly—seamen status, vessel status, negligence, and seaworthiness—were significant in

17   relation to the individual issues of causation, damages, and contributory negligence"); *Watson v.*

18   *Shell Oil Co.*, 979 F.2d 1014, 1023 (5th Cir. 1992) (affirming class certification for negligence

19   claim in mass tort litigation); *In re Telectronics Pacing Sys., Inc.*, 172 F.R.D. 271, 288 (S.D. Ohio

20   1997) (finding common issues predominated where all negligence claims seek to resolve whether

21   defendant is legally responsible for product failure, and individual issues pertain to causation and

22   damages); *In re Copley Pharm., Inc.*, 158 F.R.D. 485, 492 (D. Wyo. 1994) (finding common issues

23   predominate plaintiffs' negligence claim where "issues, surrounding the Defendant's liability for

24   the contaminated [drug], may be tried to a single jury in a unified trial. Then, if the Plaintiffs are

25   successful, class members may pursue their individual cases in separate trials to determine if they

26

27   ───────────────
     [149] *See also Paulsen v. Towers, Perrin, Forster & Crosby, Inc.*, No. C 03-03960 JW, 2010 WL
28   11614258, at *8 (N.D. Cal. Oct. 7, 2010).

1    suffered an injury from the contaminated [drug], and if so, the proper measure of any damages.");

2    *Sala v. Nat'l R.R. Passenger Corp.*, 120 F.R.D. 494, 499 (E.D. Pa. 1988) (concluding common

3    issues predominate where "each of the members of the class will base their liability claim on the

4    same common nucleus of operative facts[] . . . each class member will offer precisely the same

5    proof to establish defendant['s] alleged liability towards and breach of duty to [plaintiffs]");

6    *Hernandez v. Motor Vessel Skyward*, 61 F.R.D. 558, 561 (S.D. Fla. 1973), *aff'd*, 507 F.2d 1278

7    (5th Cir. 1975) (certifying common issue of whether defendants were negligent in preparing either

8    drinking water or food that was available for consumption by passengers as subject to a uniform

9    determination, although issues of proximate cause of each passenger's illness, contract liability,

10   the adequacy of medical treatment afforded each passenger, and damages are individual in nature).

11         Accordingly, the predominance element is met.[150]

12         **4.**    **Class Certification Is a Superior Method for Trying the Duty
13                and Breach Elements of All Class Members' Claims**

14         In addition to the predominance inquiry, Rule 23(b)(3) requires a class action to be

15   "superior to other available methods for fairly and efficiently adjudicating the controversy."  In

16   particular, the factors bearing on whether class treatment is a fair and efficient method for pursuing

17   a claim include "(A) the class members' interests in individually controlling the prosecution or

18   defense of separate actions; (B) the extent and nature of any litigation concerning the controversy

19   already begun by or against class members;[151] (C) the desirability or undesirability of

20   concentrating the litigation of the claims in the particular forum; and (D) the likely difficulties in

21   managing a class action." Fed. R. Civ. P. 23(b)(3).  Ultimately, "[a] class action is the superior

22   method for managing litigation if no realistic alternative exists," *Valentino*, 97 F.3d at 1234-35,

---

[150]  In addition, because Plaintiffs do not ask the Court to certify for a class trial the issues of specific causation and damages, there is no concern that the proposed Class "sweeps in [more than a *de minimis* number of] uninjured class members."  *Olean*, 2021 WL 1257845, at *10-11.

[151]  Factors (A) and (B) are easily met given that no other plaintiffs have sued the NFL for the conduct alleged here.

1   and "classwide litigation of common issues will reduce litigation costs and promote greater

2   efficiency," *id.* at 1234.

3        Class treatment, here, is superior to the litigation of thousands of individual actions

4   concerning the NFL's decades-long negligent conduct toward its players.  Resolution of the Class

5   issues of duty, breach, and general causation, the cornerstone of Plaintiffs' claim, will dwarf all

6   other issues, including individual specific causation and the amount of damages, which can be

7   adjudicated "in individualized follow-on proceedings," *In re Morning Song Bird Food Litig.*, 320

8   F.R.D. 540, 556 (S.D. Cal. 2017), or separate state or federal trials.  As such, class action treatment

9   is superior to other methods and will efficiently and fairly resolve the controversy.

10  **IV.   CONCLUSION**

11       Plaintiffs respectfully request that the Court grant Plaintiffs' Motion for Class Certification,

12  appoint Plaintiffs as Class representatives, appoint STSW and Robbins Geller as Class Counsel,

13  and grant such other and further relief as the Court deems just and proper.

14  DATED:  May 6, 2021                    Stuart A. Davidson
                                           Mark J. Dearman
15                                         **ROBBINS GELLER RUDMAN & DOWD LLP**

16

17                                                  *s/Stuart A. Davidson*
                                           _____
18                                              Stuart A. Davidson

19                                         120 East Palmetto Park Road, Suite 500
                                           Boca Raton, FL  33432
20                                         Telephone:  561/750-3000
                                           561/750-3364 (fax)

21                                         William N. Sinclair
                                           Steven D. Silverman
22                                         Andrew G. Slutkin
                                           Joseph F. Murphy, Jr.
23                                         Phillip J. Closius
                                           Christopher Macchiaroli
24                                         **SILVERMAN|THOMPSON|SLUTKIN|WHITE|LLC**
                                           201 N. Charles Street, Suite 2600
25                                         Baltimore, MD  21201
                                           Telephone:  410/385-2225
26                                         410/547-2432 (fax)

27

28

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Mel T. Owens
**NAMANNY BYRNE & OWENS, P.C.**
2 South Pointe Drive, Suite 245
Lake Forest, CA  92630
Telephone:  949/452-0700
949/452-0707 (fax)

Attorneys for Plaintiffs and Proposed Class Counsel

1

## **<u>CERTIFICATE OF SERVICE</u>**

2    I hereby certify that on May 6, 2021, I authorized the electronic filing of the foregoing with

3  the Clerk of the Court using the CM/ECF system which will send notification of such filing to the

4  e-mail addresses denoted on the attached Electronic Mail Notice List, and I hereby certify that I

5  caused the foregoing to be served via email to the non-CM/ECF participants indicated on the

6  attached Email Notice List.

7

8

*s/Stuart A. Davidson*

9                                          Stuart A. Davidson

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

**<u>Email Notice List</u>**

2
Christi J. Braun
Office of the Vice President and General Counsel
3
University of Florida
123 Tigert Hall
4
Gainesville, FL  32611-3125
braunc@shands.ufl.edu
5
braunc@ufl.edu

6

Anna T. Selby
7
Assistant Vice Chancellor and Associate General Counsel
8
Washington University
660 South Euclid, Campus Box 8037
9
St. Louis, MO  63110
anna.selby@wustl.edu
10

Sarah Coyne
11
Weil Gotshal & Manges, LLP
12
767 Fifth Avenue
New York, NY  10153
13
sarah.coyne@weil.com

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28