1

2

3

4

5

6                    UNITED STATES DISTRICT COURT

7

8                   NORTHERN DISTRICT OF CALIFORNIA

9

10   RICHARD DENT, J.D. HILL, JAMES
     MCMAHON, JEREMY NEWBERRY,
11   RON PRITCHARD, RON STONE, KEITH          No.  C 14-02324 WHA
     VAN HORNE, AND MARCELLUS
12   WILEY,

13            Plaintiffs,
                                              **ORDER GRANTING SUMMARY
14        v.                                  JUDGMENT**

15   NATIONAL FOOTBALL LEAGUE,

16            Defendant.

17   _____

18
                           **INTRODUCTION**
19
         In this personal injury action, plaintiffs, eight former professional football players, allege
20
     defendant professional football league voluntarily undertook a duty to them to ensure the
21
     proper recordkeeping, administration and distribution of medications by their teams and that
22
     defendant was negligent in discharging such duty, causing them musculoskeletal and internal
23
     organ injuries, and drug addiction.  Defendant now moves for summary judgment on all claims
24
     on the grounds that the claims are barred the by the relevant statutes of limitations, fail for
25
     insufficient proof of causation, or are preempted by Section 301 of the Labor Management
26
     Relations Act, 29 U.S.C. § 185.  For the reasons that follow, summary judgment in favor of
27
     defendant against all plaintiffs is **GRANTED**.
28

United States District Court
Northern District of California

1

**STATEMENT**

A prior order denying class certification detailed the history of this case.  *Dent v. Nat'l Football League*, 2021 WL 3885954 (N.D. Cal. Aug. 31, 2021).  As relevant here, defendant National Football League is an unincorporated association of 32 separately-owned and independently-operated professional football clubs/teams.  "The NFL promotes, organizes, and regulates professional football in the United States, but it does not employ individual football players; they are employees of the teams for whom they play."  *Dent v. Nat'l Football League*, 902 F.3d 1109, 1114 (9th Cir. 2018) (cleaned up) (*Dent I*).

Plaintiffs are eight retired professional football players who collectively played for sixteen different NFL teams in thirteen different states from 1969 to 2008:

- Ron Pritchard played for the Houston Oilers 1969–1971, and the Cincinnati Bengals 1972–1977.

- J.D. Hill played for the Buffalo Bills 1971–1975, and the Detroit Lions 1976–1979.

- Keith Van Horne played for the Chicago Bears 1981–1994.

- James McMahon played for the Chicago Bears 1982–1988, the San Diego Chargers in 1989, the Philadelphia Eagles 1990–1992, the Minnesota Vikings in 1993, the Arizona Cardinals in 1994, and the Green Bay Packers 1995–1997.

- Richard Dent played for the Chicago Bears 1983–1993, and in 1995, the San Francisco 49ers in 1994, the Indianapolis Colts in 1996, and the Philadelphia Eagles in 1997.

- Ron Stone played for the Dallas Cowboys 1993–1995, the New York Giants 1996–2001, the San Francisco 49ers 2002–2003, and the Oakland Raiders 2004–2005.

- Marcellus Wiley played for the Buffalo Bills 1997–2000, the San Diego Chargers 2001–2003, the Dallas Cowboys in 2004, and the Jacksonville Jaguars 2005–2006.

2

- Jeremy Newberry played for the San Francisco 49ers 1998–2006, the Oakland Raiders in 2007, and the San Diego Chargers in 2008.

Plaintiffs allege that throughout their careers, their team doctors and trainers gave them unreasonably large volumes of prescription drugs, principally, pain-killing opioids like Vicodin, and non-steroidal anti-inflammatories (NSAIDs) like Toradol, to enable them to perform in the face of otherwise debilitating pain caused by the frequent musculoskeletal injuries that are part and parcel of the game of professional football. Plaintiffs also allege that, aside from the sheer volume of medications, their team doctors and trainers administered and distributed the drugs in a negligent manner. For example, plaintiffs allege that the team doctors and trainers routinely gave them Toradol injections before games, *i.e.*, before plaintiffs had suffered any game injuries clinically indicating any need for the drug, and that such routine, prophylactic use of such drug was unreasonable. Furthermore, plaintiffs allege the team doctors and trainers did not give them warnings about the risks of side-effects, addiction, or long-term health risks, and did not give them written prescriptions. No team, however, is sued herein.

As for defendant NFL, beginning in the early 1970s, defendant has administered an annual prescription drug audit program which audited each of the teams' drug distribution, administration, and recordkeeping practices and, as the program developed, mandated the teams follow certain practices in those regards. Plaintiffs allege that by undertaking the annual prescription drug audit program, the NFL voluntarily undertook a duty to ensure the proper recordkeeping, administration, and distribution of medications to plaintiffs. *Dent v. Nat'l Football League*, 968 F.3d 1126, 1132 (9th Cir. 2020) (*Dent II*).

All eight plaintiffs allege that the use of excessive amounts of painkillers and NSAIDs provided by their teams enabled them to perform in the face of otherwise debilitating injuries and pain, thereby aggravating extant musculoskeletal injuries or causing new injuries they would not otherwise have suffered. In addition, five of the eight plaintiffs allege the volume of medications caused latent internal organ injuries, including damage to their hearts and kidneys.

United States District Court
Northern District of California

Finally, three plaintiffs, Dent, Hill, and McMahon, allege that as a result of the abuse of the drugs during their careers, they became addicted.

Plaintiffs filed this lawsuit in May 2014. The operative complaint now asserts a single claim for common law negligence based on the NFL's alleged negligence in its voluntarily undertaken duty to ensure the proper recordkeeping, administration and distribution of drugs to plaintiffs. The NFL now moves for summary judgment as to all plaintiffs. This order follows full briefing and an in-person hearing.

## ANALYSIS

Summary judgment shall be granted "if the movant shows that there is no genuine dispute of as to any material fact and the movant is entitled to judgment as a matter of law." FRCP 56(a).

> A party asserting that a fact cannot be or is genuinely disputed must support the assertion by:
>
> (A)  citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or
>
> (B)  showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

FRCP 56(c)(1).

At the summary judgment stage, the record is viewed in the light most favorable to the nonmoving party and "all reasonable inferences that may be drawn from the facts placed before the court must be drawn" in favor of the opposing party. *Stegall v. Citadel Broad. Co.*, 350 F.3d 1061, 1065 (9th Cir. 2003) (citations omitted). The judge does not make credibility determinations or weigh the evidence. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). But "bald assertions that genuine issues of material fact exist are insufficient. A factual dispute is genuine only if a reasonable trier of fact could find in favor of the nonmoving party." *Galen v. Cnty of Los Angeles*, 477 F.3d 652, 658 (9th Cir. 2007) (citations omitted).

//

//

United States District Court
Northern District of California

1    Each plaintiff except Newberry and Van Horne played for football teams in more than

2  one state.  Each of those states, along with each plaintiff's state of residence when this lawsuit

3  commenced, has a potential interest in applying its law.  *McCann v. Foster Wheeler LLC*, 48

4  Cal. 4th 68, 97–98 (2010); *Offshore Rental Co. v. Continental Oil Co.*, 22 Cal. 3d 157, 168

5  (1978); *Zinser v. Accufix Research Inst., Inc.*, 253 F.3d 1180, 1187 (9th Cir. 2011).  So, this

6  order must apply California's choice of law rules to determine the controlling substantive law.

7  *Zinser, supra*.

8    California employs a three-step governmental interest analysis for choice-of-law:

> First, the court determines whether the relevant law of each of the
> potentially affected jurisdictions with regard to the particular issue
> in question is the same or different.  Second, if there is a
> difference, the court examines each jurisdiction's interest in the
> application of its own law under the circumstances of the particular
> case to determine whether a true conflict exists.  Third, if the court
> finds that there is a true conflict, it carefully evaluates and
> compares the nature and strength of the interest of each jurisdiction
> in the application of its own law to determine which state's interest
> would be more impaired if its policy were subordinated to the
> policy of the other state and then ultimately applies the law of the
> state whose interest would be more impaired if its law were not
> applied.

16  *McCann*, 48 Cal. 4th 68, 87–88 (cleaned up).

17    Under step one of California's governmental interest test, the relevant laws of each of the

18  potentially affected jurisdictions are the same if they dictate the same outcome.  *See McCann,*

19  *supra*, at pp. 88–90; *see also Nguyen v. Barnes & Noble Inc.*, 763 F.3d 1171, 1175 (9th Cir.

20  2014).  Here, as will be shown, the relevant laws of each of the potentially affected states on

21  the two principal issues (discovery rule and causation) are the same because they dictate the

22  same outcome.  So, this order need not proceed past step one in the choice of law analysis.

23  //

24  //

25  //

26  //

27  //

28  //

5

*United States District Court*
*Northern District of California*

1    **1.    THE STATUTES OF LIMITATIONS AND DISCOVERY RULES OF THE INTERESTED JURISDICTIONS.**

2          **A.    CALIFORNIA.**

3          California, the forum state, provides a two-year statute of limitations for actions on

4    personal injuries resulting from negligence.  Cal. Civ. Proc. Code § 335.1.

5          "Generally speaking, a cause of action accrues at the time when the cause of action is

6    complete with all of its elements.  An important exception to the general rule of accrual is the

7    discovery rule, which postpones accrual of a cause of action until the plaintiff discovers, or has

8    reason to discover, the cause of action.

9          "A plaintiff has reason to discover a cause of action when he or she has reason at least to

10   suspect a factual basis for its elements.  Under the discovery rule, suspicion of one or more of

11   the elements of a cause of action, coupled with knowledge of any remaining elements, will

12   generally trigger the statute of limitations period.  *Norgart* [*v. Upjohn Co.*, 21 Cal. 4th 383, 397

13   (1999)] explained that by discussing the discovery rule in terms of a plaintiff's suspicion of

14   'elements' of a cause of action, it was referring to the 'generic' elements of wrongdoing,

15   causation, and harm.  In so using the term 'elements,' we do not take a hypertechnical

16   approach to the application of the discovery rule.  Rather than examining whether the plaintiffs

17   suspect facts supporting each specific legal element of a particular cause of action, we look to

18   whether the plaintiffs have reason to at least suspect that a type of wrongdoing has injured

19   them.

20         "The discovery rule, as described in *Bernson* [*v. Browning-Ferris Industries*, 7 Cal. 4th

21   926, 932 (1994)], allows accrual of the cause of action even if the plaintiff does not have

22   reason to suspect the defendant's identity.  The discovery rule does not delay accrual in that

23   situation because the identity of the defendant is not an element of a cause of action.  As the

24   court reasoned in *Norgart*, 'it follows that failure to discover, or have reason to discover, the

25   identity of the defendant does not postpone the accrual of a cause of action, whereas a like

26   failure concerning the cause of action itself does.'  In *Norgart*, we distinguished between

27   ignorance of the identity of the defendant and ignorance of the cause of action based on 'the

28   commonsense assumption that once the plaintiff is aware of the latter, he normally has

United States District Court
Northern District of California

sufficient opportunity within the applicable limitations period, to discover the identity of the former.'

"The discovery rule only delays accrual until the plaintiff has, or should have, inquiry notice of the cause of action.  The discovery rule does not encourage dilatory tactics because plaintiffs are charged with presumptive knowledge of an injury if they have information of circumstances to put them *on inquiry* or if they have *the opportunity to obtain knowledge* from sources open to their investigation.  In other words, plaintiffs are required to conduct a reasonable investigation after becoming aware of an injury, and are charged with knowledge of the information that would have been revealed by such an investigation." *Fox v. Ethicon Endo-Surgery, Inc.*, 35 Cal. 4th 797, 806–08 (2005) (cleaned up).

In summary, the California Supreme Court has emphasized a prospective plaintiff's obligation to conduct a reasonable investigation of the circumstances of his injury:  "Simply put, in order to employ the discovery rule to delay accrual of a cause of action, a potential plaintiff who suspects that an injury has been wrongfully caused must conduct a reasonable investigation of all potential causes of that injury.  If such an investigation would have disclosed a factual basis for a cause of action, the statute of limitations begins to run on that cause of action when the investigation would have brought such information to light.  In order to adequately allege facts supporting a theory of delayed discovery, the plaintiff must plead that, despite diligent investigation of the circumstances of the injury, he or she could not have reasonably discovered facts supporting the cause of action within the applicable statute of limitations period." *Id.* at 808–09.

## B.   ILLINOIS.

Illinois provides a two-year statute of limitations for personal injury actions.  735 Ill. Comp. Stat. 5/13-202 (2016).

"The statute starts to run when a person knows or reasonably should know of his injury and also knows or reasonably should know that it was wrongfully caused," *Witherell v. Weimer*, 421 N.E.2d 869, 874 (Ill. 1981), *i.e.*, "when possessed of sufficient information concerning his injury and its cause to put a reasonable person on inquiry to determine whether

actionable conduct is involved." *Moore v. A.H. Robins Co., Inc.*, 520 N.E.2d 1007, 1010 (Ill. App. Ct. 1988).  "At that point the burden is upon the injured person to inquire further as to the existence of a cause of action."  *Witherell, supra*.

### C.   TEXAS.

Under Texas law, "a plaintiff must commence a suit for personal injuries within two years after the day the cause of action accrues."  *Childs v. Haussecker*, 974 S.W.2d 31, 36 (Tex. 1998) (citing Tex. Civ. Prac. & Rem. Code § 16.003(a)).

"In most cases, a cause of action accrues when a wrongful act causes an injury, regardless of when the plaintiff learns of that injury or if all resulting damages have yet to occur.  However, in those rare cases when the nature of the injury incurred is inherently undiscoverable and the evidence of injury is objectively verifiable, [the Texas Supreme Court] appl[ies] a judicially-crafted exception to the general rule of accrual, known as the discovery rule.  Under this rule . . . a cause of action does not accrue until a plaintiff knows or, through the exercise of reasonable care and diligence, should have known of the wrongful act and resulting injury."  *Childs*, 974 S.W.2d at 36–37 (cleaned up).

### D.   PENNSYLVANIA.

Pennsylvania provides a two-year statute of limitations for actions for personal injuries caused by negligence.  42 Pa. Cons. Stat. § 5524.

"Generally, a claim accrues as soon as the right to institute and maintain a suit arises, which, in most tort actions, is at the moment the injury is sustained.  In order to ameliorate the sometimes harsh effects of the statute of limitations, however, Pennsylvania courts have crafted an exception to this rule for situations in which a party, through no fault of his or her own, does not discover her injury until after the statute of limitations normally would have run.  Latent disease cases often implicate this so-called 'discovery rule,' which tolls the statute.  In this type of case, the statute of limitations begins to run when the plaintiff knows, or reasonably should know:  (1) that he has been injured, and (2) that his injury has been caused by another party's conduct.  The burden is on the party claiming the benefit of the discovery rule to prove that she falls within it.

United States District Court
Northern District of California

"In order to take advantage of the discovery rule, a plaintiff must have exercised due diligence in investigating her physical condition. [The Third Circuit] ha[s] explained that the polestar of the discovery rule is not the plaintiff's actual knowledge, but rather whether the knowledge was known, or through the exercise of diligence, knowable to the plaintiff." *Debiec v. Cabot Corp.*, 352 F.3d 117, 128–29 (3rd Cir. 2003) (cleaned up).

"Reasonable diligence is just that, a reasonable effort to discover the cause of an injury under the facts and circumstances present in the case. . . . [T]here are few facts which diligence cannot discover, but there must be some reason to awaken inquiry and direct diligence in the channel in which it would be successful. This is what is meant by reasonable diligence. Reasonable diligence is an objective, rather than a subjective standard. Under this standard, the plaintiff's actions must be evaluated to determine whether he exhibited those qualities of attention, knowledge, intelligence and judgment which society requires of its members for the protection of their own interests and the interests of others. . . ." *Cochran v. GAF Corp.*, 666 A.2d 245, 249 (Pa. 1995) (cleaned up).

### E.   ARIZONA.

Arizona provides a two-year statute of limitations for actions for personal injuries. Ariz. Rev. Stat. § 12-542.

"As a general matter, a cause of action accrues, and the statute of limitations commences, when one party is able to sue another. The traditional construction of that rule has been that the period of limitations begins to run when the act upon which legal action is based took place, even though the plaintiff may be unaware of the facts underlying his or her claim. . . . Under the discovery rule, [however,] a plaintiff's cause of action does not accrue until the plaintiff knows or, in the exercise of reasonable diligence, should know the facts underlying the cause.

"In tort cases, Arizona courts were early in recognizing the equities behind the discovery rule. In 1932, [the Arizona Supreme Court held], in an action for trespass based on the unintentional, wrongful removal of underground ore, that the statute of limitations did not commence until the plaintiff knew or reasonably should have known of the removal of the ore.

9

The nature of the situation—the inherent opportunity to take the ore secretly—made it equitable to commence the limitations period upon discovery.

"Similarly, [the Arizona Supreme Court] held in 1948 that in a medical malpractice case where the injury was by nature difficult to detect, the statute of limitations did not begin to run until the plaintiff discovered the facts constituting his cause of action. . . .

*          *          *

"The rationale behind the discovery rule is that it is unjust to deprive a plaintiff of a cause of action before the plaintiff has a reasonable basis for believing that a claim exists. This reasoning is perfectly consistent with the kinds of cases to which this and other courts have applied the rule:

> A common thread seems to run through all the types of actions where courts have applied the discovery rule. The injury or the act causing the injury, or both, have been difficult for the plaintiff to detect. In most instances, in fact, the defendant has been in a far superior position to comprehend the act and the injury. And in many, the defendant had reason to believe the plaintiff remained ignorant he had been wronged. Thus, there is an underlying notion that plaintiffs should not suffer where circumstances prevent them from knowing they have been harmed. And often this is accompanied by the corollary notion that defendants should not be allowed to knowingly profit from their injuree's ignorance.

This rationale is also consistent with the cases where the discovery rule does not apply—cases where the plaintiff's injury is open and obvious." *Gust, Rosenfeld & Henderson v. Prudential Ins. Co. of America*, 898 P.2d 964, 966–67 (Ariz. 1995) (quoting *April Enters. v. KTTV*, 147 Cal.App.3d 805, 831 (Cal. Ct. App. 1983)).

### F.   NEW JERSEY.

New Jersey provides a two-year statute of limitations for actions for personal injuries. N.J. Stat. Ann. § 2A:14-2. A cause of action for personal injury resulting from a negligent act or omission "generally accrues from the date of the negligent act or omission." *Martinez v. Cooper Hospital-University Medical Ctr.*, 747 A.2d 266, 269 (N.J. 2000).

"The discovery rule delays the accrual of a cause of action until the injured party discovers, or by an exercise of reasonable diligence and intelligence should have discovered that he may have a basis for an actionable claim.

"Critical to the running of the statute is the injured party's awareness of the injury and the fault of another.  The discovery rule prevents the statute of limitations from running when injured parties reasonably are unaware that they have been injured, or, although aware of an injury, do not know that the injury is attributable to the fault of another."  *Baird v. Am. Medical Optics*, 713 A.2d 1019, 1025 (N.J. 1998).

As with the other jurisdictions that provide a permissive discovery rule, the New Jersey Supreme Court has emphasized that the plaintiff's knowledge of the facts, not a legal theory, is what matters:  "[T]he question is not whether [plaintiff] could articulate a specific cause of action . . . .  For the statute of limitations to run, the injured party need not know the state of the law positing a right of recovery upon the facts.  Instead, the statute of limitations runs when the injured party possesses actual or constructive knowledge of that *state of facts* which may equate in law with a cause of action.  The basis of such a cause of action, is, of course, constituted solely by the material facts of the case.  Thus, the statute of limitations begins to run when the plaintiff is aware, or reasonably should be aware, of facts indicating that she has been injured through the fault of another, not when a lawyer advises her that the facts give rise to a legal cause of action."  *Id.* at 1026 (citations omitted).

### G.   NEW YORK.

New York provides a residual three-year statute of limitations for actions to recover damages for personal injury.  N.Y. C.P.L.R. § 214:5 (McKinney 2021).  "A cause of action accrues for purposes of CPLR 214 when all of the facts necessary to the cause of action have occurred so that the party would be entitled to obtain relief in court."  *Blanco v. Am. Tel. & Tel. Co.*, 689 N.E.2d 506, 510 (N.Y. 1997).

New York law provides no discovery rule for actions on personal injuries not "caused by the latent effects of exposure to any substance or combination of substances . . . ."  N.Y. C.P.L.R. § 214-c(2) (McKinney 2021); *see Jensen v. General Elec. Co.*, 623 N.E.2d 547 (N.Y. 1993).  In other words, in actions for personal injuries not caused by exposure to a toxic substance, the statute of limitations begins to run when all of the facts necessary to the cause of

United States District Court
Northern District of California

1    action have occurred, usually the date of the injury, "regardless of the date on which the injury

2    was discovered." *Jensen*, 623 N.E.2d at 550.

3        New York's Civil Practice Law and Rules Section 214-c(2) provides that an action to

4    recover damages for personal injury caused by the latent effects of exposure to a toxic

5    substance accrues on "the date of discovery of the injury by the plaintiff or from the date when

6    through the exercise of reasonable diligence such injury should have been discovered by the

7    plaintiff, whichever is earlier."

8                    **H.    MICHIGAN.**

9        Michigan provides a three-year statute of limitations for actions for personal injuries.

10   Mich. Comp. Laws Ann. § 600.5805(2) (West 2021).

11       By statute, Michigan has abrogated the common-law discovery rule. *Trentadue v.*

12   *Buckler Lawn Sprinkler*, 738 N.W.2d 664 (Mich. 2007).  "Except as otherwise expressly

13   provided, the period of limitations runs from the time the claim accrues.  The claim accrues at

14   the time provided in [Michigan Complied Laws, chapter 600,] sections 5829 to 5838, and in

15   cases not covered by these sections the claim accrues at the time the wrong upon which the

16   claim is based was done regardless of the time when damage results."  Mich. Comp. Laws

17   Ann. § 600.5827 (West 2021).  In other words, except as provided by Sections 600.5829–

18   600.5838 of Michigan's Compiled Laws (which do not apply here), the claim accrues when the

19   wrong was done, regardless of when the plaintiff discovered the facts, and "regardless of the

20   time when damage results."  Mich. Comp. Laws § 600.5827 (West 2021); *Trentadue, supra*.

21                   **I.    FLORIDA.**

22       Florida provides a four-year statute of limitations for actions for personal injuries

23   "founded on negligence."  Fla. Stat. Ann. § 95.11(3)(a) (West 2021).

24       Under Florida law, the discovery rule does not apply to ordinary negligence claims

25   (negligence not founded on professional malpractice).  *Davis v. Monahan*, 832 So. 2d 708,

26   709–10 (Fla. 2002); *Cisko v. Diocese of Steubenville*, 123 So. 3d 83 (Fla. Dist. Ct. App. 2013).

27   For an action on ordinary negligence, Florida law provides that the "cause of action accrues

28

United States District Court
Northern District of California

1    when the last element constituting the cause of action occurs."  Fla. Stat. Ann. § 95.031(1)

2    (West 2021).

3              **J.    OHIO.**

4         With some exceptions not applicable here, Ohio provides a two-year statute of limitations

5    for personal injury actions.  Ohio Rev. Code Ann. § 2305.10(A) (West 2021).  Under Ohio

6    law, a cause of action for bodily injury accrues, and the statute begins to run, when the injury

7    occurs.  *Id.*

8         The Supreme Court of Ohio has recognized, however, "that application of the general

9    rule could mean that the statute of limitations bars an injured party's right to recovery before

10   he is even aware that it exists.  To alleviate that concern, the [Ohio Supreme Court] formulated

11   a discovery rule to postpone the accrual of a cause of action for the infliction of bodily injury

12   that does not manifest itself until a point subsequent to the defendant's alleged misconduct.

13   With respect to a latent injury, a claim accrues under the discovery rule on either the date on

14   which the plaintiff is informed by competent medical authority that he has been injured, or

15   upon the date on which, by the exercise of reasonable diligence, he should have become aware

16   that he had been injured, whichever date occurs first.  Accrual of a cause of action for bodily

17   injury requires that the plaintiff knows or, by the exercise of reasonable diligence should have

18   known, that he had been injured by the conduct of the defendant.  Essentially, the statute of

19   limitations begins to run when the plaintiff knows or, in the exercise of reasonable diligence,

20   should know that he has suffered a cognizable injury."  *Schmitz v. Nat'l Collegiate Athl. Ass'n*,

21   122 N.E.3d 80, 85–86 (Ohio 2018) (cleaned up).

22             **K.    WISCONSIN.**

23        Wisconsin provides a three-year statute of limitations for actions to recover damages for

24   personal injuries.  Wis. Stat. Ann. § 893.54(1m)(a) (West 2021).

25        "It is well settled that a cause of action accrues when there exists a claim capable of

26   enforcement, a suitable party against whom it may be enforced, and a party with a present right

27   to enforce it.  A party has a present right to enforce a claim when the plaintiff has suffered

28   actual damage, defined as harm that has already occurred or is reasonably certain to occur in

United States District Court
Northern District of California

13

the future.  The discovery rule does not change these basic propositions, it simply defines some of the elements.  That is, the discovery rule is so named because it tolls the statute of limitations until the plaintiff discovers or with reasonable diligence should have discovered that he or she has suffered actual damage due to wrongs committed by a particular, identified person.  Until that time, plaintiffs are not capable of enforcing their claims either because they do not know that they have been wronged, or because they do not know the identity of the person who has wronged them.  Accordingly, discovery in most cases is implicit in the circumstances immediately surrounding the original misconduct." *Pritzlaff v. Archdiocese of Milwaukee*, 533 N.W.2d 780, 785 (Wis. 1995) (cleaned up).

### L.  MINNESOTA.

Minnesota provides a six-year statute of limitations for actions on personal injuries. Minn. Stat. Ann. § 541.05 (West 2021).

Under Minnesota law, the action accrues "at such time as it could be brough in a court of law without dismissal for failure to state a claim.  An action for negligence cannot be maintained, nor does the statute of limitations begin to run, until damage has resulted from the alleged negligence.  Thus, the alleged negligence . . . coupled with the alleged resulting damage is the gravamen in deciding the date upon which the cause of action at law herein accrues." *Dalton v. Dow Chemical Co.*, 158 N.W.2d 580, 584 (Minn. 1968) (cleaned up).

In *Dalton v. Dow Chemical Co.*, a toxic chemical exposure case, the Minnesota Supreme Court also stated:  "Under our statutes it has been determined that ignorance of a cause of action not involving continuing negligence or trespass, or fraud on the part of the defendant, does not toll the accrual of a cause of actions. . . .  [W]e have adhered to the rule that except where relief is sought on the ground of fraud the statute provides no exception in favor of those who may be ignorant of the existence of the cause of action.  The period within which the action must be brought commences when the right of action accrues." *Ibid.* (citations omitted).

In *MacRae v. Group Health Plan, Inc.*, 753 N.W.2d 711 (Minn. 2008), a case of medical malpractice by cancer misdiagnosis, the Minnesota Supreme Court further stated:  "We have repeatedly held that a negligent act is not itself sufficient for a negligence cause of action to

14

accrue.  We have also held that ignorance of a cause of action does not toll the running of the statutory limitations period.  [¶]  Accordingly, we have rejected both the occurrence and discovery approaches in favor of a 'middle ground'— the 'damage' rule of accrual.  Under this approach, a cause of action accrues when some injury or damage from the negligent act actually occurs.  The damage triggering the accrual of a negligence cause of action may be any damage caused by the negligent act and is not limited to the damage or cause of action specifically identified in the complaint."  *Id.* at 719–20 (cleaned up).

### M.   INDIANA.

Indiana provides a two-year statute of limitations for actions on personal injuries.  Ind. Code Ann. § 34-11-2-4(a) (West 2021).

"[T]he cause of action of a tort claim accrues and the statute of limitations begins to run when the plaintiff knew or, in the exercise of ordinary diligence, could have discovered that an injury had been sustained as a result of the tortious act of another."  *Wehling v. Citizens Nat'l Bank*, 586 N.E.2d 840, 843 (Ind. 1992).  "[T]he claimant of an action bears the burden of bringing suit against the proper party within the statute of limitation.  The discovery rule is not intended to toll the statute of limitation period until optimal litigation conditions can be established.  Rather, as [the Indiana Court of Appeals has] stated previously, the purpose of the discovery rule is to limit the injustice that would arise by requiring a plaintiff to bring his or her claim within the limitation period during which, even with due diligence, he or she could not be aware a cause of action exists.  Therefore, [the Indiana Court of Appeals] decline[s] to extend the discovery rule to apply to cases like this one where the indeterminate fact is not the existence of an injury, but rather the identity of a tortfeasor."  *Rieth-Riley Const. Co., Inc. v. Gibson*, 923 N.E.2d 472, 476–77 (Ind. Ct. App. 2010) (citation omitted).

//

//

//

//

//

### 2.   ALL CLAIMS FOR MUSCULOSKELETAL INJURIES AND ADDICTION ARE TIME-BARRED.

As noted, plaintiffs retired from the NFL many years before this suit was filed. Pritchard last played in 1977. Hill last played in 1979. Van Horne last played in 1994. McMahon and Dent last played in 1997. Stone last played in 2005. Wiley last played in 2006. Newberry last played in 2008. This suit was filed in 2014.

### A.   MUSCULOSKELETAL INJURIES.

Plaintiffs acknowledge that at the moment each musculoskeletal injury occurred, they had actual knowledge of all of the facts supporting negligence claims against their clubs: the unreasonable volume of drugs; the unreasonable manner of administration, including prophylactic use, lack of warnings, lack of prescriptions, and drug mixing; and the resulting broken bones, torn ligaments, contusions, tears, and other musculoskeletal injuries they now seek compensation for. Thus, there is no genuine dispute that identical claims against *the clubs* accrued at the time each musculoskeletal injury occurred and, therefore, would be time-barred. *See Evans v. Arizona Cardinals Football Club, LLC*, 252 F.Supp.3d 855, 864–65 (N.D. Cal. 2017) (plaintiffs' counsel represented a different group of players alleging virtually identical claims against *the clubs* which were time-barred).

Invoking the common law discovery rule, however, plaintiffs argue that their claims against *the NFL* did not accrue until they spoke with their lawyer in 2013 because until then they did not know the facts of the NFL's conduct that forms the basis of their current negligent voluntary undertaking theory. In support of their contention, plaintiffs have filed identical, rote declarations which recite (Dkt. Nos. 203-2–203-9):

> I did not know that the National Football League, as opposed to the clubs, undertook recordkeeping regarding, and voluntarily involved itself in the administration and distribution of Medications (as that term is defined in the Third Amended Complaint in this action), as detailed in the Third Amended Complaint and Plaintiffs' Motion for Class Certification, until I discussed the same with Mel Owens in November 2013.

Two preliminary points bear mentioning. *First*, as plaintiffs' counsel knows or should know, the discovery rule applies to the discovery of facts, not a legal theory. *Evans,* 252

16

F.Supp.3d at 865.  Unless their lawyer imparted *facts* about the NFL, as opposed to a legal theory, which we cannot know without violating the privilege, the conversation with their lawyer does not qualify as a "discovery" of their claims under the law of *any* of the interested states.[1]

*Second*, although it is not the basis of any factual finding against him, this order feels compelled to point out that Van Horne's deposition testimony contradicts his declaration by showing that he in fact knew, while he was playing, not only that the NFL oversaw drug distribution and recordkeeping by his team, but also knew about the annual prescription drug audits (Van Horne Dep. 63:1–64:12, 236:20–239:10) (emphasis added):

> Q:  Any other instances, while you played, that led you to believe that the club doctors were at times putting the club's interests over your own personal interest as it related to your medical care?
>
> A:  Well, there's another instance that involves medication that I wasn't happy about.
>
> Q:  What do you recall about that?
>
> A:  Well, I had hurt my foot.  Don't ask me what year because I don't recall.  But I went to a foot specialist because, you know, I was having issues with it getting better.  You know, he did his thing, x-rays and all that.  And then he gave me some pain pills for it because it was painful, which were Percodan.
>
> And I remember going into the practice the next day, and the trainer, Fred Caito, looks at me and waves at me with his finger (indicating) like come here into his office.  And I go, yeah.  He goes, who is Dr. So-and-so?  And I go, I went to see a doctor for my foot.  Why?  *Because I got a letter here from the NFL and their drug — whatever the NFL's drug division was.*  I don't know what the name of it was.
>
> *And I think the NFL got a letter from either the FDA or the*

---

[1] The discovery rules of each of the potentially affected states requires the plaintiff—not the defendant—who seeks the protection of the discovery rule to show *how* he discovered the essential facts supporting his claim and *why* he could not have reasonably discovered those facts sooner.  *See* Section 1, *supra*.  Plaintiffs' counsel knows or should know this because counsel raised the identical, erroneous argument in *Evans*.  252 F.Supp.3d 855, 865.  Moreover, as defendant points out, by invoking a privileged conversation to toll the statute of limitations under the discovery rule, counsel has risked being ordered to violate the privilege to show why "despite diligent investigation of the circumstances of the injury, [plaintiffs] could not have reasonably discovered facts supporting the cause of action within the applicable statute of limitations period."  *Fox*, 35 Cal. 4th at 809.  For the reasons set forth in the text, however, we need not resort to such a drastic remedy.

*DEA, because what the trainer had done is order a bulk order for the whole team for the whole season and he put my name on it*. He didn't ask me. I wasn't aware of it. And he's all mad at me because I got a prescription for Percodan from a legitimate doctor. So, obviously, that's not looking out for my best interest.

Q: Do you recall speaking to anybody about this issue? Let's start with your agent at the time. Who was your agent at the time this all happened?

A: I don't recall the year. So . . . .

\*              \*              \*

Q: And what is your basis to believe that the NFL exercised oversight over what medications to give to injured players?

A: My personal experience is having the trainer put my name down on a bulk order of Percodan without my knowledge, without my consent. And he received the letter from the NFL — who had received a letter from, like I said, either the DEA or the FDA, because that flags — that many Percodan under somebody's name, that flags the Federal Government.

*So that follows that they — NFL knows what the teams are doing in terms of their medications.*

Q: So you believed, *as of when you were playing with the Chicago Bears, that the NFL was exercising oversight over the medications provided to the players* based upon that Percodan example that you testified earlier to?

A: Well, that would be my — based upon my personal experience, but having — I mean, I would have answered the question "yes" if that hadn't even happened to me, as well, because I know *that the trainer and the doctors have to turn everything in to the NFL. NFL knows everything that's going on. There's nothing that they don't know about.*

Q: When you say that the doctors and the trainers need to turn everything in to the NFL, what are you referring to?

A: I mean like lists of the drugs that they've ordered and amounts and dates, I'm sure. You know, that would have been — that would have been *an annual thing*, you know, *for every season*. . . .

Q: *Did you know that when you played for the Bears?*

A: Well, *it became very clear with that Percodan incident, yes*. . . .

Q: Other than — putting the Percodan issue aside, while you played for the Bears, were you aware that the club doctors and the trainers were providing information to the league about the

1

medications that were being prescribed to the players?

2

A: *Yes*.

3

Q: How did you learn that?

4

5

6

A: I just knew from hanging out in the training room. You know, I had seen the trainer make lists. You know, you'd ask — so you knew what was going on, I mean, not like I was sitting there making the list with him, but you could see what he was doing. And the medications would be out; you know, they'd have them all out, so —

7

8

Q: Do you know what information was being provided to the league?

9

10

11

A: I do not specifically, other than — guessing, it would be, obviously, *the name of the medication*, the — excuse me — *the amounts of the medication, and probably at the end of the year or maybe they do it throughout the year, they'd have to send a list of names of what medications have been given to what players*.

12

The foregoing notwithstanding, this order takes plaintiffs' declarations as true and

13

construes them in the light most favorable to plaintiffs to mean that plaintiffs did not have

14

actual knowledge of the facts of the NFL's role in overseeing the proper recordkeeping,

15

administration and distribution of medications to plaintiffs until they spoke with their lawyer in

16

2013. Even so, there is no genuine dispute that plaintiffs' claims for musculoskeletal injuries

17

and addiction are time-barred because the undisputed facts show, *one*, that plaintiffs had

18

inquiry notice of the NFL's conduct which forms the basis of their negligent voluntary

19

undertaking claims during their careers and, therefore, they were required to conduct a

20

reasonably diligent investigation when they were injured. And, *two*, there is no genuine

21

dispute that if plaintiffs had conducted a reasonably diligent investigation of their claims, they

22

would have learned the facts of the NFL's conduct years before 2013.

23

As shown above, even the most permissive state version of the discovery rule does not

24

make plaintiffs' claims timely because the rule requires a prospective plaintiff who knows or

25

reasonably should know that he has been injured by the wrongdoing of another to exercise

26

reasonable diligence to investigate the circumstances of his injury, including the cause and the

27

identities of those involved. A plaintiff is charged with knowledge of facts that a reasonable

28

investigation by the plaintiff would have revealed and the statute begins to run when a

United States District Court
Northern District of California

19

reasonable investigation would have revealed the factual basis for his claim.[2]  Importantly,

plaintiffs bear the burden to show that they conducted a reasonable investigation of their claims

and that despite their reasonable investigation, they could not have discovered the essential

facts of their claims any sooner.[3]

*One*, the undisputed facts show that plaintiffs had inquiry notice of their claims against

the NFL during their careers.  Defendant's interrogatory number twelve asked plaintiffs to:

"State the complete basis upon which you contend that the NFL acted directly or indirectly

through NFL member club doctors and/or trainers, as alleged in the complaint."  Each plaintiff

United States District Court
Northern District of California

---

[2] *Fox*, 35 Cal. 4th 797, 808 ([P]laintiffs are required to conduct a reasonable investigation after becoming aware of an injury, and are charged with knowledge of the information that would have been revealed by such investigation"); *Witherell*, 421 N.E.2d 869, 874 ("The statute starts to run when a person knows or reasonably should know of his injury and also knows or reasonably should know that it was wrongfully caused"); *Gust*, 898 P.2d 964, 966 ("Under the discovery rule, a plaintiff's cause of action does not accrue until the plaintiff knows or, in the exercise of reasonable diligence, should know the facts underlying the cause"); *Debiec*, 352 F.3d 117, 129 ("[T]he statute of limitations begins to run when the plaintiff knows, or reasonably should know:  (1) that he has been injured, and (2) that his injury has been caused by another party's conduct"); *Baird*, 713 A.2d 1019, 1025 ("Critical to the running of the statute is the injured party's awareness of the injury and the fault of another.  The discovery rule prevents the statute of limitations from running when injured parties reasonably are unaware that they have been injured, or, although aware of an injury, do not know that the injury is attributable to the fault of another"); *Schmitz*, 122 N.E.3d 80, 86 ("Accrual of a cause of action for bodily injury requires that the plaintiff knows or, by the exercise of reasonable diligence should have known, that he had been injured by the conduct of the defendant.  Essentially, the statute of limitations begins to run when the plaintiff knows or, in the exercise of reasonable diligence, should know that he has suffered a cognizable injury"); *Pritzlaff*, 533 N.W.2d 780, 785 ("It is well settled that a cause of action accrues when there exists a claim capable of enforcement, a suitable party against whom it may be enforced, and a party with a present right to enforce it. . . .  [T]he discovery rule is so named because it tolls the statute of limitations until the plaintiff discovers or with reasonable diligence should have discovered that he or she has suffered actual damage due to wrongs committed by a particular, identified person"); *Wehling*, 586 N.E.2d 840, 843 ("[T]he cause of action of a tort claim accrues and the statute of limitations begins to run when the plaintiff knew or, in the exercise of ordinary diligence, could have discovered that an injury had been sustained as a result of the tortious act of another").

[3] *E.g., Fox*, 35 Cal. 4th at 808 ("In order to rely on the discovery rule for delayed accrual of a cause of action, a plaintiff . . . must specifically plead facts to show (1) the time and manner of discovery *and* (2) the inability to have made earlier discovery despite reasonable diligence"); *Witherell*, 421 N.E. at 874 ("the burden is upon the injured person to inquire further as to the existence of a cause of action"); *Wyckoff v. Mogollon Health Alliance*, 307 P.3d 1015, 1018 (Ariz. Ct. App. 2013) ("The plaintiff has the burden of establishing that the discovery rule should apply to delay the statute of limitations"); *Debiec*, 352 F.3d at 129 ("The burden is on the party claiming the benefit of the discovery rule to prove that she falls within it"); *Baird*, 713 A.2d at 1027–28 ("Plaintiffs who are aware that they have been injured due to the fault of another should not be able to postpone the institution of a timely action merely by picking one theory of recovery over another. . . .  Diligence requires an injured party, once he or she knows of one claim against a defendant, to investigate other related claims."); *Rieth-Riley Const. Co., Inc.*, 923 N.E.2d at 476 ("[T]he claimant of an action bears the burden of bringing suit against the proper party within the statute of limitation").

provided an identical, verified answer, which stated, in part (Dkt. No. 204-2 at 4–5, 15–16, 26–27, 37, 47–48, 57–58, 68–69, 78–79) (emphasis original):

> A players' first introduction to the NFL is through the NFL Combine, where member clubs' doctors administer physical and mental tests to the would-be players. Because the NFL runs the Combine, not the member clubs, it would appear to a reasonable person that by using team doctors to compile information on players, the NFL is acting directly or indirectly through team doctors.

> As reported in *McNeil v. National Football League*, 790 F. Supp. 871, 878–879 (D. Minn. 1992), the NFL itself contends that the League and its member clubs "function as a single economic enterprise," "relying on the declaration of Commissioner Tagliabue in which he states that the business relationship among the NFL member clubs is not that of independent competitors but rather that of co-owners engaged in a common business enterprise, the production and marketing of professional football entertainment." . . . [T]his admission clearly reveals the NFL League Office, which administers the "common business enterprise," acts through the member clubs and club personnel.

> [Plaintiffs] further state[] that NFL Executive Vice President Jeff Pash has stated that painkiller abuse is "something that needs to be addressed on a broad basis, not just in the NFL, and it is something *__our__* doctors are looking at." A reasonable person would interpret the foregoing statement, made by an NFL senior official, to indicate that the NFL is acting directly or indirectly through team doctors.

From plaintiffs' "first introduction to the NFL," plaintiffs had inquiry notice that "NFL [was] acting directly or indirectly through team doctors." In light of their actual knowledge of the musculoskeletal injuries and the amounts of drugs given them by their team doctors and trainers, they had inquiry notice during their careers that the NFL was directly or indirectly responsible. Therefore, at the moment they suffered each musculoskeletal injury they now allege against the NFL, they were obligated to conduct a reasonable investigation of the NFL's direct or indirect responsibility.

*Two*, there is no genuine dispute that had plaintiffs done so, they would have readily learned of the facts of the NFL's conduct that is the basis of their current claims, including the annual prescription drug audit program, and the NFL's Toradol study, many years before 2013. Indeed, the only "investigation" plaintiffs say they did was to talk to their lawyer in 2013 and

United States District Court
Northern District of California

then, *viola*, they "discovered" their cause of action. Assuming that talking to their lawyer qualified as "discovery" of facts within the meaning of the discovery rule, plaintiffs have offered absolutely no explanation why they waited between five years (Newberry) and 36 years (Pritchard) after their injuries to do even that. Plaintiffs had actual knowledge of all the facts supporting their claims when each musculoskeletal injury occurred, except the NFL's role in overseeing the proper recordkeeping, administration and distribution of medications by the teams. But the undisputed facts show that plaintiffs had inquiry notice that the NFL was "acting directly or indirectly through team doctors," so they had inquiry notice of the NFL's responsibility for the alleged maladministration of drugs to them.

Because they only allege musculoskeletal injuries, no latent internal organ injuries or addiction, this analysis disposes of the claims of Pritchard and Stone entirely. Therefore, because their claims are barred by the statute of limitations, summary judgment in favor of the NFL against Ron Pritchard and Ron Stone is **GRANTED**. For the same reasons, partial summary judgment in favor of the NFL against all the other players as to their musculoskeletal injuries is **GRANTED**.

## B. DRUG ADDICTION.

In addition to musculoskeletal injuries, three plaintiffs allege the NFL's negligence caused them to become addicted to painkillers which persisted after they retired. A similar analysis applies to the claims for addiction except that this order, viewing the record in the light most favorable to the plaintiffs and drawing all reasonable inferences in their favor, assumes that the addiction claims did not accrue until after plaintiffs retired because only then would a reasonable person have understood that consuming such large amounts of painkillers over a long football career could cause him to become dependent even after his playing days were over. Nonetheless, there is no genuine dispute that the claims for addiction are also time-barred.

Hill retired in 1979. At his deposition, Hill testified that in or around 1987–1990, he worked with Sports World Ministry "travel[ing] around the country speaking to kids about staying away from drugs" (Hill Dep. 141:2–8). Hill testified that he next worked for Koinonia

Foster Home Agency as a foster parent and public relations agent (Hill Dep. 142:3–18).  Hill

testified that after working for the foster home agency for about eight years, he left the job

because he was on drugs, including pain pills (Hill Dep. 144:4–6).  Hill testified, however, that

he has been sober since 2000 (Hill Dep. 144:16–17).  There is no genuine dispute that Hill's

claim for drug addiction accrued, at the very latest, in 2000, fourteen years before this lawsuit

commenced, because at that time Hill understood that his drug addiction was causally linked to

his drug consumption in the NFL.

McMahon retired in 1997.  At the end of a long line of questions about all of the injuries

McMahon suffered while playing in the NFL, McMahon testified as follows about his

dependency on painkillers after he retired (McMahon Dep. 214:15–215:19):

> Q:  So after you retired from the league, you obviously still have pain, discomfort, issues that you're dealing with.
>
> Did you consult with any medical professionals regarding your injuries after you retired?
>
> A:  Well, after I retired, I was still taking pain medication because I couldn't get out of bed.  I couldn't — every morning, it was like two Percocets just to get out of bed.
>
> That lasted for about — I retired in '97.  I think 2001 is the last time I had a pain pill.
>
> Q:  I think you might have suggested maybe in one of your social media, or in media, that you felt you had developed an addiction to pain medication; is that true?
>
> A:  Well, like I said, I couldn't get out of bed.  I couldn't function without taking something in the morning to get me going.
>
> Q:  And you were able to somehow work yourself off of that by 2001; correct?
>
> A:  2001, I went strictly to marijuana.  That's the only thing that I use now for my pain.

There is no genuine dispute that McMahon's claim for drug dependency accrued, at the

very latest, in 2001, thirteen years before this lawsuit commenced, because at that time

McMahon understood that his drug addiction was causally linked to his drug consumption in

the NFL.

United States District Court
Northern District of California

Richard Dent also retired in 1997.  Paragraph 274 of the third amended complaint alleges that over the course of his NFL career, Dent became dependent on painkillers.  In response to the NFL's interrogatory number nine, however, which asked Dent to state the date on which Dent first learned of the injuries alleged in the complaint, Dent stated, in a verified answer, that "the only injuries he is alleging are" "muscular/skeletal injuries suffered while playing in the NFL . . . " (Dkt. No. 193-5 at 6).  In any case, Dent testified as follows about how he came to be aware after he retired that his drug dependency was linked to his time in the NFL (Dent Dep. 78:25–79:25, 80:12–15) (copied verbatim):

> Q:  . . . When you recognized, after your retirement, that you had a drug dependency and you believed that that dependency came about because of medications that you had received during your playing career, did you feel that you had been in a way betrayed by the National Football League that you thought were responsible for this dependency?
>
> A:  Well, what I felt was that it wasn't about a betrayal.  It was about what is your body doing.  Why is it that my body is acting like this, because my mind is not acting like this, but my body is acting like this.  Where is this coming from?  You know, I don't play no more.  My mind is not thinking about nothing on Sundays, but my body is acting like, you know, you're trying to go play or something.
>
> So that's not anything related — at that time, I didn't connect the two being related, is my point.  All what I did connect was that I don't play anymore and I don't practice anymore, but my body is still responding like I do.
>
> Q:  Did there ever come a time when you believed that the National Football League was responsible for your drug dependency?
>
> A:  When?  I couldn't tell you when I came to that, but, yes, I did come to that. . . .
>
> \*          \*          \*
>
> Q:  How long did your drug dependency last?
>
> A:  Once I finished, I think my body probably craved for at least somewhere between four to six years, I would say.

There is no genuine dispute that Dent's claim for drug dependency accrued, at the very latest, by the time he had overcome the dependency in or around 2003, eleven years before this

lawsuit commenced, because by that time Dent understood that his dependency was causally linked to his drug consumption in the NFL.

### C.   SUMMARY OF RULING ON MUSCULOSKELETAL INJURIES AND ADDICTION.

In sum, at the moment each musculoskeletal injury occurred, each plaintiff had actual knowledge of all facts underlying their current negligence claims except the facts of the NFL's role in overseeing the distribution, recordkeeping, and administration of drugs by the teams, principally, the NFL's annual prescription drug audit program, which it has administered since the 1970s.  Plaintiffs argue their claims against the NFL are timely under the discovery rule because they did not discover the NFL's role until they spoke with their lawyer in 2013. Taking the factual assertion as true, it does not make plaintiffs' claims timely.  The discovery rule of every interested state requires, at a minimum, that a person who knows or reasonably should know that he has been injured by the wrongdoing of another must conduct a reasonably diligent investigation of the facts surrounding the wrongdoing and his injury.

Here, plaintiffs knew all of the facts of their claims for musculoskeletal injuries and drug dependency, except the NFL's role, many years before they filed this lawsuit.  As for the NFL itself, the undisputed facts show that from their "first introduction to the NFL," plaintiffs had inquiry notice that the "NFL [was] acting directly or indirectly through team doctors" (Dkt. No. 204-2 at 4–5, 15–16, 26–27, 37, 47–48, 57–58, 68–69, 78–79).  Thus, even if plaintiffs did not have actual knowledge about the NFL's role in overseeing the proper recordkeeping, administration and distribution of medications by their clubs until they spoke to their lawyer in 2013, they had inquiry notice of the NFL's role in causing their injuries during their careers and there is no genuine dispute that if plaintiffs had conducted a reasonable investigation of their claims, they would have learned of the NFL's conduct long before 2013.

The same analysis applies to plaintiffs' claims for drug dependency except that this order assumes those claims accrued later, when plaintiffs became aware their addictions were linked to their time in the NFL.  But, again, the discovery rule does not make these claims timely. Plaintiffs did not exercise reasonable diligence.

### 3. NEWBERRY, MCMAHON, AND VAN HORNE'S CLAIMS FOR INTERNAL ORGAN INJURIES ARE ALSO BARRED BY THE STATUTES OF LIMITATIONS.

In addition to musculoskeletal injuries, six of the eight plaintiffs also allege damage to their internal organs.  Except for McMahon's kidney damage claim (see below), plaintiffs allege the sheer volume of drugs consumed caused *latent*, *long-term* injuries to their internal organs, so the statute of limitations analysis differs from the acute, obvious musculoskeletal injuries discussed above because, construing the record in the light most favorable to plaintiffs, the claims did not accrue until the latent injuries manifested.  Nonetheless, the undisputed facts show that internal organ injury claims of Newberry, McMahon, and Van Horne are time-barred.

#### A. JEREMY NEWBERRY.

Jeremy Newberry claims that the medications he received while playing in the NFL caused latent damage to his kidneys.  Newberry played for the San Francisco 49ers 1998–2006, the Oakland Raiders in 2007, and the San Diego Chargers in 2008.  When this lawsuit was filed, Newberry resided in California.  Thus, California law applies to Newberry's claim.

Newberry testified that in February 2011, after an at-home blood pressure test showed his blood pressure was alarmingly high, he went to the hospital (Newberry Dep. 161:20–162:13).  Newberry testified about his dialogue with the medical staff at the hospital regarding his medical history (Dkt. No. 193-6; Newberry Dep. 163:24–164:11):

> Q:  And do you recall that you spoke to this doctor at that time about the fact that your use of NSAIDs or nonsteroidal anti-inflammatories when you were playing might have contributed to issues with your kidney?
>
> A:  They asked me, you know, if I'd taken any of that stuff or if I was still on that stuff, and, you know, I gave them a full breakdown of what I could remember at the time.
>
> Q:  And so was it your understanding at that time it could have been caused by the medications you took while playing?
>
> A:  Yes.

Thus, the undisputed facts show that Newberry's claim for kidney damage accrued, at the very latest, in February 2011, when Newberry understood that his kidney damage could have

26

1    been caused by the drugs he took while playing in the NFL.  Therefore, and for the reasons

2    stated above with respect to the musculoskeletal injuries, Newberry's claim, filed in May 2014,

3    is barred by California's two-year statute of limitations.  Cal. Civ. Proc. Code § 335.1.

4         Summary judgment in favor of the NFL against Newberry is **GRANTED**.

5              **B.    JAMES MCMAHON.**

6         Paragraph 283 of the third amended complaint alleges, in part:  "[McMahon] also has

7    kidney problems.  The foregoing pain and limitations stem from injuries Mr. McMahon

8    suffered while playing in the NFL that were never allowed to properly heal and were

9    aggravated by continued play."  McMahon does not allege that he suffers from any latent

10   internal organ injuries.

11        McMahon played for the Chicago Bears 1982–1988, the San Diego Chargers in 1989, the

12   Philadelphia Eagles 1990–1992, the Minnesota Vikings in 1993, the Arizona Cardinals in

13   1994, and the Green Bay Packers 1995–1997.  When this lawsuit was filed, McMahon resided

14   in Arizona.  Illinois, California, Pennsylvania, and Arizona all provide a two-year limitations

15   period for McMahon's claim, while Minnesota provides a six-year limit, and Wisconsin three

16   years.  This order need not proceed past step one of California's conflicts of law test because

17   no matter which state or states' law applies to McMahon's claim, the result is the same.

18        *First*, like Dent, who alleged damage to his heart but later disclaimed such injury in his

19   interrogatory answer, McMahon's verified, supplemental answer to the NFL's interrogatory

20   number nine, which asked McMahon to state the date when he learned of his injuries, stated

21   that "at this time, the only injuries he is alleging are" "addiction . . . and muscular/skeletal

22   injuries suffered while playing in the NFL . . . ." (Dkt. No. 193-5 at 43).

23        Unlike the other plaintiffs who allege internal organ injuries that did not manifest until

24   after they retired, McMahon's deposition testimony makes clear that his kidney injury was akin

25   to the acute, obvious musculoskeletal injuries discussed above and that he knew about the

26   damage to his kidney and its cause the same day it occurred (McMahon Dep. 88:3–94:2).  The

27   point is obvious from McMahon's deposition testimony relating the gruesome details of the

28   injury to his kidney, so the testimony need not be repeated here.

United States District Court
Northern District of California

Therefore, the undisputed facts demonstrate that all of McMahon's claims accrued, at the very latest, when he retired in 1997 because the undisputed facts show that by then he had actual knowledge of all the facts supporting his claim for kidney damage except the conduct of the NFL. But there is no genuine dispute that he had inquiry notice of the NFL's conduct in overseeing the proper recordkeeping, administration and distribution of medications to him while he played in the league. Even the most permissive version of the discovery rule required McMahon to conduct a reasonably diligent investigation of his claim against the NFL. There is no genuine dispute that had he done so, he would have discovered the facts of the NFL's conduct supporting his negligent voluntary undertaking claim by 2002 (within the six-year limit provided by Minnesota). Again, the only "investigation" of his claim McMahon did was talk to his lawyer, but he waited 16 years after he retired to do even that.

Therefore, and for the reasons stated above with respect to the musculoskeletal and drug addiction claims, summary judgment for the NFL against McMahon is **GRANTED**.

### C. KEITH VAN HORNE.

Keith Van Horne played for the Chicago Bears 1981–1994. When this lawsuit was filed, twenty years after Van Horne retired, Van Horne resided in Illinois. So, Illinois law applies to Van Horne's claim.

Illinois provides a two-year limitations period for Van Horne's claim. The discovery rule under Illinois law provides that "[t]he statute starts to run when a person knows or reasonably should know of his injury and also knows or reasonably should know that it was wrongfully caused," *Witherell*, 421 N.E.2d at 874, *i.e.*, "when possessed of sufficient information concerning his injury and its cause to put a reasonable person on inquiry to determine whether actionable conduct is involved." *Moore*, 520 N.E.2d at 1010. "For purposes of the discovery rule, a party has 'knowledge' an injury was wrongfully caused so as to commence the running of the limitations period only when the injured person possesses sufficient information to alert a reasonable person of the need to inquire as to whether the cause of injury is actionable at law." *Wilson v. Devonshire Realty of Danville*, 718 N.E.2d 700, 704 (Ill. App. Ct. 1999)

United States District Court
Northern District of California

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

1    (citation omitted).  "At that point the burden is on the injured person to inquire further as to the

2    existence of a cause of action."  *Witherell, supra.*

3        Paragraph 279 of the complaint alleges:

4            Since retiring, Keith Van Horne has had two cardiac ablations and
             has suffered from, and continues to suffer from, atrial fibrillation,
5            which began in 2004, and premature ventricular contractions.  He
             has also suffered from tachycardia . . . .
6

7        Contrary to that allegation, Van Horne testified at his deposition that he first learned that

8    he suffered from atrial fibrillation in or around 2001, and also learned at the same time that the

9    condition could have been related to his time playing professional football (Van Horne Dep.

10   176:12–178:9):

11           Q:  Do you believe that that condition [atrial fibrillation]
             was in any caused by playing professional football?
12
             A:  It has been suggested that it could have had something
13           to do with it.  Athletes are — I think I was told somewhere that
             athletes are — you know, at that level of athletics, are more prone
14           to get atrial fibrillation than most.  I remember Bill Bradley was
             running for President.  He dropped out because he had atrial
15           fibrillation, so —

16           Q:  Let me just explore your basis for that.  Where did you
             learn that, sir?
17
             A:  Again, I can't remember who — who was telling me.  It
18           must have been one of my — because you see an
             electrophysiologist for that.  I mean, you go see a cardiologist, but
19           then they'll send you to an electrophysiologist.  So it might have
             been one of those guys that mentioned it.
20
             Now, again, they can't for sure say that it is, but they
21           suggest that it might be a contributor.

22           Q:  Did they say what aspect of playing professional
             football would have likely caused that, or is it just a condition
23           that's more prominent in professional athletes?

24           A:  Yeah, I don't recall a specific, you know, cause and
             effect, but I think it was just more the fact that, you know, the size
25           of guys and pumping of the heart, as much work as they do, it
             possibly contributes to it.  Again, they can't say that for sure, but
26           that was discussed with me at one point.

27           Q:  And as you sit here today, you don't recall the doctor
             who said that to you?
28

29

A:  No.  It would have been a cardiologist or electrophysiologist.  So — and I just don't know which one it would have been.  And I think I read something about it, too, because, again, referring back to that Bill Bradley, because that's what he dropped out of the race for, and I think I was reading an article.  And it might have actually been that, that article that I read it in, actually.  But anyway —

Q:  Do you remember when you first became aware of this condition?

A:  I'm going to say maybe 2001.  That's a guess.  But it's a pretty good one.

Van Horne testified that the doctors he saw in or around 2001 for the atrial fibrillation "touched on" the possibility that the condition was caused by the medications he took while playing football (Van Horne Dep. 181:11–22):

Q:  In connection with the doctors that you saw for the atrial fibrillation, did any of those doctors suggest to you that the potential cause of that condition were the medications you took while you played football?

A:  I think that was touched on as a possibility, as well as just the physical aspect of the job.  But, again — and I couldn't tell you who said that, but it would have been one of those doctors I just talked about.  But a direct correlation, they can't say that, but, you know, that's all I remember.

Approximately ten years after the events described above, in January 2011, Van Horne underwent a qualified medical evaluation by Dr. Michael Einbund, M.D., in connection with his claim for workers' compensation (England Decl. ¶ 27, Exh. 25; Dkt. No. 193-6 at 171). Dr. Einbund's January 2011 report listed Van Horne's current medications, including "Metoprolol (atrial fibrillation)" and listed "atrial fibrillation" in the list of Van Horne's medical history (Dkt. No. 193-6 at 178).  Van Horne testified that Dr. Einbund told him in January 2011 that the medications Van Horne took while playing football could have contributed to Van Horne's ailments, including the atrial fibrillation (Van Horne Dep. 218:6–219:3) (copied verbatim):

Q:  Now, in connection with your interactions with Dr. Einbund, who prepared this report — Einbund, who prepared this report, did you describe your medical history to him, kind of the injuries that you sustained?

A:  I'm sure I did.

Q:  Did you talk to him about the medications you may have taken in connection with those injuries?

A:  That, I don't recall.

Q:  Do you remember if the doctor ever suggested to you that the ailments that you were experiencing at that time may have been caused by any particular medication or combination of medications that you took during your playing days?

A:  No.  He would have — if — anything that would have been said would have been contributing, not causing.

Q:  Do you remember him saying that it was contributing or — do you have a recollection of that?

A:  Yes.  Possibly could have contributed, yes.

The undisputed facts show that by January 2011, Van Horne had actual knowledge that his atrial fibrillation may have been caused by the drugs he took while playing football so his claim against the NFL for damage to his heart accrued then.  Illinois' two-year statute of limitations thus bars his claim.

Therefore, and for the reasons stated above with regard to the musculoskeletal injuries, summary judgment for the NFL against Van Horne is **GRANTED**.

### 4.    THE REMAINING PLAINTIFFS' CLAIMS FOR INTERNAL ORGAN INJURIES FAIL FOR INSUFFICIENT PROOF OF CAUSATION.

The internal organ injury claims of the three remaining plaintiffs, Marcellus Wiley, Richard Dent, and J.D. Hill fail because all of the states with an interest in applying their law to plaintiffs' claims require an expert to competently testify that to a reasonable degree of medical certainty, the drugs actually caused the conditions they allege.  Plaintiffs' expert's assertion "that continued use of these medications *could have* significant deleterious effects on the players" is insufficient as a matter of law to meet plaintiffs' burden to show that the drugs caused their ailments (Benet Decl. ¶ 17) (emphasis added).

Wiley played for the Buffalo Bills, the San Diego Chargers, the Dallas Cowboys, and the Jacksonville Jaguars, and he resided in California when this lawsuit was filed.

1    Dent played for the Chicago Bears, the San Francisco 49ers, the Indianapolis Colts, and

2    the Philadelphia Eagles.  He resided in Illinois when this lawsuit was filed.

3    Hill played for the Buffalo Bills and the Detroit Lions, and he resided in Arizona when

4    this lawsuit was filed.

5    The law regarding medical causation in each of the potentially interested jurisdictions

6    follows.

7    ### A.    CALIFORNIA.

8    "The law is well settled that in a personal injury action causation must be proven within a

9    reasonable medical probability based upon competent expert testimony.  Mere possibility alone

10    is insufficient to establish a prima facie case.  That there is a distinction between a reasonable

11    medical 'probability' and a medical 'possibility' needs little discussion.  There can be many

12    possible 'causes,' indeed, an infinite number of circumstances which can produce an injury or

13    disease.  A possible cause only becomes 'probable' when, in the absence of other reasonable

14    causal explanations, it becomes more likely than not that the injury was a result of its action.

15    This is the outer limit of inference upon which an issue may be submitted to the jury.

16    *       *       *

17    "Proffering an expert opinion that there is some theoretical possibility the negligent act

18    *could have been* a cause-in-fact of a particular injury is insufficient to establish causation.

19    Instead, the plaintiff must offer an expert opinion that contains a reasoned explanation

20    illuminating why the facts have convinced the expert, and therefore should convince the jury,

21    that it is *more probable than not* the negligent act was a cause-in-fact of the plaintiff's injury."

22    *Cooper v. Takeda Pharmaceuticals Am., Inc.*, 239 Cal.App.4th 555, 577–78 (2015) (cleaned

23    up).

24    ### B.    ILLINOIS.

25    "Under Illinois law, proximate cause can only be established when there is a reasonable

26    certainty that the defendant's acts caused the injury.  Even assuming that [plaintiffs' expert's]

27    agreement with the statement that [Prader-Willi Syndrome] 'almost certainly' caused Jessica's

28    developmental problems did not amount to a 'ruling out' of bromism as a cause of Jessica's

United States District Court
Northern District of California

developmental problems . . . it was incumbent on the Wintzes, as the party with burden of proof, to come forward with convincing affirmative evidence that exposure to bromide caused Jessica's abnormalities in order to survive summary judgment.  Whether [plaintiffs' expert] 'ruled out' bromism as a cause of Jessica's long-term developmental problems is irrelevant— the fact that he at no point testified or indicated that bromism was the cause of those developmental problems, considered in light of the fact that his was the only evidence of causation presented . . . compels the conclusion that the trial court's grant of summary judgment with respect to Jessica's long-term developmental problems was proper.

*        *        *

"Under Illinois law, to serve as the sole basis for a conclusion that an act was the proximate cause of the plaintiff's injury, an expert must be able to testify with a reasonable degree of medical certainty that proximate cause existed.  In light of [plaintiffs' expert's] statement on cross-examination that he was not stating with any degree of medical certainty that Jessica's problems had 'at any time' been caused by bromide, we conclude that his equivocal statement during direct that there was a 'suggestion' that the symptoms were 'related' to bromide is insufficient, standing alone, to raise an issue of fact as to proximate causation of Jessica's short-term problems."  *Wintz By and Through Wintz v. Northrop Corp.*, 110 F.3d 508, 515 (7th Cir. 1997) (cleaned up).

### C.   NEW YORK.

"[T]o establish their case under New York law, plaintiffs would have to prove that Amorgianos suffered from overexposure to xylene and that he is ill; they are also required to produce expert opinion evidence based on suitable hypotheses in order to support a finding of causation.  More specifically, to establish causation, they must offer admissible expert testimony regarding both general causation, i.e., that xylene exposure can cause the type of ailments from which Amorgianos claims to suffer; and specific causation, i.e., that xylene exposure actually caused his alleged neurological problems."  *Amorgianos v. Nat'l R.R. Passenger Corp.*, 303 F.3d 256, 268 (2d Cir. 2002) (cleaned up).  *See In re New York City Asbestos Litigation*, 48 N.Y.S.3d 365, 368 (N.Y. App. Div. 2017) ("Therefore, the fact that

asbestos, or chrysotile, has been linked to mesothelioma, is not enough for a determination of liability against a particular defendant; a causation expert must still establish that the plaintiff was exposed to sufficient levels of the toxin from the defendant's products to have caused his disease. . . .  Plaintiff's experts effectively testified only in terms of increased risk and association between asbestos and mesothelioma . . .").

### D.   ARIZONA.

"[T]o establish the requisite causal connection, the plaintiff's expert is generally required to testify as to *probable* causes of the plaintiff's injury.  [The Arizona Supreme Court] has recognized that the requirement of expert testimony in a medical malpractice action is a substantive component of the common law governing this tort action, and that failure to produce such a witness results in judgment for the defendant."  *Sampson v. Surgery Ctr. of Peoria, LLC*, 491 P.3d 1115, 1118–19 (Ariz. 2021) (citations omitted).

### E.   MICHIGAN.

"Evidence of specific causation consists of proof that exposure to the toxin more likely than not caused *the plaintiff's* injury.  Specific causation requires at minimum an approximate estimate of the plaintiff's exposure level as well as an evaluation and elimination of other reasonable potential causes. . . .

*          *          *

"Nevertheless, to avoid leaving the jury to speculate [from only circumstantial evidence of causation], a plaintiff should set forth at least some evidence that he or she was exposed to the toxin at issue, including the estimated amount and duration of exposure. . . .  A plaintiff should not rely merely on a temporal relationship to establish causation because this is a form of engaging in the logical fallacy of post hoc ergo propter hoc (after this, therefore in consequence of this) reasoning.

*          *          *

"Another significant component of specific causation in a toxic tort case pertains to the evaluation and elimination of other reasonably relevant potential causes of a plaintiff's symptoms.  In order to demonstrate specific causation, a plaintiff's evidence must exclude

United States District Court
Northern District of California

other reasonable hypotheses with a fair amount of certainty.  One common method for excluding reasonably relevant potential causes of a plaintiff's injury may be a 'differential etiology,' sometimes characterized as a 'differential diagnosis.' . . .

"Without the performance of a differential etiology, there may be 2 or more plausible explanations as to how an event happened or what produced it; yet, if the evidence is without selective application to any 1 of them, they remain conjectures only and are insufficient to establish causation. . . .  In order to prove cause in fact, a plaintiff must demonstrate that there is more than an 'evenly balanced' probability that the conduct of the defendant *was*, rather than was *not*, the cause in fact of the harm suffered.  A differential etiology is included in the specific-causation inquiry under this burden because a plaintiff that fails to perform a differential etiology or some equivalent will not be able to meet his or her overall burden as . . . when various possible causes of an injury exist, and when the plaintiff has not identified the most probable of these, the probability that the defendant's conduct—as opposed to some other potential cause—constituted the cause in fact of the plaintiff's harm remains 'evenly balanced.' . . ." *Lowery v. Enbridge Energy Limited Partnership*, 898 N.W.2d 906, 914–17 (Mich. 2017) (Markman, C.J., concurring) (citations omitted).

### F.    FLORIDA.

"[I]n order to establish a *prima facie* case in a negligence action, Florida law requires Plaintiffs to prove by a preponderance of the evidence, with reasonable medical probability that [defendant's] alleged negligence was the proximate cause of Plaintiffs' injuries.  Plaintiffs must show that it is more likely than not that [defendant's] act(s) was/were a substantial factor in bringing about the injuries.  A mere possibility of such causation is not enough; and when the matter remains one of pure speculation or conjecture, or the probabilities are at best evenly balanced, it becomes the duty of the court to direct a verdict for the defendant." *Wolicki-Gables v. Arrow Intern., Inc.*, 641 F.Supp.2d 1270, 1287 (M.D. Fla. 2009) (Judge Elizabeth A. Kovachevich) (citations omitted).  "[L]ay testimony is legally insufficient to support a finding of causation where the medical condition involved is not readily observable." *Vero Beach Care Ctr. v. Ricks*, 476 So.2d 262, 264 (Fla. Dist. Ct. App. 1985).

### G.   INDIANA.

"Under Indiana law, proving negligence in a case like this one [chlorine gas exposure allegedly causing respiratory diseases] requires proof of both general and specific (or individual) causation. . . .  General causation refers to whether substance at issue had the capacity to cause the harm alleged, while individual causation refers to whether a particular individual suffers from a particular ailment as a result of exposure to a substance.

*          *          *

"Indiana law makes clear that questions of medical causation of a particular injury are questions of science necessarily dependent on the testimony of physicians and surgeons learned in such matters. . . . [W]hen there is no obvious origin to an injury and it has multiple potential etiologies, expert testimony is necessary to establish causation." *Higgins v. Koch Development Corp.*, 794 F.3d 697, 701, 703 (7th Cir. 2015) (citations omitted).

### H.   PENNSYLVANIA.

"The law of this Commonwealth is well settled as to when medical testimony will be required to establish a causal connection between the event demonstrated and the result sought to be proved. . . .  Where there is no obvious causal relationship, unequivocal Medical testimony is necessary to establish the causal connection.  This test has resulted in medical testimony being required to prove causal connection between a heart attack and heavy exertion thirty minutes earlier, between a paralytic stroke and being struck by a swinging door, between a refracture and failure on the part of the attending physician to be as attentive as his patient requested.

"But where the disability complained of is the natural and probable result of the injuries, the fact-finding body may be permitted to so find, even in the entire absence of expert opinion. The two must be so closely connected and so readily apparent that a layman could diagnose (except by guessing) the causal connection." *Smith v. German*, 253 A.2d 107, 108–09 (Pa. 1969) (citations omitted).

### I.   TEXAS.

"[T]o constitute evidence of causation, an expert opinion must rest in reasonable medical probability.  This rule applies whether the opinion is expressed in testimony or in a medical record, as the need to avoid opinions based on speculation and conjecture is identical in both situations."  *Burroughs Wellcome Co. v. Crye*, 907 S.W.2d 497, 500 (Tex. 1995).

### J.   PLAINTIFFS' SOLE EXPERT OPINES ONLY THAT THE DRUGS "COULD HAVE" CAUSED PLAINTIFFS' INJURIES.

In opposition to defendant's instant motion, plaintiffs have offered the recycled declaration of Dr. Leslie Z. Benet, Ph.D., unchanged from when plaintiffs' counsel offered it in support of identical claims against the clubs in the parallel *Evans* litigation.  Dr. Benet is a professor of bioengineering and therapeutic sciences at the University of California San Francisco.  His areas of specialization have included "pharmacokinetics/pharmacodynamics, biopharmaceutics, drug delivery and dosage forms, drug metabolism, drug transporters, drug toxicity, bioequivalence and other scientific aspects of drug regulatory issues" (Benet Decl. ¶ 4).  Because Dr. Benet prepared the declaration that plaintiffs have filed in this case for the *Evans* case, Dr. Benet did not review *any* of plaintiffs' medical records or histories or speak to them or examine them personally before forming the opinions stated in the declaration plaintiffs now rely on.  This alone would be fatal under Federal Rule of Evidence 702 to any attempt by Dr. Benet to opine that a plaintiff's internal organ injury was caused by drugs he took many years prior.

More to the point, Dr. Benet's declaration does not even offer such an opinion.  Instead, Dr. Benet's declaration only states that the drugs plaintiffs took *could have* caused their current ailments, and that the *risk* of such ailments increased with excessive use of the drugs, especially Toradol.  Paragraphs 17 and 24 are the only portions of the declaration relevant to the issue of causation (copied exactly):

> In my opinion there was, at the time of drug administrations to the NFL players, clear-cut warnings in the FDA approved package inserts for these drugs, based on sound scientific evidence, that continued use of these medications could have significant deleterious effects on the players during and beyond their active career as players in the NFL, particularly with respect to musculoskeletal morbidity, but also with respect to kidney, liver

and cardiac morbidities and addiction conditions.

$$*\qquad\qquad*\qquad\qquad*$$

The prominent black box warning for toradol states that the drug is indicated for short term (up to five days in adults), management of moderately severe acute pain that requires analgesia at the opioid . . . the total combined use of toradol oral and ketorolac tromethamine [toradol systemic] should not exceed five days. This five-day limit and a daily maximum of 40mg is stated so as not to increase the risk of developing serious adverse events such as: gastrointestinal risk – "peptic ulcers, gastro intestinal bleeding and/or perforation of the stomach or intestines, which can be fatal"; cardiovascular risk "serious cardiovascular thrombotic events, myocardial infarction and stroke, which can be fatal. This risk may increase with duration of use"; renal risk – "in patients with advanced renal impairment and in patients at risk for renal failure due to volume of depletion"; risk of bleeding – the drug is "contra-indicated in patients with suspected or confirmed cerebrovascular bleeding, patients with hemorrhagic diathesis, incomplete hemostasis and those at high risk of bleeding"; and concomitant use with NSAIDs (nonsteroidal anti-inflammatory drugs) is "contra-indicated in patients currently receiving aspirin or NSAIDs because of the cumulative risk of inducing serious NSAID-related side effects". In my opinion, it is disingenuous for the teams and the team physicians to believe that because they do not dose toradol continuously over a five day period that these warnings are not of consequence when the NFL players receive the drugs before games, at half-time and during practice. In short, the administration of toradol to players also taking NSAIDS such as Indocin and Naprosyn, very common in the NFL – increases the risk of liver and kidney problems, not to mention bleeding.

At his deposition, Dr. Benet acknowledged that he could not determine to a reasonable medical certainty if any of plaintiffs' internal organ injuries were caused by the drugs (Benet Dep. 90:19–91:1).

*First*, with regard to plaintiffs Hill and Wiley, *there is absolutely nothing in the record showing that the drugs they consumed while playing football actually caused, or even substantially contributed to, their internal organ conditions*. The two paragraphs above from Dr. Benet's report do not support a reasonable inference of causation because they speak only in terms of possible causation and increased risk, but it is undisputed that plaintiffs' conditions had other plausible causes and contributors (*see* Wiley Dep. 161:12–14, 21–25, 162:9–16, 163:9–22).

*Second*, plaintiffs point to the following hearsay statements from Dent's deposition testimony which, they argue, in addition to the fact of increased risk, suffice to raise a triable factual question as to causation (Dent. Dep. 29:5–21):

> Q:  And did the doctor or doctors at the Cleveland Clinic about three years ago [deposition taken in April 2021] tell you that your enlarged aorta was caused by these medications that you told them you had taken during your career as a football player?
>
> A:  There's a very good chance that that's part of it, too, and as well as the stress that you put on your body as well.
>
> Q:  But my question is whether, about three years ago, a doctor or doctors at the clinic — Cleveland Clinic told you that they thought that medications that you had taken during your career as a football player probably caused your enlarged aorta.
>
> A:  Yes.
>
> Q:  They told you that?
>
> A:  Yes.

These solitary hearsay statements, combined with Dr. Benet's possible causation and increased risk opinions, are insufficient as a matter of law.  *One*, Dent's statements are quintessential hearsay from an unidentified doctor or doctors.

*Two*, defendant has provided an excerpt of the deposition testimony of Dr. Dermot Phelan, MD, a sports cardiologist who treated Dent at the Cleveland Clinic in or around 2018. (It is unclear from the record if Dr. Phelan is the doctor to whom Dent was referring in the deposition testimony excerpted above.)  Dr. Phelan testified that according to a study published in 2017 he co-authored, "the aorta was much more likely to be enlarged in retired NFL athletes than in a control cohort," the study did not make any explanatory or cause-and-effect conclusion for the difference, but the authors postulated that one explanation was (Phelan Dep. 40:24–41:2):

> [R]elated to the actual hemodynamic stress of exercise.  When you do any kind of exercise, you increase your blood pressure, particularly for resistance training.  And these were athletes that were doing very high levels of resistance training for many, many years.  So that we felt could impact it.

Dr. Phelan further testified that there is no definitive link between the NSAIDs Dent took while playing football and an enlarged aorta, and, further, that although non-steroidal drugs *can* increase blood pressure (which contributes to aortic enlargement), the effect on blood pressure ends when consumption of the drug ends (Phelan Dep. 43:2–17):

> Q:  What about pain medications of any kind, is there any known connection between the use of pain medications and enlarged aortic root?
>
> A:  Not that I'm aware of.
>
> Q:  Okay.
>
> A:  Although certain pain medications, nonsteroidals, can increase your blood pressure.  And so it's possible.  But I don't know of any data definitively linking those two things.
>
> Q:  The increase in blood pressure from taking a nonsteroidal, does that cessate [*sic*] once you cessate [*sic*] use of the nonsteroidal?
>
> A:  Yes.

Dent had high blood pressure when Dr. Phelan examined him in or around 2018 (Phelan Dep. 45:16–46:10).

Finally, Dr. Phelan testified as follows about his interaction with Dent at the Cleveland Clinic in or around 2018 (Phelan Dep. 47:6–48:20):

> Q:  I'll represent for you that Mr. Dent, who is a plaintiff in this litigation, testified that when he was at the Cleveland Clinic he was told that his enlarged aorta was caused by medications he took during his football career.  Is that something that you said?
>
> A:  I would — I don't recall meeting Mr. Dent.  But I would — that's not what I would normally say.  I don't think so, because I don't believe that.
>
> Q:  Okay.  When you say you don't believe that, what do you mean?
>
> A:  Well, let me take that back.  I mean, I don't — I think that there are much more common and more plausible issues for why the aorta gets bigger.  And so I don't think — I generally — I know what I usually talk about when I would speak to these players, because I used to see this a lot.  And I never talked about medications.

United States District Court
Northern District of California

1      Q:  What would you have talked about when you talked to
       players about this sort of issue?

2      A:  So I was really more focusing on the fact that we found
       this commonly in retired NFL players.  I didn't really get in in [*sic*]
3      detail in why I thought it would happen.  Because it was all
       guesswork.  So I generally didn't actually speak about it.  I just
4      said look, this would be something that we observed in these
       athletes.  And I focused really on what we needed to do from here
5      on out in terms of management.

6      So I mean, I don't recall the visit.  And so I would just be
       surprised if I said that.

7

8      The NFL has also submitted the expert report of Dr. Stanley J. Schneller, MD, the

9  Herbert and Florence Irving Professor of Cardiology at Columbia University Irving Medical

10 Center (Dkt. No. 193-6 at 321; Schneller Rep. ¶ 3).  Dr. Schneller's report concurred with Dr.

11 Phelan's testimony that NSAIDs can increase blood pressure, and that the effect on blood

12 pressure ends when consumption of the drug ends (Schneller Rep. ¶¶ 24, 25).  Dr. Schneller

13 also opined (Schneller Rep. ¶ 26):

14     NSAID therapy, even of long duration and at significant dose, does
       not cause or contribute to hypertension after the NSAID is stopped.
15     A person who was treated with NSAIDs for a time and whose
       blood pressure is elevated after the NSAID is stopped does not
16     have hypertension due to NSADI therapy.  There is no clinically
       accepted evidence that remote NSAID treatment is a cause of
17     hypertension months or years after NSAID treatment is stopped.
       In clinical practice, remote NSAID treatment is not considered a
18     cause or contributor to current hypertension, months or years after
       NSAID therapy was discontinued.

19

20 With regard to Dent specifically, Dr. Schneller concluded (Schneller Rep. ¶ 42):

21     Mr. Dent's left atrial enlargement and left ventricular hypertrophy
       are due to his untreated hypertension.  His hypertension in
22     retirement is "essential" [meaning its cause is undiscernible and
       unique to the particular individual] and was neither caused nor
23     worsened by NSAIDs he may have taken as a player.  He gained
       weight as he became older and his weight may have exacerbated
24     his hypertension.

25

26 This order does not judge the credibility of either side's experts or give any greater

27 weight to one or the other expert.  This order has provided the above expert evidence to

28 illustrate an critical, undisputed fact:  plaintiffs' internal organ conditions have plausible causes

United States District Court
Northern District of California

41

and contributors other than the medications they took while playing professional football, causes and contributing factors which cannot reasonably be said to have been proximately caused by the NFL's alleged negligence in failing to ensure the proper recordkeeping, administration and distribution of medications by plaintiffs' teams to plaintiffs.  In these circumstances, under the law of every potentially interested state, it was incumbent on plaintiffs to put forth competent, expert medical evidence that to a reasonable medical certainty, the medications caused the internal organ ailments they allege defendant is responsible for.  Plaintiffs have not come even close to doing so.

Therefore, and for the reasons stated above in the application of the statutes of limitations, summary judgment in favor of the NFL against Wiley, Dent, and Hill is GRANTED.

### CONCLUSION

In light of the foregoing, it is unnecessary to reach defendant's argument that Section 301 of the Labor Management Relations Act preempts plaintiffs' negligence claims.  For the foregoing reasons, summary judgment in favor of the NFL against Richard Dent, J.D. Hill, James McMahon, Jeremy Newberry, Ron Pritchard, Ron Stone, Keith Van Horne, and Marcellus Wiley is GRANTED.  This is the end of the case.  Final judgment shall be entered promptly.

**IT IS SO ORDERED.**

Dated:  December 17, 2021

_____
WILLIAM ALSUP
UNITED STATES DISTRICT JUDGE